**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BAYSHORE CAPITAL ADVISORS, LLC, BCA ALTERNATIVE INCOME FUND, LP, and ROCKING T RANCH, LLLP, <br><br> Plaintiffs, <br><br> v. <br><br> CREATIVE WEALTH MEDIA FINANCE CORP., BRON CREATIVE CORP., BRON CREATIVE USA CORP., BRON STUDIOS, INC., BRON STUDIOS USA, INC., HUDSON VALLEY WEALTH MANAGEMENT, INC., JASON CLOTH, AARON L. GILBERT, CHRISTOPHER CONOVER, DAVID K. JONAS, and DOES 1-21, <br><br> Defendants. | Case No: 1:22-cv-1105 |

## FIRST AMENDED COMPLAINT

Plaintiffs Bayshore Capital Advisors, LLC ("BCA"), BCA Alternative Income Fund, LP ("BAIF"), and Rocking T Ranch, LLLP ("RTR"), by and through their undersigned counsel, allege as follows:

## INTRODUCTION

1.      Plaintiffs are the victims of Defendants' fraudulent scheme to solicit funds to finance motion pictures. The scheme, which amounts to violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as other violations of law, works as follows:

2.      Defendants targeted and falsely induced a series of unsuspecting lenders to participate in film financings with promises of full repayment, significant interest, and other financial benefits. Once Defendants had the funds in hand, Defendants either simply did not pay

despite their repeated promises to do so or, similar to a Ponzi scheme, used new lenders' funds, like that contributed by Plaintiffs, to pay off prior failed loans.

3.     More specifically, Defendants, through Hudson Valley Wealth Management, Inc. ("Hudson") and its principals, Christopher Conover and David Jonas, targeted lenders like BCA and RTR to induce them to co-finance various film projects with Creative Wealth Media Finance Corp. ("CWMF") and BRON Creative, defined below. Those entities are controlled by Jason Cloth and Aaron Gilbert.

4.     Defendants, working together for the purpose of gaining access to funds to use in their financing scheme, solicited and induced Plaintiffs to participate in the financing through a series of material misrepresentations, omissions, and false statements including, among others, that the loans would be repaid within months, that repayment was not dependent upon the film's commercial success, that each financing opportunity was secured by collateral, and that Hudson and CWMF had a proven track record upon which no loans had defaulted and investors had been fully repaid.

5.     These and other representations were not only false and misleading, but Defendants also failed to disclose the true facts: that while soliciting Plaintiffs' investments Defendants were engaged in disputes with other lenders who were already victims of the scheme, that Defendants had already pledged Plaintiffs' promised collateral to others, and that Hudson was significantly beholden financially to CWMF, which had just made an $18 million loan to Hudson so that Hudson could meet its capital requirements after a series of failed film investments. What's more, that loan was structured so that it would be repaid through commissions each time Hudson lured an investor into the scheme.

6.       Despite their due diligence Plaintiffs were aware of none of this. In reliance upon Defendants' false statements and omissions Plaintiffs participated in three film financings, described below, and loaned Defendants a total amount of $9,750,000, with the promise of being paid back principal and interest. Additionally, Defendants made assurances that after the loans were repaid in full, with interest, Plaintiffs would receive contingent compensation based upon the films' revenues.

7.       BRON Studios, defined below, which was also controlled by Gilbert, engaged in the scheme in conjunction with the other Defendants. BRON Studios produced the films, benefiting from the loans made to it using Plaintiffs' money.

8.       All of Defendants' promises, commitments, and assurances were made in furtherance of Defendants' scheme, including for the purpose of preventing Plaintiffs from taking steps to enforce their rights to repayment and other remedies. With the exception of a small partial repayment in 2019, Plaintiffs have not been paid and Defendants have made clear that they have no intentions of paying what is rightly owed.

9.       As a result of Defendants' wrongful and fraudulent conduct, Plaintiffs seek to recover damages in an amount to be determined at trial, together with attorneys' fees and costs incurred in bringing this action.

## **PARTIES**

A.     **Plaintiffs**

10.     Bayshore Capital Advisors, LLC, defined above as "BCA," is a limited liability company organized under the laws of Florida, with its principal place of business located in Tampa, Florida. BCA is a registered investment advisor that provides clients with access to a

variety of investment opportunities, and also makes direct investments through special purpose entities such as BAIF.

11.     BCA's members are individuals who are citizens of the State of Florida.

12.     BCA Alternative Income Fund, LP, defined above as "BAIF," is a limited partnership organized under the laws of Delaware, with its principal place of business located in Tampa, Florida. BAIF is an investment fund managed by BCA.

13.     BAIF's general partner is BCA Alternative Income Fund GP, LLC, whose sole member is BCA, and thus it is a citizen of Florida as described above. BAIF's limited partners are citizens of Florida, South Carolina, Oregon, Tennessee, Texas, and the U.S. Virgin Islands.

14.     Except where otherwise noted, BCA and BAIF are referred to together herein as "Bayshore."

15.     Rocking T Ranch, LLLP, defined above as "RTR," is a limited liability limited partnership organized under the laws of Florida, with its principal place of business in Tampa, Florida. RTR is an advisory client of BCA, and also loaned funds directly to Defendants.

16.     RTR's partners are the Thomas D. Arthur GST Trust of 2012, the trustee of which is a citizen of the State of North Carolina, as well as Rocking T. MGP, Inc. and Rocking T AGP, Inc., which are both Florida corporations with their principal places of business in Florida. It is thus a citizen of North Carolina and Florida.

**B.     The Hudson Defendants**

17.     Hudson Valley Wealth Management, Inc., defined above as "Hudson," is a New York corporation with its principal place of business in Pearl River, New York, in Rockland County. It is a citizen of the State of New York.

18.     Hudson describes itself as an investment advisor offering "holistic asset management services to high net-worth families" that provides an "access point for investors to

pursue a spectrum of investment opportunities in film and television in both liquid and longer-term formats."

19.     Christopher Conover ("Conover") is the founder and president of Hudson, and is a resident of Blauvelt, New York, in Rockland County. He is a citizen of the State of New York.

20.     David K. Jonas ("Jonas") is a principal of Hudson, and is a resident of Westport, Connecticut. He is a citizen of the State of Connecticut.

**C.     The Creative Wealth Defendants**

21.     Creative Wealth Media Finance Corp., defined above as "CWMF," is a corporation incorporated under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada. CWMF is a citizen of Canada.

22.     On its website, CWMF describes itself as "a prolific film and television financing company that has executive produced over 50 movies, while raising and deploying in excess of $650 million for a portfolio of critical hits, commercial blockbusters and cult favorites."

23.     CWMF is the primary financier for BRON Studios, defined below.

24.     Jason Cloth ("Cloth") is an individual who resides in Toronto, Canada. Cloth also has substantial ties to the United States, including through, among other things, ownership of property and a business in Miami, Florida.

25.     Cloth and CWMF also have significant ties to New York, and both regularly and systematically conduct business in the State, directly and through agents in the state, which include, Hudson, Conover, and Jonas.

26.     Cloth is the founder of CWMF and serves as its managing director. He is also the co-founder of defendant BRON Creative, as described below. Cloth is a citizen of Canada.

**D.    The BRON Defendants**

27.    BRON Studios USA, Inc. is a corporation incorporated under the laws of Nevada with its principal place of business in Beverly Hills, California. BRON Studios describes itself as a global media and entertainment firm focusing on the strategic development, production, and financing of motion pictures, television, and digital media content. It is a citizen of the State of California.

28.    BRON Studios, Inc. is a corporation incorporated under the laws of the Province of Vancouver, Canada, with its principal place of business in Vancouver, British Columbia. It is a citizen of Canada.

29.    Except where otherwise noted, BRON Studios USA, Inc. and BRON Studios, Inc. are referred to together herein as "BRON Studios."

30.    BRON Studios has significant ties to New York, and regularly and systematically conducts business in the State. Among other things, BRON Studios has an office in Manhattan and employees who work in the state. BRON Studios also conducts business in New York through agents, including CWMF, Hudson, Conover, and Jonas.

31.    Aaron L. Gilbert ("Gilbert") is an individual who resides in Los Angeles, California, and Canada. Gilbert is the chairman and chief executive officer of BRON Studios. He is a citizen of Canada.[1]

32.    BRON Creative USA Corp. is a corporation organized under the laws of the State of Nevada, with its principal place of business in Beverly Hills, California. It is a citizen of the State of California.

---

[1] BRON is an amalgamation of the first names of its founders, husband and wife BRenda and AarON Gilbert.

33.     BRON Creative Corp. is a corporation incorporated under the laws of the Province of Ontario, with its principal office located in Toronto, Canada. It is a Citizen of Canada.

34.     Except where otherwise noted, BRON Creative USA Corp. and BRON Creative Corp. are referred to together herein as "BRON Creative."

35.     BRON Creative has significant ties to New York, and regularly and systematically conducts business in the State, directly and through agents, including Cloth, CWMF, BRON Studios, Gilbert, Hudson, Conover, and Jonas.

36.     Cloth and Gilbert are the owners and directors of BRON Creative.

## JURISDICTION AND VENUE

37.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because Plaintiffs' federal claims, pursuant to 18 U.S.C. § 1962, arise under the Constitution and laws of the United States. The Court has supplemental jurisdiction over the non-federal question claims set forth herein pursuant to 28 U.S.C. § 1367(a).

38.      The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as this is a dispute between citizens of different States and a foreign state. The amount in controversy exceeds $75,000, exclusive of interest and costs.

39.     The Court has personal jurisdiction pursuant to 18 U.S.C. § 1965 because it has jurisdiction over at least one defendant and the ends of justice require that other parties residing in other districts be brought before the Court.

40.     The Court also has personal jurisdiction over Defendants because they regularly conduct business within the State of New York, and many of the transactions and occurrences out of which these claims arise transpired within the State of New York. In addition, in several of

the underlying loans made to finance the film productions, in which Plaintiffs participated,

certain non-resident Defendants consented to the jurisdiction of the state or federal courts located

in New York County.

41.     Venue is proper in this judicial district pursuant 28 U.S.C. § 1391 because a

substantial part of the events giving rise to this lawsuit occurred in this district. Venue is also

proper under 18 U.S.C. § 1965 because Hudson Valley Wealth Management, Inc. and

Christopher Conover reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.      Defendants Are A Closely-Knit Enterprise Engaged In Criminal Conduct**

42.     Through BRON Studios, CWMF, BRON Creative, and Hudson, defendants

formed an association-in-fact enterprise (the "Enterprise") for the unlawful purpose of

intentionally defrauding Plaintiffs, as well as other investors, and stealing their money.

43.     There is significant evidence of the Enterprise being purposefully joined together

and functioning as a continuing unit to perpetuate the frauds alleged herein.

44.     For example, there can be no doubt as to BRON Studios' longtime relationship

with CWMF and Cloth. Indeed, BRON Studios boasts of the association on its website, stating

that "BRON [Studios] works alongside its colleagues at [CWMF], under the branding 'BRON

Creative,' to provide equity or senior secured debt financing for studio motion pictures and

global network series television." Thus, BRON Studios produces films, certain of which are

financed by BRON Creative, which is merely a brand name of CWMF.

45.     To help bring in money for the financing scheme, Defendants included Hudson in

the Enterprise. Hudson was tasked, under Cloth and Gilbert's direction and control, with

convincing lenders like Plaintiffs, through false and misleading statements, to pour millions of dollars into BRON's productions.

46.     Hudson's relationship with BRON Creative, BRON Studios, and CWMF went so deep that, by 2017, nearly every film in which Hudson's clients invested was produced by BRON Studios. In emails and other correspondence Hudson repeatedly underscored its relationship with the other members of the Enterprise and made clear that the purported investment opportunities offered to Plaintiffs (and others) originated from CWMF and BRON.

47.     This was confirmed when Hudson presented Plaintiffs with the documentation for the transactions described below, which left no doubt that Hudson was acting on behalf of BRON Studios, CWMF, Gilbert, and Cloth.

48.     And, by 2018, Hudson announced that it had entered into a new venture with BRON called BRON Ventures, which it touted as "a division of the studio that will make strategic equity investments in content-driven production companies and leaders in the film, TV, digital and animation spaces."

49.     Defendants worked seamlessly to commit the violations described below that they could not accomplish alone. Defendants' collaboration in the Enterprise allowed them to access funds from investors like Plaintiffs to produce films with little or no financial risk, while pocketing the proceeds.

**B.     Defendants Induce Bayshore and RTR Into The Film Financing Scheme**

50.     In 2016, Bayshore was introduced to Hudson, an investment advisor that claims on its website an ability to provide a "one of a kind investment opportunity specializing in funding independent and large studio films," featuring "a risk managed, progressive investment alternative that provides consistent and attractive returns with little volatility and no correlation

with liquid, exchange traded market instruments."[2] This was the beginning of a nearly two year

effort by Defendants to convince Plaintiffs to participate in Defendants' scheme.

51.     From the start, Hudson, working in concert with the other Defendants and as part

of the Enterprise, made numerous false statements, misrepresentations and material omissions

regarding the purported stability and reliability of the film financing scheme.

52.     For example, in an email dated August 15, 2016, Hudson's Jonas sent an email to

Bayshore's Chris Grizzard in which he explained that the "loans are collateralized by municipal

production incentives and distribution guarantees, locking in double digit returns. *Importantly,

we are not trying to guess which films are going to be commercially successful* (the bet most

investors get burned on); the returns are completely independent of this." (italics in original).

53.     Jonas' email attached a July 2016 presentation prepared by Hudson, which

similarly underscored the purported security of the film financing, informing Bayshore that "[a]ll

of the investments the fund makes are either **backed by contractual payment agreements**

between production companies and distribution companies . . . or **State sponsored production**

**incentives**," i.e., transferrable tax credits. (bold in original).

54.     The presentation also touted the irrelevance of box office success:

---

[2] See www.hudcos.com/film-funding/



55.     Likewise, a March 2016 presentation prepared by Hudson and sent to Bayshore said "Investing in the film and television production industry should provide *extremely stable*, uncorrelated investment returns relative to most major foreign and domestic equity indices," and that "most of the investments that the Fund will invest in generate returns and repay investors *based solely on timely delivery of the completed project, not on box office or television success*." (emphasis added).

56.     Hudson repeated these assurances in several subsequent communications with Bayshore, including in substantially similar "Pitchbooks" dated December 2016, February 2017, and June 2017.

57.     Although Bayshore did not invest in Hudson's fund, Hudson, acting in concert with the other Defendants, continued to pursue Plaintiffs a year after they were first introduced. In early August of 2017, Jonas, on behalf of Hudson, emailed Bayshore about a "new opportunity" for film financing, secured by contracts for the film's distribution rights. Jonas informed Bayshore that it could expect a full return of principal plus interest within seven

months, with an additional return from distribution companies approximately three months after the end of the film's cinema run.

58.     Jonas' emails made it clear that Hudson, through Conover, had a "relationship with the production company and always seem[s] to have up to the minute color on these opportunities." That production company was BRON Studios.

59.     Shortly thereafter, on August 14, 2017, Conover formally introduced Bayshore to CWMF, which Hudson described as the entity the loan would be "papered against," and which "is the financing strategic partner of BRON."

60.     The same day, Conover provided Bayshore with more detailed information about CWMF, including its most recent pitchbook. It heralded CWMF's success, including that it had financed more than 60 film projects and, critically, highlighted the assertion that it had no defaulted loans:



61.     Other documents prepared by CWMF and provided to Bayshore directly or by Hudson included a "Project Evaluation Process" document, which detailed CWMF's "sophisticated and rigorous review and approval process when considering projects," which are

designed to "assess the viability of the project and if the proposed investment confirms to Fund requirements / parameters through the due diligence review process."

62.     And, making the same statement that had been made earlier by Hudson, CWMF pronounced on its website that repayment of the film loans was not dependent on box office success:



63.     Such statements by Hudson, CWMF, and Cloth were made with the knowing and intentional participation of the other Defendants, including BRON Studios, Cloth, Gilbert, and BRON Creative.

64.     In addition, these and other statements by Defendants were false when made. As described below, for example, Plaintiffs discovered only after they loaned money that Defendants' position was that the investments were very much dependent upon box office success and that prior loans orchestrated by the Enterprise were in default. Indeed, a significant portion of Hudson's film financing portfolio had suffered significant losses, necessitating a financial rescue from other Defendants.

65.     In late 2017, when Plaintiffs remained unaware of Defendants' scheme and had not yet loaned any funds for Hudson/CWMF/BRON projects, Defendants persisted in soliciting Bayshore's funds for financing.

66.     Conover was clearly working in concert with CWMF, Cloth, Gilbert, and the BRON entities, indicating in emails that he was relaying information to Bayshore that he had received from Cloth.

67.     For example, on September 15, 2017, Conover sent an email to Bayshore attaching a spreadsheet – prepared by CWMF – purporting to summarize prior loans that had already been fully or partially repaid.

68.     The spreadsheet listed 23 film projects, and for each provided information about the loan, the sales dollars received for each film, the applicable interest rate, the return on investment, and whether the loan had been repaid.

69.     For 21 of the entries the spreadsheet indicated that the loan had been fully repaid.

70.     However, Bayshore later learned that the information contained on the spreadsheet was materially false and misleading.

71.     For example, the spreadsheet described the loan for the movie "The Layover" as having been fully repaid with a 50% return on investment. Plaintiffs have since discovered, however, a 2019 lawsuit brought by investors in that project against CWMF, BRON and Cloth, alleging that principal and interest remained outstanding.

72.     In a separate lawsuit discovered by Plaintiffs, lenders who participated in the film "Drunk Parents" alleged that more than $2.7 million remains unpaid. Yet the 2017 spreadsheet provided by Defendants misleadingly told Bayshore that the loan for that project "will pay in full with interest," plus additional potential upside following theatrical release.

73.     Although Bayshore did not provide any film financing to Hudson or CWMF in 2017, Defendants' solicitation efforts continued, undeterred.

74.     In October 2017, for example, Hudson sought to convince Bayshore to invest in the BRON film The Front Runner, starring Hugh Jackman. Jonas told Bayshore in an email that "[w]e have continued to been [sic] busy with our friends at BRON/Creative Wealth," and that "we have been giving more time to find investors for Frontrunner, which is helpful." Although Plaintiffs did not ultimately lend money towards The Front Runner, Jonas' email and others like it leave no doubt that Hudson was working in concert with the other Defendants.

75.     Defendants' efforts continued. On February 5, 2018, Jonas emailed Bayshore informing it that Hudson's monthly returns for January 2018 would be "about +1.2%," and later emailed an updated version of the Hudson pitchbook presentation, mentioned above, showing Hudson's 2017 annual return of 8.10%.

76.     Later, in May of 2018, Hudson sent Bayshore a new document titled "Film Investment Risks and Mitigation Strategies." Like the prior materials provided by Hudson to Bayshore, this document reiterated that "Hudson's film finance strategy is focused exclusively on 'taking investment risk' where there is collateral in place . . . against which we will loan capital."

77.     Defendants also sought to induce Bayshore's financing by emphasizing BRON Studios' participation in the film projects, lending a purported imprimatur of legitimacy to the financing scheme.

78.     By way of illustration, in May 2018 Hudson in coordination with BRON Studios relayed to Plaintiffs an April 2018 presentation detailing BRON Studios' active productions, as well as productions that had already been released and those that were in development. The

presentation described numerous productions, and serves not only to underscore the close

relationship between and among BRON Studios, CWMF, BRON Creative, Gilbert, and Cloth,

and Hudson, but also leaves no doubt that Defendants intended to dupe unsuspecting investors.

79.     More specifically, nearly every project in which BRON was the producer together

with CWMF, BRON Creative, or Cloth, resulted in investors lending money and not being

repaid. These include not only the films at issue in this lawsuit—Needle In A Timestack, A

Simple Favor, The Spy Who Dumped Me, Chaos Walking, and The Nightingale—but also

projects that harmed other lenders, such as Drunk Parents, Fonzo, Greyhound, and Bombshell.[3]

On the other hand, for films produced by BRON Studios independent of the Enterprise, it

appears that the projects were not tainted by Defendants' criminal conduct and lenders were

repaid.

80.     Of course, Bayshore was unaware of Defendants' scheme at the time and,

according to Hudson and CWMF, the involvement of a major motion picture studio like BRON

provided financing access to higher quality films, underscoring the low-risk nature of the

financing projects.

81.     Indeed, CWMF was described to Bayshore by Defendants as BRON's "captive

finance arm," and both Hudson and CWMF sought to leverage their relationship with BRON to

further induce Bayshore and others to provide financing.

82.     Plaintiffs conducted due diligence during the period preceding their investments,

requesting extensive documentation and information from Defendants. At no time, however, did

the information provided by Defendants reveal the falsity of their misstatements and

misrepresentations.

---

[3] These films are the subject of other lawsuits.

83.     During Bayshore's due diligence process, Bayshore asked Hudson to describe any "formal agreement with CWM/BRON re: participation in their projects," including "any agreement re: CWM/BRON purchasing any potentially future impaired loans from Hudson."

84.     Conover responded by email on July 3, 2018 that "[t]here is a formal agreement - we have right of first refusal on all of the films they finance and produce. *Creative has agreed to take any future impairments off our books at their full book value at the end of each calendar year.*" (emphasis added).

85.     This statement regarding CWMF's purported agreement to buy back impaired loans was materially false and misleading, and clearly was intended as subterfuge to provide Bayshore additional assurances regarding the security of any loans it made.

86.     The truth, as described in more detail below, was that any agreement by CWMF to "take any future impairments off our books" was a mere disguise, for tax purposes, of a nearly $18 million loan that had been made by CWMF to Hudson, and which would be paid off through commissions earned on each loan that Hudson sourced for CWMF.

87.     Had Bayshore known that Hudson was in dire financial straits, and needed capital to prop up its books due to failed film financings, Plaintiffs would not have made the loans described below.

88.     However, after two years of solicitation, based on all of Defendants' false assurances and representations, Bayshore and Hudson eventually entered into a sourcing agreement, dated June 29, 2018, with a term of 24 months with an optional six-month extension (the "Sourcing Agreement").

89.     The Sourcing Agreement's stated "Intent" was that "BCA intends to participate in film loan opportunities sourced by Hudson that meet BCA predefined loan criteria." Under the

agreement such investment criteria included only films where Bayshore would have a first position lien on all assets of the financed film, as well as a "direct sightline to specific tax credit(s) and/or distribution right(s) collateral (either executed or unexecuted)." For films that met this criteria Bayshore agreed to an $8 million funding commitment to be deployed during the agreement's term.

90.     The Sourcing Agreement also confirmed the existence of the Enterprise, leaving no doubt that the projects would be "sourced by Hudson via its relationship with [CWMF]," and "[p]roduced or co-produced by BRON Studios USA Inc."

**B.     Hudson Was Beholden To CWMF And Motivated To Lie**

91.     As mentioned above, during the two-year period Hudson solicited Bayshore to participate in film financings with CWMF, Hudson failed to disclose that CWMF had loaned it nearly $18 million.

92.     The circumstances of the loan show that Hudson was not only beholden to CWMF, but also that Hudson's solicitation efforts were motivated by self-interest: Hudson's debt was to be paid off by commissions earned each time it arranged a financing for CWMF with an entity like Bayshore.

93.     Ironically, Hudson needed the $18 million loan from CWMF *due to significant losses in its film financing investments*, which Hudson repeatedly said carried nearly no risk. Hudson's dire capital situation was never disclosed to Bayshore and was only discovered years after Plaintiffs made their loans.

94.     Purportedly for tax and regulatory reasons, but more likely to obscure the true facts from Bayshore and others, Hudson requested that the loan from CWMF be structured as a "purchase" of Hudson's existing interests in failed film projects. It wasn't, and this fact puts the

lie to Hudson's assertion, mentioned above, that CWMF had simply agreed to "take any future impairments off our books."

95.    Moreover, Hudson and CWMF agreed that the loan would be repaid out of commissions or up-front payments earned on the film financings arranged by Hudson for CWMF. In other words, the more Hudson successfully induced lenders like Plaintiffs to participate in film financing deals, the faster its loan from CWMF would be paid off.

96.    These allegations are not mere supposition or conjecture. They were revealed in recent court submissions by lawyers for CWMF, BRON Studios, and Cloth, and show not only that Defendants lied to Bayshore, but also that Hudson was motivated primarily by the goal of repaying its debt to CWMF, and would say anything to convince lenders like Bayshore to participate in the film financing scheme.[4]

97.    These facts also shine light on the fraudulent nature of Defendants' promises and assurances, made to Plaintiffs before they loaned money to the film financing scheme, that repayment of Plaintiffs' loans was not dependent upon a film's commercial success. With Hudson's portfolio of failed film financings requiring a financial rescue from other members of the Enterprise, all the Defendants knew that the loans they hyped as secure were nothing of the sort.

C.    **Plaintiffs Agree To Finance Film Projects**

      *Needle In A Timestack*

98.    Bayshore's first film investment, sourced by Hudson, was for a movie called "Needle In A Timestack" ("Needle"), starring Leslie Odom Jr. and Orlando Bloom.

---

[4] *See Hudson Private LP v. BRON Studios USA Inc.*, et al., No. 7:21-cv-08259 (CS).

99.     On June 26, 2018, Jonas sent Bayshore a deal summary for the Needle financing opportunity, for which Defendants sought $2.5 million in principal.

100.    Jonas' email to Bayshore explained that Needle was "the first of the films we would like to allocate to," i.e., it was the first film that Hudson wanted to provide financing to with a portion of Bayshore's $8 million commitment. Jonas also confirmed that BRON Studios would be associated with the film.

101.    Jonas' June 26, 2018 email attached a deal summary, likely prepared by CWMF, which described Needle's cast and crew, as well as details of the opportunity. It assured Bayshore that collateral would consist of a transferrable Canadian tax credit, that Bayshore's loan would earn interest at 11% per annum, and that the "deal [is] expected to return capital in less than 12 months."

102.    The deal summary further sought to portray the attractiveness of the opportunity, stating that "[n]ormally the studio would simply utilize their banking facility for this potion of a project's financing, but in recognition of the importance of the relationship with Hudson, they are making this very secure paper available to our syndicate."

103.    Again underscoring that the financing was unrelated to success of the films, Bayshore was told that "[t]he tax credit is not dependent on either the commercial success or even the completion/delivery of the film," and that "distribution deals are currently being negotiated with digital distributors – all in-excess of the total budget of the film."

104.    Bayshore, through BAIF, entered into the Needle Financing Term Sheet, dated July 5, 2018 (the "Needle Term Sheet"). Under the Needle Term Sheet, Bayshore agreed to participate in the financing of Needle in the amount of $2.5 million, and the parties agreed that "this loan will earn interest at a rate of 11% per annum, for a period of 12 months from the date

of the execution of this term sheet," and that after 12 months "any outstanding balance remaining will continue to earn interest at a rate of 1.5% per month until such time as it is repaid in full."

105.    The Needle Term Sheet further provided that "Collateral for the BCA Financing" consisted of Canadian federal and British Columbia tax credits totaling more than $2.6 million.

106.    Following the payment in full of principal and interest to Bayshore, the Needle Term Sheet also provided for contingent compensation, consisting of 6% of "any further proceeds received by BRON Studios USA Inc. under the [Needle Loan Agreement, defined below]."

107.    Cloth signed the Needle Term Sheet both as a director of BRON Studios USA Inc., as well as the managing partner of CWMF.

108.    For sourcing Bayshore's financing of Needle, Hudson received a 1.5% sourcing fee in the amount of $37,500, which, as described below, was likely used to pay down Hudson's debt to CWMF.

109.    The Needle Term Sheet was structured as a participation in a larger loan that had previously been agreed to between CWMF and BRON Studios USA Inc., dated May 8, 2018 ("Needle Loan Agreement").

110.    The underlying Needle Loan Agreement memorialized CWMF's agreement to lend $8.625 million to Needle in a Timestack, LLC, to fund the production costs for Needle. The loan would bear interest at 11% annually, and CWMF was also entitled to a loan fee of $431,250.00 (the "Loan Fee").

111.    In addition to the Loan Fee, CWMF was entitled to participate in the film's revenues in an amount equal to 20% of Net Receipts, as that term was separately defined in a

Collection Account Management Agreement, which governed the management and disbursement of Needle's gross receipts.

112.     The Needle Loan Agreement required full repayment of principal and interest (including that contributed by Bayshore) 24 months after the first disbursement, which upon information and belief was made around the time the agreement was executed in May of 2018.

113.     Thus, CWMF should have been repaid, in an amount that included Bayshore's share of financing, by May of 2020. Regardless, the repayment of Bayshore's loan was not contingent upon CWMF being repaid under the Needle Loan Agreement.

114.     Apart from BRON's financial obligations, the Needle Loan Agreement also required that BRON provide CWMF with regular updates regarding the status of Needle's production and distribution. BRON was required each month to "provide a reporting letter . . . to [CWMF] with an update as to the progress of production, changes to the budget, post-production process, sales process, market strategies or any other pertinent information with regard to the Loan."

115.     The Needle Loan Agreement, attached as Schedule A to the Needle Term Sheet, showed that Needle In A Timestack LLC, an entity controlled by BRON Studios, BRON Creative, CWMF, Cloth, and Gilbert, had an address of 153 West 27th Street in New York City—the same location is BRON Studios' New York operations. In addition, the parties to the agreement irrevocably submitted to the jurisdiction of state and federal courts in New York County.

116.     Two months after the Needle Loan Agreement was executed, on July 4, 2018, Needle In A Timestack, LLC and Needle Production Services BC Inc. also executed a

Promissory Note in the amount of $9,071,200.00 in favor of CWMF (the "Needle Promissory Note").

117.    Although not executed until July, the Needle Promissory Note was to be effective as of May 8, 2018 – the day the Needle Loan Agreement was executed. Gilbert signed the Needle Promissory Note on behalf of the Needle entities. Like the Needle Loan Agreement, the BRON-controlled entities that executed the Promissory Note consented to the jurisdiction of New York State courts.

118.    As of the date of this complaint, three and a half years after Bayshore contributed $2.5 million to finance the production of Needle, Bayshore has not been repaid a single dollar.

119.    While Defendants now claim that the film did not perform as expected – a fact that Defendants told Bayshore was irrelevant to whether the financing would be repaid – such assertions are belied by the facts.

120.    For example, on July 3, 2019, approximately one year after Bayshore's loan, Cloth wrote an email to Bayshore boasting of Needle's success. He said that "Needle In A Timestack [is a] Great little film, we are currently in negotiations for global deal from tow [sic] major streaming services. *The value of both deals gets us out with full interest.* I should have a final deal shortly."

121.    Later the same day, after Bayshore raised concerns that the initial 12-month regular interest period on Needle was coming to an end, and that Bayshore's auditors were concerned about potentially having to impair the loan, Cloth again assured Bayshore that the tax credit collateral would provide a "worst case backstop," and again assured Bayshore that "we will complete our deal to a streamer shortly."

122.    Cloth's email was signed as both a managing partner of CWMF, as well as a director of BRON Creative.

123.    These statements were made to Bayshore for the purpose of providing false assurances that its loan was secure and influencing Bayshore not to pursue a course of action against Defendants to recover what it was owed.

124.    Further perpetuating Defendants' scheme, Cloth continued to provide false assurances regarding Needle, both with respect to the impending distribution agreements with streaming services like Netflix and Amazon, as well as the availability of the tax credit collateral and repayment to Bayshore.

125.    For example, a year after the July 3, 2019 email mentioned above, during a phone call on May 8, 2020, Cloth told Bayshore that physical production of Needle had been completed and that the film required re-editing, but that several streaming services were interested in the film and Cloth was trying to obtain a deal that would bring the most money for the film.

126.    No further details about Needle's distribution were ever provided. However, Needle was ultimately distributed by Lionsgate, a major film production company and distributor, and the movie is currently available to stream on services like Amazon and Apple TV.

127.    Needle was also available for streaming as part of Delta Airlines' inflight entertainment, as shown below:



128.    Nevertheless, Bayshore's loan remained unpaid, including any contingent compensation it was owed.

129.    Additionally, Bayshore did not receive any timely financial information about Needle, including any information concerning the transactions by which Needle appeared on these streaming services.

130.    Upon information and belief CWMF also failed to obtain the financing guarantees afforded by the tax credit collateral, which Cloth insisted at all times was in place to secure Bayshore as a "worst case backstop."

131.    As of January 31, 2022, Bayshore is owed at least $4,057,191.78 in principal and interest on the Needle production, as well as contingent compensation to which Bayshore may be entitled upon an examination of Defendants' books and records.

### *The Lionsgate Slate*

132.    Bayshore's next financing, in which RTR participated as well, was to finance a slate of four films that BRON Studios, CWMF, and BRON Creative were producing in

conjunction with Lionsgate: "The Spy Who Dumped Me," "A Simple Favor," "Anna," and "Chaos Walking" (together, the "Lionsgate Slate").

133.    Plaintiffs agreed to participate in the Lionsgate Slate financing around the same time that Bayshore entered the Needle Term Sheet.

134.    Hudson, through a June 26, 2018 email from Jonas, brought the Lionsgate Slate to Bayshore's attention. Jonas represented that Lionsgate would be distributing the four films, that Bayshore's loan would earn interest at 12% annually for the first 18 months, followed by 18% interest on any remaining balance, and that "[o]f course, all the films are cross collateralized."

135.    To further prop up the attractiveness of the opportunity, Jonas told Bayshore that the total budget for the slate was more than $200 million and would feature an A-list cast including Mila Kunis, Daisy Riley, Tom Holland, Helen Mirren, Anna Kendrick, and Blake Lively.

136.    Before Bayshore and RTR agreed to participate in the financing, BRON Creative – the joint venture between CWMF and BRON Studios – entered into a new partnership with nonparty Hercules Film Investors I (the "Hercules Partnership"). The sole purpose of the Hercules Partnership was to participate in the financing of the Lionsgate Slate.

137.    The Hercules Partnership Agreement was executed by Cloth and Gilbert.

138.    On July 9, 2018, Bayshore, through BAIF, entered into a Term Sheet dated July 9, 2018 with BRON Creative USA Corp., BRON Studios USA, Inc., and CWMF to participate in the financing of the Lionsgate Slate in the amount of $3.5 million. The term sheet ("Lionsgate Term Sheet") was later amended on August 1, 2018.

139.    Under the Lionsgate Term Sheet, the parties agreed that "BCA shall be entitled to a fixed rate of return of twelve per cent (12%) per annum, compounded annually," for the first 18

months following execution of the term sheet, and that "after 18 months, any outstanding balance remaining will continue to earn interest at a rate of 1.5% per month until repaid."

140.    The Lionsgate Term Sheet further provided that full repayment was to be made no later than July 1, 2022.

141.    Following the repayment of Bayshore's principal and interest in full, Bayshore would also be entitled to 2.173% of any further proceeds received by BRON Creative.

142.    On August 1, 2019, RTR entered into a Term Sheet for financing the Lionsgate Slate that was substantially identical to the Lionsgate Term Sheet executed by Bayshore, except that RTR agreed to participate in the financing in the amount of $500,000.00, and its percentage of proceeds after the repayment of principal and interest was 0.310%.

143.    For sourcing Bayshore's financing in the Lionsgate Slate Hudson received a 1.5% sourcing fee in the amount of $52,500.

144.    For their purported roles in the Lionsgate Slate financings, out of Plaintiffs' loan, BRON was to receive an upfront payment of $320,000, BRON Creative was to receive $1,518,000, and CWMF was to receive $512,000.

145.    The Bayshore and RTR term sheets for the Lionsgate Slate were each executed by Cloth and Gilbert on behalf of BRON Creative USA Corp., Gilbert on behalf of BRON Studios USA Inc., and by Cloth on behalf of CWMF.

146.    Although never provided to Plaintiffs, there purportedly exists a Loan and Security Agreement, dated June 7, 2018, between Hercules Film Investors ("Hercules"), as borrower, and BRON Creative, as lender. The obligation to repay Plaintiffs, however, was not dependent upon any parties' performance under this agreement with Hercules.

147.    In October of 2018, only a few months after Plaintiffs' participation in the Lionsgate Slate, Hudson and CWMF told Plaintiffs that the films were performing well.

148.    For example, in a written update dated October 17, 2018, Hudson and CWMF told Bayshore and RTR that the first film to be released from the slate, "The Spy Who Dumped Me," produced worldwide box office revenues of $66 million against a new production budget of $45.6 million. According to Hudson and CWMF, this was "in line with the producer and distributor expectations," and "should lead to further solid revenue production from ancillaries such as DVD/Blue-Ray sales, Video on Demand rentals and sales, as well as streaming services (including airlines) over the course of the coming year."

149.    As to the second film in the Lionsgate Slate, "A Simple Favor," Hudson and CWMF told Plaintiffs it was "performing ahead of expectations," with $83 million in worldwide box office revenues against a net production budget of $26.5 million. The update further stated that theater distribution to international markets would cause the total box office figure to continue to grow, and that "[g]iven the strong performance to this point, we also anticipate ancillary revenues to be commensurately strong."

150.    According to the update, Chaos Walking, starring Daisy Ridley and Tom Holland, had not yet been released.

151.    But Bayshore still had not received any repayment of its principal and interest.

152.    For months thereafter, Hudson and Cloth continued to provide Plaintiffs with assurances repayment. For example, on August 16, 2019, Cloth told Bayshore that "the loan is not in jeopardy of not being repaid."

153.    Similarly, during a November 2019 telephone call between Bayshore's Grizzard and Conover, Conover assured Bayshore that Hudson's clients had participated in more than 30 deals with CWMF, and that it had never failed to pay what was owed.

154.    Such statements were false when made (including because the Enterprise *had* failed to pay what was owed to other financiers) and intended to prevent Plaintiffs from taking action to recover money they were owed. Indeed, the very nature of Defendants' Ponzi-like scheme depended upon perpetuating the myth that the loans in question were low risk, and the myth would have been revealed if lawsuits from lenders like Plaintiffs became well known to the market.

155.    To provide further assurances, Conover also reported that CWMF would make $100 million in profit from its unrelated investment in "The Joker," which had made $1 billion in global box office revenues. The implication was that this influx of cash could be used to repay Plaintiffs' loans, underscoring the Ponzi-like nature of Defendants' scheme.

156.    While Hudson and CWMF provided occasional reporting regarding the Lionsgate Slate they acknowledged that it was always out of date and missing key financial information.

157.    On August 7, 2020, Bayshore received a partial repayment of its Lionsgate loan in the amount of $1,192,977.77. On August 10, 2020, RTR received partial repayment in the amount of $168,898.28.

158.    No other payments were made. As of January 31, 2022, Bayshore and RTR are owed at least $4,520,939.00 and $641,198.85, respectively, in principal and interest on the Lionsgate Slate, as well as contingent compensation to which they may be entitled upon an examination of Defendants' books and records.

159.    Plaintiffs have no reason to believe that BRON Creative has not been repaid the total amount of the financing it agreed to provide for the Lionsgate Slate, a substantial portion of which consisted of Plaintiffs' money.

***The Nightingale***

160.    On September 26, 2018, only a couple of months after Bayshore's initial participation, and before it became clear that the financing arrangements were not what they seemed, Hudson approached Plaintiffs with the opportunity to finance a film called "The Nightingale" ("Nightingale") in the amount of $3.5 million.

161.    As with Needle and the Lionsgate Slate, Hudson and CWMF, with BRON necessarily participating as a producer, presented Nightingale as a highly attractive opportunity "collateralized by already completed minimum guaranteed distribution sales in international markets (via FilmNation Entertainment one of the largest international film distributors) thus far of $3.5 million."

162.    According to CWMF, the film was already complete and had been shown at the Venice Film Festival in September 2018.

163.    In a separate email dated October 8, 2018, Jonas suggested that the financing for Nightingale be structured as "a Purchase Agreement rather than a loan," by which Bayshore would effectively purchase "the rights to approx. $3.5 million for $3.25 million today (or something akin to this)."

164.    When asked to elaborate on the deal structure, Jonas in a separate email explained as follows:

> **From:** David Jonas <djonas@hudsonprivate.com>
> **Sent:** Monday, October 8, 2018 1:09 PM
> **To:** Chris Grizzard <cgrizzard@bayshorecap.com>
> **Subject:** RE: Hudson: A new investment opportunity
>
> Here's how this would work:
>
> - BRON/Creative would originate a loan to Nightingale's SPV for $3.5mm
> - In exchange for that loan, BRON would be in first position to recoup their loan plus interest (the "receivable") from existing international sales as negotiated by Film Nation, payable upon delivery of the film - these future receivables would be pledged to BRON/Creative
> - We/Bayshore can purchase the right to receive the receivables at a discount, with a fixed repayment date – essentially factoring the receivables
> - Once repaid, we/Bayshore will retain back-end participation in the film, and will be entitled to a percentage of the net profits of the film for the foreseeable future
>
> That's how we have done them in the past for the fund.
>
> I hope that's helpful…

165.    Thus, as explained by Jonas, on behalf of the Enterprise, Bayshore was all but guaranteed under this structure to at least recoup its loan because the existing negotiated sales by FilmNation, which BRON Studios and BRON Creative would be in first position to receive, exceeded the amount of the loan.

166.    To further falsely assure Bayshore, on the same day, Conover sent Bayshore a purported copy of sales estimates from FilmNation reflecting projected sales of $3,565,000.

167.    Plaintiffs would not learn until later, however, after it became clear that they would not be repaid on Nightingale, that Defendants by this time were involved in a separate dispute with another lender who had contributed funds to the Nightingale project. Plaintiffs could not have known about this dispute at the time.

168.    However, the dispute ripened into a lawsuit filed only days after Plaintiffs provided financing, brought by Premium Properties Limited and Colonia Trustco against, among others, BRON Creative, Cloth, and Gilbert (the "Prior Nightingale Claim").

169.    In the Prior Nightingale Claim the plaintiffs allege that BRON Creative breached a term sheet and participation agreement for financing Nightingale, including by failing to

provide documents requested, failing to collect and pay out amounts due under the parties' agreements, and failing to properly secure the collateral.

170.    The facts of the Prior Nightingale Claim are particularly troubling because it alleges that BRON Creative pledged the same collateral to multiple lenders as "first priority," including the collateral that Defendants, in October 2018, had pledged to Bayshore and RTR.

171.    Had Defendants disclosed the Prior Nightingale Claim Plaintiffs would not have made their loans, and certainly not on the terms that had been proposed.

172.    However, in reliance upon Defendants' false representations and omissions, Bayshore, through BAIF, entered into a Term Sheet with BRON Creative Corp., dated October 17, 2018 (the "Nightingale Term Sheet"). The Nightingale Term Sheet was signed by Cloth on behalf of BRON Creative.

173.    Bayshore's participation was limited to $2,250,000, representing a 69.23% interest in the larger loan that Jonas had earlier described. As stated by the Nightingale Term Sheet, this participation was structured such that Bayshore's funds were payable to BRON Creative which, as "Lender," would advance those funds to Nightingale Film Holdings Pty Ltd. -- the entity producing the film.

174.    Under the Nightingale Term Sheet, the "Repayment Amount," defined to include Bayshore's participation, would earn interest at an annual rate of 12% and would have a maturity date 12 months from initial disbursement of the loan, after which the outstanding Repayment Amount would be subject to default interest at 17%.

175.    Bayshore was to be repaid out of gross receipts, meaning all proceeds derived from Nightingale from all sources worldwide, excluding Australia and New Zealand.

176.    The term sheet further provides that the Loan "shall be in first priority position for all collateral receipts therefrom in the Lender's Territory," which included the entire world except Australia and New Zealand.

177.    Security and collateral were defined expansively by the Nightingale Term Sheet to include:

> all of Borrower's and Prod Co's assets, including, without limitation, Borrower's right, title and interest in or relating to the Picture [Nightingale Production], and all of Borrower's (and any of its respective affiliates') right, title and interest in any of the revenue arising out of or relating to the Picture (except as set forth below), and all tax and other incentives and so-called "soft monies' in connection with the Picture . . . .

178.    On the same day that Bayshore entered into the Nightingale Term Sheet, RTR entered into a separate term sheet under which BRON Creative would advance the loan proceeds to Nightingale Film Holdings Pty Ltd. on behalf of RTR in the amount of $1 million. RTR's term sheet was otherwise substantively identical to Bayshore's.

179.    Thus, Plaintiffs' total investment in Nightingale was $3,250,000.

180.    Under the Nightingale term sheets BRON Creative, i.e., the joint venture controlled by BRON Studios, CWMF, Cloth, and Gilbert,  was to receive a "loan fee" of 5% of the loan, or $162,500.

181.    Both term sheets for Nightingale have a maturity date that is 12 months after the initial disbursement of the loan, which is on or around October 17, 2019. The Nightingale term sheets are governed by New York law.

182.    Likewise, in the underlying Loan and Security Agreement between Nightingale Film Holdings Pty Ltd. (i.e., BRON Studios' special purpose entity), as borrower, and BRON Creative, as lender, those parties agreed that any claims would be governed by New York law,

that New York County would be the exclusive jurisdiction for any disputes arising out of the

agreement, and that they would be subject to personal jurisdiction in New York.

183.    As with the prior financing projects, Hudson and CWMF were quick to provide

assurances about the Nightingale's success meant to keep Plaintiffs from taking action.

184.    For example, on January 11, 2019, Conover and Grizzard had an email exchange

discussing recent news that Nightingale had been sold to IFC Films, the large U.S. film

production and distribution company. Conover explained that the IFC acquisition was separate

from the collateral originally securing Plaintiffs' loan, and thus provided even greater loan

protection:



From: Hudson Private <cconover@HudsonPrivate.com>
Sent: Friday, January 11, 2019 4:32 PM
To: Chris Grizzard <cgrizzard@bayshorecap.com>
Subject: Re: 'The Babadook' Director Jennifer Kent Sells 'The Nightingale' to IFC – Variety

Exactly right

On Jan 11, 2019, at 4:20 PM, Chris Grizzard <cgrizzard@bayshorecap.com> wrote:

    Ok that makes sense. So can I think about this as additional collateral for our loan – i.e. our loan was also
    secured by the unsold domestic that is now "sold" and thus more firm collateral?
    Chris Grizzard, CFA, CAIA
    Vice President
    O:
    M:
    www.bayshorecap.com

185.    Months later, in July 2019, Cloth provided additional assurances that the

FilmNation and IFC distribution proceeds would provide a quick repayment for Plaintiffs' loans,

and "[w]e anticipate being paid out all at once, at worst we might see two payments (one from

Film Nation for foreign $ and one from IFC for the domestic $."

186.    Thereafter, with no payments made, Plaintiffs continued to seek payment and

additional information regarding both the status of the distribution agreements, as well as

documentation regarding the collateral that Defendants had promised would protect Plaintiffs'

investment.

187.     Defendants continued to string Plaintiffs along. For example, on October 17, 2019 – a year after the Nightingale loan was made – Cloth assured Bayshore that payments for Nightingale would start to arrive within weeks. When no money arrived, both Conover, on behalf of Hudson, and Cloth told Bayshore to be patient, and that none of Hudson's deals with CWMF had ever defaulted.

188.     No money was ever repaid. As of January 31, 2022, Bayshore and RTR are owed at least $3,787,029.97 and $1,683,124.43, respectively, in principal and interest on Nightingale, in addition to any contingent compensation.

**D.     Defendants Continue To Falsely Promise Repayment**

189.     By mid-2020, nearly two years after Plaintiffs' initial loans, Defendants began to promise that Plaintiffs would be repaid from sources other than the film financing projects. As with their prior false assurances, these efforts by Defendants were intended only to string Plaintiffs along so that the Ponzi-like scheme could continue.

190.     During a May 8, 2020 telephone call, for example, Cloth told Bayshore that BRON Studios was about to close on a line of credit with Comerica, which would provide it with tens of millions of dollars. Cloth, on behalf of BRON Studios, told Bayshore that this money would be used to pay off Bayshore's loans and others like it.

191.     Over the following months Plaintiffs sought additional information about the Comerica financing, and were continually told that the Comerica financing was going forward.

192.     Defendants' story soon shifted, however. In July 2020 Cloth told Bayshore that BRON Studios had been "working with a UK financier for the better part of 6 months arranging financing for general corporate purposes, including the repayment of older unpaid loans. The negotiations are in their latter stages and Bayshore is earmarked to have all its loans repaid with the first advance of funding."

193.    When pressed for proof of the transaction, Bayshore received a letter dated July 8, 2020, from Ryan McWaters of DeRoyce Capital, who claimed that DeRoyce and BRON Media Corp. "are presently in advanced negotiations with the intention of allocating investment in excess of $100,000,000 across BRON's various operating divisions," and that "approved use-of-funds has been consented to retire loans in films that have taken longer than anticipated to repay . . . ."

194.    Upon information and belief, McWaters is Defendants' confederate, and his letter was nothing more than a component of Defendants' scheme. Indeed, DeRoyce Capital's purportedly prestigious London address is merely a shared office space, and the address used by McWaters in the United States is the same as BRON Studios' address in Los Angeles.

195.    Defendants never provided any additional substantive information about the purported financing and, of course, Defendants were never repaid their outstanding loan amounts.

196.    Whether intended to cause Plaintiffs' forbearance or otherwise, Defendants' statements about new financing to pay off Plaintiffs' loans were false and misleading, like all of the others before.

**FIRST CAUSE OF ACTION**

**Civil RICO, 18 U.S.C. § 1962(c)**

**(Against all Defendants)**

197.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

198.    Plaintiffs are corporate entities and, as such, are "persons" within the meaning of 18 U.S.C. § 1961(3).

-36-

199.    Defendants are natural persons and corporate entities and, as such, are "persons" within the meaning of 18 U.S.C. § 1961(3).

***The Enterprise***

200.    CWMF, BRON Creative, BRON Studios, and Hudson comprise an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise").

201.    Cloth, Conover, Jonas, and Gilbert are associated with the Enterprise as founders and principals of its members.

202.    Defendants agreed to conduct and participate in the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs (and others) and stealing their money.

203.    The purpose of the Enterprise and the role of each member is as follows:

    a.    Hudson, CWMF, BRON Studios, and BRON Creative convinced lenders like Plaintiffs to provide financing for film projects. Both Hudson and CWMF earned up-front fees upon doing so, some of which were used to pay off Hudson's loan.

    b.    In each of the financing projects described above – Needle, the Lionsgate Slate and Nightingale – CWMF or BRON Creative, controlled by Cloth and Gilbert, agreed to make a loan to finance the production of the films.

    c.    A substantial portion of the money used to make those loans, however, came from Plaintiffs. Thus, CWMF and BRON Creative obtained the benefit of Plaintiffs' financing without any risk or financial downside. Those risks were transferred to Plaintiffs, while Defendants reaped the benefits.

    d.    BRON Studios produced the films, either directly or through special purpose vehicles, using the loan proceeds, and profited from doing so.

    e.    CWMF, Hudson, BRON Creative, and BRON Studios each profited from Plaintiffs' loans.

    f.    Defendants thus all benefited from Plaintiffs' loans, but never repaid or intend to repay what is owed.

204.    These activities had an effect on interstate commerce.

205.    Defendants accomplished their scheme through materially false and misleading statements and omissions.

206.    These false statements and omissions include statements, described in greater detail herein, that the financings are not dependent upon box office success, that no loan made in conjunction with CWMF had ever defaulted, and that the financings were collateralized so as to fully secure Plaintiffs' loans.

207.    At the same time, Defendants hid material information from Plaintiffs, including that Defendants had failed to repay prior lenders similar to Plaintiffs, that Defendants were in disputes regarding the exact same type of misconduct described here, and that Hudson was beholden to CWMF and self-interested as a result of the undisclosed $18 million loan from CWMF to Hudson.

208.    Defendants also provided numerous false assurances after the loans were made, which were intended to deter Plaintiffs from exercising their rights to secure their investments and seek the return of money owed. Doing so was important for Defendants because their scheme would unravel if it became widely known that loans made to the Enterprise would simply go unpaid, or be used to pay prior loans revealing the Ponzi-like nature of Defendants' financing.

*Pattern Of Racketeering Activity*

209.    Defendants, individually and as part of the Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity in furtherance of their scheme, in violation of 18 U.S.C. § 1962(c).

210.    Each Defendant's participation is critical to the racketeering scheme, and they have enabled, conducted, and maintained the scheme by, among other things, knowingly making

materially false or misleading statements, or material omissions, through the wires, to induce

Plaintiffs and other similarly situated lenders to participate in film financings, in violation of 18

U.S.C. § 1343 (wire fraud).

211.   Individual acts in violation of 18 U.S.C. § 1343 include, among others described

above:

a.   Jonas' statement, sent by email on August 15, 2016, on behalf of Hudson and CWMF, that the film financing loans "are collateralized by municipal production incentives and distribution guarantees, locking in double digit returns," which are "completely independent" of commercial success.

b.   Statements contained within Hudson's PowerPoint presentations, sent to Plaintiffs in 2016 and 2017, including that "most of the investments that the Fund will invest in generate returns and repay investors based solely on timely delivery of the completed project, not on box office or television success."

c.   Conover's email, dated August 14, 2017, attaching CWMF's "pitchbook," which stated that CWMF had financed more than 60 projects, with "no defaults."

d.   The statement on CWMF's website that "[t]he repayment of our loans is not dependent on box office success."

e.   Conover's email, dated September 15, 2017, sent on behalf of Hudson, CWMF, BRON, and BRON Creative, containing a spreadsheet listing 23 film projects, 21 of which were designated "fully repaid."

f.   Jonas' email, dated February 5, 2018, containing statements and a PowerPoint attachment bragging of Hudson's monthly and annual returns.

g.   Hudson's document titled "Film Investment Risks and Mitigation Strategies," sent to Bayshore in May 2018, stating that "Hudson's film finance strategy is focused exclusively on 'taking investment risk' where there is collateral in place . . . against which we will loan capital."

h.   Hudson's statement by email on July 3, 2018, that CWMF and BRON had agreed to "take future impairments off our books at their full book value at the end of each Calendar year."

i.   Hudson and CWMF's failure to disclose that CWMF had made an $18 million loan to Hudson to provide capital for failed film investments, that Hudson had insisted this loan be falsely characterized as a purchase of

impaired assets, and that the loan was to be repaid from commissions earned through Hudson's loan sourcing activities.

j.  Jonas' email, dated June 26, 2018, stating that the Needle financing opportunity would be fully collateralized by a Canadian tax credit, and "is expected to return capital in less than 12 months."

k.  Jonas' statement, also made on June 26, 2018, that the "tax credit is not dependent on either the commercial success or even the completion/delivery of the film," and that "distribution deals are currently being negotiated with digital distributors – all in excess of the total budget of the film."

l.  The representations made in the Needle Financing Term Sheet, dated July 5, 2018, signed by BRON Studios (by Cloth) and CWMF.

m.  Cloth's email, dated July 3, 2019, regarding Needle, that "we are currently in negotiations for global deal from tow [sic] major streaming services," and that "the value of both deals gets us out with full interest."

n.  Cloth's email, dated July 3, 2019, that the Canadian tax credits for Needle provided a "worst case backstop," and that "we will complete our deal to a streamer shortly."

o.  Statements made by Cloth during a May 8, 2020 phone call, including that several streaming services were interested in the film and that Cloth was trying to obtain a deal that would bring the most money for the film.

p.  Jonas' email, dated June 16, 2018, stating that the Lionsgate Slate investment was cross collateralized.

q.  The representations made in the Lionsgate Term Sheet, dated July 9, 2018 and amended August 1, 2018, signed by Gilbert and Cloth on behalf of BRON Creative, Gilbert on behalf of BRON Studios, and Cloth on behalf of CWMF.

r.  The October 17, 2018 "update" on the Lionsgate Slate, provided to Plaintiffs by email, stating that at least two of the films were performing at or above expectations, which "should lead to further solid revenue production."

s.  Cloth's August 16, 2019 email stating, with respect to the Lionsgate Slate, that "the loan is not in jeopardy of not being repaid."

t.  Statements made by Conover during a November 19, 2019 phone call that Hudson's clients had participated in more than 30 deals with CWMF, all of which had been repaid.

u.   Hudson's email, dated September 26, 2018, regarding Nightingale, including that the opportunity was "collateralized by already completed minimum guaranteed distribution sales in international markets . . . thus far of $3.5 million."

v.   Jonas' email, dated October 8, 2018, that Plaintiffs' participation in Nightingale would entitle it to "first position" to recoup its investment, while at the same time failing to disclose the existence of a dispute with a third-party investor who had previously invested in Nightingale.

w.   Conover's email, dated January 11, 2019, assuring Plaintiffs that the sale of domestic distribution rights for Nightingale further secured the loan by providing additional collateral.

x.   Cloth's July 4, 2019 email regarding Nightingale, assuring repayment based upon distribution deals.

y.   Statements made by Cloth during a May 8, 2020 telephone call that BRON was about to close on a loan with Comerica, and that this money would be used to pay off Plaintiffs' loans.

z.   Cloth's email, dated July 1, 2020, stating that BRON was "working with a UK financier" to arrange financing, and that "Bayshore is earmarked to have all its loans repaid with the first advance of funding."

aa.  Statements contained in the July 8, 2020 letter from DeRoyce capital, transmitted by email, regarding a $100,000,000 financing that BRON would use to pay Bayshore's loan.

212.   Each of these acts were related, and in furtherance of Defendants' fraudulent scheme, enabling Defendants to take money and property from Plaintiffs by means of false pretense and materially false or misleading statements or omissions.

213.   Each of the Defendants directly or indirectly conducted and participated in the conduct of the Enterprise's affairs through this patten of racketeering activity, in violation of 18 U.S.C. § 1962(c).

214.   Indeed, each of the statements above were made with each Defendants' knowing and intentional participation, as described in the preceding paragraphs herein.

215.     Defendants' unlawful Enterprise has been and remains longstanding and continuous, reflecting both a closed-ended and open-ended pattern of continuity.

216.     The predicate acts described above span a period of nearly four years, involve at least two victims, and several participants.

217.     Defendants' pattern of racketeering activity can also be characterized as open ended, as the predicate acts reflect Defendants' regular way of doing business, and there is a significant threat of continued criminal activity.

218.     Defendants also appear to have engaged in separate but similar schemes during this time period, as evidenced by the Prior Nightingale Claim, as well as the claims brought against Defendants by other parties involving "The Layover" and "Drunk Parents."

219.     Plaintiffs are also aware of a more recent lawsuit filed in this district by an entity called Preserver LP which, like Plaintiffs, appears to have been induced to provide financing for a movie called "Bombshell."[5] Other investors were duped involving investments into the films The Survivor, Capone, and Greyhound.

220.     Indeed, websites published by Hudson, BRON Creative, and BRON Studios, as well as by media outlets, reflect that Defendants' conduct is continuous and ongoing, as they seek to lure new investors into the financing scheme.

221.     For example, on February 14, 2022 it was reported that BRON Studios and CWMF, Gilbert and Cloth were producing the film "National Anthem." More recently, on May 4, 2022, Variety reported that BRON Studios and Gilbert (in association with CWMF and Cloth) were producing "Reggie," a film about Reggie Jackson, which is being financed by CWMF.

---

[5] *See Preserver, LP v. Creative Wealth Media Finance Corp. and Jason Cloth*, No. 21-CV-2456 (JPO).

222.     Based upon information that Plaintiffs have received from other lenders,

Defendants have continued to seek the participation of unwitting lenders for their other projects.

***Plaintiffs' Injuries***

223.     As a direct and proximate result of Defendants' racketeering activities, and in

violation of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in

that:

a.     As of the date of this Complaint Bayshore is owed at least $4,057,191.78 for the Needle financing, with default interest continuing to accrue, in addition to any contingent compensation that may be owed, but which Plaintiffs cannot ascertain due to Defendants' failure to provide timely and accurate information.

b.     As of the date of this Complaint Bayshore is owed at least $4,520,939.00 for the Lionsgate Slate financing, with default interest continuing to accrue, in addition to any contingent compensation that may be owed, but which Plaintiffs cannot ascertain due to Defendants' failure to provide timely and accurate information.

c.     As of the date of this Complaint RTR is owed at least $641,198.85 for the Lionsgate Slate financing, with default interest continuing to accrue, in addition to any contingent compensation that may be owed, but which Plaintiffs cannot ascertain due to Defendants' failure to provide timely and accurate information.

d.     As of the date of this Complaint Bayshore is owed at least $3,787,029.97 for the Nightingale financing, with default interest continuing to accrue, in addition to any contingent compensation that may be owed, but which Plaintiffs cannot ascertain due to Defendants' failure to provide timely and accurate information.

e.     As of the date of this Complaint RTR is owed at least $1,683,124.43 for the Nightingale financing, with default interest continuing to accrue, in addition to any contingent compensation that may be owed, but which Plaintiffs cannot ascertain due to Defendants' failure to provide timely and accurate information.

## SECOND CAUSE OF ACTION

### Civil RICO Conspiracy, 18 U.S.C. § 1962(d)

### (Against all Defendants)

224.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

225.    In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants conspired to violate the provisions of 18 U.S.C. § 1962(c) in that, beginning no later than August of 2016 and continuing through the date of this Complaint, they knowingly agreed and conspired to conduct or participate in, directly or indirectly, the affairs of the Enterprise through the pattern of racketeering activity described above.

226.    The volume and frequency of the fraudulent activity, and the continuance of the scheme for over nearly four years, could not have occurred without the consent and knowing collusion of Defendants and other conspirators.

227.    As part of, and in furtherance of, their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that those acts were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and did commit at least two predicate acts of racketeering.

228.    Plaintiffs' property interests have been injured by, and as a direct and proximate result of, Defendants' violations of 18 U.S.C. § 1962(d), as described more fully in the preceding cause of action.

## THIRD CAUSE OF ACTION

### Fraud

### (Against all Defendants)

229.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

230.    Defendants fraudulently induced Plaintiffs to participate Defendants' film financing scheme.

231.    Defendants perpetrated their fraud through their knowing misrepresentations and omissions described in Count I. These misrepresentations and omissions include, but are not limited to:

      a.    Statements made by Defendants that the financings in which Plaintiffs participated were not dependent upon the commercial success of the films. These statements include those made by Hudson, Jonas, Conover, CWMF, and Cloth described in more detail above.

      b.    Statements made by Defendants regarding the security of the proposed financings, including that the loans were secured by collateral consisting of transferrable tax credits and/or distribution agreements. These statements include those made by Hudson, Jonas, CWMF, Cloth, and Conover described in more detail above. Such statements also include representations made within the Term Sheets, signed by Cloth and Gilbert on behalf of BRON Studios, BRON Creative, and CWMF.

      c.    Statements by Hudson, Conover, Jonas, Cloth, and CWMF, described in more detail above, that most if not all financings arranged by CWMF and BRON Creative were fully repaid, and that there had been no defaults.

      d.    Defendants' intentional failure to disclose other lawsuits brought by prior film investors, which lawsuits contradict the Defendants' claims, including those by Conover, Hudson, CWMF, BRON Studios, and BRON Creative, that prior loans had been fully repaid and were not in default.

      e.    Statements within the Term Sheets, signed by Cloth and Gilbert on behalf of BRON Studios, BRON Creative, and CWMF, that Plaintiffs' principal and interest would be repaid.

      f.      The failure to disclose the $18 million loan made by CWMF to Hudson, and instead misrepresenting that CWMF and BRON Studios had agreed to buy back impaired loans at book value.

      g.      Cloth's representations regarding Needle that distribution agreements were in the process of being finalized, and that the value of the agreements would cause Bayshore to be repaid in full.

      h.      Hudson, CWMF, and Cloth's statements, described in more detail above, that at least two films from the Lionsgate Slate were performing at or above expectations.

      i.      Cloths' statement that the Lionsgate loans "were not in jeopardy of not being repaid."

      j.      Defendants' assertions regarding Nightingale, described in more detail above, including that Bayshore and RTR would be in "first position," while at the same time failing to disclose that the same security had been pledged to another lender who was preparing a lawsuit against certain Defendants.

      k.      Defendants' claim, made by Hudson and Cloth with other Defendants' knowing and intentional participation, that BRON Studios was finalizing a separate financing that would be used to pay off Plaintiffs' loans in full.

232.     These misrepresentations and omissions were material because Plaintiffs would not have participated in the film financings had they known them to be false and misleading.

233.     In reliance upon these material misrepresentations and omissions, Plaintiffs participated in the film financings and forbore from taking any earlier action to address Defendants' failure to comply with their loan obligations.

234.     As a result of the Defendants' fraud, Bayshore has been damaged in an amount to be determined at trial, but in no event less than $12,365,160.75. RTR has been damaged in an amount to be determined at trial, but in no event less than $2,324,323.28.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Fraud

### (In the alternative against BRON Studios, Inc., BRON Studios USA Inc., and Gilbert)

235.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

236.    As described above, Defendants fraudulently induced Plaintiffs to participate Defendants' film financing scheme through a series of false and misleading statements and misrepresentations, as well as material omissions. Defendants' fraudulent statements were also intended to influence Plaintiffs to not take steps to enforce their rights under the relevant agreements and seek the immediate return of their loans.

237.    Defendants BRON Studios, Inc., BRON Studios USA Inc., and Gilbert, as key elements of the Defendants' overall scheme, had knowledge of the fraud and substantially assisted the other Defendants to achieve the goals of the conspiracy and benefit financially.

238.    Indeed, as more fully described above, BRON Studios and Gilbert were integral to the scheme, because the movies they produced provided a vehicle for the fraud, and the imprimatur of a major movie studio was a key component of the Count III Defendants' fraudulent activities.

239.    More fundamentally, Gilbert signed several of the agreements that resulted from the Count III Defendants' fraud, including those related to the Lionsgate Slate.

240.    As a result of BRON Studios, Inc., BRON Studios USA Inc., and Gilbert's aiding and abetting fraud, Bayshore has been damaged in an amount to be determined at trial, but in no event less than $12,365,160.75. RTR has been damaged in an amount to be determined at trial, but in no event less than $2,324,323.28.

## FIFTH CAUSE OF ACTION

### Breach of Contract - Needle

### (Against CWMF and BRON Studios)

241.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

242.    The Needle Term Sheet is a valid and binding contract between Bayshore, on the one hand, and CWMF and BRON Studios, on the other.

243.    Bayshore performed its obligations under the Needle Term Sheet.

244.    CWMF and BRON Studios breached the Needle Term Sheet by, among other breaches, failing to repay money owed to Bayshore and failing to secure Bayshore's collateral.

245.    As a result of the breach, Bayshore has been damaged in an amount to be determined at trial, but in no event less than $4,057,191.78.

## SIXTH CAUSE OF ACTION

### Breach of Contract – Lionsgate Slate

### (Against CWMF, BRON Creative, and BRON Studios)

246.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

247.    The Lionsgate Term Sheets are valid and binding contracts between Bayshore and RTR, on the one hand, and CWMF, BRON Creative, and BRON Studios, on the other.

248.    Bayshore and RTR performed their obligations under the Lionsgate Term Sheets.

249.    CWMF, BRON Creative, and BRON Studios breached the Lionsgate Term Sheets by, among other breaches, failing repay money owed to Bayshore and RTR and failing to secure Plaintiffs' collateral.

250.     As a result of the breaches, Bayshore has been damaged in an amount to be determined at trial, but in no event less than $4,520,939.00. RTR has been damaged in an amount to be determined at trial, but in no event less than $641,198.85.

### SEVENTH CAUSE OF ACTION

**Breach of Contract – Nightingale**

**(Against BRON Creative)**

251.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

252.     The Nightingale Term Sheets are valid and binding contracts between Bayshore and RTR, on the one hand, and BRON Creative, on the other.

253.     Bayshore and RTR performed their obligations under the Lionsgate Term Sheets.

254.     BRON Creative breached the Nightingale Term Sheets by, among other breaches, failing repay money owed to Bayshore and RTR.

255.     As a result of the breaches, Bayshore has been damaged in an amount to be determined at trial, but in no event less than $3,787,029.97. RTR has been damaged in an amount to be determined at trial, but in no event less than $1,683,124.43.

## EIGHTH CAUSE OF ACTION

**Breach of the Covenant of Good Faith and Fair Dealing – Needle**

**(Against CWMF and BRON Studios)**

256.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

257.     The Needle Term Sheet is an enforceable contract that includes an implied covenant that CWMF and BRON Studios would act in good faith and deal fairly with Bayshore.

258.     CWMF and BRON Studios materially breached the Nightingale Term Sheet, including by failing to repay money owed to Bayshore and by failing to secure Bayshore's collateral.

259.     Bayshore has performed all its obligations under the Needle Term Sheet.

260.     Defendants' breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Needle Term Sheet, and which disappointed Bayshore's reasonable expectations by denying it the benefit of the Needle Term Sheet.

261.     As a direct and proximate cause of Defendants' breaches of the implied covenant of good faith and fair dealing, Bayshore has been damaged in an amount to be determined at trial.

262.     Furthermore, Defendants' conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## NINTH CAUSE OF ACTION

**Breach of the Covenant of Good Faith and Fair Dealing – Lionsgate Slate**

**(Against CWMF, BRON Creative, and BRON Studios)**

263.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

264.     The Lionsgate Term Sheets are enforceable contracts that include an implied covenant that CWMF, BRON Creative, and BRON Studios would act in good faith and deal fairly with Plaintiffs.

265.     Defendants materially breached the Lionsgate Term Sheets, including by failing to repay money owed to Plaintiff and by failing to secure Plaintiffs' collateral.

266.     Plaintiffs have performed all their obligations under the Lionsgate Term Sheets.

267.     Defendants' breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Lionsgate Term Sheets, and which disappointed Plaintiffs' reasonable expectations by denying them the benefit of the Lionsgate Term Sheet.

268.     As a direct and proximate cause of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial.

269.     Furthermore, Defendants' conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

**TENTH CAUSE OF ACTION**

**Breach of the Covenant of Good Faith and Fair Dealing – Nightingale**

**(Against BRON Creative)**

270.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

271.    The Nightingale Term Sheets are enforceable contracts that include an implied covenant that BRON Creative would act in good faith and deal fairly with Plaintiffs.

272.    BRON Creative materially breached the Nightingale Term Sheets, including by failing to repay money owed to Plaintiff and by failing to secure Plaintiffs' collateral.

273.    Plaintiffs have performed all their obligations under the Nightingale Term Sheets.

274.    BRON Creative's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Nightingale Term Sheets, and which disappointed Plaintiffs' reasonable expectations by denying them the benefit of the Nightingale Term Sheets.

275.    As a direct and proximate cause of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial.

276.    Furthermore, Defendants' conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

**ELEVENTH CAUSE OF ACTION**

**Breach of Contract**

**(Against Hudson)**

277.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

278.    The Sourcing Agreement is a valid and binding contract between Bayshore and Hudson.

279.    Bayshore performed its obligations under the Sourcing Agreement.

280.    Hudson breached the Sourcing Agreement by, among other things, presenting film financing opportunities to Bayshore that did not meet the criteria stated in the Sourcing Agreement, including that Bayshore would have a first position lien on all assets of the financed film, as well as a "direct sightline to specific tax credit(s) and/or distribution right(s) collateral (either executed or unexecuted)."

281.    As a result of the breaches, Bayshore has been damaged in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### Breach of the Covenant of Good Faith and Fair Dealing

### (Against Hudson)

282.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

283.    The Sourcing Agreement is an enforceable contract that includes an implied covenant that Hudson would act in good faith and deal fairly with Plaintiffs.

284.    Hudson materially breached the Sourcing Agreement, including by, among other things, presenting film financing opportunities to Bayshore that did not meet the criteria stated in the Sourcing Agreement, including that Bayshore would have a first position lien on all assets of the financed film, as well as a "direct sightline to specific tax credit(s) and/or distribution right(s) collateral (either executed or unexecuted)."

285.    Plaintiffs have performed all their obligations under the Sourcing Agreement.

286.     Hudson's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Sourcing Agreement, and which disappointed Plaintiffs' reasonable expectations by denying them the benefit of the Sourcing Agreement.

287.     As a direct and proximate cause of Hudson's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined at trial.

288.     Furthermore, Hudson's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION

### Unjust Enrichment

### (Against all Defendants)

289.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

290.     By refusing to repay amounts loaned by Plaintiffs for the Needle, Lionsgate Slate, and Nightingale productions, Defendants were enriched at Plaintiffs' expense.

291.     Equity and good conscience militate against permitting Defendants to retain the amounts Plaintiffs seek to recover.

292.     As a direct and proximate cause of Defendants' unjust enrichment, Plaintiffs have been damaged in an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION

### Accounting

### (Against CWMF, BRON Creative, and BRON Studios)

293.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

294.     Bayshore and RTR have a fiduciary relationship with CWMF, BRON Creative, and BRON Studios (the "Accounting Defendants") with respect to Plaintiffs' financings of Needle, the Lionsgate Slate, and Nightingale.

295.     Based on the fiduciary relationship, the Accounting Defendants are required to account to Plaintiffs for, among other things, all financial information related to Needle, the Lionsgate Slate, and Nightingale, including revenues received and paid (or payable) to Defendants and their affiliates in connection with the productions.

296.     However, in breach of their fiduciary duties, the Accounting Defendants have improperly refused Plaintiffs' prior demands for timely, accurate and complete information concerning the financial affairs of each production.

297.     Absent judicial relief, Plaintiffs will not be able to assess the financial condition of the productions.

298.     Plaintiffs have no adequate remedy at law other than this cause of action to have its rights determined as to the matters set forth herein.

299.     Plaintiffs are entitled to an accounting with respect to the Needle, Lionsgate Slate, and Nightingale productions.

## JURY TRIAL DEMAND

300.    Plaintiffs hereby request a trial by jury on all claims so triable.

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment against

Defendants, as follows:

a.    On the First Cause of Action, awarding Plaintiffs monetary damages in an amount to be determined at trial, but in no event less than treble damages totaling $44,068,452.09, plus interest;

b.    On the Second Cause of Action, awarding Plaintiffs monetary damages in an amount to be determined at trial, but in no event less than treble damages totaling $44,068,452.09, plus interest;

c.    On the Third Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

d.    On the Fourth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

e.    On the Fifth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial, but in no event less than $4,057,191.78, plus interest;

f.    On the Sixth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial, but in no event less than $5,162,137.85, plus interest;

g.    On the Seventh Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial, but in no event less than $5,470,154.40, plus interest;

h.    On the Eighth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

i.    On the Ninth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

j.    On the Tenth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

k.    On the Eleventh Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

l.    On the Twelfth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

    m.      On the Thirteenth Cause of Action, awarding Plaintiffs damages in an amount to be determined at trial;

    n.      On the Fourteenth Cause of Action, an accounting of Defendants with respect to the film projects in which Plaintiffs participated;

    o.      Plaintiffs' attorneys' fees and costs; and

    p.      Such other and further relief as the Court deems just and appropriate.

Dated: New York, New York
       May 18, 2022

          Respectfully submitted,

          BRACEWELL LLP

          By: /s/ Seth D. Ducharme
              Seth D. Ducharme
              seth.ducharme@bracewell.com
              Rachel B. Goldman
              rachel.goldman@bracewell.com
              David A. Shargel
              david.shargel@bracewell.com
              31 West 52nd Street, 19th Floor
              (212) 508-6100

              *Attorneys for Plaintiffs*