**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BAYSHORE CAPITAL ADVISORS, LLC, BCA
ALTERNATIVE INCOME FUND, LP, and
ROCKING T RANCH, LLLP,

                    Plaintiffs,

          v.

CREATIVE WEALTH MEDIA FINANCE
CORP., BRON CREATIVE CORP., BRON
CREATIVE USA CORP., BRON STUDIOS,
INC., BRON STUDIOS USA, INC., HUDSON
VALLEY WEALTH MANAGEMENT, INC.,
JASON CLOTH, AARON L. GILBERT,
CHRISTOPHER CONOVER, and DAVID K.
JONAS, and DOES 1-21,

                    Defendants.

Case No: 1:22-cv-1105

---

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' MOTIONS TO DISMISS</u>

BRACEWELL LLP
31 West 52nd Street, 19th Floor
New York, New York 10019
(212) 508-6100

*Attorneys for Plaintiffs*

October 10, 2022

Table of Contents

Page

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT .......................................................................................1

ARGUMENT ...................................................................................................................4

    I.     The Court Has Personal Jurisdiction Over All Defendants ....................................4

          A.     Defendants Are Subject To Nationwide RICO Jurisdiction ........................5

          B.     The Court Also Has Jurisdiction Under New York's Long Arm
                Statute ........................................................................................................9

          C.     The Court Should Alternatively Permit Jurisdictional Discovery .............15

    II.    There Is No Reason To Sever The Creative Defendants On The Basis Of
        Forum Non Conveniens ........................................................................................16

          A.     Plaintiffs' Choice Of Forum Is Entitled To Great Deference ...................17

          B.     Canada Is Not An Adequate Alternative Forum For Plaintiffs'
                Claims .......................................................................................................19

          C.     Private and Public Interests Weigh Heavily In Favor Of Plaintiffs'
                Choice Of Forum .....................................................................................19

    III.   Plaintiffs Have Adequately Pleaded Their RICO Claims......................................22

          A.     Plaintiffs' RICO Claims Are Timely ........................................................23

           B.     Plaintiffs Have Alleged A Pattern Of Racketeering Activity ...................23

          C.     Plaintiffs Have Established The Existence Of A RICO Enterprise ..........34

          D.     Plaintiffs Adequately Allege A RICO Conspiracy Claim ........................40

    IV.   Plaintiffs' State Law Claims Should Stand...........................................................42

          A.     Choice Of Law ..........................................................................................42

          B.     Fraud (Count 3) .........................................................................................43

          C.     Aiding And Abetting Fraud (Count 4) ......................................................45

          D.     Breach Of Contract Concerning Financing Term Sheets
                (Counts 5-6) ..............................................................................................47

i

## Table of Contents
(continued)

Page

E.    Breach Of Contract Against Hudson (Count 11)........................................48

F.    Breach Of The Covenant Of Good Faith And Fair Dealing
      Concerning Financing Term Sheets (Counts 8-10, Count 12)..................49

G.    Unjust Enrichment (Count 13)....................................................................50

CONCLUSION....................................................................................................................50

Table of Authorities

Page(s)

**Cases**

*Abbott Labs. v. Adelphia Supply USA*,
    No. 15-CV-5826 (CBA), 2017 WL 57802 (E.D.N.Y. 2017)...................................................40

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009).......................................................................................47

*Alliance of Am. Insurers v. Cuomo*,
    854 F.2d 591 (2d Cir. 1988)........................................................................................16, 18, 19

*Allstate Ins. Co. v. Lyons*,
    843 F. Supp. 2d 358 (E.D.N.Y. 2012) ......................................................................................28

*Angermeir v. Cohen*,
    14 F. Supp.3d 134 (S.D.N.Y. 2014)....................................................................................29, 30

*Arch Ins. Co. v. Precision Stone, Inc.*,
    584 F.3d 33 (2d Cir. 2009)........................................................................................................43

*Bank Midwest, N.A. v. Hypo Real Est. Cap. Corp.*,
    No. 10-CV-232 (WHP), 2010 WL 4449366 (S.D.N.Y. Oct. 13, 2010) ................................49

*Barbarotto Int'l. Sales Corp. v. Tullar*,
    188 A.D.2d 503 (2d Dep't 1992)..............................................................................................13

*Bice v. Robb*,
    No. 07-CV-2214 (PAC), 2010 WL 11586924 (S.D.N.Y. Jan. 15, 2010)................................50

*Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*,
    817 F. Supp. 326 (E.D.N.Y. 1993) .............................................................................................6

*Boyle v. United States*,
    556 U.S. 938 (2009)....................................................................................................22, 34, 35

*BWP Media USA Inc. v. Hollywood Fan Sites, LLC*,
    69 F. Supp. 3d 342 (S.D.N.Y. 2014).........................................................................................5

*Chevron Corp. v. Donziger*,
    871 F. Supp. 2d 229 (S.D.N.Y. 2012).......................................................................................30

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)..................................................................................................9, 13

*Chrysler Cap. Corp. v. Century Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)..........................................................................................14

Table of Authorities
(continued)

Page(s)

*In re ClassicStar Mare Lease Litig.*,
    823 F. Supp. 2d 599 (E.D. Ky. 2011) .......................................................................31

*Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
    271 F.3d 374 (2d Cir. 2001)....................................................................................22

*Crabhouse of Douglaston Inc. v. Newsday*,
    801 F. Supp. 2d 64 (E.D.N.Y. 2011) .......................................................................41

*Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*,
    7 N.Y.3d 65 (2006) ................................................................................................10

*DiRienzo v. Philip Servs. Corp.*,
    294 F.3d 21 (2d Cir. 2002).......................................................................................20

*Elsevier Inc. v. W.H.P.R., Inc.*,
    692 F. Supp. 2d 297 (S.D.N.Y. 2010) .....................................................................39

*Elsevier, Inc.* v. *Grossman*,
    77 F. Supp. 3d 331 (S.D.N.Y. 2015).........................................................6, 9, 13, 14

*Emby Hosiery Corp. v. Tawil*,
    196 A.D.3d 462 (2d Dep't 2021) .............................................................................50

*Equinox Gallery Ltd. v. Dorfman*,
    306 F. Supp. 3d 560 (S.D.N.Y. 2018)...............................................................32, 33

*First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002)........................................................................6

*First Cap. Inv. Holdings LLC v. Wilson Cap. Grp, Inc.*,
    No. 10-CV-2948, 2010 WL 4967833 (S.D.N.Y. Nov. 30, 2010)...............................14

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) .............................................................................................9, 10

*Fournier v. Starwood Hotels & Resorts Worldwide, Inc.*,
    908 F. Supp. 2d 519 (S.D.N.Y. 2012)..................................................................17, 19

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
    640 F. Supp. 2d 300 (S.D.N.Y. 2009)..................................................................38, 39

*Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*,
    No. 20-CV-1395 (KMW), 2022 WL 2159823 (S.D.N.Y. June 15, 2022) ...........19, 20, 21

*Hemmerdinger Corp. v. Ruocco*,
    976 F. Supp. 2d 401 (E.D.N.Y. 2013) .....................................................................35

Table of Authorities
(continued)

Page(s)

*Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*,
    331 F. Supp. 3d 130 (S.D.N.Y. 2018)..........................................................................5

*ICD Cap., LLC v. CodeSmart Holdings, Inc.*,
    842 F. App'x 705 (2d Cir. 2021).............................................................................47

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)....................................................................................40

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)................................................................................18, 21

*Johnson v. JPMorgan Chase Bank, N.A.*,
    488 F. Supp. 3d 144 (S.D.N.Y. 2020).....................................................................27

*Kaczmarek v. International Business Machines Corp.*,
    30 F. Supp. 2d 626 (S.D.N.Y. 1998).......................................................................40

*Kalimantano GmbH v. Motion in Time, Inc.*,
    939 F. Supp. 2d 392 (S.D.N.Y. 2013).....................................................................22

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988).............................................................................................12

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)................................................................................42, 43

*Laborers Local 17 Health and Ben. Fund v. Philip Morris, Inc.*,
    26 F. Supp. 2d 593 (S.D.N.Y. 1998).........................................................................6

*Landy v. Mitchell Petroleum Tech. Corp.*,
    734 F. Supp. 608 (S.D.N.Y. 1990)..........................................................................31

*Leon v. Shmukler*,
    992 F. Supp. 2d 179 (E.D.N.Y. 2014) .....................................................................16

*Levitin v. Sony Music Ent.*,
    101 F. Supp. 3d 376 (S.D.N.Y. 2015)................................................................17, 19

*Lewis Fam. Grp. Fund LP v. JS Barkats PLLC*,
    No. 16-CV-5255 (AJN) (JLC), 2021 WL 1203383 (S.D.N.Y. Mar. 31, 2021)................29, 30

*Licci ex rel. Licci v. Lebanese Canadian Bank*,
    SAL, 732 F.3d 161 (2d Cir. 2013)...........................................................................15

*Madanes v. Madanes*,
    981 F. Supp. 241 (S.D.N.Y. 1997)............................................................................5

Table of Authorities
(continued)

Page(s)

*In re Mediators, Inc.*,
  105 F.3d 822 (2d Cir. 1997).............................................................................................45

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  379 F. Supp. 2d 348 (S.D.N.Y. 2005)..............................................................................44

*Minnie Rose LLC v. Yu*,
  169 F. Supp. 3d 504 (S.D.N.Y. 2016)...............................................................................15

*Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*,
  531 F. Supp. 3d 673 (S.D.N.Y. 2021)...............................................................................25

*Moss v. BMO Harris Bank, N.A.*,
  258 F. Supp. 3d 289 (E.D.N.Y. 2017) ..............................................................................39

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*,
  86 F. Supp. 2d 137 (E.D.N.Y. 2000) ..................................................................................6

*New York Dist. Council of Carpenters Pension Fund v. Forde*,
  939 F. Supp. 2d 268 (S.D.N.Y. 2013)...............................................................................41

*Nico Mexi Food, Inc. v. Abarrotera Cent. #2 Wholesale, Corp.*,
  No. 14-CV-296 (KNF), 2016 WL 873466 (S.D.N.Y. Feb. 10, 2016) .....................................7

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
  416 F.3d 146,157 (2d Cir. 2005).......................................................................................19

*In re Optimal U.S. Litig.*,
  837 F. Supp. 2d 244 (S.D.N.Y. 2011)...............................................................................17

*Oster v. Kirschner*,
  77 A.D.3d 51 (1st Dep't 2010) .........................................................................................47

*Pludeman v. N. Leasing Sys., Inc.*,
  10 N.Y.3d 486 (2008) ......................................................................................................45

*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*,
  879 F.2d 10 (2d Cir. 1989)...............................................................................................33

*PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*,
  138 F.3d 65 (2d Cir. 1998)............................................................................................5, 6

*Quintanilla v. WW Int'l, Inc.*,
  541 F. Supp. 3d 331 (S.D.N.Y. 2021)...............................................................................43

*In re Refco Inc. Sec. Litig.*,
  826 F. Supp. 2d 478 (S.D.N.Y. 2011)...............................................................................49

Table of Authorities
(continued)

Page(s)

*Rio Tinto PLC v. Vale S.A.*,
   No. 14-CV-3042 (RMB) (AJP), 2014 WL 7191250 (S.D.N.Y. Dec. 17, 2014) ...................19

*Ritchie v. N. Leasing Sys., Inc.*,
   14 F. Supp. 3d 229 (S.D.N.Y. 2014)......................................................................................35

*Rudersdal, EOOD v. Harris*,
   No. 18-CV-11072 (GHW) (RWL), 2020 WL 9815180
   (S.D.N.Y. Aug. 18, 2020) ......................................................................................................18

*Sargiss v. Magarelli*,
   12 N.Y.3d 527 (2009) ............................................................................................................45

*Serin v. N. Leasing Sys., Inc.*,
   No. 7:06-CV-1625, 2009 WL 7823216 (S.D.N.Y. Dec. 18, 2009) ........................................28

*Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*,
   17 F. Supp. 3d 207 (E.D.N.Y. 2014) ....................................................................................39

*Stratagem Dev. Corp. v. Heron Int'l N.V.*,
   153 F.R.D. 535 (S.D.N.Y. 1994) ..........................................................................................16

*In re Sumitomo Copper Litig.*,
   120 F. Supp. 2d 328 (S.D.N.Y. 2000)...................................................................................11

*Truetox Lab'ys, LLC v. Healthfirst PHSP, Inc.*,
   68 Misc. 3d 1209(A), 2020 WL 4556907 (Sup. Ct. NY County 2020) .................................49

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
   216 F. Supp. 2d 198 (S.D.N.Y. 2002)...................................................................................22

*United States v. Johnson*,
   945 F.3d 606 (2d Cir. 2019)...................................................................................................32

*United States v. Kaplan*,
   886 F.2d 536 (2d Cir. 1989)...................................................................................................31

*Vicon Fiber Optics Corp. v. Scrivo*,
   201 F. Supp. 2d 216 (S.D.N.Y. 2002)...................................................................................32

*Wild Bunch, SA v. Vendian Ent., LLC*,
   256 F. Supp. 3d 497 (S.D.N.Y. 2017)...................................................................................44

*Williams v. Equitable Acceptance Corp.*,
   443 F. Supp. 3d 480 (S.D.N.Y. 2020)................................................................24, 25, 28, 33

*Zalkow v. Taymor Indus. U.S.A., Inc.*,
   No. 2:14-CV-00243 (JWS), 2015 WL 2128902 (D. Ariz. May 5, 2015)...............................49

Table of Authorities
(continued)

Page(s)

**Statutes**

18 U.S.C.
    § 1331 .................................................................................................42
    § 1332 .................................................................................................42
    § 1343 ..............................................................................................1, 5
    § 1962(c) ...................................................................................1, 22, 30
    § 1962(d) .................................................................................................1
    § 1965(a)-(b) .......................................................................................2, 5
    § 1965(b) .................................................................................................6

**Rules**

CPLR 302(a) ................................................................................... *passim*

Fed. R. Civ. P. 9(b) ....................................................................24, 29, 30, 43

Plaintiffs Bayshore Capital Advisors, LLC ("BCA"), BCA Alternative Income Fund, LP ("BAIF") (together, "Bayshore"), and Rocking T Ranch, LLP ("RTR") respectfully submit this memorandum of law in opposition to the motions to dismiss dated August 26, 2022, separately filed by Hudson Valley Wealth Management, Inc., Christopher Conover, and David K. Jonas (the "Hudson Defendants"); Creative Wealth Media Finance Corp. ("CWMF"), Bron Creative Corp., Bron Creative USA, Corp., and Jason Cloth (the "Creative Defendants"); and BRON Studios, Inc., BRON Studios USA, Inc., and Aaron J. Gilbert (the "BRON Defendants" and collectively "Defendants").

## PRELIMINARY STATEMENT

In their three motions to dismiss Defendants seek to isolate themselves from the RICO enterprise they formed, claiming that they simply engaged in their own businesses as film producers, financiers, and investment advisors, and were not involved in the fraudulent scheme set forth in the First Amended Complaint, dated May 18, 2022 ("FAC"). But try as they might to obfuscate the facts, their efforts fail, as the FAC alleges, in significant detail, how Defendants worked together in a coordinated effort to take Plaintiffs' money, and that of other unwitting film financing participants, through a series of false statements, omissions, and material misrepresentations constituting wire fraud under 18 U.S.C. § 1343. Their conduct amounts to a scheme to commit wire fraud in violation of the civil RICO statute, 18 U.S.C. § 1962(c), as well as a conspiracy to violate the RICO statute under 18 U.S.C. § 1962(d). In short, Plaintiffs have stated valid claims for relief in the FAC, and Defendants' motions should be denied in their entirety. Moreover, many disputes raised by Defendants are factual, and not appropriate for resolution on a motion to dismiss.

Defendants' threshold arguments provide no basis to dismiss. For example, the Creative Defendants and most of the BRON Defendants argue that the Court lacks personal jurisdiction.

However, as described below, the Court may properly exercise jurisdiction over these Defendants both under the RICO statute's nationwide service and jurisdiction provision, 18 U.S.C. §§ 1965(a)-(b), as well as under New York's long arm statute.

Nor is there any basis for the argument, made by the Creative Defendants, that the Court should dismiss the claims against them under the doctrine of forum non conveniens. All the factors courts consider weigh in favor of the Court retaining this matter, including the fact that the Creative Defendants regularly participate in litigation before New York courts, and regularly agree to have disputes heard here. Indeed, this argument ignores the fact that some of the fraudulent term sheets at issue in this case are governed by New York, not Canadian, law.

Turning to Plaintiffs' RICO claims, the arguments raised by Defendants in support of dismissal are unavailing. Collectively, Defendants argue that the FAC does not plead a pattern of racketeering activity or the existence of a RICO enterprise, while the Hudson Defendants add that Plaintiffs' RICO claims are time-barred. They are wrong. For example, Plaintiffs have adequately alleged a pattern of racketeering activity, as required by the statute. Trying to convince the Court otherwise, Defendants argue that not every one of them is alleged to have made false or misleading statements. Aside from the factual inaccuracy of this position, Defendants appear to misunderstand well-settled law providing that where, as here, a RICO claim is based upon wire fraud, the complaint need only plead each defendants' knowing or intentional participation in the scheme. The FAC meets that standard by establishing, in detail, the relationships among the Defendants, and how they joined forces to defraud Plaintiffs. *See*, *e.g.*, FAC ¶¶ 42-49. The FAC also describes each Defendant's intent and motivation to engage in the Ponzi-like scheme, in which Defendants took money from Plaintiffs as a "loan" for their movie productions, with promises of security and collateral (with such collateral having been promised to other lenders), and then profited from the

productions without returning Plaintiffs' money. Defendants, including BRON Studios, evidencing their participation in the scheme, then would promise to pay once they had financing from another source. Through this sophisticated con the Creative Defendants were making loans with other people's money for movie production to the BRON Defendants, while the BRON Defendants knowingly obtained easy money without any repayment obligation.

The FAC further sufficiently alleges that the Hudson Defendants were motivated to act in furtherance of the scheme not only because they stood to receive significant fees from defrauding Plaintiffs and others, but also because, unknown to Plaintiffs, they had borrowed nearly $18 million from CWMF and planned to repay the loan with commissions earned as part of the film financing scheme to fund the BRON Studios movies. *See* FAC ¶¶ 91-97. The Hudson Defendants devote a significant portion of their papers to efforts to refute these facts, arguing that the loan was instead merely a generous agreement by CWMF, without any reason, to purchase a collection of underperforming movies from Hudson's portfolio, with Hudson having no obligation to repay the money. *See* Hudson Brief at 10-11. But the purported "term sheets" submitted by the Hudson Defendants with their motion support Plaintiffs' version of events, not Hudson's, as they repeatedly define Hudson as the "borrower" in the transaction.[1] Moreover, Plaintiffs' understanding of the loan is derived from letters submitted to a different court in this district from counsel for the Creative and BRON Defendants who, tellingly, asserted that it was a loan and not a purchase, and do not dispute that position here.

The same letters provide an independent to conclude the Hudson Defendants are not mere outsiders, as they would like to have the Court believe: Hudson had entered a separate agreement

---

[1] Additional facts are set forth in the FAC, which Plaintiffs respectfully incorporate by reference. *See* Declaration of David A. Shargel, dated October 10, 2022 ("Shargel Decl."), Exhibit ("Ex.") A.

with CWMF whereby Hudson would serve as executive producer on certain films, including Needle In A Timestack ("Needle") and The Nightingale ("Nightingale") – two of the three projects for which Plaintiffs loaned money.[2] Regardless, Hudson's arguments consist largely of factual issues not appropriate for resolution on a motion to dismiss.

There is also no basis for Defendants' other RICO arguments, such as that the FAC does not plead closed or open-ended continuity. It does, showing not only a pattern of racketeering activity spanning from 2016 through 2020, which is more than the two years used by the Second Circuit as a benchmark, but Plaintiffs' allegations also show a threat of ongoing criminal activity by Defendants. Similarly without merit are Defendants' arguments regarding the existence of a RICO enterprise. The FAC more than adequately addresses the symbiotic relationships among members of the enterprise—consisting of CWMF, BRON Creative, BRON Studios, and Hudson— and that they acted with a common purpose. And, given each Defendants' role in the fraudulent course of conduct alleged by the FAC, there is no reason to dismiss Plaintiffs' RICO conspiracy cause of action.

Finally, Defendants offer a series of arguments as to why Plaintiffs' state law claims should be dismissed. For the reasons described below, none warrant dismissal.

## ARGUMENT

### I.    The Court Has Personal Jurisdiction Over All Defendants

The Creative Defendants, together with BRON Studios, Inc. and Gilbert, assert that the Court lacks personal jurisdiction over them. The Court, however, may properly exercise jurisdiction over these defendants under RICO's nationwide service and jurisdiction provision, as well as under New York's long arm statute.

---

[2] The third was a slate of films produced by BRON Studios in conjunction with Lionsgate, referred to herein and in the FAC as the "Lionsgate Slate." *See* FAC ¶¶ 98-160 (describing film financings)

###### A.    Defendants Are Subject To Nationwide RICO Jurisdiction

Given the existence of a valid civil RICO claim, all Defendants, each of which were served in the United States, are subject to personal jurisdiction under the RICO statute's nationwide service and jurisdiction provisions, 18 U.S.C. §§ 1965(a)-(b).

The Second Circuit has held that, while § 1965 "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found," such an action may "be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998); *see also Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.*, 331 F. Supp. 3d 130, 145 (S.D.N.Y. 2018). "Once that initial personal jurisdiction is established, the statute authorizes the court's assertion of nationwide personal jurisdiction over other parties, including co-defendants and third-party defendants, where the 'ends of justice' so require." *Hitachi*, 331 F. Supp. 3d at 145. "In order to comply with due process, any such additional defendant need meet only a national contacts test, meaning they must have minimum contacts with the United States." *Id.* Contacts with the United States "may be demonstrated by: (1) doing business in the United States; (2) doing an act in the United States; or (3) causing an effect in the United States by an act done elsewhere." *Madanes v. Madanes*, 981 F. Supp. 241, 260 (S.D.N.Y. 1997).

Here, there is no dispute that the Court may properly exercise personal jurisdiction over at least two defendants, Hudson and Conover. Thus, the initial personal jurisdiction requirement described above has been met. The "ends of justice" standard has also been met, which requires a showing that there is no other district court that would have jurisdiction over all defendants. *See*, *e.g.*, *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 352 (S.D.N.Y. 2014). No Defendant claims otherwise. Instead, Defendants' only ground for disputing the application of

RICO's nationwide service provision is to claim that it does not apply to foreign defendants, relying almost exclusively upon the court's decision in *Elsevier, Inc*. v. *Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015). Defendants' reliance on that case is misplaced.

As explained by the court in *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 86 F. Supp. 2d 137 (E.D.N.Y. 2000), which was issued shortly after the Second Circuit's decision in *PT United*, the Circuit's interpretation of § 1965(b) "would seem to permit the assertion of personal jurisdiction over RICO defendants residing abroad," provided only that "such defendant must be served with process within the United States." *Id*. At 140. An examination of the cases relied upon by the court in *Elsevier*, moreover, confirms that it is in accord with this interpretation. *See*, *e.g.*, *Laborers Local 17 Health and Ben. Fund v. Philip Morris, Inc*., 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998) (observing that "a foreign party against whom a RICO claim is asserted must be served with process in this country" and that the defendant was not served in the United States); *First Cap. Asset Mgmt., Inc. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 392 (S.D.N.Y. 2002) (same). To be sure, even Judge Polk Failla in *Elsevier* noted that the court was "mindful" of the Second Circuit's interpretation, but stated that the plaintiff in the case before her had not argued that service occurred in the United States. *See Elsevier*, 77 F. Supp. 3d at 343, n.7.

Here, on the other hand, service took place in the United States upon Defendants' counsel. Defendants do not dispute this fact in their motion papers. In agreeing to accept service on behalf of their clients, Defendants' counsel did not condition their acceptance of service upon any jurisdictional defenses. *See* Shargel Decl. Ex. B. This is enough to establish RICO jurisdiction. *See*, *e.g.*, *Biofeedtrac, Inc. v. Kolinor Optical Enterprises & Consultants, S.R.L.*, 817 F. Supp. 326, 332 (E.D.N.Y. 1993) (suggesting without deciding that a stipulation to accept service without

expressly reserving defenses as to personal jurisdiction could constitute service in the United States for RICO jurisdictional purposes).

In any event, Defendants overstate the application of their arguments, including because several parties who Defendants claim are "foreign" are not. Among the Creative Defendants, Defendants admit, via the Declaration of Jason Cloth, that BRON Creative USA "is a Nevada corporation with its main office in Beverly Hills, California and its bank accounts in California and Washington." Declaration of Jason Cloth, dated August 25, 2022 ("Cloth Decl.") ¶ 5. It is not "foreign." Likewise as to Cloth himself, the FAC alleges that Cloth has substantial ties to the United States, and specifically that he owns residential property and a business in Miami, Florida. *See* FAC ¶ 24. Cloth does not dispute this, stating in his declaration only that he purportedly has "never owned any real estate or maintained a bank account in New York." Cloth Decl. ¶ 2. This is not enough to establish that he does not "reside" anywhere else in the United States.

With respect to the BRON Defendants, they say that Aaron Gilbert and BRON Studios, Inc. are "foreign," but offer little to substantiate that proposition. The FAC alleges that Gilbert "resides in Los Angeles, California and Canada." FAC ¶ 31. In opposition, the BRON Defendants provide only the declaration of Gilbert's counsel, Mr. Margulis, who says that "[w]hile Mr. Gilbert does reside in Canada, he is not a resident of Los Angeles, nor of California otherwise." Declaration of Benjamin Margulis, dated August 26, 2022 ("Margulis Decl.") ¶ 11. As an initial matter, Mr. Margulis fails to explain the basis of his purported "personal knowledge" concerning where Gilbert lives or resides, rendering his declaration ineffective. *See*, *e.g.*, *Nico Mexi Food, Inc. v. Abarrotera Cent. #2 Wholesale, Corp.*, No. 14-CV-296 (KNF), 2016 WL 873466, at *3 (S.D.N.Y. Feb. 10, 2016). And, as a definitional matter, Gilbert may still *reside* in California without being a "resident" of the State—a situation that is borne out by publicly-available

information showing that Gilbert divides his time between California and Canada. *See* Shargel Decl. Ex. C (Instagram posts regularly made in California); Ex. D (2021 Film Summit Keynote Speaker biography describing Gilbert as someone who "divides his time" between Los Angeles and Vancouver). The BRON Defendants similarly provide no reason for the Court to conclude that BRON Studios, Inc.—apart from Defendants' self-serving definition of that entity as "BRON Studios Canada"—should be considered a foreign defendant. While it may be incorporated in Canada, and have an office there, BRON Studios is also alleged to conduct substantial business in the United States, including through its offices in Los Angeles and New York City.[3] *See*, *e.g.*, FAC ¶¶ 30, 115, 194.

Finally, the BRON Defendants, but not the Creative Defendants, claim that RICO nationwide jurisdiction is lacking because "the FAC does not establish that BRON Studios Canada or Mr. Gilbert have the requisite minimum contacts with the United States." BRON Brief at 7. The FAC, however, plainly establishes BRON Studios' and Gilbert's minimum contacts with the United States, including, as discussed above, the facts that both BRON Studios entities regularly do business in the United States and have offices here, and that Gilbert resides in, spends time in, and does substantial business in the United States in connection BRON Studios' business. *See*, e.g., FAC ¶¶ 27-36. Further, Plaintiffs' allegations are more than sufficient to show conduct and connection to the United States such that BRON Studios and Gilbert could reasonably anticipate being haled into court here, including through their extensive involvement in communications, containing fraudulent statements, that were transmitted by wire in the United States. These include, by way of example, the preparation of the fraudulent spreadsheet purporting to show that BRON Studios' prior film projects had been repaid (¶¶ 67-72), representations that Plaintiffs would be

---

[3] Defendants do not claim that BRON Studios USA is a foreign defendant.

fully repaid (¶¶ 104, 106, 112, 140-41), representations concerning BRON's other sources of income that would be used to repay Plaintiffs (¶¶ 190, 192), as well as other representations and omissions made by the other Defendants, with BRON's knowing assistance and participation, concerning Plaintiffs' investments.

For these reasons, the Court may properly exercise jurisdiction over the moving Defendants under the RICO statute.

### B. The Court Also Has Jurisdiction Under New York's Long Arm Statute

The Court alternatively has jurisdiction over Defendants under New York's long arm statute.[4] Under those provisions, a court may exercise personal jurisdiction over any non-domiciliary who, in person or through an agent, "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ." CPLR 302(a)(1)-(2); *see also Elsevier*, 77 F. Supp. 3d at 343-44.

#### 1. Defendants Transacted Business In New York And Committed Tortious Acts Here

A defendant transacts business within the state when it purposefully "avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007). "[C]ourts have explained that section 302 is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (internal quotation marks omitted). The New York Court of Appeals has "recognized CPLR 302(a)(1) long-arm jurisdiction over commercial actors and investors using electronic and telephonic means to

---

[4] As mentioned above, the Hudson Defendants do not contest that the Court has personal jurisdiction over them.

project themselves into New York to conduct business transactions." *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006).

Here, the BRON and Creative Defendants entered into a long-standing business relationship with Hudson, and the scope of their relationship with the New York-based company was substantial. Hudson was a key part of Defendants' scheme and was tasked with convincing lenders like Plaintiffs to loan millions of dollars to fund the BRON Defendants' productions. *See* FAC ¶ 45. Indeed, Defendants do not dispute that by 2017, nearly every film in which Hudson's clients invested was produced by BRON Studios, and in order to effectuate that, the BRON and Creative Defendants regularly communicated via email and telephone with Hudson in New York. *See, e.g.*, FAC ¶ 60 (CWMF's "pitchbook" passing through Hudson in New York); ¶ 61 (Hudson relaying project evaluation process); ¶ 67 (transmitting spreadsheet prepared by CWMF purporting to summarize prior loans in which CWMF was involved).

Moreover, BRON Studios and, by extension its financing arm, CWMF, have offices in New York City, *see* FAC ¶ 30, and have used that address to transact business related to the film financing scheme. For example, the underlying loan agreement that was part of the Needle financing showed that Needle In A Timestack LLC—an entity controlled by the BRON and Creative Defendants—used 153 West 27th Street as its headquarters. *See* ¶ 115. These facts are more than sufficient to establish personal jurisdiction under CPLR 302(a)(1), as well as 302(a)(2), given that the BRON and Creative Defendants' New York activities resulted in tortious conduct against Plaintiffs. *See, e.g.*, *Fischbarg*, 9 N.Y.3d at 380-81 (finding that "[t]he quality of defendants' contacts here establishes a transaction of business in New York" where defendants "sought out" a party in New York and "established an ongoing . . . relationship with him"); *Deutsche Bank Sec., Inc*, 7 N.Y.3d at 72 ("[A] sophisticated institutional trader knowingly entering

our state—whether electronically or otherwise—to negotiate and conclude a substantial transaction is within the embrace of the New York long-arm statute.").

### 2. Defendants Acted Through An In-State Agent

As a separate ground for exercising jurisdiction over the BRON and Creative Defendants, CPLR 302(a) "provides that a court may exercise personal jurisdiction over a non-domiciliary defendant who meets certain requirements 'in person or through an agent.'" *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 335 (S.D.N.Y. 2000) (quoting CPLR 302(a)). The Hudson Defendants engaged in purposeful activities in New York (inducing Plaintiffs to loan money for Defendants' films) with the consent and knowledge of the Creative and BRON Defendants, who both benefitted from Hudson's activities and exercised control over Hudson in the underlying transactions. Under CPLR 302(a)(2), Defendants, through Hudson, also engaged in tortious conduct within New York.

Defendants do not dispute the notion that New York's long arm jurisdiction may be exercised on the basis of an agency theory, but argue instead that Plaintiffs have not set forth sufficient facts to establish an agency relationship. *See, e.g.*, BRON Brief at 8; Creative Brief at 9-10. The Creative Defendants assert, for example, that "Plaintiffs' own allegations that Bayshore entered into a Sourcing Agreement directly with Hudson, and that no Creative Defendant was a party thereto, substantiates that Hudson was acting on its own behalf in its dealing with Bayshore and undercuts any claim that Hudson acted on behalf of—let alone under the control of—the Creative Defendants." Creative Brief at 10.

Defendants, however, misconstrue the import of the Sourcing Agreement. It specifically provides, among other things, that the *only* films in which Plaintiffs would invest "would be 'sourced by Hudson via its relationship with [CWMF],' and '[p]roduced or co-produced by BRON Studios Inc.'" FAC ¶ 90. In other words, all projects that were the subject of the Sourcing

11

Agreement were those in which the Creative and BRON Defendants were directly involved. Accordingly, Hudson's New York activities directed to Plaintiffs were necessarily undertaken with the "consent and knowledge" of the other Defendants.

Defendants also overstate the extent of the agency relationship necessary to invoke jurisdiction under CPLR 302(a). As explained by the New York Court of Appeals, "Plaintiff need not establish a formal agency relationship . . . . He need only convince the court that the [in-state entity] engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the [out-of-state] defendants and that they exercised some control over [the in-state entity] in the matter." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). Under this standard there can be no serious dispute that the FAC satisfies such requirements. It alleges that Hudson engaged in purposeful activities in New York related to the transactions at issue—convincing investors like Plaintiffs to contribute funds for Defendants' scheme—for the benefit of not only Hudson but also the out-of-state parties, and that Hudson acted with those parties' knowledge, consent, and control. For example, in October 2017, when Hudson was seeking to convince Bayshore to invest in the BRON film The Front Runner (for which, it turned out, Hudson was an executive producer), Jonas wrote in an email to Bayshore that BRON and CWMF had given Hudson "more time to find investors for Frontrunner, which is helpful." FAC ¶ 74. Similarly, when Hudson sought Plaintiffs' investment in Needle, Hudson made clear that "the studio," in "recognition of the importance of the relationship with Hudson, [is] making this very secure paper available to our syndicate." ¶ 102.

Moreover, in each of the transactions at issue, Hudson presented term sheets to Plaintiffs that had already been executed by Cloth and Gilbert on behalf of BRON Studios, CWMF, and BRON Creative. *See*, *e.g.*, FAC ¶¶ 107, 145, 172. Thus, before Hudson could commit Plaintiffs to

any transaction, it necessarily required those Defendants' assent and approval. Clearly, therefore, the BRON and Creative Defendants exercised sufficient control over Hudson with respect to the transactions at issue. This is underscored by the fact that, in September of 2018, the same time period in which Plaintiffs agreed to loan money, Hudson entered into a joint venture relationship with BRON Studios. *See* FAC ¶ 48; Shargel Decl. Ex. E.

The court's decision in *Barbarotto Int'l. Sales Corp. v. Tullar*, 188 A.D.2d 503, 504 (2d Dep't 1992) is instructive. In that case, the court found personal jurisdiction satisfied where the foreign defendant requested that the New York-based plaintiff solicit sales of its equipment in North America, and the foreign entity exercised control over its agent by retaining the right to accept or reject any sales of its equipment. And, in *Elsevier*, the Court found personal jurisdiction over Brazilian defendants, PTI and Grossman, who participated in a fraudulent subscription scheme when the subscriptions billed to the Brazilian parties were in fact purchased by an in-state entity, IBIS, "mak[ing] plausible the allegation that IBIS acted with consent and knowledge of PTI and Grossman." *Elsevier*, 77 F. Supp. 3d at 345. The same conclusion is appropriate here.

Aside from claiming that Hudson was not the other Defendants' agent, the Creative Defendants also argue that "any few email and phone solicitations that Hudson allegedly made on the Creative Defendants' behalf are insufficient to invoke long-arm jurisdiction . . . because they do not constitute transacting business in New York." Creative Brief at 10. But this argument misconstrues the law and the facts. As mentioned above, "section 302 is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction." *Chloe*, 616 F.3d at 170 (internal quotation marks omitted). In any event, as to Hudson's in-state activities, the Court is not confronted with a discrete act that may have occurred in New York. Rather, Hudson is based here, and all of its conduct to lure Plaintiffs into the film financing scheme took place in the state.

13

### 3.    Conspiracy Jurisdiction

In addition to personal jurisdiction based upon the agency relationship among Hudson and the other parties, the Creative and BRON Defendants are also subject to jurisdiction because they participated in a conspiracy that involved the commission of tortious acts in New York. "It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2)." *Chrysler Cap. Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).

The FAC makes a *prima facie* showing of Defendants' participation in a conspiracy, including by establishing "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury." *First Cap. Inv. Holdings LLC v. Wilson Cap. Grp., Inc.*, No. 10-CV-2948, 2010 WL 4967833, at *2 (S.D.N.Y. Nov. 30, 2010). More specifically, the FAC describes an agreement among the Creative, BRON, and Hudson Defendants to lure Plaintiffs into their film financing scheme, and also sets forth numerous overt acts, including misstatements and omissions, in which all Defendants knowingly participated, taken in furtherance of the agreement. And, of course, Plaintiffs have suffered damages resulting from Defendants' theft of their money. This is enough to establish conspiracy jurisdiction. *See*, *e.g.*, *id.*; *see also Chrysler Cap. Corp.* 778 F. Supp. at 1268.

### 4.    Long Arm Jurisdiction Comports With Due Process

Given the existence of long arm jurisdiction under CPLR 302(a), the only remaining question is whether the Court's jurisdiction comports with due process. "There are two parts to the due process test for personal jurisdiction: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Elsevier,* 77 F. Supp. 3d at 347. Both are satisfied here. "The requisite 'minimum

contacts' analysis 'overlaps significantly' with New York's § 302(a)(1) inquiry into whether a defendant transacted business in the State." *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 515 (S.D.N.Y. 2016). As described above, the Creative and BRON Defendants—directly and through Hudson as their agent and co-conspirator—purposefully engaged in business transactions in New York.

The reasonableness requirement of due process has also been met. "Relevant factors at this second step of the analysis may include: '(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's interest in obtaining convenient and effective relief . . . .'" *Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (modifications in original). The BRON Defendants have not even attempted to argue that they would be burdened by litigating this case in New York, and the Creative Defendants regularly litigate in New York or have previously agreed to do so. Indeed, as noted by the court in *Minnie Rose*, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *Minnie Rose*, 169 F. Supp. 3d at 515-16 (internal quotation marks omitted). Next, New York courts have a strong interest in adjudicating a course of fraudulent conduct that emanated from a New York corporation, Hudson. And, Plaintiffs have a strong interest in efficiently litigating this matter in New York. Indeed, certain Term Sheets entered into by Plaintiffs in this case are governed by New York law. *See* FAC ¶ 181; Shargel Decl. Exs. I and J. Accordingly, all of these factors weigh in favor of personal jurisdiction over the Creative and BRON Defendants. *Id.*

## C.    The Court Should Alternatively Permit Jurisdictional Discovery

Plaintiffs respectfully submit that the Court has personal jurisdiction over each Defendant. However, in the alternative, Plaintiffs have demonstrated the appropriateness of jurisdictional discovery.

"It is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014); *see also Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 597 (2d Cir. 1988) ("Before dismissing a case for want of jurisdiction, a court should permit the party seeking the court's intervention to engage in discovery of facts supporting jurisdiction.").

Jurisdictional discovery is especially appropriate where Plaintiffs "have made a sufficient start toward establishing personal jurisdiction." *Stratagem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994). Although Plaintiffs have made a prima facie showing of personal jurisdiction, there can be little dispute that Plaintiffs have, at the very least, made a sufficient start and jurisdictional discovery would be warranted in place of any dismissal. Here, such discovery could include, among other things, the extent of the Creative and BRON Defendants' connections to New York and the United States more generally.

## II.    There Is No Reason To Sever The Creative Defendants On The Basis Of Forum Non Conveniens

The Creative Defendants argue that the claims against them should be dismissed under the doctrine of forum non conveniens in favor of litigation in Canada.[5] *See* Creative Brief at 13. Applying the test courts use to assess the merits of dismissal for forum non conveniens, however, there is no valid reason for the Court to dismiss. Moreover, it is obvious that the Creative Defendants' forum non conveniens argument is no more than a tactical litigation position intended

---

[5] In a single sentence the BRON Defendants purport to "adopt" the Creative Defendants' forum non conveniens arguments, albeit only as to Defendants' state law claims. *See* BRON Brief at 18. The BRON Defendants, however, offer no additional argument as to whether, or how, Canada would serve as an adequate alternative forum. This is particularly so for BRON Studios USA, which is a domestic entity. *See* FAC ¶ 27.

to avoid liability, as they take no issue in regularly conducting business in New York, often agree to be bound by New York forum selection provisions, and have already participated numerous times without objection to litigation in New York.

Courts apply a three-part test in evaluating a motion to dismiss for forum non conveniens. "First, the court determines the degree of deference properly accorded the plaintiff's choice of forum; second, it considers whether the alternative forum proposed by the defendant is adequate to adjudicate the parties' dispute; third, it balances the private and public interests implicated in the choice of forum." *Fournier v. Starwood Hotels & Resorts Worldwide, Inc.*, 908 F. Supp. 2d 519, 522 (S.D.N.Y. 2012) (internal quotation marks omitted).

### A.    Plaintiffs' Choice Of Forum Is Entitled To Great Deference

Under New York law, a court's review of a motion to dismiss for forum non conveniens, "should begin with the assumption that the plaintiff's choice of forum will stand." *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 250 (S.D.N.Y. 2011); *see also Fournier*, 908 F. Supp. 2d at 522–23 ("The more it appears that the plaintiff selected the forum for legitimate reasons, the more deference that choice commands."). The Creative Defendants incorrectly claim that Plaintiffs have "no connection to this forum, as they reside outside of New York and operate their businesses in Florida." Creative Brief at 13.

As an initial matter, Plaintiffs are United States citizens, and as such they are "at home" in this forum, regardless of whether New York is their home state. As explained by the Court in *Levitin v. Sony Music Ent.*, 101 F. Supp. 3d 376, 391 (S.D.N.Y. 2015), "[p]laintiffs are U.S. citizens and residents, and the fact that they are not residents of New York is irrelevant." This is because "[a]s a United States citizen Plaintiff's home forum is a United States Court." *Id.* (citing *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000)).

17

Regardless, in their assessment of whether a "connection" to the forum exists, the Creative Defendants fail to consider the very transactions from which Plaintiffs' claims arose. The FAC alleges Plaintiffs' reasoning plainly, in that, as described above, much of the conduct giving rise to Plaintiffs' claims took place in New York, supporting the legitimacy of Plaintiffs' choice of forum. Plaintiffs chose this forum for reasons of convenience and a valid connection to the facts giving rise to this lawsuit, and despite the Creative Defendants' assertions that Canada is a more convenient forum for them, *all* Defendants are subject to personal jurisdiction in New York. *Iragorri v. United Techs. Corp.,* 274 F.3d 65,72 (2d Cir. 2001) ("[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for forum non conveniens."). As the Creative Defendants regularly conduct business in New York, and have used the forum to defraud Plaintiffs, they should have no issue with this case being heard here.

The Creative Defendants also say that the mere inclusion of a civil RICO claim is evidence of forum shopping, relying upon *Rudersdal, EOOD v. Harris*, No. 18-CV-11072 (GHW) (RWL), 2020 WL 9815180 (S.D.N.Y. Aug. 18, 2020). *See* Creative Brief at 15. But the facts in *Rudersdal* are different, as plaintiffs in that case were made up exclusively of foreign parties. Here, on the other hand, the Plaintiffs, all domestic, chose a forum where much of the conduct occurred and where Defendants are subject to the Court's jurisdiction. There was no forum shopping, and the Creative Defendants offer no legitimate arguments to the contrary.

Finally, the Creative Defendants' reliance on the governing law provisions within the film loan term sheets is misplaced, because those provisions merely reflect a permissive, rather than exclusive, "attornment" to the jurisdiction of Canadian courts. *See* Creative Brief at 13,15. They

18

do not require that Plaintiffs' claims be heard before any particular court. Had the parties intended
to make any forum mandatory, they would have done so.

**B.    Canada Is Not An Adequate Alternative Forum For Plaintiffs' Claims**

The second step in the analysis requires the Creative Defendants to show that an adequate
alternative forum exists. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146,157 (2d
Cir. 2005). To do so, a defendant must establish that "(1) the defendants are amenable to service
of process there and (2) it permits litigation of the subject matter of the dispute." *Fournier*, 908 F.
Supp. 2d at 523.

"The Second Circuit has held that, in order to grant a motion to dismiss for forum non
conveniens, 'a court must satisfy itself that the litigation may be conducted elsewhere against *all*
defendants.'" *Rio Tinto PLC v. Vale S.A.*, No. 14-CV-3042 (RMB) (AJP), 2014 WL 7191250, at
*13 (S.D.N.Y. Dec. 17, 2014) (emphasis added). However, while arguing that the Court *has the
ability* to sever the claims only against them, the Creative Defendants fail to address whether all
Defendants are amenable to service and litigation in Canada. Their failure to do so shows that the
Creative Defendants' true intentions are to "splinter 'the suit into [numerous parts] in [numerous
nations], complicate the suit, delay it, and render it more expensive.'" *Levitin*, 101 F. Supp. 3d at
393 ( modifications in original) (internal citations omitted). Accordingly, the Creative Defendants
have not established that Canada is an adequate alternative forum for all defendants.[6]

**C.    Private and Public Interests Weigh Heavily In Favor Of Plaintiffs' Choice Of
Forum**

The Creative Defendants also fail to meet their burden of establishing that private and
public interest factors weigh in favor of an alternative forum. *See Glob. Art Exhibitions, Inc. v.*

---

[6] Even if they had, this factor is not dispositive. *See Fournier,* 908 F. Supp. 2d at 523–24 ("Ultimately, however, the
Court need not determine whether Finland provides an adequate alternative forum, because, even if it does, the
private and public interest factors tip decisively in Fournier's favor.").

*Kuhn & Bulow Italia Versicherungsmakler GmbH*, No. 20-CV-1395 (KMW), 2022 WL 2159823, at *10 (S.D.N.Y. June 15, 2022) (observing that defendant bears the burden of establishing factors in its favor). In considering these non-exhaustive factors, key criteria include, "'(1) relative ease of access to sources of proof'; (2) availability of compulsory process to force the attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; and (4) 'all other practical problems that make trial of a case easy, expeditious, and inexpensive.'" *Id.* at 11 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

Most of the private interest factors involve the ease or difficulty of accessing evidence for trial, but the Creative Defendants cannot legitimately claim that there is additional hardship by having this case heard in New York. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) (finding that Canadian defendants failed to show how a trial in the United States would be "oppressive" or "vexatious," noting that, "[s]uch travel today is not burdensome in terms of cost or time, and defendants have not shown otherwise."). Further, as shown in the FAC, the Creative Defendants regularly consent to have disputes heard in New York, and they are currently involved in separate litigations here. *See* FAC ¶¶ 40, 115, 117, 182, 219; s*ee also* Fritz Decl. Ex., B, F. Notably, the Creative Defendants recently filed a motion to dismiss Hudson's claims against them and did not make a forum non conveniens argument. *See* Shargel Decl. Ex. K. This further underscores the fact that the Creative Defendants' arguments here are merely a litigation position intended to thwart Plaintiffs' efforts to seek relief.

Moreover, the Creative Defendants cannot claim any legitimate hardship because they consented to the jurisdiction of New York Courts in the Needle Loan Agreement, which was the transaction underlying Bayshore's participation in the Needle film project. *See* FAC ¶ 115. They also agreed to the jurisdiction of New York Courts in the agreement underlying Plaintiffs'

participation in The Nightingale project. *See* ¶ 182. These defendants should not be permitted to pick and choose when litigating in New York is convenient for them.

And, of course, not all the Creative Defendants are Canadian. The FAC alleges, and they do not dispute, that BRON Creative USA is an American company, and that Cloth owns residential property and a business in Florida. *See* FAC ¶¶ 24, 32.

In contrast, the burden on Plaintiffs to seek relief for Defendants' fraudulent scheme in a foreign court would be significant. In arguing that requiring Plaintiffs to litigate in Canada "would impose little additional hardship" because "they are based in Florida," Creative Brief at 17, the Creative Defendants fail to explain why it wouldn't be more difficult for these U.S.-based Plaintiffs to bring their claims to a foreign country to which they have no connection. Indeed, under the law of this district, "[b]alancing the private interests entails 'a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country.'" *Glob. Art Exhibitions, Inc.*, 2022 WL 2159823, at *11 (quoting *Iragorri*, 274 F.3d at 74).

Public factors also favor Plaintiffs' choice of forum. Key considerations include "(1) the administrative difficulties flowing from court congestion, (2) the local interest in having localized controversies decided at home and the unfairness of burdening citizens in an unrelated forum with jury duty, and (3) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Glob. Art Exhibitions, Inc.,* 2022 WL 2159823, at *12 (internal quotation marks omitted).

Again, despite the Creative Defendants' naked assertions that public interest factors weigh in their favor of dismissal, they offer little support and, not for the first time, ignore their makeup, as some of them are domestic, not foreign, and all of them have significant ties to New York.

Further, the Creative Defendants' reliance on the Canadian choice of law provisions in the Needle and Lionsgate Term Sheets ignores that the Nightingale Term Sheet is governed by New York law. *See* FAC ¶ 181. In any event, New York courts interpret Canadian law. *See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198 (S.D.N.Y. 2002).

As set forth above and in the FAC, the Creative Defendants leveraged their relationships with the Hudson and BRON Defendants in New York to enlist Plaintiffs into their film financing scheme. To claim that New York has no interest in hearing this dispute fundamentally ignores the facts of this case. As with the other factors, the public interest factors tip decidedly in favor of Plaintiffs' choice of forum, and the Creative Defendants' effort to dismiss on forum non conveniens grounds should be denied.

### III.   Plaintiffs Have Adequately Pleaded Their RICO Claims

"The RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting RICO statute). "Dismissal of a civil RICO complaint for failure to state a claim is appropriate only when 'it is clear that no relief could be granted under any set of facts that could be proved consistent with [plaintiff's] allegations." *Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989)) (modification in original). "To establish a claim for a civil violation of section 1962(c), a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (quotation marks omitted).

In their motions to dismiss, Defendants argue that Plaintiffs' RICO-based claims should be dismissed because the FAC does not adequately allege the existence of a RICO enterprise or a

pattern of racketeering conspiracy. The Hudson Defendants alone add the argument that Plaintiffs'

RICO claims are time barred. None of these arguments merit dismissal.

### A.    Plaintiffs' RICO Claims Are Timely

The Hudson Defendants offer the halfhearted argument that, with respect to the fraudulent

statements made in 2016 and 2017, "[t]he Amended Complaint . . . does not allege that Plaintiffs

made any inquiry, including requesting underlying documentation, thereby shutting their eyes to

the alleged misstatements." Hudson Brief at 21. As a result, these Defendants assert that

"Plaintiffs' RICO claims are time barred because the latest date Plaintiffs would have been aware

of its injuries was late 2017, which is over four (4) years prior to February 8, 2022, the date

Plaintiffs filed their initial Complaint." *Id*.

These arguments provide Defendants no benefit. According to the FAC, Plaintiffs did not

even agree to finance Defendants' film projects until July 2018, when Bayshore agreed to lend

money for the movie Needle in a Timestack. *See* FAC ¶ 104. The Hudson Defendants do not, and

cannot, explain how Bayshore would have been "aware of its injuries" in late 2017, long before it

agreed to finance the film, offering only the conclusory argument that Plaintiffs did not conduct

due diligence. That argument is not only nonsensical, but the FAC shows that Plaintiffs engaged

in due diligence over the course of almost *two years* before Plaintiffs agreed to lend money. *See*,

*e.g.*, ¶¶ 50, 82-83. Accordingly, Defendants' claim that the RICO claims are time barred is simply

wrong.

### B.    Plaintiffs Have Alleged A Pattern Of Racketeering Activity

Defendants collectively devote the majority of their motions to presenting various

arguments attempting to show that the FAC does not adequately set forth a pattern of racketeering

activity. These arguments fall generally into three categories: (1) that certain Defendants did not

directly make any fraudulent statements constituting a predicate act of wire fraud; (2) that the FAC

impermissibly utilizes group pleading and does not satisfy the requirements of Fed. R. Civ. P. 9(b); and (3) that Plaintiffs have not adequately established closed- or open-ended continuity sufficient to show a pattern of racketeering activity. Each of these arguments fails.

### 1. The FAC Alleges Defendants' Participation In Wire Fraud Predicates

Defendants allege that the FAC does not contain allegations sufficient to show that each defendant participated in the RICO enterprise by engaging in at least two predicate acts. For example, while conceding that CWMF engaged in a sufficient number of predicate acts, the Creative Defendants assert that BRON Creative, BRON Creative USA, and Cloth are not alleged to have done so. *See* Creative Brief at 23. Similarly, the BRON Defendants say that "[a]mongst the litany of almost thirty alleged predicates in the FAC, *only two* claim alleged misstatements by BRON Studios Defendants," and that these are insufficient to establish RICO liability. *See* BRON Brief at 10 (emphasis in original).

The FAC, however, shows that each of these defendants knowingly participated in the predicate acts alleged. For example, while Defendants seek to eschew the import of the Needle Term Sheet, which was signed separately by Cloth on behalf of CWMF and BRON Studios USA, claiming that it contains no promises to repay Plaintiffs, the term sheets clearly reflect a promise to pay. *See* Shargel Decl. Ex. F. And, the fact that the term sheet was executed by both CWMF and BRON Studios USA evinces an intent by both those parties to participate in the scheme. The same is true with respect to the Lionsgate Term Sheet, executed by Gilbert and Cloth on behalf of BRON Creative USA and BRON Studios USA, which contained an explicit promise to repay the money that Plaintiffs had paid. *See* Shargel Decl. Exs. G, H.

Additionally, Defendants overstate the requirement that each defendant in a RICO claim alleging wire fraud as predicate acts must individually have made a false statement with respect to the fraudulent scheme. As explained by the court in *Williams v. Equitable Acceptance Corp.*, 443

F. Supp. 3d 480 (S.D.N.Y. 2020), "[a] complaint alleging mail and wire fraud as predicate acts of a RICO claim needs to plead only '(1) the existence of a scheme to defraud, (2) defendant's *knowing or intentional participation in the scheme*, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *Id*., at 492 (quoting *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996)) (emphasis in original). "Under this standard, plaintiffs need not allege that each defendant itself made a misrepresentation as long as they allege sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud." *Id*.; *see also Monterey Bay Military Housing, LLC v. Ambac Assurance Corp.*, 531 F. Supp. 3d 673, 703 (S.D.N.Y. 2021) (same) (citing *Taylor v. Bob O'Connor Ford, Inc.*, No. 97-CV-0720, 1998 WL 177689, at *16 (N.D. Ill. Apr. 13, 1998) ("[A] defendant does not have to make a misrepresentation or omission himself in order to be liable . . . . The question is whether the complaint permits an inference that [a defendant] participated in the scheme to defraud with knowledge of the scheme's fraudulent intent and with the intent that its illicit objectives be achieved.") (modifications in original). Here, the FAC leaves no doubt every named Defendant intentionally participated in the scheme to defraud regardless of whether every defendant explicitly and directly made a fraudulent statement.

The FAC lays bare a pervasive scheme among Defendants to commit wire fraud, with each defendant assuming an important role in the fraud. The scheme begins with the BRON Defendants, led by Gilbert, seeking loans for which they can ignore any repayment obligation. CWMF, for its part, as BRON Studios' captive financing arm, finds outside "investors" to provide financing for certain BRON-produced films, while the various Creative Defendants are used to sign the fraudulent term sheets providing a false promise of repayment. *See* FAC ¶¶ 44-45. And, Hudson serves as the BRON and Creative Defendants' solicitation arm, to convince unsuspecting lenders

like Plaintiffs to act as film financiers. Each set of defendants knowingly participated in the scheme.

The FAC details numerous misstatements and omissions made by Hudson's Conover and Jonas, *see*, *e.g.*, ¶ 211, but also makes evident that those statements could not have been made without the knowing and intentional participation of the BRON and Creative Defendants. For example, from the outset, the Hudson Defendants assured Plaintiffs that the film financings were secure and would be "**backed by contractual payment agreements** between production companies and distribution companies . . . or **State sponsored production incentives**." ¶ 53 (emphasis in original). Such an assertion regarding arrangements made by the production company, *i.e.* BRON Studios, must have been made with the BRON Defendants' knowing participation. Jonas left no doubt as to the BRON Defendants' intimate involvement when he told Bayshore that Hudson "had a 'relationship with the production company and always seem[s] to have up the minute color on these opportunities.'" ¶ 58 (modification in original).

The same is true as to CWMF and the Creative Defendants, against whom Hudson told Plaintiffs the loans would be "papered." FAC ¶ 59. But CWMF was not merely a passive counterparty, as evidenced by the cavalcade of information that Hudson passed to the Plaintiffs from the Creative and BRON Defendants, beginning with CWMF's "pitchbooks" and other materials, which are alleged to contain numerous misstatements and omissions. *See* ¶¶ 60-64. Such other materials included the spreadsheet purporting to show the success of Defendants' prior projects, ¶¶ 67-72, as well as the "Project Evaluation Process," ¶ 61, which were meant to assure Plaintiffs of the security of the financings Defendants sought. The Project Evaluation Process document demonstrates both the Creative and BRON Defendants' knowing participation, describing how "BRON and Creative Wealth have adapted . . . processes to ensure all CW projects

undergo a rigorous and extensive review process."[7] Shargel Decl. Ex. L, at 1. And, the "Project Evaluation Process" is a document labeled with BRON Studios Inc.'s name and address. See *id*.

In a subsequent email, in October 2017, when Defendants were trying to convince Plaintiffs to invest in a film called The Front Runner, Hudson again confirmed the other Defendants' knowing participation, informing Bayshore that Hudson had "continued to been [sic] busy with our friends at BRON/Creative Wealth," and that Hudson had "been giving  more time to find investors for Frontrunner . . . ." FAC ¶ 74. Later, further evidencing BRON's involvement, Hudson sent Plaintiffs a presentation reflecting BRON Studios' "active productions," which stated that it had been "provided to Creative Wealth Media by BRON on a confidential basis." See ¶ 77-78; Shargel Decl. Ex. M, at 1. And, Hudson underscored the triumvirate relationship among itself and the BRON and Creative Defendants when it told Bayshore that they had "a formal agreement" whereby "we have right of first refusal on all the films they finance and produce." ¶ 84.

The deep involvement of the BRON and Creative Defendants is also evidenced by the actual financing arrangements in which Plaintiffs participated. Cloth, Gilbert, CWMF, BRON Creative, and BRON Studios not only signed the term sheets with Plaintiffs, described above and in the FAC, but those parties were the ultimate beneficiaries of Plaintiffs' agreements to lend money. Plaintiffs' financing of Needle, for example, was structured as a participation in a larger loan that had purportedly been agreed to prior between CWMF and BRON Studios USA (and signed by Gilbert), whereby CWMF agreed to lend a total of $8.625 million to fund the production costs for Needle. *See* FAC ¶ 110. Both CWMF and BRON Studios benefited from Plaintiffs' loans because Plaintiffs' funding (combined with that provided by others) left CWMF, as the underlying lender, with no risk, while BRON Studios reaped the value of the loan proceeds to fund its

---

[7] "In deciding a motion to dismiss, the Court can consider documents incorporated by reference in the complaint." *Johnson v. JPMorgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, n. 29 (S.D.N.Y. 2020).

production costs without repayment to Plaintiffs. *See* ¶¶ 203(c)-(f). The same is true with respect to the Lionsgate and Nightingale transactions, by which Plaintiffs gave the Creative and BRON Defendants, who had no intention of repayment, money to produce their films. *See* ¶¶ 146, 173.

Post-financing conduct also underscores BRON Studios' knowing participation in the scheme. For example, when pushed for repayment, the FAC alleges that that Plaintiffs received assurances that BRON Studios would shortly be receiving a $100,000,000 investment from a company called DeRoyce Ltd.—which is also likely a sham given that it shares a business address in the United States with BRON Studios—and that those investment proceeds would be used to repay Plaintiffs' loans. *See* FAC ¶¶ 193-94; *see also* Shargel Decl. Ex. N (letter from DeRoyce Ltd. to Bayshore sent on behalf of BRON Studios).

Taken together, these and other allegations in the FAC confirm that each Defendant knowingly participated in the scheme to commit wire fraud. *See Williams*, 443 F. Supp. 3d at 492 ("As long as EAC had an intent to defraud in participating in the scheme and the scheme contained a material misstatement, EAC may be held liable for mail and wire fraud violations."); *Serin v. N. Leasing Sys., Inc.*, No. 7:06-CV-1625, 2009 WL 7823216, at *8 (S.D.N.Y. Dec. 18, 2009) ("Because the Amended Complaint alleges that the individual Defendants, by nature of their positions . . . orchestrated, supervised, monitored, and/or oversaw the day-to-day operations of the alleged scheme, the Plaintiffs' allegations against all of the Defendants are sufficient to allege a pattern of racketeering activity for purposes of RICO."). Defendants' arguments to the contrary "fail[] to take seriously the court's obligation at this stage to assume the truth of the well-pleaded factual allegations in the Complaint and to draw all reasonable inferences in favor of [Plaintiffs]." *Allstate Ins. Co. v. Lyons*, 843 F. Supp. 2d 358, 370 (E.D.N.Y. 2012).

### 2. The FAC Meets The Standards Of Rule 9(b) And Does Not Improperly Rely On Group Pleading

Defendants next assert that the RICO claims should be dismissed because the FAC improperly relies upon group pleading and that, under Fed. R. Civ. P. 9(b), Plaintiffs' allegations are not stated with sufficient particularity. *See*, *e.g.*, BRON Brief at 11-12.

As to Rule 9(b), where, as here, the FAC alleges that interstate wires were used in furtherance of a master plan to defraud, including in the context of "complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *Angermeir v. Cohen*, 14 F. Supp.3d 134, 145-46 (S.D.N.Y. 2014) (quoting *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998)). "Instead, 'Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Id.*; *see also Lewis Fam. Grp. Fund LP v. JS Barkats PLLC*, No. 16-CV-5255 (AJN) (JLC), 2021 WL 1203383, at \*7 (S.D.N.Y. Mar. 31, 2021). In this case, the FAC describes, with significant particularity, a catalogue of fraudulent statements, including those intended to induce Plaintiffs to lend Defendants their money, as well as statements in furtherance of the fraud to cause Plaintiffs not to take any action to enforce their rights and thus expose Defendants' scheme. *See*, *e.g.*, FAC ¶¶ 211(a)-(aa). As stated above, the FAC also sets forth, in considerable detail, each Defendants' participation in the alleged scheme. "These allegations sufficiently plead, with particularity, the existence of a fraudulent scheme as well as Defendants' specific intent to defraud. Plaintiffs describe Defendants'

alleged fraud 'in detail and 'connect the allegations of fraud to each individual defendant.'"[8] *Lewis Fam. Grp. Fund LP*, 2021 WL 1203383, at \*7.

Further, the FAC's allegations of wire fraud satisfy Rule 9(b) as to each defendant, and do not improperly rely upon group pleading. As described above, the FAC describes the role of each defendant in the alleged scheme, including the BRON Defendants' role as producers of the films, the Creative Defendants' role as BRON Studios' funding partner, and the Hudson Defendants' role attracting investors, all with the unified purpose of fraudulently inducing entities like Plaintiffs to loan money for the film projects. Thus, the FAC is sufficient because it "includes multiple allegations specific to each Defendant that satisfies Rule 9(b)'s requirement that Plaintiffs allege each Defendant's knowledge of or participation in the fraudulent scheme." *Angermeir*, 14 F. Supp. 3d at 148; *see also id.* at 150 (rejecting group pleading where "the Complaint's other allegations specific to each Defendant are sufficient to give Defendants fair notice of the claims against them and to accomplish the other goals of Rule 9(b)").

### 3.    The FAC Adequately Alleges Continuity

Defendants next argue that the FAC should be dismissed because it fails to adequately allege either closed- or open-ended continuity. Defendants are, again, wrong.

### a.    Closed-Ended Continuity

With respect to closed-ended continuity, Defendants offer various reasons why the FAC does not adequately allege a series of predicate acts spanning at least two years, which is traditionally required by the Second Circuit to establish continuity. For example, the Creative

---

[8] The BRON Defendants also claim that a "[l]ack of 'reasonable reliance' in fact precludes Plaintiffs' fraud allegations against the BRON Studios Defendants generally." BRON Brief at 14. Such arguments have been described as "patently incorrect as a matter of law," given that the Supreme Court has held "that 'no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail [or wire] fraud," *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 250 (S.D.N.Y. 2012) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008)).

Defendants argue that the first alleged act involving any of them took place on August 14, 2017, while the last took place on October 17, 2018, "when Plaintiffs entered into the Term Sheets to provide funds for the Nightingale." Creative Brief at 26. Similarly, the BRON Defendants say that their conduct spanned only three weeks, as Plaintiffs "do not allege any interactions with BRON Studios Defendants before the Needle agreement, dated July 5, 2018, or after the Lionsgate agreement, August 1, 2018." BRON Brief at 15. In addition, all Defendants claim that the FAC does not establish continuity because Plaintiffs have only alleged Defendants' involvement in a single isolated scheme. *See*, *e.g.*, Hudson Brief at 15.

As to the length of Defendants' pattern of racketeering activity, "[t]he determination of the existence or non-existence of continuity requires the court to look beyond the bare enterprise and predicate acts. It is necessary for the court to examine the 'overall context in which the acts took place' in order to ascertain whether sufficient continuity exists." *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 624 (S.D.N.Y. 1990) (quoting *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989)). Here, regardless of Defendants' myopic view of the facts, the FAC alleges that Defendants acted in concert to defraud Plaintiffs over a period of more than two years, beginning in August of 2016, *see* FAC ¶ 52, and ending no earlier than July of 2020, *see* ¶ 193.

As described above, each Defendant had a specific role in the fraudulent scheme and knowingly participated in other Defendants' fraudulent statements and predicate acts. Thus, as in *Landy*, "[t]he amended complaint as a whole clearly alleges that these defendants acted in concert to the detriment of plaintiffs over a period of years." *Landy*, 734 F. Supp. at 624; *see also In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 631 (E.D. Ky. 2011) (finding closed-ended continuity where "Plaintiffs have established as set forth in detail above that at various times

throughout the scheme each defendant either made decisions on behalf of the enterprise or knowingly carried out those decisions.").

The BRON and Creative Defendants seek to sidestep the presence of closed-ended continuity by claiming that post-loan statements by Defendants are not actionable. Leaving aside the fact that, even without these post-investment misstatements and omissions the racketeering activity spans at least two years—August 2016 through October 2018, when Plaintiffs provided funding for The Nightingale, *see* FAC ¶ 172—these post-funding statements constitute an important part of Defendants' scheme. The FAC alleges that Defendants' fraudulent activity constitutes their regular way of doing business. Given the nature of Defendants' Ponzi-like scheme, where Defendants would use new investors' money to pay off prior loans, it was imperative that Defendants' racketeering enterprise was prolonged until new sources of money could be found, while at the same time remaining unknown to the public so that it would be possible to for them to obtain fresh loan proceeds from other investors. *See, e.g.*, ¶¶ 189-196. Such efforts by Defendants to conceal their fraud are actionable, and serve to prolong the fraudulent scheme. *See, e.g.*, *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 573 (S.D.N.Y. 2018) (finding closed-ended continuity based upon allegation that "when it appeared that they were at risk of being caught, Meyer and Dorfman joined forces to conceal their scheme and ensure the enterprise's survival."); *United States v. Johnson*, 945 F.3d 606, 615 (2d Cir. 2019) (finding post-transaction misrepresentations material where "a reasonable jury . . . could have viewed [the misrepresentations] as influencing [victim's] decision not to pursue various courses of action immediately after the fact").[9]

---

[9] The Creative Defendants' authority to support their arguments concerning post-investment activity is inapposite. For example, in *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 219 (S.D.N.Y. 2002), the Court held that the predicate acts alleged had nothing to do with plaintiff's injuries. This is not the case here.

Finally, there is no basis for Defendants' argument that continuity is lacking because "they allege only a single, limited 'scheme' involving a limited number of predicate acts, participants and victims." Creative Brief at 27. To be sure, courts have uniformly rejected similar arguments. *See*, *e.g.*, *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 16 (2d Cir. 1989) ("We have explicitly eschewed any multiple scheme or episode requirement to demonstrate the continuity of the pattern of racketeering activity."); *see also Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 573 (S.D.N.Y. 2018). Regardless, Plaintiffs' allegations concern financings for three distinct film projects and, as discussed below in the context of open-ended continuity, involve numerous other schemes and victims apart from the named Plaintiffs in this action.

### b. The FAC Also Pleads Open-Ended Continuity

The FAC also permits a finding of open-ended continuity. In these circumstances, Plaintiffs may establish open-ended continuity by showing that Defendants' predicate acts were the regular way in which they conducted their business. *See Williams*, 443 F. Supp. 3d at 493. The FAC makes this showing by identifying a host of other victims of Defendants' film financing scheme, including in the United States and Canada. *See* FAC ¶ 71-72. And, while Hudson's submission contends that it was not part of any ongoing criminal activity, the complaint it filed against the BRON and Creative Defendants shows a continuation of the exact type of conduct about which Plaintiffs complain. For example, just like Plaintiffs allege here, Hudson alleges facts showing that "Film Loan proceeds were used by Creative Wealth for unrelated purposes and dissipated to unidentified recipients, all with the knowledge and approval of Cloth." Fritz Decl. Ex. B, at 10. More specifically, the Hudson complaint recounts how $3 million loaned for the movie Greyhound "was utilized for purposes other than in connection with the 'Greyhound' motion picture and [] such funds were never conveyed to the underlying production company borrower, Sony Pictures." *Id*. More disturbingly, the Hudson complaint reflects that "Cloth also told Hudson LP that it double-

sold the same interest in the Bombshell Loan to both Hudson LP and an affiliate of Creative Wealth," *id*. at 11, mirroring Plaintiffs' allegation in this case that, with respect to Nightingale, BRON Creative had "pledged the same collateral to multiple lenders as 'first priority,' including the collateral that Defendants . . . had pledged to Bayshore and RTR," ¶ 170.

Allegations of similar conduct span additional lawsuits against Defendants in the United States, such as in the *Preserver* action which has since settled, *see* FAC ¶ 219, as well as in numerous actions pending in Canada, *see*, *e.g.*, Fritz Decl. Ex. G, at ¶¶ 50-54 (Canadian lawsuits describing misrepresentations in regarding film financing agreements). The FAC also alleges that Defendants are continuing to seek new investors for other film projects, *see* FAC ¶¶ 221-222, rendering it plausible that Defendants' conduct will result in future harm. At the very least, the question of whether Plaintiffs have established open-ended continuity presents a factual issue.

### C.    Plaintiffs Have Established The Existence Of A RICO Enterprise

Defendants also each argue that Plaintiffs have not sufficiently alleged a RICO enterprise. The Creative and BRON Defendants, for example, assert that they are not alleged to have done "anything other than conduct their own businesses in the ordinary course for their own benefit, instead of on behalf of the alleged enterprise as a whole." Creative Brief at 21; *see also* BRON Brief at 16 ("Each of the actions allegedly taken by BRON Studios Defendants is readily explained by their business as movie producers . . . ."). The Hudson Defendants offer similar arguments, asserting that they merely had an arms-length relationship with the BRON and Creative Defendants, that they were actually victims of the other Defendants' schemes, and that they did not control or manage the enterprise. *See* Hudson Brief at 8-14. Contrary to these arguments, and especially at the motion to dismiss stage, Plaintiffs have sufficiently established a RICO enterprise.

The Supreme Court's decision in *Boyle*, 556 U.S. 938 (2009), recognized a low threshold for pleading the existence of an association-in-fact enterprise under RICO, which may be

established by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*, at 945; *see also Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 413 (E.D.N.Y. 2013). Characteristics of a RICO enterprise include showing that its members are dependent upon one another, joined together as a group acting to benefit one another, and that members contribute to the enterprise's goals in some "necessary and symbiotic manner." *Hemmerdinger*, 976 F. Supp. 2d at 413 (quoting *City of New York v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013)). Further, "as is true of enterprises generally, proof of a pattern of racketeering activity may be sufficient in a particular case to permit the factfinder to infer the existence of an association-in-fact enterprise." *Hemmerdinger*, 976 F. Supp. 2d at 413–14 (internal quotation marks and citation omitted). The FAC meets these standards.

### 1.    The Hudson Defendants

Beginning with the Hudson Defendants, they devote a significant portion of their motion attempting to refute Plaintiffs' allegations that Hudson, Conover, and Jonas were beholden to CWMF and the BRON Defendants and motivated to lie. More specifically, the FAC alleges that Hudson had failed to disclose that CWMF had loaned Hudson $18 million—a bailout needed due to Hudson's significant losses in its film financing investments, as alleged by CWMF and BRON Studios in other litigation—and that Hudson's debt was to be paid off by commissions earned each time it arranged a financing for the other Defendants with entities like Bayshore and RTR. *See* FAC ¶¶ 91-93. In their motion to dismiss, however, the Hudson Defendants insist that the loans were not loans, "but rather Creative Wealth paid millions to *purchase* an interest in the Other Films." Hudson Brief at 10 (emphasis in original).

As a threshold matter, resolution of these factual matters is not appropriate on a motion to dismiss. *See Ritchie v. N. Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 245 (S.D.N.Y. 2014) ("Defendants' argument is unavailing, as it depends on the resolution of a disputed factual issue

in their favor at the motion-to-dismiss stage."). But even if the Court were to consider the factual issues raised by the Hudson Defendants, it is not difficult to conclude that their version of events is highly doubtful, and that whatever financial arrangement exists between Hudson and the other Defendants is far from an arms-length, disinterested transaction. Indeed, the Hudson Defendants offer no explanation as to why CWMF would be willing to pay $18 million to purchase Hudson's interest in films of which, as evidenced by the purported Library Purchase Term Sheets attached to the Fritz Declaration, nobody had ever heard of. *See*, *e.g.*, Fritz Decl. Ex. C, at 6 (Schedule A) (indicating that the parties did not even know the names of certain films at issue). Moreover, the sloppily drafted Library Purchase Term Sheets appear to support Plaintiffs' version of events, not Hudson's, describing Hudson interchangeably as the "Seller" and the "Borrower" and referencing a related "long form loan agreement" and promissory note that the parties were to execute separately. *See id.* (January 8, 2018 term sheet at 3).

Further, the FAC's characterization of the undisclosed loan from CWMF to Hudson is not based upon mere conjecture but, as noted, upon representations to the court from counsel for the Creative and BRON Defendants concerning the underlying dispute with Hudson. *See* FAC ¶ 96. That letter, from Mr. Fried, describes how "[p]urportedly for tax and regulatory reasons, Hudson insisted that the Library Loans be structured as a purchase of Hudson's existing interests in various motion pictures (none expected to yield any return), with the understanding that Hudson would finance Bron Studios' films and the commissions paid by Hudson to CW on these film financings . . . would be used to repay the Library Loans." *See* Shargel Decl. Ex. O (Letter to Hon. Cathy Seibel, dated December 8, 2021 from William R. Fried, in Case No. 7:21-cv-008259). Counsel for BRON Studios USA, Mr. Schiller, separately concurred with CWMF's description of the loans to Hudson. *See* Shargel Decl. Ex. P (Letter to Hon. Cathy Seibel, dated December 8, 2021 from

Joshua I. Schiller). Tellingly, in their submissions here Mr. Fried and Mr. Schiller neither recant their earlier positions nor offer any reason to support Hudson's version of events. Moreover, the fact that the Creative and BRON Defendants were willing to indulge Hudson's need to hide the true nature of the transaction from regulators (i.e., by disguising the loan as a sham "purchase") only serves to underscore the Defendants' close-knit criminal relationship.

The same series of letters to Judge Seibel demonstrate other ways in which Hudson was connected to the enterprise and had an interest in convincing Plaintiffs to participate in financings. The letters refer to an Executive Producer Agreement between Hudson and CWMF and its affiliates, whereby Hudson would act as executive producers of several films, including Needle, Nightingale, and A Simple Favor – three of the productions that are at issue in this dispute.[10] *See* Shargel Decl. Ex. Q; *see also* Shargel Decl. Ex. R (Hudson press releases announcing film production partnerships). The FAC also alleges that, also in 2018, Hudson and BRON Studios formed a new "venture" called BRON Ventures, which was touted as "a division of the studio that will make strategic equity investments in content-driven production companies and leaders in the film, TV, digital and animation spaces." FAC ¶ 48; *see also* Shargel Decl. Ex. E. Given these and other facts alleged in the FAC, the Hudson Defendants cannot credibly claim that they were mere "outsiders" to the enterprise. *See* Hudson Brief at 11.

Hudson separately argues that it cannot be part of a RICO enterprise with the other Defendants because Hudson has filed lawsuits against certain Creative and BRON Defendants, and that such lawsuits show that "the Hudson Defendants and their affiliates are not co-conspirators, but victims of the Bron Defendants, Creative Wealth and Cloth's misdeeds." Hudson

---

[10] Underscoring the close relationship among Defendants, Conover, Cloth, and Gilbert's wife, Brenda (the other half of the BRON portmanteau), were photographed on the red carpet at the film premiere for The Front Runner on September 12, 2018, the time period in which Defendants were seeking to convince Plaintiffs to lend money. *See* Shargel Decl. Ex. S.

Brief at 10. Leaving aside that these lawsuits serve to confirm the wide-ranging and persistent nature of Defendants' criminal conduct, and that Creative and BRON would go so far as to defraud their confederates, Hudson's argument only reflects infighting among co-conspirators. The Hudson Defendants offer no authority for the proposition that subsequent litigation between members of a RICO enterprise serves to erase RICO liability. Moreover, despite the purported disputes among Hudson and its confederates, Hudson still today touts its relationship with BRON Studios on its website. *See*, *e.g.*, Shargel Decl. Ex. E.

Finally, the Hudson Defendants argue that the FAC fails to allege "facts sufficient to show that Conover, Jonas or Hudson had a role in the operation and management of the alleged Enterprise." Hudson Brief at 13. The FAC, however, clearly delineates Hudson's role as the entity tasked with identifying, luring, and ensnaring lenders like Plaintiffs into Defendants' scheme. *See*, *e.g.*, FAC ¶ 45. Indeed, as described above, the Hudson Defendants boasted of their right of first refusal with respect to financing films produced by BRON Studios, *see* ¶ 84, and by 2017, nearly every film in which Hudson's clients invested was produced by BRON Studios, *see* ¶ 46. Moreover, the $18 million loan from CWMF to Hudson provided Hudson with the additional motivation to engage in deceitful conduct, given that the loan was to be repaid via commissions earned with each financing Hudson secured. *See* ¶¶ 91-97.

These facts establish that the Hudson Defendants participated in the operation and management of the enterprise. In arguing otherwise, the Hudson Defendants "misconstrue [Plaintiffs'] burden with respect to pleading operation or management of the alleged RICO enterprise." *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 314 (S.D.N.Y. 2009). "The Supreme Court has held that 'an enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.'

At a minimum, the Complaint alleges that the defendants exercised discretion in carrying out [other Defendants'] directions." *Id.* (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993)). To be sure, the FAC leaves no doubt that the Hudson Defendants were "vital actors who enabled the scheme," which is sufficient, especially at the motion to dismiss phase. *See Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 225 (E.D.N.Y. 2014).

In this regard, cases cited by the Hudson Defendants are inapposite, because they involve circumstances where a defendant only "*provided services* that were helpful to the association in fact enterprise." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 308 (S.D.N.Y. 2010) (emphasis added); *see also Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 307 (E.D.N.Y. 2017) (finding control element lacking where "the SAC states that defendant engaged in 'arms length commercial transaction[s]'" with other members of the enterprise) (modification in original) (collecting cases where defendant only loaned money to an enterprise, provided banking services, or provided other professional services). In this case, the Hudson Defendants are not mere service providers, but served as an integral and active participant in the enterprise.

### 2.    The Creative And BRON Defendants

As an offshoot of the same arguments, the Creative and BRON Defendants assert that the FAC does not adequately plead an enterprise because it alleges only that these defendants were conducting their own legitimate affairs and not those of an illegal enterprise. This assertion is without merit, as the FAC plainly alleges that Defendants, including the Creative and BRON Defendants, conspired to engage in a fraudulent scheme they could not accomplish independently. As described above, the BRON Defendants served as the producers of the films and participated in obtaining fraudulent loans based on false promises of security and repayment. The Creative Defendants, as BRON Studio's captive financing arm, arranged funding for the films on a fraudulent basis, while the Hudson Defendants sought to induce outside investors. *See*, *e.g.*, FAC

¶¶ 42-49 Each Defendant benefitted from the scheme: The Creative Defendants used other people's money to make loans, while earning a profit, to the BRON Defendants, who knowingly took Plaintiffs' free money (and signed fraudulent agreements) to make its films without any expected repayment obligation, while Hudson and CWMF received fees as part of the loans, some of which would be used to repay CWMF's loan to Hudson. *See* ¶¶ 91-97; 198-203. The possibility that the interest of the enterprise may overlap with the legitimate business of its members, rather than providing a ground for dismissal, only "provides the incentive for members to participate in the enterprise." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010) ("Here, defendants' alleged collaboration in the Marsh-centered enterprise, most notably the bid rigging, allowed them to deceive insurance purchasers in a way not likely without such collusion.").

Cases cited by Defendants highlight the inapplicability of their arguments. For example, in *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826 (CBA), 2017 WL 57802, at *4 (E.D.N.Y. 2017), the Court found enterprise allegations lacking where the complaint named 300 defendants, clustered them by the nature of their business—pharmacies and distributors—and alleged in conclusory terms that alleged only that the "distributors sold to pharmacies . . . and pharmacies sold to consumers, but it fails to allege facts showing how these are the actions of 'members functioning as a unit.'" Likewise, in *Kaczmarek v. International Business Machines Corp.*, 30 F. Supp. 2d 626, 630 (S.D.N.Y. 1998), the court rejected allegations of a RICO enterprise involving IBM where plaintiffs had alleged "nothing more than the ordinary methods by which a product finds its way from the manufacturer to the end user." These cases serve only to confirm the sufficiency of Plaintiffs' allegations here.

### D.    Plaintiffs Adequately Allege A RICO Conspiracy Claim

Defendants argue primarily that Plaintiffs' RICO conspiracy claim should be dismissed because the FAC fails to set forth a valid substantive RICO claim. *See* Creative Brief at 30; BRON

Brief at 16; Hudson Brief at 20. However, these arguments fail for the simple reason that, for all the reasons described above, Plaintiffs have adequately alleged a substantive RICO claim. Nor is there any basis for Defendants' assertion that the RICO conspiracy claims are conclusory, given the detailed factual allegations contained in the FAC demonstrating with particularity that Defendants knowingly agreed and conspired to participate in a wire fraud scheme.

The Hudson Defendants argue specifically that Conover and Jonas should be released from any RICO conspiracy liability, asserting that they did not participate in the alleged enterprise. *See* Hudson Brief at 5-6. This argument, however, ignores the allegations of the FAC, which are replete with knowingly fraudulent statements and omissions made by both of these defendants.[11] It also ignores that the "operation or management" test, discussed above in the context of the RICO enterprise, does not apply to a RICO conspiracy. *See Crabhouse of Douglaston Inc. v. Newsday*, 801 F. Supp. 2d 64, 89 (E.D.N.Y. 2011). Rather, "[a]ssuming that a RICO enterprise exists, [one] must prove only that the defendants . . . know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual roles." *Id.*

More broadly, the viability of Plaintiffs' RICO conspiracy claim is not, as Defendants would have it, inextricably dependent upon their substantive RICO claims. For example, even if the continuity requirement with respect to each Defendant were not established, "such a requirement is not attached to a claim for RICO conspiracy as to each particular conspiracy defendant." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 284 (S.D.N.Y. 2013). Accordingly, Plaintiffs' RICO conspiracy claim should not be dismissed.

---

[11] In support of these arguments the Hudson Defendants rely almost exclusively upon cases providing that a director is not personally liable for his corporation's contractual breaches. *See* Hudson Brief at 5-6. This authority, however, has no bearing on whether Conover and Jonas participated in RICO violations, and the FAC establishes they did.

**IV.    Plaintiffs' State Law Claims Should Stand**

In addition to their RICO claims, Plaintiffs assert several non-federal claims against Defendants, including breach of contract claims against the Creative Defendants, who do not argue for dismissal of those causes of action. As to the remaining claims, for fraud, breach of contract (against Hudson), breach of the covenant of good faith and fair dealing, and unjust enrichment, Defendants have offered no valid basis for dismissal. Before reaching the merits of Defendants' arguments, it is worth noting that the Court has subject matter jurisdiction over Plaintiffs' state law claims even if the federal claims are dismissed. In addition to jurisdiction under 18 U.S.C. § 1331, the FAC also establishes diversity jurisdiction under 18 U.S.C. § 1332. *See* FAC ¶ 38. No Defendant argues otherwise.

**A.    Choice Of Law**

Although Defendants do not offer a choice of law analysis, Plaintiffs respectfully submit that New York law should apply to the FAC's state law claims other than those concerning the interpretation of two term sheets governed by Ontario law.[12] Canadian law should have no application beyond those term sheets because the choice of law provisions are narrow and apply only to contract claims. *See*, *e.g.*, Shargel Decl. Ex. F (Needle Term Sheet providing that "*[t]his Term Sheet* shall be governed by and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein and the Parties hereto hereby irrevocably attorn to the jurisdiction of the courts of the City of Toronto.") (emphasis added); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (analyzing a similarly narrow choice of law provision and rejecting application over tort claims). Therefore, the Canadian choice of law provisions have no bearing on which law applies to Plaintiffs' remaining claims.

---

[12] The Nightingale term sheets entered into by Bayshore and RTR are governed by New York law. *See* Shargel Decl. Ex. I, J. The Needle and Lionsgate term sheets are governed by Ontario law. *See* Shargel Decl. Exs. F-H.

"In the absence of an applicable choice-of-law provision, New York has adopted an interest analysis, which requires that [ ] the law of the jurisdiction having the greatest interest in the litigation . . . be applied." *Krock*, 97 F.3d at 645 (internal quotation marks omitted) (modifications in original). Where, as here, "the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws," *id*. at 646, which include "laws regulating allegedly fraudulent conduct," *id*.

As discussed above, much of the conduct at issue occurred in New York. Moreover, the parties appear to agree that New York law should apply, given that Defendants' briefing generally relies on it.[13] Where the parties' briefing assumes that New York law governs, the Court may "follow[] their lead." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 350 n.11 (S.D.N.Y. 2021); *see also Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

### B.    Fraud (Count 3)

Defendants argue that Plaintiffs' fraud claim should be dismissed, echoing arguments made in connection with the RICO claims. The Hudson Defendants, for example, say that the FAC's allegations about statements made by Jonas and Conover do not demonstrate a then-present intent to deceive, or that the statements were false when made. *See* Hudson Brief at 22. The Creative Defendants, meanwhile, assert that the fraud claim is duplicative of Plaintiffs' breach of contract claim, and that any alleged misrepresentations by the BRON Creative entities and Cloth are not actionable. *See* Creative Brief at 31-32.

With respect to the Hudson Defendants, despite their conclusory arguments, the FAC makes clear, with the specificity required by Rule 9(b), that Jonas and Conover's statements were made with fraudulent intent. Such statements include those made in connection with Jonas' and

---

[13] In discussing the non-contract claims, the Creative Defendants offer various citations to Canadian and Florida law. They appear to do so, however, only to show that the law of those jurisdictions is in accord with New York law.

Conover's years-long efforts, beginning in 2016, to convince Plaintiffs that the film financings were secure and fully collateralized. Among other conduct, they consist of Conover transmitting the spreadsheet purporting to summarize the success of prior film investments (FAC ¶¶ 67-70), Jonas falsely bragging about Hudson's monthly and annual returns (¶ 75), and Conover's statement that the other defendants had agreed to take any future impairments off Hudson's books (¶ 84). These statements were false when made, as the film investments were neither secure nor collateralized as promised (*see*, *e.g.*, ¶¶ 165-166), the spreadsheet included other film investments that had, in fact, not been repaid (¶¶ 70-72), and there was no agreement to take "future impairments" off Hudson's books. The Hudson Defendants, moreover, failed to disclose the true nature of their backroom deals with the other Defendants, including that Hudson required a bailout in the form of a loan from CWMF, and that Hudson, and by extension Conover and Jonas, were hopelessly conflicted given that each financing they arranged would go towards paying off the debt. *See* ¶¶ 91-97. "Taken as a whole, these allegations are sufficient to support an inference of fraudulent intent." *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 379 F. Supp. 2d 348, 387 (S.D.N.Y. 2005).

With respect to the arguments advanced by the Creative Defendants, Plaintiffs' fraud claim is not duplicative, as it is based upon Defendants' fraudulent *inducement* of Plaintiffs to enter into the film financing arrangements. *See* FAC ¶¶ 229-231. As explained by the Court in *Wild Bunch, SA v. Vendian Ent., LLC*, 256 F. Supp. 3d 497, 505 (S.D.N.Y. 2017), a case cited by the Creative Defendants, where "a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim." (internal quotation marks omitted).

44

Here, the Creative Defendants do not dispute that the FAC alleges pre-contract misrepresentations by CWMF but argue that Cloth himself did not make any actionable misrepresentations. *See* Creative Brief at 32. However, the allegations of the FAC surrounding the false statements made by CWMF give rise to a reasonable inference that Cloth participated in the fraud of the closely-held entities he controlled. Indeed, it would have been impossible for any of the Creative Defendants to have engaged in fraud without Cloth's involvement. *See*, *e.g.*, *Sargiss v. Magarelli*, 12 N.Y.3d 527, 531 (2009) ("If there was a fraudulent scheme, Julius's knowledge of it and participation in it are clear because it would have been impossible for decedent to carry out the fraudulent scheme as alleged without Julius knowing of the scheme and participating in it."); *Pludeman v. N. Leasing Sys., Inc.*, 10 N.Y.3d 486, 493 (2008) (upholding fraud claim where allegations were sufficient to infer participation in the scheme "given the degree of [the president's] personal activities [within the organization]") (modifications in original). Moreover, Cloth is alleged to have personally made post-funding misrepresentations which, as discussed above, are actionable.

A similar conclusion can be reached with respect to the BRON Creative entities, who the Creative Defendants insist did not make any fraudulent misrepresentations. *See* Creative Brief at 32. The BRON Creative entities were controlled by Cloth, and those entities ultimately became the contracting parties chosen by CWMF and Cloth as borrowers under the term sheets. As such, the fraudulent conduct of the other Creative Defendants, including Cloth, may be imputed to them. *See*, *e.g.*, *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) (imputing misconduct of sole shareholder and decision maker to corporation under "sole actor" rule).

### C.    Aiding And Abetting Fraud (Count 4)

Next, the BRON Defendants argue that they cannot be liable for aiding and abetting fraud because the FAC does not allege that they had knowledge of the fraud or that they provided

substantial assistance. *See* BRON Brief at 19. It does, and the BRON Defendants cherry pick allegations regarding their participation in the fraud that they say are vague but ignore others that leave no doubt as to the BRON Defendants' active, knowing, and intentional participation in the fraudulent scheme. For example, when Defendants were trying to convince Plaintiffs to lend their money, BRON Studios provided Plaintiffs, through Hudson, with their brochure describing active productions. *See* FAC ¶ 78. BRON Studios did so to convince Plaintiffs to invest and the brochure turned out to be a roadmap to other projects in which financiers like Plaintiffs had not been repaid. *See* ¶ 79. Stated otherwise, by the time BRON Studios provided its brochure, meant to attract new investors into the Ponzi-like scheme, it knew that it had already defaulted on other repayment obligations and had no intention of repaying plaintiffs. BRON Studios' knowing participation is also evidenced by the Sourcing Agreement entered into by Hudson and Bayshore, as BRON Studios necessarily permitted Hudson to enter into the agreement, which provided that all film investments would be for projects produced by BRON Studios. *See* ¶ 90.

Moreover, as described by the FAC, Bayshore's participation in the film project financing was always as a participant in a larger loan transaction where BRON Studios was the ultimate borrower and the recipient of Plaintiffs' money. *See*, *e.g.*, FAC ¶ 106. In that role, BRON Studios cannot credibly claim that it lacked knowledge about the scheme that made those funds available to it. This is not mere supposition. BRON Studios (and Gilbert) signed two of the term sheets under which Plaintiffs agreed to provide financing, showing that, even if, as Defendants claim, they didn't have any contractual obligations, they were intimately involved in the scheme. *See* Shargel Decl. Exs. F, G.

BRON Studios' knowledge and participation is also shown by its post-financing conduct, where the FAC shows that it was directly involved in false promises and reassurances to repay

46

Plaintiffs, including by using other investors' money. These were empty promises, however, intended only to prolong the scheme. *See*, *e.g.*, FAC ¶ 190-194. While the BRON Defendants attempt to distance themselves from any underlying fraud by arguing that the existence of a mere "business relationship" among the parties is insufficient to establish actual knowledge, the parties here are not alleged to be connected by an arms-length business association. Rather, the FAC shows that Defendants, including the BRON Defendants, undertook a massive scheme to defraud not only Plaintiffs, but also other lenders, and that they worked arm-in-arm at every step to do so.

Comparing these facts to the authorities offered by the BRON Defendants shows they are inapposite. For example, in *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 167 (S.D.N.Y. 2009), the aiding and abetting fraud claim was dismissed because the defendant at issue, Bank of New York, was merely alleged to have conducted contractually required duties in connection with a failed structured investment vehicle. *Id*. at 187. Likewise, the plaintiffs in *ICD Cap., LLC v. CodeSmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021) sought to amend their complaint to include an aiding and abetting claim against a party "almost entirely on [his] status as chief operating officer." *Id*. Plaintiffs' allegations against the BRON Defendants are far more substantial. As explained by the court in *Oster v. Kirschner*, 77 A.D.3d 51, 55 (1st Dep't 2010), "[p]articipants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud," and "an intent to commit fraud is to be divined from surrounding circumstances." Here, the detailed surrounding circumstances involving the BRON Defendants' participation in the fraud are more than sufficient and support the conclusion that the aiding and abetting fraud claim should be permitted to proceed.

### D.    Breach Of Contract Concerning Financing Term Sheets (Counts 5-6)

As mentioned above, the Creative Defendants do not argue for dismissal of the breach of contract claims against them. Rather, the BRON Defendants say that they cannot be liable for

breach because BRON Studios USA (and BRON Studios Canada, for that matter) are "not the borrower under any of the term sheets and therefore could not be under any obligation to 'repay money owed.'" BRON Brief at 22.

There is no dispute, however, that BRON Studios USA executed two of the term sheets, evidencing an intent to be bound by their repayment and other obligations. *See* Shargel Decl. Exs. F, G. And such intent is logical in light of the underlying loan agreements, which were supported by Plaintiffs' fractional participation in the film financings, in which the BRON Defendants were the ultimate borrower with repayment obligations. *See* FAC ¶¶ 182. Those loan agreements were specifically referenced in, and attached to, the term sheets signed by Plaintiffs. *See* Shargel Decl. Exs. F, J, K. Under these circumstances, Plaintiffs' breach of contract claims should be permitted to proceed against the BRON Studios entities.

### E.    Breach Of Contract Against Hudson (Count 11)

The Hudson Defendants argue that they cannot be liable for breaching the Sourcing Agreement because "Plaintiffs cannot adequately plead that the Hudson Defendants' alleged breach of contract was the direct and proximate cause of their loss." Hudson Brief at 23.

Under the Sourcing Agreement, Hudson agreed to identify film participation opportunities for Plaintiffs that fit specified criteria. *See* FAC ¶¶ 89-90. The FAC alleges that Hudson breached the Sourcing Agreement by failing to adhere the sourcing criteria, including that any loan in which Bayshore participated would be secured by a first position lien on the assets of the financed film, as well as a "direct sightline" to collateral. *See* ¶ 280. Hudson does not argue that they were not bound by these obligations, or that the FAC sufficiently alleges they were breached. Instead, they argue that Plaintiffs' losses were caused by the other Defendants, not a breach of the Sourcing Agreement. The law, however, is that the presence of other potential causes does not negate a finding that Hudson's conduct was a proximate cause of Plaintiffs' injuries, especially at the

48

pleadings stage. *See Bank Midwest, N.A. v. Hypo Real Est. Cap. Corp.*, No. 10-CV-232 (WHP), 2010 WL 4449366, at *3 (S.D.N.Y. Oct. 13, 2010) ("If the damages are the 'natural and probable consequence' of the breach, then the defendant's actions are a proximate cause of that injury, even if other factors also contributed."); *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 515 (S.D.N.Y. 2011) ("Questions of proximate cause are generally left to the jury.").

F.    **Breach Of The Covenant Of Good Faith And Fair Dealing Concerning Financing Term Sheets (Counts 8-10, Count 12)**

Defendants argue that Plaintiffs' claims for breach of the covenant of good faith and fair dealing should be dismissed because they are duplicative of the contract claims. At the pleading stage, however, Plaintiffs are permitted to plead these claims in the alternative. *See*, *e.g.*, *Truetox Lab'ys, LLC v. Healthfirst PHSP, Inc.*, 68 Misc. 3d 1209(A), 2020 WL 4556907, at *2 (Sup. Ct. NY County 2020). This is especially true in light of the positions taken by Defendants in their motions, such as where the BRON Defendants argue that, on the face of the term sheets, they have no repayment obligation, despite signing the term sheets and taking Plaintiffs' money that was loaned under those agreements. Indeed, if BRON Studios' conduct is not explicitly barred by the term sheets, such conduct deprives Plaintiffs of receiving the benefits of their bargain, which is exactly what the covenant of good faith and fair dealing is designed to protect against.

The BRON and Creative Defendants' arguments for dismissal of these causes of action fare no better under Canadian law, which recognizes a "'duty of honesty in contractual performance' for all contracts, meaning that the 'parties must not lie or otherwise knowingly mislead each other about matters directly linked to the performance of the contract.' That is, the parties must be honest with each other in relation to the performance of their contractual obligations." See *Zalkow v. Taymor Indus. U.S.A., Inc.*, No. 2:14-CV-00243 (JWS), 2015 WL 2128902, at *4 (D. Ariz. May 5, 2015) (quoting *Bhasin v. Hrynew*, 2014 SCC 71, Para. 32 (Can.)).

The FAC clearly sets forth the ways in which Defendants misled and lied to Plaintiffs in relation to the performance of their contractual obligations.

Finally, as to Hudson, even if, as Hudson argues, it did not breach the explicit terms of the Sourcing Agreement, Hudson's other conduct, including its complicity with the other Defendants' fraudulent scheme, deprived Plaintiffs the benefit of receiving the benefits of its bargain under the Sourcing Agreement.

### G.    Unjust Enrichment (Count 13)

Plaintiffs' unjust enrichment claim, which is also pled in the alternative, should be permitted to stand, at the very least, against the BRON Defendants, who disavow any contractual relationship with Plaintiffs and claim to have no liability under the term sheets. *See Emby Hosiery Corp. v. Tawil*, 196 A.D.3d 462, 465 (2d Dep't 2021) ("The complaint asserts these causes of action as alternate theories of recovery, and where a bona fide dispute exists as to the existence of a contract, the plaintiff need not elect its remedies and may proceed upon theories of unjust enrichment or quasi-contract.").

Further, the elements of unjust enrichment have easily been met. Defendants benefitted by obtaining money from Plaintiffs, at their expense, to finance their film productions, and nobody argues that equity and good conscience do not require restitution. *See Bice v. Robb*, No. 07-CV-2214 (PAC), 2010 WL 11586924, at *5 (S.D.N.Y. Jan. 15, 2010) (reciting elements).

### <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motions to dismiss should be denied in their entirety.

Dated: New York, New York
       October 10, 2022

Respectfully submitted,

BRACEWELL LLP

By: /s/ Seth D. Ducharme
    Seth D. Ducharme
    seth.ducharme@bracewell.com
    Rachel B. Goldman
    rachel.goldman@bracewell.com
    David A. Shargel
    david.shargel@bracewell.com
    31 West 52nd Street, 19th Floor
    (212) 508-6100

*Attorneys for Plaintiffs*