# EXHIBIT F

**THE MOTION PICTURE "NEEDLE IN A TIMESTACK"**
**FINANCING TERM SHEET**

This term sheet (the "Term Sheet") dated as of July 5, 2018 sets to writing the agreement by and among Creative Wealth Media Finance C o r p ("CWMF"), an Ontario limited partnership, and BCA Alternative Income Fund LP, a limited partnership, with regard to the subject matter herein below. The parties may hereinafter be referred to individually as a "Party" or collectively as "Parties."

**RECITALS**

WHEREAS CWMF and BRON Studios USA Inc. entered into a Loan Agreement dated as of May 8, 2018 (the "Loan Agreement") ,and attached hereto as Schedule A, wherein CWMF agreed to finance that certain live-action motion picture currently entitled "Needle In A Timestack" (the "Picture");

NOW THEREFORE, this Term Sheet is made by and between the Parties in consideration of the mutual undertakings, agreements and acknowledgements contained in this Term Sheet and for other good and valuable consideration the sufficiency and receipt of which each Party hereto acknowledges.

| | |
|---|---|
| Principal, Interest & Collateral | BCA Alternative Income Fund LP wishes to participate in the financing of the Picture in the amount of $2,500,000.00 USD. (The "BCA Financing") It is understood and agreed that this loan will earn interest at a rate of 11% per annum, for a period of 12 months from the date of the execution of this term sheet. It is further understood that after 12 months, any outstanding balance remaining will continue to earn interest at a rate of 1.5% per month until such time as it is repaid in full.<br><br>Collateral for the BCA Financing is specifically outlined and identified in Schedule B of this Term Sheet. |
| Contingent Compensation | Following repayment in full to B C A A l t e r n a t i v e I n c o m e F u n d L P of the Principal & Interest stated above, (the "BCA Financing") any further proceeds received by Bron Studios USA Inc under the Loan Agreement shall be distributed as follows:<br>• 34 % to Hudson Private Corp.<br>• 35 % to CWMF;<br>• 25 % to Bron Studios Inc for past and ongoing administration services; and<br>• 6 % to BCA Alternative Income Fund LP |

| | |
|---|---|
| Disposition of Gross Receipts | Disposition of Gross Receipts of the Picture shall be made pursuant to the Collection Agreement as defined in the Loan Agreement. |
| Representations and Warrants | The Parties represent and warrant that: (a) each has the full right, power and authority to enter into and perform this Term Sheet; and (b) no Party has assigned, hypothecated, encumbered or otherwise transferred (or entered into an agreement to do any of the foregoing) any rights contemplated hereunder to any other party or person. CWMF further represents, warrants and agrees that it has the ability to fully perform all of its financial obligations hereunder, and that it shall do so in strict conformity with all applicable securities laws, regulations and treaties. |
| Governing Law and Dispute Resolution: | This Term Sheet shall be governed by and interpreted in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein and the Parties hereto hereby irrevocably attorn to the jurisdiction of the courts of the City of Toronto. In the event of a dispute arising hereunder, the prevailing party shall be entitled to recover its reasonable outside attorneys' fees and costs. |
| Miscellaneous: | It is expressly agreed that this Term Sheet is an agreement between separate entities. The Parties each acknowledge that they are independent contractors and that solely by entering into this Term Sheet no partnership, joint venture, agency or employment relationship has or will be created by this Term Sheet. No Party hereto shall have the right or authority to create or assume any obligations in any other Party's name or on any other Party's behalf, whether express or implied, or act or purport to act as any other Party's agent or legally empowered representative for any purpose whatsoever, without the other Party's prior written consent in each instance. No Party shall be liable to any third party in any way for any engagement, obligation, commitment, contract, representation, transaction, act or omission to act of the other Party(ies).

This Term Sheet contains the entire understanding of the Parties relating to its subject matter and supersedes and replaces all prior agreements and understandings, written or oral. No change or modification of this Term Sheet will be binding upon any Party unless it is made by a written instrument signed by all Parties. A waiver by any Party of any provision of this Term Sheet in any instance shall not be deemed to waive such provision for the future. This Term Sheet may be executed electronically and in counterparts, all of which together shall |

|  | constitute a single Term Sheet. Signatures obtained via electronically transmitting a copy of this Term Sheet with an attached portable document file ("PDF") or electronically executed and thereafter sent by PDF shall be valid and enforceable as if signed by the that Party in person. |

[Signature page to follow]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Term Sheet as of the date set forth above by their duly authorized representatives with full rights, power and authority to enter into and perform this Term Sheet.

**BRON STUDIOS USA INC.**

By: _____

Name: Jason Cloth
Its:      Director

**CREATIVE WEALTH MEDIA FINANCE CORP.**

By: _____

Name: Jason Cloth
Its: Managing Partner_____

**BCA Alternative Income Fund LP**

By: _____

Name: Tready A. Smith_____
 Its: As Manager of BCA Alternative Income
Fund GP, LLC, General Partner of BCA
Alternative Income Fund, LP

**SCHEDULE A**

**LOAN AGREEMENT**

# LOAN AGREEMENT

This Loan Agreement (the "**Agreement**") dated May 8, 2018 ("**Effective Date**") by and between **NEEDLE IN A TIMESTACK, LLC**, a Delaware limited liability company with an office address at 153 W 27th St., Suite 204, New York, NY (the "**Borrower**"); **NEEDLE PRODUCTION SERVICES, INC.**, a British Columbia corporation, with an office address at 5542 Short St, Burnaby, B.C. V5J 1L9 ("**Designee**"); and **CREATIVE WEALTH MEDIA FINANCE CORP.**, an Ontario limited partnership, with principal offices at 151 Bloor Street West, Suite 700 Toronto, Ontario M5S 1S4, Canada (the "**Lender**"). This Agreement sets out the terms upon which Lender is prepared to make a loan to Borrower to fund production costs for the motion picture currently entitled "<u>**Needle In A Time Stack**</u>" (the "**Picture**"), based on an the short story written by Robert Silverberg and the screenplay adapted by John Ridley (the "**Screenplay**") dated March 13, 2018.

The Borrower, Lender and Designee (collectively, the "**Parties**" or "**parties**") hereby agree as follows:

## 1.   GENERAL

### 1.1   Definitions

The terms used in this Agreement or in any Note, certificate, report or other document made or delivered pursuant to this Agreement shall have the following meanings as set out in <u>Schedule A</u> hereto.

### 1.2   Schedules

The following schedules are attached to this Agreement and form an integral part hereof:

|   |   |   |
|---|---|---|
| **SCHEDULE A** | - | Definitions |
| **SCHEDULE B** | - | Chain of Title |
| **SCHEDULE C** | - | Closing Documents |
| **SCHEDULE D** | - | Approved Cash Flow Schedule |
| **SCHEDULE E** | - | Financing Plan |

## 2.   AGREEMENT TO LEND

### 2.1   Loan

2.1.1   Subject to the terms and conditions required to be satisfied hereunder, and in consideration of Borrower's and Designee's agreement, representations, warranties and covenants herein, Lender agrees to make available to the Borrower a loan in the total amount of up to <u>**USD$8,625,000.00,**</u> in US Dollars ("**Loan**"). Proceeds of the Loan, less the Loan Fee, shall be used exclusively to finance the development, pre-production, production, post-production, and delivery of the Picture in accordance with the Approved Production Budget (with producer fees and overhead fees to be approved by Lender) and the Finance Plan attached hereto at <u>Schedule E</u>.

**2.2** **Interest**

2.2.1 **Interest Rate.** Subject to the rights and recourses of Lender hereinafter, the Loan will bear interest on so much of the outstanding amount thereof as may remain unpaid from time to time at the rate of 11% compounded annually (the "**Interest**") on the total of the Loan calculated on a going-forward basis from the date of the Initial Disbursement (as hereafter defined) of the Loan to the Borrower, subject to Paragraph 2.2.1 and 2.11.1, until payment in full has been received by Lender. Except as otherwise provided herein, all interest shall be payable in arrears..

2.2.2 **Limitation on Interest.** It is the intention of the parties hereto to conform strictly to applicable usury laws under the laws of the State of New York. Accordingly, all agreements between Borrower and the Lender with respect to the Loan is hereby expressly limited so that in no event, whether by reason of acceleration of maturity or otherwise, shall the amount paid or agreed to be paid to the Lender or charged by any Lender for the use, forbearance or detention of the money to be lent hereunder or otherwise, exceed the maximum amount allowed by law. If the Loan would be usurious under applicable law, then, notwithstanding anything to the contrary in the Loan Documents: (1) the aggregate of all consideration which constitutes interest under applicable law that is contracted for, taken, reserved, charged or received under the Loan Documents shall under no circumstances exceed the maximum amount of interest allowed by applicable law, and any excess shall be credited on the Note by the holders thereof; and (2) if maturity is accelerated in accordance with the terms hereof, or in the event of any prepayment, then any consideration which constitutes interest may never include more than the maximum amount allowed by applicable law. In such case, excess interest, if any, provided for in the Loan Documents or otherwise, to the extent permitted by applicable law, shall be amortized, prorated, allocated and spread from the date of advance until payment in full so that the actual rate of interest is uniform through the term hereof. If such amortization, proration, allocation and spreading is not permitted under applicable law, then such excess interest shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the Note. The terms and provisions of this Paragraph shall control and supersede every other provision of the Loan Documents. If at any time the laws of the United States of America permit Lender to contract for, take, reserve, charge or receive a higher rate of interest than is allowed by applicable state law (whether such federal laws directly so provide or refer to the law of any state), with the effect that otherwise applicable state law is preempted, then such federal laws shall to such extent govern as to the rate of interest which the Lender may contract for, take, reserve, charge or receive under the Loan Documents, to the exclusion of applicable state law that is so preempted.

**2.3** **Loan Fees**

As consideration for Lender's entering into this Agreement and its commitment to make the Loan, Borrower shall pay to Lender a non-refundable commitment and set up fee (the "**Loan Fee**") up to the total amount of **USD$431,250.00** which amount shall be earned by Lender on a pro-rated

basis as Disbursements (as hereafter defined) under the Loan are paid by Lender. The Loan Fee shall be paid to Lender by deducting a pro-rated portion of the Loan Fee from each Disbursement made by Lender hereunder, such that once 100% of the Loan (less the Loan Fee and Interest) has been disbursed by Lender hereunder, 100% of the Loan Fee shall have been deducted from the Disbursements and paid to Lender in full. The Loan Fee shall not be included in the Approved Budget.

## 2.4 Application and Payment of Gross Receipts

The parties acknowledge and agree that, pursuant to the Collection Agreement, all Gross Receipts will be allocated and paid in the manner agreed by the Parties in the Collection Agreement.

2.4.1 Collection Account. Collection Account. Borrower and Designee shall direct all Gross Receipts received by or credited to them to one or more collection account(s) (each, a "**Collection Account**") to be managed exclusively by a collection account manager approved by Borrower and Lender (Freeway CAM B.V. is pre-approved) (the "**Collection Administrator**") pursuant to the terms of a Collection Account Management Agreement (the "**Collection Agreement**") in form and substance satisfactory to Lender.

2.4.2 Repayment Amount. Subject to the Interparty Agreement, Lender shall recoup the full Repayment Amount in first position from Gross Receipts in all territories, subject only to guild reserves, including those of SAG, DGA, and WGA, as applicable, and the following amounts if and to the extent pre-approved by Lender pursuant to the Collection Agreement: Collection Administrator fees/commissions and non-deferred sales fees and expenses.

2.4.3 Net Receipts Participation. As further consideration to Lender for making the Loan, Lender shall be entitled to receive an amount equal to 20% of 100% of Net Receipts ("**Net Receipts Participation**") as defined and paid pursuant to, and as provided in, the Collection Agreement. Notwithstanding the foregoing, Lender's Net Receipts Participation shall be defined, accounted and paid for on a "most favoured nations" basis (i.e., if Borrower), or any other participant in Net Receipts, net receipts, net proceeds, or any similar or analogous concept receives a more favourable definition, payment and/or accounting terms, Lender will also receive the benefit of such more favourable definition, payment and/or accounting terms).

2.4.4 Overages: In the event the cost of production for the Picture exceeds the Budget for any reason, the recoupment of such additional over-budget costs, including, without limitation, any related financing fees or expenses (collectively "**Additional Costs**"), by the Borrower, or any financier thereof, as applicable (but excluding interest, premiums or fees, however the same may be denominated, charged and collected by Lender pursuant to this Agreement and/or any other of the Loan Documents), shall not affect or be taken into account in relation to Lender's first position recoupment or when calculating the "**Net Receipts**" to be allocated to Lender in accordance with the Collection Agreement. Any such Additional Costs shall be notified to the Collection Administrator by the Borrower , and shall be

repaid only after full and complete repayment of the Repayment Amount due Lender hereunder.

2.4.5  Post-Production: The benefit of any post-production deals which may include in-kind or equity investments shall reduce the final negative cost of the Picture.

2.4.6  Underbudget Savings: Borrower shall pay or cause to be paid to Lender any savings from the Approved Production Budget as determined in the Interparty Agreement, or in the absence of an Interparty Agreement, directly to Lender.

## 2.5 Disbursements

2.5.1  Disbursements. Subject to Lender's satisfaction, in its sole discretion, that all conditions precedent in Paragraph 6 below have been met, Lender shall pay the following amounts, upon dates to be mutually agreed by Lender and Borrower from the proceeds of the Loan: (i) to Lender, the pro-rated portion of the Loan Fee;, and (ii) to the production account established by Producer for the sole benefit of the Picture and a certificate and payment direction in a form approved in writing by Lender and Borrower (a "**Borrowing Certificate**"), duly executed by Borrower (the "**Initial Disbursement**"), be disbursed according to the Approved Cash Flow Schedule attached hereto at Schedule D, provided that no Event of Default (as defined herein) has occurred. Each payment of proceeds of the Loan hereunder is a "**Disbursement**", and all payments of proceeds of the Loan hereunder (including the Initial Disbursement, and including any proceeds of the Loan paid to and retained by Lender) are referred to collectively as the "**Disbursements**". For clarity, all Disbursements, including the Loan Fee, shall be remitted in U.S. Dollars.

2.5.2  **Early Disbursement.** Any Disbursement made by Lender to Borrower prior to the Closing Date ("**Early Disbursement**") shall be evidenced by a Borrowing Certificate, and shall reduce the amount of the Initial Disbursement obligation by the amount of the Early Disbursement and, for clarity (a) Lender shall have no obligation to make any Early Disbursement and (b) Interest shall begin accruing on the Early Disbursement from the date of such Early Disbursement being made available to the Borrower.

2.5.3  **Conditions Precedent to Each Disbursement:**

(a)  The Borrower shall give Lender sufficient notice and indicate the amount of the requested Disbursement in US Dollars and the date of delivery of the requested Disbursement.

(b)  Lender shall have no obligation to effect any transaction relating to the Loan in any currency other than US Dollars.

(c)  Borrower agrees to execute any document which might reasonably be required by Lender including, without limitation, advance request or borrowing certificates, an authorization and direction to pay (if applicable) and demand notes, all in form and substance satisfactory to Lender.

(d)     All of Borrower's and Designee's representations and warranties herein, or otherwise made in writing in connection herewith, shall be true and correct as of the date of each Disbursement with the same effect as though the representations and warranties had been made on the date of such Disbursement.

(e)     At the date of each Disbursement, no Event of Default, and no condition, event or act which, with notice or lapse of time, or both, would constitute an Event of Default, shall exist.

(f)     At the date of each Disbursement, no order, judgment or decree of any court, arbitrator or governmental authority shall purport to enjoin or restrain Lender from making the Loans.

(g)     At the date of each Disbursement, there shall be no pending or threatened litigation, arbitration proceeding or governmental proceeding against Borrower or Designee.

## 2.6     Legal Fees

Lender reserves the right to choose its legal counsel for the purposes hereof.  A portion of the Loan Fee will be used by Lender to pay Lender's legal fees in connection with this Agreement.  The legal fees and expenses related to the preparation, revision and registration of the Security Documents (as defined herein) and to searches, if applicable, shall be at the Borrower's expense whether the Loan is completed or not.  Furthermore, the legal fees related to the opinions to be given by the Borrower's legal advisors will be at the Borrower's expense.

## 2.7     Event of Default

Lender shall have no obligation to make any Disbursements under the Loan at any time after the occurrence of an Event of Default, unless such Event of Default has been cured, to Lender's satisfaction, within the applicable time period permitted hereunder (if any).

## 2.8     No Obligation to Fund Prior to Satisfaction of Conditions Precedent

Lender shall not be obligated to provide the any Disbursement if any condition precedent in Paragraph 6 below has not been met to Lender's satisfaction.  If Lender has made any Disbursements as of or prior to the Closing Date, Interest on such Disbursements shall accrue as of the date that such Disbursements have been disbursed hereunder.

## 2.9     Promissory Note

2.9.1   <u>Execution and Delivery</u>.  Prior to Lender making the Initial Disbursement under the Loan, and as a condition thereof, Borrower shall execute in Lender's favour and deliver to Lender one promissory note (the "**Note**") in a form acceptable to Lender in the principal amount of the Loan USD $8,625,000.00.

2.9.2 <u>Balance of Note</u>. The amount and date of all Disbursements under the Loan, and all amounts paid or repaid on the Note, shall be indicated in Lender's books so that the principal balance owing from Borrower to Lender on the Note and payment of any fees, costs or expenses payable hereunder will be reflected therein; and the parties hereto agree that said balance and each entry shall be presumptive evidence that such balance exists, and that such payments were made, in the amounts written.

2.9.3 <u>Payment in Full</u>. The Note shall be marked "**cancelled**" and returned to Borrower when Borrower has indefeasibly paid the Repayment Amount to Lender.

**2.10 Default Date:**

2.10.1 Unless sooner paid, all unpaid amounts of the total amount of the Loan and any charges or other amounts owing thereon pursuant to this Agreement shall be due and payable on, and Borrower shall pay the same to Lender not later than, the date which is twenty-four (24) months from the date that the first Disbursement has been released to Borrower by the Lender (the "**Default Date**").

2.10.2 Notwithstanding the preceding, amounts outstanding under this Agreement shall immediately become due and payable pursuant to Paragraph 9.2 below.

**2.11 Additional Fees**

<u>Default Penalty – Interest Rate Increase</u>. Borrower recognizes and agrees that any default in the payment of the Loan and the Interest thereon when due hereunder will result in losses and expenses to Lender which are difficult to quantify. Therefore, Borrower agrees that in the Event of Default, in addition to any and all other rights and remedies of Lender hereunder, under the Loan Documents or otherwise at law or in equity, the Interest rate charged on that portion of the Loan principal then outstanding shall be increased from 11% compounded annually to 17%, compounded annually in arrears (or in each case, the maximum interest rate allowable by law if said rates equal or exceed the lawful maximum interest rate).

2.11.1 <u>Voluntary Prepayments</u>. At any time following the date of the Initial Disbursement of the Loan, the Borrower may, at its option, prepay all or any of the outstanding amounts under the Loan, provided, however, that any such prepayments shall also include the applicable Interest amount payable on the Loan, calculated in accordance with the terms of this Agreement.

2.11.2 <u>Mandatory Repayments</u>. The Repayment Amount shall be repaid as follows:

(a)     Until such time as the Repayment Amount is repaid in full, Borrower and Designee shall pay, or cause to be paid, directly to the Collection Account(s) all amounts paid or payable to Borrower, Designee or Sales Agent with respect to exploitation of the Picture, including without limitation, all Gross Receipts and subject to deduction of Sales Agent fees to be paid out of the Collection Account (as approved by Lender in writing), in all instances after the applicable minimum guarantees are paid, all sums payable to the

Borrower, Designee or Sales Agent under the Distribution Agreements. In addition, Borrower and Designee shall direct or contractually require that Sales Agent direct in writing all parties obligated to make payments to Borrower with respect to any of the foregoing amounts to pay such amounts to the Collection Account(s). If any Person pays any such sums to which the Borrower is entitled, directly to the Borrower or any other Person, such Borrower or such other Person, as applicable, shall receive such sums as Lender's trustee and, promptly upon receipt thereof, Borrower shall cause such Person to remit such sums (or cause such sums to be remitted) to the Collection Account(s) as set forth above.

(b) The Repayment Amount shall be repaid in full on or before the Default Date.

## 2.12 Application of Payments

2.12.1 The Collection Administrator shall be approved in writing by Lender (Freeway CAM B.V. is pre-approved). Lender shall be a named party to the Collection Agreement which shall be in a form approved in writing by Borrower and the Lender. The Collection Agreement will provide, in part, for certain monies derived from the exploitation of the Picture to be paid to Lender for the account of the Borrower which amounts shall be remitted by the Collection Administrator and/or the Borrower, as the case may be, to the Lender. For greater certainty, until the Repayment Amount has been indefeasibly paid to Lender in full in accordance with the terms hereof, irrespective of whether a Collection Agreement is fully executed and delivered by the relevant parties in respect of the Picture, the Borrower acknowledges and agrees that any and all Gross Receipts to which the Borrower is now or at any time hereafter entitled and/or which are or may at any time hereafter be received or receivable by the Borrower, shall be subject to the Security Interest of the Lender, received in trust for and on behalf of the Lender and shall be immediately upon receipt remitted to the Collection Account or if there is no Collection Account, directly to the Lender. Should the Borrower fail to honour this undertaking, Lender reserves the right to demand immediate payment of the Repayment Amount. If the Collection Administrator will not assume the obligation to pay proceeds pursuant to the Collection Agreement in the absence of a fully executed Collection Agreement (contemplating untimely execution by the guilds) and payments are received prior to a fully executed Collection Agreement, Borrower shall ensure that all payments due to Lender hereunder shall be made in accordance with Schedule F attached hereto. The parties shall endeavour to cause the Collection Agreement to provide that it is effective among the signatory parties notwithstanding that less than all parties have signed, provided that Lender, Borrower, Sales Agent(s) and any necessary guilds have signed the Collection Agreement, and provided further that each party (a "**Later Party**") that signs the Collection Agreement after it becomes effective will become a party, and have the rights and be subject to the obligations of a party, upon such party's execution and delivery of the Collection Agreement. Prior to a Later Party's signing the Collection Agreement, such Later Party shall be treated as a beneficiary (as such

term is commonly used in collection agreements) but not a party, in accordance with the provisions of the Collection Agreement relating to such Later Party.

2.12.2  Until the Repayment Amount has been indefeasibly paid to Lender in full in accordance with the terms and conditions hereof, all amounts paid to Lender hereunder with respect to the Picture by the Collection Administrator pursuant to the Collection Agreement, or by any other Person on behalf of the Borrower shall be applied by Lender to reduce the Repayment Amount in the following priority: first, to amounts payable to Lender in reimbursement of its costs and expenses pursuant to Paragraph 7.8 hereof, to the extent the same are not duly and timely paid to Lender as required by Paragraph 7.8 hereof; second, to pay Interest due pursuant to Paragraph 2.2.1 hereof; third to repayment of the outstanding principal balance of the Loan; and last, to repayment of the balance of the Repayment Amount.

2.12.3  Until the Repayment Amount is paid to Lender in full, Borrower and Designee shall, at their own expense, promptly make or shall contractually require the Sales Agent to promptly make collection, and take all legal action necessary to enforce collection, of all receipts and revenues which may be owing from the Distributors pursuant to the Distribution Agreements, or from any other Persons pursuant to any other agreements entered into by Borrower or Designee with respect to the Collateral, and shall remit all sums so collected to the Collection Account(s) or to Lender, as applicable.

## 2.13    Making of Payments: Offset

2.13.1  <u>Making of Payments</u>.  All payments which are due hereunder and which are made directly by Borrower or any other Person to Lender (as opposed to payments to Lender by the Collection Administrator) shall be made in immediately available funds by Borrower or such other Person to Lender by wire transfer to the following account:

| | |
|---|---|
| Beneficiary: | Creative Wealth Media Finance Corp.. (USD Account) 151 Bloor Street West, Suite 700 Toronto, ON  M5S 1S4, Canada, Attention: Jason Cloth |
| Intermediary Bank | None |
| Beneficiary Bank: | TD Bank |
| Branch: | 00572 |
| Account Number: | 7302102 |
| Reference | "Needle In A Time Stack" |

All payments shall be in immediately available Dollars, without any setoff, defense or counterclaim, not later than 3:00PM, Eastern Time, on the date due, as provided above; and funds received on any Business Day after that hour, or on any day that is not a Business Day, shall be deemed to have been received by Lender on its next following Business Day.

**3.     FILM PRODUCTION, REPORTING, COMPLETION, DELIVERY AND DISTRIBUTION**

Borrower hereby warrants, represents, covenants and agrees as follows:

**3.1     Budget; Cash Flow; Screenplay; Production Schedule**

Borrower represents and warrants that:

3.1.1   True and complete copies of the Budget, the Approved Cash Flow Schedule, the Screenplay, and the Approved Production Schedule and, upon request of the Lender, any agreements with any Person whose services are a requirement of any such agreements, have been or will be furnished to the Lender and such services agreements, Screenplay, Budget, Approved Cash Flow Schedule and Approved Production Schedule shall be in form and substance consistent with the provisions of this Agreement;

3.1.2   The Budget will include a minimum 10% contingency.  Deferrals, if any, to be included in the Budget will be in an amount to be mutually agreed by Borrower and Lender.

3.1.3   Any other Person having approval rights with respect thereto have approved the Budget, the Approved Cash Flow Schedule, Screenplay, and the Approved Production Schedule, and all elements with respect to which they have approval rights under this Agreement;

3.1.4   (i) The Budget includes provisions for all expenses necessary for the production of the Delivery Items in accordance with the terms of this Agreement , the Tax Pass-Through Intermediary License Agreements if any and the Distribution Agreements, and (ii) the Budget does not include provisions for the Loan Fee, or any other interest, costs, reimbursement obligations in connection with fees, taxes (if any), or fees, expenses, or other sums payable hereunder; and

3.1.5   The service agreements for the Picture with the Individual Producers, Approved Director and Key Cast require written approval by the Lender, and such agreements, once executed, are or will be in full force and effect and no party to any such agreement is in material default thereunder or shall have any accrued right of termination thereunder.

**3.2     Picture Production**

3.2.1     The Borrower shall produce the Picture and the Delivery Items in accordance with the Budget, the Approved Cash Flow Schedule, the Screenplay and the Approved Production Schedule, and in a manner consistent with the provisions of this Agreement.

3.2.2     The Borrower shall not make or permit to be made any material changes, modifications, or revisions to the Budget, the Approved Cash Flow Schedule, Screenplay or the Approved Production Schedule without the express prior written authorization of the Lender and any other Person having approval rights with respect thereto.

3.2.3     The Borrower shall not make any change in the Budget that would increase any category of the Budget by more than 5% or any change that would adversely impact the payment to Lender in full of the Repayment Amount without the prior written approval of the Lender and any other Person having approval rights with respect to such changes.

3.2.4     The Borrower shall cause the Picture and the Delivery Items, as appropriate, to strictly conform to all of the Technical Specifications and Non-Technical Specifications, pursuant to the requirements of the Interparty Agreement.

3.2.5     Subject to an Event of Force Majeure, , the Borrower shall complete principal photography for the Picture within the time and in the locations specified in the Approved Production Schedule.

3.2.6     All material decisions and fees which may affect payment to Lender of the Repayment Amount in respect to the Key Cast, Distribution Agreements, and ancillary rights licensing with respect to the Picture and/or the production entity controlling the rights in and to the Picture, shall be subject to the mutual approval of Borrower and Lender. Lender must be notified and given a reasonable amount of time (not to exceed two (2) days during production and five (5) business days during post-production and/or Delivery subject to the Interparty Agreement) to respond and give its feedback and approvals, if any.

3.2.7     If, by reason of the occurrence of an Event of Force Majeure, Delivery is or is likely to be delayed, the Borrower shall immediately upon becoming aware of the same give written notice to the Distributors providing particulars of the Event of Force Majeure and the expected delay (each, an "**FM Notice**"). Borrower shall instruct the Distributors that upon receipt of an FM Notice, the Distributor will notify each of its licensees (if any) of the matters set out in the FM Notice in accordance with the terms of the relevant Distribution Agreement and will use its reasonable endeavors to secure an extension to the deadline for Delivery of the Picture thereunder (to the extent that any such extension is given under each of the Distribution Agreements, a "**Delivery Extension**"). If, following the delivery of

an FM Notice, a Delivery Extension comes into effect, then the Delivery Date shall be extended by a period equal to the Delivery Extension.

3.2.8　If, at any point during production, Borrower is more than five (5%) over the Budget, based upon the Approved Cash Flow Schedule, or is four (4) days behind schedule based on the Approved Production Schedule, and it reasonably seems to Lender in the exercise of its good faith sound business judgment that such matter is likely to cause the Picture to not be produced within the Budget (where the delivery requirements of the Sales Agent cannot be met within the Budget), within the Production Schedule, or is likely to cause the Borrower to fail to carry out its obligations in all other respects under this Agreement in such a way as to ensure timely Delivery to the Distributors and the Sales Agent(s), and the observance of all the rights of each Distributor under one or more of the relevant Distribution Agreements ("**Completion and Delivery Requirements**"), Borrower shall give such explanations as may be reasonably required without undue delay and (if required by the Lender) shall attend one (1) or more meetings at which the producer, director or any other person concerned with the production, whose presence the Lender shall reasonably request, shall be present to discuss the matter with the Lender's representatives (provided always that no such meetings shall by reason of their place, time or frequency interfere with the production of the Picture) and shall give full consideration to the views and proposals put forward by the Lender regarding the steps to be taken to avoid or reduce such risk.

3.2.9　If after such explanations or meeting(s) the Lender shall not be satisfied, in the exercise of its reasonable good faith sound business judgment, that the likelihood of such risk arising will be avoided or adequately reduced by the steps proposed to be taken by the Borrower, or at any time it seems to Lender, in the exercise of its reasonable good faith sound business judgment, that the production is not likely to meet its Completion and Delivery Requirements, or Borrower shall at any time after such explanation or meeting fail, refuse or willfully neglect to comply with any of the material terms of this Agreement or of the Sales Agent Agreement and Lender determines in the exercise of its reasonable good faith sound business judgment that such failure, refusal or neglect is likely to cause Borrower to not meet its Completion and Delivery Requirements, Lender shall give written notice to Borrower specifying the events which the Lender believes create a risk of its inability to meet its Completion and Delivery Requirements and Borrower shall have three (3) Business Days (twenty-four (24) hours if during principal photography) from receipt of such notice to satisfy Lender that such risk does not exist.　If Lender is not satisfied with Borrower's response, the Borrower shall (i) forthwith and thereafter faithfully comply with all instructions given by the Lender with respect to the production of the Picture for the purpose of avoiding or reducing such risk or remedying such failure, refusal or neglect, including but not limited to the dismissal of any person(s) engaged in the production of the Picture other than any of the Individual Producers, provided that no such instruction shall be contrary to any contractual obligations of the Borrower in respect of the Picture previously approved in writing by the Lender, except with the consent of the third person concerned, and (ii) if requested by the Lender, place at the disposal of the Lender

the production bank accounts and all other production funds in relation to the Picture, but the Lender shall expend such funds only for the production and Delivery of the Picture as well as with respect to any monetary contractual obligations of the Borrower to third parties relating to the production of the Picture, provided such monetary contractual obligations have been made known to Lender and approved in writing by the Lender and are consistent with the provisions of this Agreement, the Budget and the Production Schedule.

3.2.10  If the Lender exercises its right to take over control of the production and/or Delivery of the Picture, the Lender shall be deemed to have been irrevocably appointed the manager and agent of the Borrower for such purpose.  The Lender shall give the Borrower written notice of its decision to take over control of the production of the Picture, as aforesaid, which notice shall specify in reasonably sufficient detail the reasons for Lender's decision, and forthwith upon service of such notice the Borrower shall place at the disposal and under the control of the Lender the production bank account(s) and all other production funds, and all persons, facilities and equipment employed and used and to be employed and used by the Borrower for the production of the Picture, and shall in all other respects required by the Lender cooperate with the Lender so that all necessary personnel, facilities and equipment will be available to the Lender, as manager and agent for the Borrower, to the extent the same is under Borrower's control, as would have been available to the Borrower had the Borrower remained in control of production of the Picture.  The Borrower irrevocably appoints the Lender its attorney-in-fact, with power to appoint other persons as attorney-in-fact, to execute such instruments in the name and stead of the Borrower after the Lender properly exercises its right to take control as aforesaid as they may consider necessary and proper in acting pursuant to this Paragraph 3.2.10 should Borrower fail to execute such documents within five (5) business days of its receipt of Lender's request therefor.  Lender agrees to observe the contractual obligations of the Borrower to third parties relating to the production of the Picture, provided that they have been made known to the Lender and approved in writing by the Lender and are consistent with the provisions of this Agreement, the Budget and Production Schedule.  Lender reserves all of its rights and remedies against the Borrower, at law or in equity, in the event of any material or substantial breach of this Agreement by the Borrower. The exercise of the rights granted to the Lender under this Paragraph 3.2.10 shall terminate if Borrower shall raise such additional funds or take such other steps as shall in the Lender's reasonable good faith sound business judgment adequately fulfill its Completion and Delivery Requirements, but without prejudice to the right of the Lender subsequently to exercise any of its rights under this Paragraph 3.2.10, if the Lender should again conclude in the exercise of its good faith sound business judgment that Borrower's ability to fulfill its Completion and Delivery Requirements is at risk.  If the Lender takes over control of production of the Picture, the Lender shall keep true and accurate records of its expenditures in relation to the Picture, and shall retain all such records, and any other documents which it may obtain in relation to its production of the Picture, for not less than two (2) years and Lender shall allow Borrower access to such documents and records at Borrower's written request.  Thereafter, if Lender desires to dispose of such

records and documents, it shall first offer them in writing to the Borrower, who in the meanwhile shall have access thereto at reasonable times for auditing purposes. If the Borrower fails to take possession of such records and documents within thirty (30) days after they are offered to the Borrower, the Lender shall have the right to destroy them.

## 3.3    Picture Credits

Lender will be entitled to an on-screen main title corporate credit; and static logo at the end of the end crawl tied to all other financiers, debt lenders or equity financiers on a "favoured nations" basis; the on-screen main title corporate credit in connection with the Picture shall be an "in association" credit which shall be on a single card in last position of the "in association" credits in the main titles of the Picture as follows:

"In association with  Creative Wealth Media." or such other entity as Lender may designate.

Additionally, Lender will have the right to designate four (4) "Executive Producer" credits for Lender's designees which credits shall be on a shared card (shared only with Lender's designees) in the main titles of the Picture (or, if there are no production credits at the beginning of the Picture, in the end titles) in an average size of type and duration no less favorable than the average size of type and duration used to accord any other producer credit on the Picture; (collectively the "Lender Credits") subject to customary distributor exclusions and restrictions.  Lender shall also receive, in the same form and position as the screen credits, Lender Credits in the billing block of all so called "paid ads", and its corporate "bug" logo on all paid ads of the Picture issued by or under the Borrower's control including but not limited to, trailers, posters, home video packaging, soundtrack albums, "one-sheets", newspaper advertising, print advertising and any other advertising and promotional materials where any other production company and/or producer credits appear (subject to customary exclusions for honorary awards), including but not limited to Borrower's credits or a full billing block appears (the "**Paid Ads**") and any ancillary products (including packaging for DVDs, soundtracks, etc.) and one-sheets, subject to customary distributor exclusions, as well as a corporate logo on any Paid Ads whenever a billing block appears.  The credit block shall be submitted to Lender for Lender's approval prior to its use.  For greater certainty, the font size and duration and all other aspects of the foregoing credits shall be no less favourable than those provided to any other "Producer" or "Executive Producer" on the Picture.

No inadvertent failure of Borrower to comply with any of the provisions of this Paragraph 3.3 shall constitute a breach of this Agreement and the rights and remedies of Lender or any third party, in the event of a breach relating to credit by Borrower, shall be limited to an action at law for damages, provided that within a reasonable time after receipt of written notice from Lender specifying a material failure to accord proper credit to Lender in accordance with this Paragraph 3.3, Borrower shall use good faith efforts to cure prospectively any such failure after the date of Borrower's receipt of such notice.  Borrower shall contractually obligate third party licensees with whom Borrower is in contractual privity to comply with the credit obligations contained herein.

## 3.4    Picture Element Changes

Except as permitted by the express terms of this Agreement Borrower shall not make, agree to

make, or permit to be made any material variation or modification in any of the elements of the Picture which are subject to approval or consent pursuant to the Distribution Agreements, the Tax Pass-Through Intermediary License Agreements or this Agreement without the prior written approval of the Lender and otherwise in accordance with terms of the Loan Documents. Notwithstanding anything herein to the contrary, the Borrower shall not replace an Approved Director, Key Cast member or Individual Producer, if applicable without the express prior written authorization of the Lender and any other Person having approval rights with respect thereto.

### 3.5 "Stop Date"; Contingent Compensation; Fees

Absent Lender's prior written consent, Borrower represents, warrants, and covenants that no actor shall be granted a "stop date" (as that term is understood in the motion picture industry) in connection with such actor's engagement for the Picture unless approved in writing by Lender. Absent Lender's prior written consent, the Borrower shall not enter into any agreement to pay any Person from the Gross Receipts any residuals (other than residual payments that are included in the Collection Agreement) profit participations, deferred compensation, contingent compensation, whether computed on the basis of the Gross Receipts, net receipts from exploitation of the Picture, or otherwise (whether in a fixed amount or computed on a percentage basis), unless all such payments are payable only from receipts of the Picture remaining after the Repayment Amount has been satisfied in full. For greater certainty, the Lender shall not have any obligation to pay any such payments to any Person.

### 3.6 Sales Agent and the Interparty Agreement

Lender shall have right of approval, in its sole discretion, of the Picture's foreign sales agent (i.e., the world excluding U.S. and Canada) (the "**Foreign Territories**") and a right of approval regarding the domestic sales agent (i.e., U.S. and Canada) (respectively, the "**Foreign Sales Agent**" and the "**Domestic Sales Agent**" and collectively, the "**Sales Agent**"), which shall include an agency acting as a Sales Agent. Lender may, in its sole discretion, condition its approval of the Foreign Sales Agent upon the proposed Foreign Sales Agent's entering into a Sales Agent Interparty Agreement with Lender and Borrower in form and substance acceptable to Lender in its sole discretion. Lender may be a party to an Interparty Agreement by and among Lender, Borrower and a third party tax credit financier, if any (as defined herein) ("**Interparty Agreement**") which sets forth the terms and conditions of the relations between the parties, including the following (for certainty, until such time as the Interparty Agreement is executed by Lender, if ever, Borrower and Designee shall be bound by the following terms):

    3.6.1    Caps on fees and expenses paid to Sales Agent. Sales Agent will be entitled to receive a capped sales agent commission and to deduct a capped marketing/sales expenses until repayment in full of the Repayment Amount. For greater certainty, if Lender has not approved any sales commissions or distribution fees or expenses in writing, Sales Agent shall not be entitled to receive any such sales commissions or distribution fees or recoup any monies out of Gross Receipts until repayment in full of the Repayment Amount to Lender.

3.6.2     Borrower shall (or shall instruct Sales Agent to) submit sales estimates that include both "high" and "low" sales estimate values (the "**Sales Estimates**"), to be pre-approved in writing by Lender, for all territories.

3.6.3     It is agreed and understood that until irrevocable and indefeasible payment to Lender of the Repayment Amount, Borrower, Sales Agent, Tax Pass-Through Intermediary or anyone acting as an agent of Borrower shall not enter into any Distribution Agreement without the prior written approval of Lender if the minimum guarantee, licensee fee or advance payable pursuant to the license for such sale is less than the "low" Sales Estimates or that provides for a requirement for a U.S. theatrical release of the Picture as a condition precedent to the payment of such minimum guarantee (each, an "**Unacceptable Distribution Agreement**"). In addition, Sales Agent shall obtain from each Distributor, concurrently with execution of its Distribution Agreement and as a precondition to such Distributor's exercise of rights, a notice and acknowledgement of assignment in a form approved in writing by Lender, signed by Distributor and requiring such Distributor to make payments to Lender.

3.6.4     It is additionally agreed and understood that, until full payment to Lender of the Repayment Amount, (1) Lender shall have the right, but not the obligation, to direct exploitation method(s) and strategy employed by Borrower, Sales Agent, Tax Pass-Through Intermediary or anyone acting as an agent of Borrower, or terminate or replace same and to account to Lender and receive Lender's approvals, pursuant to the Interparty Agreement; and (2) Sales Agent shall provide Lender with monthly reports showing the status of its licensing activities with respect to the Picture and shall provide any information with respect to such activities directly to Lender, upon Lender's request.

3.6.5     Until full payment to Lender of the Repayment Amount, Lender shall have the right to pre-approve, in writing (i) any distribution or sales agent agreement entered into by Borrower (or by Sales Agent on Borrower's behalf), subject to the terms of the Interparty Agreement; (ii) Budget; (iii) Approved Cash Flow Schedule; (iv) Production and Post-Production Schedules; (v) all sales agents, (vi) Finance Plan; and (vii) Key Cast/Crew.

## 3.7    Reporting

Until repayment of the Repayment Amount in full, on or before the 15th of each month, Borrower shall provide a reporting letter (such letter may be via email) to Lender with an update as to the progress of production, changes to the budget, post production process, sales process, market strategies or any other pertinent information with regard to the Loan (provided that nothing in this Paragraph 3.7 shall excuse the Borrower from performing its obligations under this Agreement, the other Loan Documents, and the Borrower's completion agreement, with regard to restrictions on changes to any of the foregoing matters).

**3.8     Performance and Amendment of Agreements**

3.8.1     To the best of its ability, the Borrower shall supervise and monitor the performance of and payments by each Sales Agent under its Sales Agent Agreement and all Distributors under all Distribution Agreements and the Tax Pass-Through Intermediary under the Tax Pass-Through Intermediary License Agreements.

3.8.2     Except as otherwise expressly agreed in writing by Lender, the Borrower shall not grant and shall not permit the Sales Agent to grant any Distributor access to the applicable delivery items unless and until the Distributor has paid in full its minimum guaranteed payment.

3.8.3     <u>Approvals/Consultations</u>.   Notwithstanding anything to the contrary herein, any approval or consultation rights that Lender has pursuant to this Paragraph 3 or under any Loan Documents shall cease upon payment to Lender in full of the Repayment Amount.

**3.9     Sources of Funds / Financing Plan**

The sources of funds to be used to finance the production of the Picture are set forth in the Financing Plan attached hereto at <u>Schedule E</u>.   No material changes shall be made to the Financing Plan without the prior written consent of Lender.   Furthermore, if at any time Lender deems that the sources of funds are insufficient to complete the Picture according to its Budget and Production Schedule, the Borrower, its shareholders or Designee shall, at Lender's request, find the necessary sums to cover the excess costs required to complete the Picture and shall do so, and cause such sums to be funded to the Production Account, before any other amount is advanced by Lender (and Lender shall not be obligated to advance any further amounts before such sums are funded to the Production Account).

**4.     SECURITY INTEREST AND COLLATERAL; GUARANTEE**

**4.1     Assignment of Proceeds**

To secure the repayment of the Repayment Amount (including without limitation Borrower's obligation to pay Lender its Net Receipts Participation) and the performance of its obligations to Lender, Borrower hereby assigns and grants to Lender a security interest in all right, title and interest of every kind and nature whatsoever in and to its right to Gross Receipts, and, without limiting the generality of the foregoing, (a) Borrower's rights, including all rights to receive payment, under any distribution, license, sale, presale or other agreement with any other party relating in any manner to the Picture, whether now existing or hereafter arising; and (b) Borrower's rights to receive or otherwise in connection with, any tax credit, rebate, incentive or other right, entitlement or program.   Borrower shall cause Sales Agent to furnish Lender with a fully executed copy of each Distribution Agreement promptly after its execution. The assignment to Lender hereunder is only of the benefits of the Distribution Agreements, and Lender does not assume any obligations or liabilities under any such agreement. Notwithstanding such assignment, Borrower shall continue to perform or cause to be performed all obligations under the Distribution Agreements to be performed by the Borrower.

## 4.2   Lender's Security Interest

To secure the repayment of the Repayment Amount and for Borrower's full and prompt performance of the terms and conditions of this Agreement (including without limitation Borrower's obligation to pay Lender its Net Receipts Participation) and of the other instruments, documents and agreements executed in connection herewith, the Borrower and Designee undertake to provide the following security, in form and substance satisfactory to Lender and to its legal advisors, in their sole discretion (collectively, the "**Security Documents**"):

4.2.1   a first ranking mortgage and assignment of copyright from each of the Borrower and Designee in favour of Lender in respect of the Screenplay and the Picture ("**Copyright Mortgage**");

4.2.2   a first ranking general security interest from each of the Borrower and Designee in favour of Lender ("**Security Agreements**");

4.2.3   a Laboratory Pledgeholder Agreement for each Laboratory, executed by all parties thereto other than Lender;

4.2.4   a power of attorney signed by Borrower in favour of Lender;

4.2.5   a completion and delivery guarantee from Bron Studios Inc. ("**Bron**"); and

4.2.6   any other reasonable security deemed necessary by Lender and/or Lender's legal advisors, at their own discretion, which shall be negotiated in good faith with Borrower;

(i)   Grant of Security:   Each of Borrower and Designee hereby irrevocably grants Lender a first ranking continuing Security Interest in and to all of its respective right, title and interest in and to the collateral as described in the Security Documents.   The collateral described in the Security Documents together with the rights assigned and the collateral pledged pursuant to Paragraph 4.1 above, is collectively referred to herein as the "**Collateral**".   To the extent any materials or rights in and to either Picture or any other item of Collateral are not yet in existence or not yet acquired, such materials and rights are hereby assigned and conveyed to Lender by way of present assignment of future rights.   Notwithstanding the foregoing, it is acknowledged that Borrower may grant customary liens to guilds and labs providing services on the Picture, which are listed in the definition of "Permitted Encumbrances" hereunder.   Any liens to any laboratory on the Picture shall be subject to the Laboratory Pledgeholder Agreement for such laboratory.   This Agreement shall constitute a security agreement within the meaning of the New York Uniform Commercial Code.

(ii)   Tax Credits:   Lender shall have a priority security interest in any proceeds of the Tax Credits financed by a financier of the Tax Credits, subject to the terms of the Interparty Agreement.

(iii)   Remedies:   It is acknowledged and agreed that at any time after the occurrence of an Event of Default (unless such Event of Default is cured within the applicable time period (if any)

permitted hereunder), Lender shall be entitled to exercise the remedies described herein including those described in Paragraph 9.2 hereof and to exercise any and all of the rights and remedies under the *Uniform Commercial Code*, or the applicable *Personal Property Security Act* at the time, or any other remedies pursuant to the laws of any applicable jurisdiction, which shall be available to a secured creditor after default, including, without limitation, the right of Lender to sell any and all rights in and to the Picture, in which the Borrower has an interest, which have not been sold by Borrower or on its behalf, on the terms and conditions stated therein.

### 4.3    Perfection of Security Interest

Concurrently with the execution of this Agreement, Borrower shall execute and deliver, or cause to be executed and delivered, the Security Documents and any and all other instruments which Lender may request to perfect or preserve Lender's Security Interest and to effectuate the purposes and intent hereof.

### 4.4    Authorization to File Financing Statements

Borrower hereby authorizes Lender to file *Uniform Commercial Code* Financing Statements, and Personal Property Security Registry filings, instruments or notices, in such jurisdictions as Lender may deem appropriate in order to create, perfect, or preserve its Security Interest hereunder. Lender shall provide Borrower with copies of any documents necessary for such filings. Borrower hereby agrees to do such further acts and things and to execute and deliver to Lender such additional conveyances, assignments, agreements, and instruments as Lender may require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder.

### 4.5    Guarantee

As an inducement to Lender to enter into this Agreement, Bron hereby guarantees to Lender the completion and delivery of the Picture by Borrower to any and all Distributor(s) with a Distribution Agreement for the Picture (collectively, the "**Borrower Obligations**") and the prompt and complete performance by Designee of its obligations and agreements under the Production Services Agreement (collectively, the "**Designee Obligations**"). This guarantee shall be continuing and irrevocable and, without limiting the generality of the foregoing, the liability of Bron under this guarantee shall be primary and absolute and none of the Borrower Obligations, the Designee Obligations, nor the obligations of Bron shall be (i) in any way affected by any extensions of time or modifications granted by any party in favour of another, to enforce any of the provisions of this Agreement. For clarity, this guaranty only extends to the completion and delivery of the Picture, not its financial performance.

### 5.    REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement, Borrower and Designee, as applicable, each agree, represent and warrant to Lender as follows (which agreements, representations and warranties shall survive the execution and delivery, and any termination, of this Agreement):

**5.1     Organization**

Borrower is a limited liability company organized under the laws of the state of Nevada.  Designee is a corporation incorporated under the laws of the state of New York.  Each is a legally existing entity in good standing, duly organized and existing under the laws of its jurisdiction as set forth in the preceding sentences of this Paragraph and has the power, permits and licenses and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business.  Its principal places of business and the places where its books and records are maintained are at the addresses set forth herein. It shall notify Lender immediately of any change of either its principal places of business or of the places where its books and records are maintained, and of any change in its name or organization.

**5.2     Eligibility for Tax Credits**

Borrower satisfies or will satisfy all eligibility requirements to receive the Tax Credits.

**5.3     Financial Statements**

All financial statements, information and other data regarding Borrower or Designee furnished to Lender hereunder, if any, are, in all material respects, accurate and correct, and the financial statements have been prepared in accordance with the customary standards typically applicable to similar entities in the entertainment industry and accurately represent the financial condition of the persons or companies to whom or which such statements relate. No materially adverse changes have occurred since the dates of such statements. No liabilities exist, contingent or otherwise, not shown on such financial statements.

**5.4     Corporate or Limited Liability Company Power and Authority**

It has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and to execute and deliver the Note, and all documents, instruments and agreements to be executed and delivered by it hereunder, and it has taken all corporate, limited liability company or other organizational action necessary to authorize the execution and delivery of this Agreement, the borrowing hereunder and the execution and delivery of the Note, and the other Loan Documents.

**5.5     No Conflicts**

Neither the execution and delivery of this Agreement or any other document, instrument or agreement to be executed pursuant hereto, nor the consummation of the transactions contemplated by this Agreement, nor compliance with the terms and provisions hereof or with the terms and provisions of any other Loan Document or any other instrument, agreement or document executed in connection herewith will violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency, will conflict or be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which it is a party, by which it may be bound or to which it may be subject, or will violate any provision of its articles or certificate of incorporation or articles of organization, bylaws or operating agreement, or other organizational documents.

**5.6     No Pending or Threatened Legal Actions**

There are no actions, suits or proceedings, pending or threatened, at law or in equity or by or before any governmental instrumentality or other agency concerning the Picture, the Collateral, the Borrower or Designee, or any investigation of the affairs concerning the Picture, the Collateral, the Borrower or Designee in any respect.

**5.7     Binding Obligation**

This Agreement, and the Note, and each document, instrument or agreement executed by it  and delivered to Lender hereunder, when executed and delivered pursuant hereto, will constitute legal, valid and binding obligations of it, enforceable against it, in accordance with their respective terms and conditions.

**5.8     Valid Security Interest**

This Agreement and the other instruments, agreements and documents to be executed and delivered to Lender hereunder will effect (after the proper recordation of those documents required to be recorded) a valid first priority security interest in favour of Lender in the Collateral.  The foregoing will be subject to any Permitted Encumbrances agreed by Lender hereunder.

**5.9     No Other Consent**

In connection with the execution, delivery, performance, validity and enforceability of this Agreement, and the Note or any other instrument, agreement or document to be executed and delivered hereunder, no consent of any Person, and no consent, license, approval, authorization, registration or declaration with any governmental authority, bureau or agency is required.

**5.10     Ownership**

It owns all rights, property and interests and Collateral assigned or conveyed by it to Lender hereunder and it has good and marketable title to all such property and interests free and clear of all prior Liens, except for Permitted Encumbrances.  Borrower owns all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Picture throughout the universe.

**5.11     Representations with Respect to the Picture**

The Picture as produced: (i) will be original and will not infringe upon any copyright or any literary, dramatic or intellectual property right, and to the best of Borrower's knowledge (in the exercise of reasonable diligence), will not violate the right of privacy nor constitute a libel or slander of any Person, or violate any statutory or common law rights of any kind of any Person; (ii) shall qualify for a rating from the Motion Picture Association of America, Inc. not more restrictive than "R" (unless approved by Lender in writing); (iii) shall be produced in accordance with the Budget, Production Schedule and Financing Plan and will be based upon the Screenplay, contain the performances of the Key Cast and be directed by the Approved Director. The Picture will be duly and timely delivered to the Sales Agents in accordance with the requirements of the relevant Sales Agent Agreement(s) and to the Distributors in accordance with the requirements of the Distribution Agreements, and the Borrower shall acquire all rights (including, without

limitation, all rights in and to the music to be included in the Picture) as may be required by the Distribution Agreements, and as may be necessary for the Distributors to exercise all rights granted to them under the Distribution Agreements; and (iv) the Picture will be completed and delivered and will be technically acceptable for exhibition in first class theatres in the U.S. and elsewhere.

**5.12    Location**

The Picture will primarily be filmed in the general area of the state of New York with post-production to take place in British Columbia, Canada and New York, New York, United States**.**

**5.13    Music Rights**

Neither the Borrower nor Designee nor any other Person shall enter into any agreement relating to music rights (other than with respect to music publishing or the soundtrack of the Picture if permitted under the Distribution Agreements) in connection with the Picture unless such agreement grants all rights with respect thereto for such media and duration as such rights are required under the Distribution Agreements.

**5.14    Contingent Compensation; Fees to Borrower**

Borrower shall not pay any contingent compensation (whether in a fixed amount or computed on a percentage basis) to any Person computed on the basis of the gross receipts or net profits from the exploitation of the Picture unless such amounts are paid by Borrower only from receipts of the Picture remaining after the Repayment Amount is repaid in full (excepting residuals provided for in the Collection Agreement). No deferments shall be payable by Borrower in connection with the Picture other than deferments payable from the receipts of the Picture remaining after the Repayment Amount is repaid in full. Lender shall have no obligation to make payments of any kind to any such Persons.

**5.15    No Third Party Rights**

Neither Borrower, Designee, nor any other Person has conveyed to any other Person any rights in or to the Picture (including, without limitation, the copyright and physical properties thereof and distribution rights therein) or the proceeds thereof, except as expressly acknowledged herein. Except as expressly acknowledged herein, neither Borrower, Designee, nor anyone else on their behalf) has transferred, assigned or encumbered any rights previously (or hereafter to be) acquired by Borrower with respect to the Picture or any other Collateral prior to the date hereof and will not do so after the date hereof except by way of a license of distribution rights to the Distributors. Except as expressly noted above, no Person (other than Borrower) has any rights of any kind in or to the Picture or the Collateral, except to the extent approved by Lender hereunder.  No rights, property or interests exist or will be granted to any third party which are in any way inconsistent with or adversely affect Lender's rights and Security Interest under this Agreement. Notwithstanding the foregoing Lender acknowledges that Borrower has granted customary liens to guilds and labs providing services on the Picture as included in the definition of "Permitted Encumbrances" hereunder. Any liens to labs on the Picture shall be subject to the Laboratory Pledgeholder Agreement.

**5.16    No Insolvency or Bankruptcy Proceeding**

No insolvency or bankruptcy proceedings of any nature are now pending or threatened by or against it, and except as permitted pursuant to Paragraph 5.15, above, none of the existing or future obligations of it or any other Person are or will be secured by a Lien in any collateral inconsistent with or having priority over the Security Interest granted to Lender hereunder.

**5.17    Loan Proceeds**

None of the Loan proceeds shall be used, directly or indirectly, for any purpose other than to pay for the costs of production and delivery of the Picture, and to pay amounts due to Lender hereunder.

**5.18    Timely Performance**

Borrower will duly and timely perform all of its obligations and agreements hereunder.

**5.19    Ownership of Margin Stock**

It does not presently, and will not prior to repayment in full of the Repayment Amount, own any "margin stock" (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States). Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying any margin stock, and no part of the Loan proceeds will be used, directly or indirectly, to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or to reduce or retire any Repayment Amount originally incurred to purchase or carry any margin stock within the meaning of said Regulation U.

**5.20    ERISA & Pension Obligations**

Neither it nor any member of a "controlled group of corporations" (as defined in Section 1563 of the Internal Revenue Code of 1986, as amended), nor any trade or businesses which is under common control with Borrower (as provided in Section 414(c) of the Internal Revenue Code), nor any member of any affiliated service group with Borrower (as provided in Section 414(m) of the Internal Revenue Code) now has, nor will they have prior to repayment in full of the Repayment Amount, any plan subject to Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), as amended, or any such plan to which it, any member of a "controlled group" or affiliated service group, or any trade or business under common control with it are required to contribute on behalf of its employees, including any "multiemployer plan" (within the meaning of Section 3(37) of ERISA).

**5.21    Compliance With Laws**

It has complied in all material respects with all provisions of all applicable laws and regulations, including those relating to their ownership of real or personal property, the conduct and licensing of their business, the payment and withholding of taxes, ERISA or other employee matters, safety and environmental matters.  It is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

**5.22    No Breaches**

No condition, event or act has occurred which, with notice or lapse of time, or both, would constitute a breach by it of any covenant or other term or condition of this Agreement, the Distribution Agreement or any other agreement entered into in connection with any such agreements. It is not in default under the agreements to which it is a party nor under any law or regulation applicable to the conduct of its business.

**5.23    Taxes**

All Taxes, assessments, deductions at source, income tax or annuities for which the payment thereof is guaranteed by prior claim have been paid by it and it has timely filed all tax returns and other reports which it was required by law to file on or prior to the date hereof and has timely paid all taxes, assessments, fees and other governmental charges and penalties and interest, if any, against it or its property, income, or franchise, that are due and payable.

**5.24    Distribution Agreements**

It acknowledges and agrees that it shall be bound by all such conditions and restrictions in relation to the production, delivery and exploitation of the Picture as are expressed to apply to the Distributors under the Distribution Agreements and nothing included in the Picture will breach any contract entered into by it or will cause a breach of any of the Distribution Agreements.  It will promptly convey to Lender any communication received from a Distributor under or in connection with any of the Distribution Agreements that would reasonably be deemed material to the Lender or to any Distribution Agreement. It will not terminate or agree to the termination of any of the Distribution Agreements without the prior written consent of Lender.

**5.25    Chain of Title**

Borrower: (i) owns all right, title and interest in and to the Screenplay and has all right, title and interest necessary to produce, distribute, own, exhibit and otherwise exploit the Picture throughout the universe; (ii) no material or matter used in or in connection with the Picture will infringe any copyrights, statutory or common law, or violate the rights of any third party; (iii) the Picture will be completed and delivered and will be technically acceptable to exhibition in first class theatres in the U.S. and elsewhere; (iv) it has performed all obligations under the chain of title agreements in respect of the Picture, to the full extent necessary to vest all rights in Borrower necessary for Borrower's production, completion, delivery and exploitation of the Picture; and (v) it will perform all such obligations (to the extent such obligations are due in the future) under the chain of title agreements in respect of the Picture.

**6.    CONDITIONS PRECEDENT**

Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to make any Disbursement under the Loan unless the all of the following conditions precedent, including but not limited to the following fully executed documents, instruments and agreements (each a "**Condition Precedent**" and collectively, "**Conditions Precedent**"), have been satisfied to the satisfaction of Lender and its legal advisors:

**6.1** **Deliverables to Lender**.  Lender shall have received each of the following:

6.1.1   <u>Payment of Fees.</u>  Payment in full of the Loan Fee as required hereunder.

6.1.2   <u>Advances.</u> Evidence to Lender's satisfaction that the proceeds of all production financing contemplated by the Financing Plan (other than the Loan), and the proceeds of all other sources of funds contemplated by the Financing Plan, have been advanced to the production account established by the Producer for the Picture.

6.1.3   <u>Evidence of Full Financing.</u>  Copies of all agreements evidencing all sources of funds contemplated by the Financing Plan, as well as evidence deemed satisfactory to Lender confirming all the deferments, holdbacks and/or investments under or in the Picture.

6.1.4   <u>Borrowing Certificate.</u>  The Borrowing Certificate, which shall confirm, among other things, that the representations and warranties of the Borrower and the Designee continue to be true and correct and confirm that no event of default shall have occurred and no other event shall exist that is likely to materially adversely affect the financial position of the Borrower or Designee and be accompanied by a <u>Cost Report</u> related to the Picture.

6.1.5   <u>Loan Agreement</u>.  This Agreement, duly executed by Borrower and Designee.

6.1.6   <u>Operating Agreement.</u>  If applicable, copies of the Operating Agreement and related subscription agreements in respect of the Borrower, duly executed by all parties thereto.

6.1.7   <u>Note</u>.  The Note for the Loan.

6.1.8   <u>UCC/PPSA</u>.  Reports acceptable to Lender confirming that there are no filings of record (whether in any copyright office, or any UCC filing office, or any PPSA registry, or otherwise) which indicate that another Person has rights or a Lien in any of the Collateral (other than as expressly provided for herein) which would be inconsistent with or have priority over the Security Interest granted to Lender hereunder.

6.1.9   <u>Production Services Agreement</u>.  A copy of the Production Services Agreement to which Borrower and Designee are party, duly executed by each of them.

6.1.10  <u>Power of Attorney/Authorization to Communicate</u>.  The Power of attorney signed by the Borrower in favour of the Lender to allow the Lender be privy to information regarding the Borrower.

6.1.11  <u>Laboratory Pledgeholder Agreements</u>.  A Laboratory Pledgeholder Agreement in favor of Lender with respect to the Picture for each Laboratory that holds or will hold any Picture Elements, duly executed by an authorized agent of such Laboratory, and the appropriate Person.

6.1.12  <u>Insurance Binder</u>.  An insurance binder with respect to the insurance coverage required to be obtained and maintained pursuant to Paragraph 7.13 hereof, and including certificates reflecting Lender being named as loss payee or additional insured thereunder as required pursuant to Paragraph 7.13 hereof, and evidence, in form and substance acceptable to Lender and its legal advisors, that the Borrower has compiled with the provisions dealing with insurance herein and in the Security Documents, and that the Borrower has paid the required premiums to the all applicable insurers in respect of the Picture.

6.1.13  <u>Registration of Screenplay</u>. Evidence satisfactory to Lender that the Screenplay has been registered for copyright in the United States Copyright Office.

6.1.14  <u>Security</u>.  The instruments or contracts creating the security contemplated hereunder, including without limitation, all of the Security Documents, duly executed by the Borrower and the Designee, and all other parties concerned; and (as to all of the Security Documents) the same, or filings respecting the same, which shall have been duly registered, recorded or filed in all places in the United States or elsewhere where such registration, recordation or filing is necessary and duly signified or served when such signification or service is required under the terms thereof, together with copies of the registered, recorded or filed documents, showing official evidence of such registration, recordation or filing.

6.1.15  <u>Collection Agreement</u>.  The Collection Agreement duly executed by the Collection Administrator and any other necessary Persons.

6.1.16  <u>Chain of Title Opinion/Documents.</u>  A written opinion from the Borrower's legal advisors with respect to the chain of title of the Picture and confirming that the Borrower is the owner of or has licensed all necessary copyrights and other rights to produce, complete, deliver, own, market and exploit the Picture, together with the chain of title documents for the Picture.

6.1.17  <u>Corporate Opinion.</u>  A written opinion, in form and substance acceptable to Lender and its legal advisors, from the legal advisors of the Borrower and of Designee regarding their status and capacity to perform the obligations described hereunder, including a confirmation that all the agreements related to the Picture have been duly signed and create enforceable obligations against the each of them.

6.1.18  <u>Tax Credit/Financing.</u>  A copy of the agreement with financier of Tax Credits with respect to the Tax Credits.

6.1.19  <u>Articles of Organization or Incorporation</u>.  Duly certified copies of the articles of organization or articles of incorporation, or the equivalent, of each of Borrower and Designee together with certificates of the date of filing thereof and certificates of good standing from the appropriate authorities in the jurisdictions of their formation or incorporation, as applicable, and certificates of qualification to do business in any jurisdictions in which Borrower or Designee, respectively, is required by applicable law and by the nature of its business to be qualified to do business.

6.1.20   <u>Corporate Resolutions</u>.  Duly certified copies of resolutions from Borrower's and Designee's boards of directors or members, as applicable, authorizing the execution, delivery and performance of this Agreement, as well as all of the transactions contemplated thereby, and such other documents relating thereto as Lender may reasonably request (including a duly certified copy of the borrowing by-law (if applicable) and certificates setting forth the functions and signatures of the individuals authorized to represent the Borrower and Designee in their dealings with Lender).

6.1.21   <u>Guild Subordination Agreements, Interparty Agreement</u>.   Fully executed subordination agreements with each of WGA, DGA, and SAG-AFTRA that has or requires a Lien on any of the Collateral; the fully executed Interparty Agreement; and confirmation, to Lender's satisfaction, that all residuals due and owing to applicable guilds and unions in connection with the Picture will be paid by Borrower on a timely basis and that all residuals payable in connection with the Picture have been provided in the Budget, or otherwise.

6.1.22   <u>Distribution Agreements</u>.  Copies of all Distribution Agreements entered into prior to the Closing Date, each in fully executed form and each with all exhibits, schedules, annexes and other attachments.

6.1.23   <u>Notices of Assignment</u>.  For each Distribution Agreement entered into prior to the Closing Date, a fully executed Notice of Assignment (if applicable) executed by the Distributor for such Distribution Agreement and the Borrower (or the applicable Sales Agent on behalf of the Borrower).

6.1.24   <u>Additional Documents</u>.  Any such additional documents, instruments or agreements that Lender may reasonably require to effectuate the purposes of this Agreement including, without limitation, (i) the Budget and Production Schedule of the Picture; (ii) the Approved Cash Flow Schedule; (iii) the Screenplay; (iv) all the duly signed material contracts; and (v) the Closing Documents.

6.1.25   <u>Sales Agent Interparty Agreement</u>.  If required by Lender, Interparty Agreement with Sales Agent(s) whereby Lender has the right to terminate the Sales Agent(s) in accordance with the terms of the Interparty Agreement.

6.1.26   <u>Sales Estimates.</u>  Borrower shall (or shall instruct Sales Agent to) submit Sales Estimates that include both "high" and "low" sales estimate values, to be pre-approved in writing by Lender, for all territories.

## 6.2      Corporate, Legal Proceedings

All corporate or limited liability company proceedings and all legal proceedings, and all documents, instruments and agreements executed or to be executed in connection with the transactions contemplated by this Agreement, shall be reasonably satisfactory in form and substance to Lender and its counsel.

**6.3** **Forward Currency Exchange Arrangements.**

Borrower shall have entered into arrangements satisfactory to Lender (in its sole discretion) to cover all foreign currency exchange risks for any and all amounts denominated in the Budget to be paid in a foreign currency.

**6.4** **Margin Regulations.**

No portion of the proceeds of any borrowing under this Agreement shall be used by Borrower or any of its subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, Regulation T or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**6.5** **Litigation.**

Borrower and Designee shall have disclosed all material developments which have occurred with respect to any matter prior to the Closing Date which, in Lender's opinion, is likely to adversely affect Borrower's or Designee's financial position or business, or impair its respective ability to perform its respective obligations under this Agreement or the Note.

The Loan shall be disbursed after the aforementioned general and specific provisions have been met to Lender's satisfaction. If a material change deemed unfavourable by Lender occurs in the nature of the risk inherent in the financings, Lender reserves the right to cancel the said financings at its sole discretion and to demand repayment of any sum already advanced in respect thereof.

For greater certainty, Lender shall have no obligation to provide any (or, if any Disbursements have been provided, any further) Disbursements in respect of the Loan hereunder unless and until all Conditions Precedent have been satisfied (as determined by Lender in its sole discretion). Any waiver of one Condition Precedent at Lender's sole discretion shall not be deemed a waiver of any others, and waiver in connection with any one or more Disbursements shall not be deemed a waiver in connection with any other Disbursement.

**7.** **AFFIRMATIVE COVENANTS**

Each of Borrower and Designee hereby covenants and agrees as follows:

**7.1** **General Affirmative Covenants; Deliverables.**

Each of Borrower and Designee shall:

      7.1.1    use the proceeds of the financings solely for the purposes provided for herein;

      7.1.2    carry on its business in a diligent and continuous manner;

      7.1.3    furnish to Lender the tax filings of the Borrower relating to each fiscal year within one hundred twenty (120) days of the end of the Borrower's fiscal year end;

7.1.4   furnish to Lender an audited cost report on the date that is within ninety (90) days of Delivery to each applicable Distributor or any other licensee of the Picture or such earlier period as may be requested by Lender in writing;

7.1.5   furnish to Lender, on demand and/or at the Closing Date a written account as to the amounts contributed to the Picture, as of that point in time, by each of the sources of financing in the financing structure including, without limitation, those described in Schedule E;

7.1.6   furnish to Lender, on a monthly basis and/or on demand, prior to each Disbursement and prior to each proposed release of funds under the Escrow Agreement, (i) a list of the funds receivable and priority interests with respect to the Picture, and (ii) a Borrowing Certificate duly signed by the Borrower together with a report detailing the production costs incurred for the Picture to the date of the Borrowing Certificate versus the Budget and showing that the funds available to the Borrower are sufficient to complete the Picture. Moreover, any material variance from the Budget, the Production Schedule and/or the Approved Cash Flow Schedule must be disclosed and explained in writing;

7.1.7   furnish to Lender, production reports and hot costs for the Picture on a weekly basis during principal photography of the Picture, and furnish itemized production cost statements weekly during principal photography and monthly thereafter until Delivery (including, without limitation, item by item good faith estimates of the cost to complete the Picture) together with comparisons of same to the Approved Production Budget;

7.1.8   file, by the stipulated deadlines, its income tax returns and any other documents required, as applicable, with the competent authorities for the purpose of obtaining its Tax Credits and provide Lender with a copy of the income tax filings of the Borrower within ninety (90) days of the end of its fiscal year end;

7.1.9   furnish to Lender copies of the tax returns with respect to the Tax Credits claim, the audit, the financial statements of the Borrower and the advance rulings from applicable authorities regarding the Tax Credits in form and substance acceptable to Lender;

7.1.10  ensure that all filings and collection of the Tax Credits in connection with the Picture are prepared or made by an accountant approved by Lender, in its sole discretion;

7.1.11  promptly notify Lender and provide Lender with a copy of all notices of assessment issued by tax authorities;

7.1.12  at all times, give Lender's representatives the right to inspect the Borrower's and Designee's establishments and provide access thereto, and further permit Lender's representatives to examine their books of account and other records, and take extracts therefrom and/or copies thereof;

7.1.13  maintain, at all times, insurance coverage on the property of the Borrowers against loss or damage caused by fire and any other risk as is customarily maintained by companies carrying on a similar business;

7.1.14  obtain and maintain in effect the permits and licenses required to carry on its business;

7.1.15  complete and deliver the Picture in accordance with the Completion and Delivery Requirements on or before the Delivery Date.  The Borrower shall notify Lender immediately, in writing, upon becoming aware of any cause of delay in so delivering the Picture by the Delivery Date;

7.1.16  notify Lender, without delay, of any Event of Default or any event which, following notice or the expiry of a delay, could constitute an Event of Default;

7.1.17  punctually pay all taxes, assessments, and deductions at source; and

7.1.18  provide Lender with any information or document it may reasonably require from time to time.

## 7.2    Books and Records

Until payment in full to Lender of the Repayment Amount, Borrower and Designee shall maintain true, full and complete books and records of its financial transactions with respect to its interests in the Picture in accordance with generally accepted accounting principles in the motion picture industry, and shall permit Lender (or its designee) to examine such books and records at such times during reasonable business hours as Lender (or its designee) may request, but not more than once per quarter in each calendar year (except while an Event of Default shall have occurred and be continuing), and take excerpts therefrom and make copies thereof. Until such time as payment in full of the Repayment Amount, all such books and records (or duplicates thereof) shall be maintained at its principal places of business and shall not be maintained in any other place without Lender's prior written consent. Borrower and Designee, as applicable shall furnish to Lender its compiled annual financial statements within ninety (90) days of the end of its fiscal year.

## 7.3    Statements, etc.

Until payment in full to Lender of the Repayment Amount, but not more than once per quarter in each calendar year (except while an Event of Default shall have occurred and be continuing), Borrower and Designee shall furnish, or cause to be furnished, to Lender all information in connection with the Picture as Lender may request, including, without limitation, the following:

7.3.1  copies of all statements and other financial information received by it or any Affiliated Person related to the Picture;

7.3.2  copies of all agreements (executed or otherwise) in respect of the Key Cast, Individual Producers and Approved Director entered into by Borrower, or on Borrower's behalf and copies of all correspondence relating thereto; and

7.3.3      summaries of all revenues received and income paid and payable to Borrower by Distributors or any other Person in connection with the Picture; provided however, unless Borrower has received any revenues directly itself, the statements provided to Lender by the Collection Administrator shall suffice.

During production of the Picture, Borrower shall (a) keep Lender reasonably informed as to the progress of production and the plans for continuing and completing the production and Delivery, (b) email or send to Lender by email weekly production progress reports through delivery of the Picture, (c) prepare and promptly deliver to Lender weekly itemized production cost statements (including, without limitation, item by item good faith estimates of the cost to complete the Picture) together with comparisons of same to the Approved Production Budget, and (d) promptly submit to Lender any estimates of future expenditures or statements of costs incurred or other production reports which Lender may reasonably require from time to time.

## 7.4     Reconciliation of Statements

Upon Lender's reasonable request, Borrower shall promptly furnish to Lender a reconciliation of information concerning any discrepancy with respect to any item in any summary or statement of revenues paid and payable by Borrower or any other Person, and Borrower further agrees that, if Lender in its good faith business judgment, believes that an Event of Default may have occurred, Lender shall have the right to appoint an accountant to prepare such information as Lender may require, the reasonable fees and expenses of such accountant to be borne and paid by Borrower.

## 7.5     Notice of Legal Proceedings

Borrower and Designee shall promptly give Lender written notice of all litigation, proceedings, controversies which in any way may adversely affect Lender's rights or Security Interest hereunder or under any of the documents referred to herein, or interruptions (i.e., Events of Force Majeure) in the production or distribution of, or claims materially affecting, the Picture, and/or any of Borrower's or Lender's rights with respect thereto, and, where applicable, Borrower shall appear in and defend any and all such actions and proceedings and shall obtain and furnish to Lender from time to time, upon demand, all instruments, agreements, financial statements, documents, releases and subordinations of claims or liens as Lender may require, consistent with this Agreement, to maintain the priority of Lender's Security Interest under this Agreement.

## 7.6     Corporate Existence

Borrower and Designee shall, at all times hereunder, each maintain its corporate or limited liability company existence and shall cause to be supplied, all necessary services in connection with the production, sale, distribution, exhibition and exploitation of the Picture and all necessary services required to be performed by Borrower under the Distribution Agreements, and such other distribution agreements as may hereafter be entered into by Lender pursuant to Paragraph 9.4 below.

## 7.7     Laboratory

All physical property relating to the Picture shall be deposited with a Laboratory, and a Laboratory Pledgeholder Agreement shall be duly executed by each Laboratory and delivered to Lender

promptly upon execution of this Agreement. No print, preprint, sound or other materials relating to the Picture shall be deposited at any laboratory or maintained at any place other than a Laboratory which has executed a Laboratory Pledgeholder Agreement without Lender's prior written consent. Lender acknowledges that the Borrower and the Distributor(s) may have access to such film materials, but only to the extent permitted in the Laboratory Pledgeholder Agreement.

## 7.8 Costs and Expenses

If Borrower refuses to accept the Loan from Lender and attempts to terminate this Agreement or the Loan contemplated hereunder, without Lender's written consent, Borrower shall pay all of Lender's actual out-of-pocket costs and expenses (including, without limitation, Lender's attorney's fees incurred in connection with this Agreement, including, without limitation, all costs and expenses incurred in connection with the negotiation and preparation of this Agreement and the other agreements and documents referred to herein or Lender's enforcement of its rights hereunder or under the Distribution Agreements or in connection with the realization upon any Collateral). Such costs and expenses (including, without limitation, court costs and attorney's fees) shall constitute a Disbursement hereunder (which, together with all other Disbursements, may exceed the Loan) and shall be secured and recoupable on the same terms as the Loan is secured and recoupable hereunder; provided, however, that Borrower shall pay any reasonable attorney's fees, court costs and out-of-pocket expenses incurred by Lender in connection with this Agreement immediately upon demand by Lender. At Lender's election, Lender shall have the right (and is hereby authorized by Borrower) to make additional Disbursements under the Loan (even if such Disbursements, together with all other Disbursements, exceed the amount of the Loan) for the repayment to Lender of all such amounts.

## 7.9 Performance, Copyright Registration

Borrower and Designee shall diligently and duly perform and observe all of the terms, covenants and conditions to be performed and observed by such Persons, respectively, under and pursuant to the Distribution Agreements and those distribution agreements (if any) negotiated or entered into by Lender pursuant to Paragraph 9.4 below, and shall otherwise facilitate Lender's performance of such agreements. Promptly upon execution of this Agreement, Borrower shall cause to be registered the Screenplay with the United States Copyright Office, if Borrower has not already done so, and give Lender written notice of all names and titles which the Screenplay and the Picture have had or been known by. Promptly upon completion of principal photography of the Picture, Borrower shall notify Lender in writing and, promptly after delivery of the Picture to Sales Agent, Borrower shall register (or cause to be registered) the Picture with the United States Copyright Office and deliver to Lender a fully executed Copyright Mortgage for the Picture. In addition to executing such Copyright Mortgage, Lender shall provide Borrower with copies of any documents necessary for registration of such Mortgage with the Copyright Office. Borrower hereby agrees to do such further acts and things and to execute and deliver to Lender such additional conveyances, assignments, agreements, and instruments as Lender may require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder upon being provided with an opportunity to review and comment on the same. Borrower shall also give Lender prompt written notice each time the Screenplay or the Picture acquires or becomes known by a new or different name or title.

**7.10    Indemnity**

7.10.1    Borrower shall, at all times, indemnify and hold Lender and its shareholders, officers, directors, employees, representatives and agents harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, expenses (including, without limitation, reasonable outside verifiable attorney's fees), costs, settlements, judgments or recoveries arising out of or resulting from (i) any breach of any representations, warranties, agreements or covenants made herein or under any Loan Documents to which it is a party, (ii) any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the development, production, exploitation and promotion of the Picture and transactions contemplated by this Agreement or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder (except those arising due to Lender's gross negligence, reckless or intentional misconduct, or failure to advance the Loan in accordance with the terms of this Agreement), or (iii) if there is any Event of Default hereunder, any suit or proceeding that Lender may in good faith deem necessary or advisable to institute, in the name of Lender, Borrower, Designee or any of them, against any other Person for any reason whatsoever to protect Lender's rights hereunder, or any rights granted to Lender, all of which shall be charged to and paid by Borrower and shall be secured by Lender's Security Interest in the Collateral.

7.10.2    Lender shall, at all times, defend, indemnify and hold Borrower and its shareholders, members, officers, directors, employees, representatives and agents harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, expenses (including, without limitation, reasonable outside verifiable attorney's fees), costs, settlements, judgments or recoveries arising out of or resulting from (i) any breach of any representations, warranties, agreements or covenants made by Lender herein or under any Loan Documents to which it is a party, or (ii) any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with any breach of any representations, warranties, agreements or covenants made by Lender herein or under any Loan Documents to which it is a party (except those arising due to gross negligence, reckless or intentional misconduct, or breach of this Agreement by Borrower or Designee).

7.10.3    In order to seek or receive indemnification hereunder: (a) the party seeking indemnification must have promptly notified the other of any claim or litigation to which the indemnification relates; and (b) the party seeking indemnification must have afforded the other the opportunity to participate at the expense of such other party in any compromise, settlement, litigation or other resolution or disposition of such claim or litigation.

**7.11    Further Assurances**

If Lender requests, Borrower shall (and if Lender requests, shall cause Designee to) execute and deliver, or cause to be executed and delivered, to Lender such further instruments, documents and

agreements consistent herewith as Lender may reasonably require, and shall do, or cause to be done, such further acts as Lender may reasonably require to carry out or effectuate the purposes of this Agreement and enable Lender to exercise its rights and remedies hereunder. Borrower and Designee hereby appoint Lender as Borrower's and Designee's irrevocable attorney-in-fact, with full power of substitution and with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver any and all such further instruments, documents or agreements, in Borrower's or Designee's (or any combination of the foregoing) name and on Borrower's or Designee's (or any combination of the foregoing) behalf, as Borrower or Designee (or any combination of the foregoing), respectively, shall fail to execute or deliver to Lender within five (5) Business Days after Lender's request therefor, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable.

**7.12    Notice of Events of Default**

Borrower shall give Lender prompt written notice of all Events of Default under any of the terms or provisions of this Agreement and of any changes in management, litigation, or of any other matter which has resulted in or may result in a materially adverse change in Borrower's or Designee's financial condition or operations.

**7.13    Insurance**

> 7.13.1    "Producer's Package" Coverage.  Borrower and Designee shall cause to be at all times hereunder at no cost to the Lender obtained and kept in full force and effect in amount, kind and form reasonably satisfactory to Lender and with insurers approved in writing by Lender, the following types of insurance providing such coverage as is customarily provided by such types of insurance: Negative Insurance in an amount equal to the amount of the Budget; faulty stock, camera and processing insurance; props, sets and wardrobe insurance; miscellaneous equipment insurance; property damage and liability insurance and any other insurance policies on such terms and at such times as are required under the Distribution Agreements.

> 7.13.2    Lender Named as Loss Payee Cancellation Provisions.  Such insurance policies as are enumerated in the preceding Paragraph, shall include Lender as a loss payee, and shall include a provision for the issuance to Lender of written notice of any cancellation of or material change in such insurance coverage, which written notice shall be given to Lender not less than thirty (30) days in advance of such cancellation of or material change in such insurance coverage.

> 7.13.3    Liability Insurance.  Borrower shall cause to be obtained and kept in full force and effect at all times hereunder at no cost to the Lender and keep in full force and effect and in an amount, kind and form reasonably satisfactory to Lender and with insurers approved in writing by Lender, errors and omissions insurance covering, among other things, the legal liability and defense of Borrower against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition. Such insurance shall also protect against alleged libel, slander, defamation of character and invasion of privacy. The errors

and omissions insurance shall be at least the minimum amount and a period of coverage of not less than the minimum required under any Distribution Agreement or any other third party agreement and shall not contain any exclusions unless approved by Lender.

7.13.4 <u>Naming Lender "Additional Insured"</u>. The insurance enumerated in Paragraph 7.13.3 shall name Lender as an additional insured thereunder and shall provide for the issuance of written notice to Lender of any cancellation of or material change in any such insurance coverage, which written notice shall be given to Lender not less than thirty (30) days in advance of such cancellation of or material change in such insurance coverage.

7.13.5 <u>Payment of Premiums</u>. The insurance policies (or the Certificates of Insurance reflecting that such coverage is in effect) referred to in this Paragraph 7.13 shall: (i) contain an endorsement which negates the "other insurance" clause in such policies and a statement that the insurance being provided is primary and any insurance carried by Lender is neither primary nor contributory; and (ii) be delivered to Lender. Lender shall not have any liability to pay for any premiums or calls with respect to any of the insurance policies referred to in this Paragraph 7.13.

## 7.14 Compliance with Laws

Borrower and Designee shall comply in all respects with all labor, minimum wage, overtime and child labor laws, to the extent applicable.

## 7.15 Payments from the Distributors

At all times (including, without limitation, after the occurrence of an Event of Default hereunder) prior to repayment in full of the Repayment Amount, Borrower shall supervise and monitor the performance of and payments from the Distributors under the Distribution Agreements, and shall keep true, full and complete books and records of such payments, which books and records shall be in accordance with generally accepted accounting practices in the motion picture industry. Borrower shall duly and timely pay the entire Repayment Amount payable to Lender hereunder as and when due and payable. Until full payment to Lender of the Repayment Amount:

7.15.1 Lender shall have the right to approve, at all times and in its sole discretion, all Sales Agents of the Picture, the terms and conditions of the sales agency agreement entered into with each Sales Agent and the sales estimates for the Picture, it being understood that Lender will have the right to approve all commissions payable to such approved Sales Agent and the maximum distribution expenses payable to such approved Sales Agents.

7.15.2 Borrower will require each Sales Agent to furnish to Lender, on a monthly basis and/or on demand, a report on all sales concluded and all potential sales with respect to the Picture; together with an executed copy of all contracts regarding such sales.

7.15.3 Borrower will require each Sales Agent, and each Sales Agent shall agree in writing with the Lender or for the benefit of the Lender, to take all customary actions to minimize the withholding taxes on sales concluded in connection with the Picture.

7.15.4 Lender shall have the right, at all times and in its sole discretion, to terminate and replace any Sales Agent if such Sales Agent is in material uncured default under its Sales Agent Agreement, in accordance with the terms thereof, or under any agreement entered into between such Sales Agent and Lender. Lender shall have the right to hire or have hired on behalf of the Borrower, any replacement Sales Agents in connection with the Picture.

7.15.5 Borrower and/or the applicable Sales Agent shall obtain the approval of Lender, which approval may be given or withheld by Lender in its sole discretion, before concluding any sales for an amount lower than the amount of the minimum sales estimates provided in the Sales Agent Agreement to which such Sales Agent is party, which minimum sales estimate shall be approved by Lender, in its sole discretion.

7.15.6 The Sales Agent shall agree to take all required actions to minimize the withholding taxes on sales concluded in connection with the Picture.

## 7.16 Notices of Assignment

7.16.1 Borrower shall obtain (or shall cause Sales Agent to obtain) from each Distributor, currently with such Distributor's execution of its Distribution Agreement (after the date hereof) and as a precondition to such Distributor's exercise of rights thereunder, a Notice of Assignment, in form and substance acceptable to Lender and its counsel, signed by such Distributor requiring such Distributor to make payments to the Collection Account as provided herein and therein.

## 7.17 Loan Assignment Note and Notice of Assignment

Borrower shall execute a promissory note(s) in the same form and substance as the Note, which cancels and supersedes the Note and a notice of assignment, or a portion of the Loan, if and when the Loan and all the Loan Documents are assigned to a third party by Lender.

## 7.18 Foreign Exchange

Borrower assumes all risks associated with exchange rate fluctuations between the Dollar and any currency other than the Dollar. Without limiting the generality of the foregoing, Borrower assumes the risk that (i) to the extent that any of the costs of production of the Picture are to be paid in a currency other than Dollars, the Loan proceeds may be inadequate to pay all of the costs of production of the Picture due to changes in the exchange rates between the Dollar and the currency or currencies which are to be used to pay the costs of production of the Picture, (ii) to the extent that one (1) or more of the Distributors makes payment to Lender in a currency other than Dollars, the total of all payments made to Lender by the Distributors may not be sufficient to repay the Repayment Amount in full, and (iii) the value of any currency other than the Dollar (whether such currency is to be used to pay costs of production of the Picture or to repay the Repayment Amount)

may decline relative to the Dollar. Borrower shall, upon demand by Lender, hedge such currency risks arising out of the provision in the Approved Cash Flow Schedule for foreign currencies as are identified in such demand through forward purchases of foreign currencies, and the Financing Plan will provide for such hedging of foreign currency risk as is necessary to address the funding of all amounts of foreign currencies in the Approved Cash Flow Schedule. For purposes of this Paragraph, "foreign currency" means any currency other than the United States Dollar.

### 7.19   Taxes and Other Liabilities

Each of Borrower and Designee shall pay and discharge, before the same become delinquent and before penalties accrue thereon, all Taxes, assessments and governmental charges upon or against it or upon its income or profits or upon any of its properties and all its other liabilities at any time existing and shall pay all governmental charges at any time payable or ruled to be payable with respect to the existence, execution or delivery of this Agreement or the other Loan Documents by reason of any existing or hereafter enacted federal, provincial or state statute.

### 7.20   Compliance

Borrower and Designee shall comply with all laws, rules and regulations relating to the production, completion, delivery and exploitation of the Picture, or to the Collateral, or to the Borrower or Designee, and shall pay prior to delinquency all license fees, registration fees, taxes, guild or union pension, health and welfare payments, supplemental market, reuse and other required payments and assessments and all other charges, including without limitation non-governmental levies or assessments, which may be levied upon or assessed against, or which may become a lien on, the ownership, operation, possession, maintenance, exploitation, exhibition or use of, the Collateral, or which create or may create a lien upon the Collateral, or any part thereof. Borrower and Designee, as applicable, shall pay prior to delinquency all required guild or union residual payments arising with respect to the Picture.

### 8.   NEGATIVE COVENANTS

### 8.1   Written Consent

Borrower hereby covenants and agrees that, as long as this Agreement is in effect and until Borrower's obligations to Lender hereunder are fully discharged, the Borrower and Designee will not, without first having procured Lender's written consent:

8.1.1   terminate, amend, alter or modify, or consent to or permit the termination, amendment, alteration or modification of, the Distribution Agreements or any other material agreement referred to herein or secured by Lender's Security Interest hereunder in any manner, or enter into any other agreement, that would adversely affect or lessen any of the rights granted to Lender under this Agreement, or under any instruments, documents or agreements executed by Borrower in connection herewith;

8.1.2   merge with another company, wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in all or substantially

all of its properties and assets, or change its corporate or trade name or modify its corporate existence;

8.1.3    create, assume or suffer to exist any Lien of any kind upon the Collateral (other than Permitted Encumbrances);

8.1.4    substantially change the nature of its operations or business;

8.1.5    change, or suffer a change of, the ownership of the Borrower or Designee, which is currently reflected in the constating documents to be provided by Borrower and Designee to Lender as a condition precedent to the advance of the Loan hereunder;

8.1.6    declare or pay dividends on its shares/units, purchase or redeem its shares/units or otherwise reduce its capital;

8.1.7    grant loans to its officers, directors or shareholders other than in the ordinary course of business; or

8.1.8    grant a loan or an investment or provide financial assistance to a third party by way of a guarantee or otherwise other than in the ordinary course of business.

## 8.2    Use of Funds

Borrower shall not use any funds disbursed by Lender under the Loan for any purpose or thing other than to pay the costs of production of the Picture in accordance with the Approved Production Budget and to fund the fees specified herein.

## 8.3    Entry into Distribution Agreements

Expressly subject to Paragraph 3.6 above, Borrower shall not (and shall not permit any Sales Agent to) enter into (i) any Unacceptable Distribution Agreements, (ii) or, if no Sales Estimates have been approved by Lender in writing, any Distribution Agreement), or (iii) any other agreements (including without limitation any intermediary license agreements, whether in the nature of tax pass-through intermediary license agreements or otherwise) for the distribution or exploitation of the Picture whatsoever which have not been previously approved in writing by Lender (which approval may be granted or withheld in Lender's sole and absolute discretion).

## 9.    EVENTS OF DEFAULT

## 9.1    Specified Events of Default

Each of the following hereby constitutes and is referred to herein as an "**Event of Default**":

9.1.1    Borrower's or Designee's failure to make (or cause to be made) payments of principal, interest, fees or any other amount which may become payable hereunder or under any of the Security Documents or other agreements or documents provided for herein, including, without limitation, payment in full of the Repayment Amount as and when due and payable hereunder;

9.1.2    any failure by Borrower or Designee to maintain (or cause to be maintained) in full force and effect the insurance policies required pursuant to Paragraph 7.13 hereof for the full periods required by Lender;

9.1.3    default by Borrower or Designee in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations contained in this Agreement, the Note or in any other agreement relating to the Loan or the Picture;

9.1.4    failure by Borrower or Designee to perform or observe, in a due and timely manner, any of the other terms, provisions, covenants, conditions, agreements or obligations contained herein or in any other agreement, contract, indenture, document or instrument executed, or to be executed or delivered, by Borrower or any other Person in connection with this Agreement or pursuant hereto;

9.1.5    the material falsity of any financial statement given to Lender by Borrower or Designee, or of any representation or warranty made by Borrower or Designee or any other Person in writing in or in connection with this Agreement or in or in connection with the instruments, documents and assignments to be executed by Borrower, Designee or any other Person pursuant hereto;

9.1.6    the default by any party of any obligation under the Production Services Agreement;

9.1.7    the default by any third party in such party's observance or performance of any material term, covenant, condition, warranty or representation made or agreed to in any agreement referred to herein (including, without limitation, the Loan Documents, and/or any Distribution Agreements), that, in Lender's good faith business judgment, would adversely affect or lessen any of the rights granted to Lender under this Agreement, or under any instruments, documents or agreements executed by Borrower or any other Person in connection herewith;

9.1.8    the suspension by Borrower, Designee or any Sales Agent of any of their respective business operations which suspension would in any way materially and adversely affect Lender's rights and Security Interest hereunder or under any documents referred to herein;

9.1.9    the issuance or levy of any warrant of attachment, execution or other writ on the proceeds payable pursuant to any agreement referred to herein or any agreement rights under which are included in the Collateral or which is secured by Lender's Security Interest or Borrower fails to post (or cause to be posted) an indemnity bond for the maximum liability pursuant to any such attachment, execution or other writ;

9.1.10   if Borrower: (i) becomes insolvent or is unable to pay its debts as they mature (including, without limitation, the Repayment Amount), (ii) makes an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its properties or assets, (iii) files a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors,

(iv) files an answer admitting the jurisdiction of any court and the material allegations of an involuntary petition filed pursuant to any applicable United States laws (or the laws of any other applicable country) relating to bankruptcy or reorganization, (v) joins in any such petition for an adjudication or for a reorganization or other arrangement, (vi) becomes or is adjudicated a bankrupt under the laws of any jurisdiction, (vii) applies for or consents to the appointment of a receiver or trustee for itself or for any of its properties, assets or business, (viii) allows an order to be entered against it pursuant to any applicable laws of the United States (or the laws of any other applicable country) relating to bankruptcy or reorganization, (ix) allows a receiver or a trustee to be appointed otherwise than on its own application or consent for all or a substantial part of its properties, assets or business; or (x) becomes party to a process of execution enforced or levied by a third party on the property of the Borrowers or any part thereof;

9.1.11 if there exists or occurs any event or condition which, in Lender's good faith business judgment (exercised in Lender's sole discretion), is an Event of Default or which would have a material adverse effect on Borrower's or Designee's ability or obligation to perform their respective obligations under this Agreement and under the other documents, agreements and instruments to be executed pursuant hereto;

9.1.12 if a final judgment or judgments for the payment of money is entered or affirmed by a court against Borrower or any Affiliated Person from which no further appeal may be taken, and such party does not discharge the same or provide for its or their discharge in accordance with its or their terms or procure a stay of execution thereof within thirty (30) days from the date of entry thereof;

9.1.13 if any Loan Document ceases to be in full force and effect or the occurrence of a default thereunder not otherwise caused by Lender; or

9.1.14 if Lender receives from any present or future guarantor of all or any of the Borrower's obligations a notice proposing to terminate or limit such guarantor's liability under its guarantee.

## 9.2   Remedies

Upon the occurrence of any of the Events of Default expressly set forth in Paragraph 9.1.10, all amounts owed hereunder, including the entire Repayment Amount, shall immediately and without notice become due and payable, including without limitation, Lender's actual, direct, third party legal fees, costs, and expenses incurred by Lender in connection with such Event of Default.  At Lender's option, upon the occurrence of any other Event of Default, and at any time thereafter while such Event of Default is continuing, Lender may elect that all amounts owed hereunder, including the entire Repayment Amount, shall immediately and without notice become due and payable, including without limitation, Lender's actual, direct, third party legal fees, costs, and expenses incurred by Lender in connection with such Event of Default.  Upon the occurrence of

any Event of Default, and at any time thereafter while such Event of Default is continuing, Lender shall be entitled to exercise any or all of the following additional remedies,:

9.2.1   the Borrower shall not be entitled to receive any further Disbursements;

9.2.2   Lender may charge the Borrower reasonable analysis, administration and follow-up charges and may also incur and pay any reasonable amount for services rendered (including the fees for legal counsel, accountants or any other professional whose services may be required or deemed necessary) with respect to the realization, sale, transfer, delivery or payment to be made in the exercise of any security held by Lender and may withhold such charges and fee amounts from the proceeds of the realization on its Security Interest;

9.2.3   any amount collected or received by Lender, including the balance of any proceeds of the realization on its Security Interest, may be withheld by Lender and may, at Lender's discretion, be applied to any portion of the Borrower's indebtedness to Lender;

9.2.4   Lender shall be entitled to exercise, with respect to the Collateral, all of the rights and remedies available to a secured party upon default under the applicable *Uniform Commercial Code* or the applicable *Personal Property Security Act* at the time which shall be applicable for the purpose of establishing the relative rights of Lender, Borrower, as applicable, and under procedures to be followed in the event this Paragraph becomes operative, including, without limitation, the right to sell the Collateral or any portion thereof and, in addition thereto, the rights and remedies provided for herein and such other rights and remedies as may be provided by law or in equity.

9.2.5   Lender may require Borrower to assemble the Collateral and make it available to Lender at a place or places to be designated by Lender.

9.2.6   Lender may, in its sole discretion, in its name or in the Borrower's name, or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement reasonably deemed desirable with respect to, any of the Collateral, but Lender shall be under no obligation to do so, Lender shall consult with Borrower with regard to such matters, provided that in all cases Lender's decision shall be final. Lender may extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting the liability of, Borrower. Lender will not be required to take any steps to preserve any rights of or against any Person which in any way relate to the Collateral. If Borrower fails to make payment or take any action required under this Agreement, or any Loan Document, Lender may make such payments and take all such actions as Lender reasonably deems necessary to protect Lender's security interests in the Collateral or the value thereof, and Lender is hereby authorized (without limiting the general nature of the authority conferred herein) to pay, purchase, contest or

compromise any Liens which in Lender's good faith judgment appear to be equal to, prior to or superior to Lender's security interests in the Collateral.

9.2.7   Lender may, without notice or demand or legal process, enter upon any premises, or wherever any portion of the Collateral may be, and take possession of the Collateral together with all additions and accessories thereto; demand and receive such possession from any Person who has possession thereof; remove, keep and store the Collateral or any position thereof, or put a custodian in charge thereof; and take such other measures as it may deem reasonably necessary or proper for the care or protection thereof.  If Lender is held by any court to have any duty contrary to the foregoing, such duty shall be limited to the Collateral in the possession of Lender and shall consist only of such duties as are provided for in Section 9-207 of the Uniform Commercial Code.

9.2.8   Lender may, with or without taking possession thereof, sell or cause to be sold all or any portion of the Collateral, at such commercially reasonable price or prices as Lender, in its sole and absolute discretion, shall determine, and for cash or on credit or for future delivery, without assumption of any credit risk, at any public or private sale, without demand of performance or notice of intention to sell or of time or place of sale; provided, however, that unless the Collateral in Lender's possession is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give Borrower reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or other intended disposition thereof is to be made. The requirement of reasonable notice shall be met if notice of the sale or other intended disposition is delivered or mailed, by registered mail, postage prepaid, to Borrower as set forth in this Agreement or such other address as Borrower may have furnished to Lender as provided herein, at least ten (10) Business Days prior to the time of such sale or other intended disposition. The purchaser at any such sale (including, if applicable, Lender) shall hold the property sold absolutely free from any claim or right of whatever kind including, without limitation, any equity of redemption, and Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereafter enacted. Any public or private sale of the Collateral or any part thereof shall be held at such time or times within ordinary business hours and at such place or places as Lender may fix in the notice of such sale. At any such sale, the Collateral, or any portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as Lender may (in its sole discretion) determine and, if permitted by law, Lender may bid (which bid may be, in whole or in part, in the form of cancellation of, or credit in reduction of, Repayment Amount) for and purchase the Collateral or any portion thereof for the account of Lender. Lender shall not be obligated to make any sale of the whole or any part of the Collateral if it determines not to do so, regardless of the fact that notice of sale of the Collateral has been given. Lender may, by announcement at the time and place fixed for sale, without prior notice or publication, adjourn any public or private sale of the Collateral or cause any such sale to be adjourned from time to time, and such sale may, without further notice, be made at the time and

place to which it was so adjourned. In case a sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by Lender until the sale price is paid by the purchaser or purchasers thereof; provided, however, that Lender shall not incur any liability in case any such purchaser or purchasers fails to pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again.

9.2.9   Any laboratory which has possession of any of the Collateral is hereby constituted and appointed by Borrower as pledgeholder for Lender and Lender may authorize each such pledgeholder to sell all or any portion of the Collateral upon Lender's order and direction, and Borrower hereby waives any and all claims for damages, or otherwise, for any action taken by such pledgeholder.

9.2.10  Lender shall be entitled to the appointment of a receiver to take possession of all or any portion of the Collateral and to exercise such powers as the court may confer upon the receiver, and Borrower hereby waives, to the fullest extent permitted by law, notice and the right to receive notice of any application by Lender for such appointment; provided, however, that Lender shall use reasonable efforts to send Borrower a courtesy notice of such application; provided, however, that Lender's failure to send such notice shall not affect Lender's rights under this Paragraph or elsewhere hereunder or constitute a breach of this Agreement by Lender, and provided further that, notwithstanding any such application or appointment, Lender shall be entitled to apply, without notice to Borrower, any cash or cash items constituting Collateral in Lender's possession to payment of Borrower's Repayment Amount under this Agreement and payment to Lender of its Net Receipts Participation, the Note and the other Loan Documents.

9.2.11  Upon any sale of any item of Collateral by Lender hereunder (whether by virtue of the power of sale herein granted, pursuant to judicial process or otherwise), a receipt issued by Lender or the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of such item or items of Collateral so sold, and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid to Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

9.2.12  Lender or any holder of the Note is hereby authorized at any time and from time to time, without notice to Borrower (any such notice being expressly waived by Borrower), to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, including, without limitation, any certificate of deposit, and any other amount at any time owing by Lender or such holder of the Note to or for Borrower's credit or account against any and all of Borrower's then-due Repayment Amount now or hereafter existing under this Agreement, the Note or any other Loan Document (including, without limitation, any Repayment Amount due by reason of any acceleration hereunder), irrespective of whether or not Lender or such holder of the Note has made any demand under this Agreement, the Note or any other Loan Document. Lender agrees to promptly notify Borrower after any such setoff and application. Lender's rights under this

Paragraph 9.2.12 are in addition to any other rights and remedies (including, without limitation, other rights of setoff) which Lender may have.

9.2.13 Subject to the terms of the Completion Guaranty, Lender may, but shall not be obligated to, take over the production of the Picture. If the Lender takes over production of the Picture, subject to existing third party agreements (including the Sales Agent Agreement(s) and the Distribution Agreements), Lender may substitute personnel, cut, edit, score and make such changes in the Picture as it may desire, abandon production of the Picture, and be free of any obligation to make any payment in any such event of any fee payable to Borrower in connection with the production of the Picture. Borrower hereby agrees to waive any right to claim that it sustained any loss or damage by reason or as a result of any action taken by Lender pursuant to this Paragraph 9.2.13.

9.2.14 Lender may, at its option, engage others to exercise or discharge any of its rights or obligations hereunder. The amounts payable to such others by Lender shall be recoupable by Lender and secured as provided in Paragraph 7.8 hereof.

## 9.3    Cure Period

With respect to the Events of Default set forth in Paragraphs 9.1.1 (except as to any payment of principal on the Loan), 9.1.3, 9.1.4, 9.1.6, or 9.1.11 above, if such an Event of Default is capable of cure, Borrower shall have a period of ten (10) business days after receipt of written notice of such Event of Default within which to cure any such Event of Default, except if the Event of Default is that the Borrower has exceeded the Approved Production Budget, or has fallen behind the Approved Production Schedule, in each of which cases no cure period is applicable.

## 9.4    Attorney-in-Fact

Should an Event of Default occur hereunder, each of the Borrower and Designee hereby irrevocably designates, constitutes and appoints Lender as its true and lawful attorney-in-fact with full power of substitution and with full and irrevocable power (which power shall be deemed coupled with an interest), in such party's place and stead and in either such party's or Lender's name: (i) to lease, license, sell or otherwise dispose of any rights such party may have in or to the Picture (or to engage others to do so with the costs and expenses thereof to be recoupable by Lender as provided in Paragraph 7.8 hereof); (ii) to negotiate such lease, license, sale or other agreements and to enter into such agreements on such party's behalf on such terms and conditions as Lender deems appropriate; (iii) to renegotiate the Distribution Agreements or such other agreements as Lender has a Security Interest in as Lender in its sole and exclusive discretion deems proper; (iv) to require, demand, collect, receive, settle, adjust and compromise, and to give acquittances and receipts for, the payment of any and all monies payable pursuant to the Distribution Agreements or such other agreements as Lender has a Security Interest in and such licenses and agreements as Lender may enter into as provided in this Paragraph; (v) to file any claims or proofs of claim, and to commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender advisable for the purpose of collecting or enforcing payment of any such monies; (vi) to endorse any checks, drafts or other orders or instruments for the payment of monies payable to such Borrower which shall be issued with respect to such monies; (vii) to execute any and all such

instruments, agreements or documents as may be necessary or desirable in the premises; and (viii) to apply any receipts so derived as provided herein. However, Lender shall not be obligated to make any demand or present or file any claim or take any action authorized hereby. If Lender requests, Borrower shall deliver to Lender all materials, books, records, documents and things of any nature required by Lender in the exercise of its rights hereunder. Thereafter, unless Lender requests Borrower to do otherwise, Borrower shall continue to perform, and such other Persons shall continue to be obligated to perform, their respective obligations in accordance with the Distribution Agreements and any other agreements entered into by them prior thereto and all other agreements thereafter entered into by Lender pursuant hereto.

### 9.5 Waiver, Omission

Lender may grant delays, accept or waive security, accept arrangements, grant releases and discharges and transact with the Borrower as it shall deem acceptable without in any way limiting the responsibility of the Borrower and/or Designee or infringing on the rights of Lender under the security provided for hereunder.

The omission on the part of Lender to notify the Borrower and/or Designee of any Event of Default hereunder or to avail itself of any of its rights hereunder shall not be construed as a waiver by Lender to take recourse in the event of such Event of Default or to exercise its rights.

### 10. SPECIAL PROVISIONS

### 10.1 Premiere & Festivals

Borrower shall procure Lender six (6) complementary invitations to all premieres of the Picture in Canada and the United States of America (at Lender's discretion) and all major film festival screenings of the Picture.

### 10.2 DVD & BluRay

Borrower shall provide Lender, for personal use only, with four (4) DVDs (BluRay, if available) or digital download to own copies (if available) of the Picture when promotionally available.

### 10.3 Publicity and Announcements

Any public disclosure or announcement by Borrower with regard to Lender or this Agreement must be approved in writing by Lender prior to issue, with Lender's meaningful consultation and prior written approval to be obtained prior to any such disclosures and announcements.

### 11. MISCELLANEOUS

### 11.1 Notices

All notices, requests, demands or other communications to the parties hereto shall be in writing and shall be deemed to have been received by the party to which sent within one (1) day after being sent by fax, email or overnight courier or five (5) days after being sent by mail, and shall be addressed to Lender, Borrower, Designee or Bron at the following addresses:

LENDER

Creative Wealth Media Finance Corp.
151 Bloor Street West, Suite 700
Toronto, ON  M5S 1S4
Canada

Attention:      Jason Cloth
Fax:            905-947-9654

Attention:  Catharine Piccioli
Email:  catharine.piccioli@cwmoviefund.coa


With a courtesy copy to:

Goodmans LLP
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7
Canada

Attention:      Tara Parker
Email:          tparker@goodmans.ca

BORROWER

Needle In A Timestack, LLC
1728 Whitley Avenue
Los Angeles, CA 90028

Attention:      Aaron L. Gilbert
Email:          agilbert@bronstudios.com

With a courtesy copy to:

c/o Bron Studios
5542 Short Street
Burnaby, BC  V5J 1L9

Attention:      Business Affairs
Email:          biz_affairs@bronstudios.com

DESIGNEE

Needle Production Services BC Inc.
5542 Short Street,
Burnaby, British Columbia V5J 1L9

Attention:    Aaron L. Gilbert
Email:        agilbert@bronstudios.com

With a courtesy copy to:

c/o Bron Studios
5542 Short Street
Burnaby, BC  V5J 1L9

Attention:    Business Affairs
Email:        biz_affairs@bronstudios.com

## 11.2    No Waiver; Amendments in Writing

Except as expressly provided herein to the contrary, no failure of, nor any delay on the part of, the Lender in exercising any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, preclude any other or further exercise thereof, or the exercise of any other right, power or privilege; nor shall any waiver by the Lender of any right, power, privilege or default hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any other default of the same or of any other term or provision. All rights and remedies provided herein are cumulative and not exclusive of any rights or remedies otherwise provided by law or at equity.  No amendment to, or modification or waiver of, or consent with respect to, any provision of this Agreement or the Note shall be effective unless in writing and signed and delivered by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

## 11.3    Taxes

Any and all payments (including payments of principal, interest and all fees) by the Borrower or Designee hereunder shall be made free and clear of and without deductions for any and all present or future taxes and other taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, taxes imposed on the Lender's income or measured by the overall net income or gross receipts of the Lender, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "**Taxes**").  If the Borrower, Designee, any Sales Agent or any Distributor, shall be required by law to deduct any Taxes (other than with regard to foreign and/or U.S. withholding taxes, which, for greater certainty, shall not be applicable to the Repayment Amount) from or in respect of any sum payable hereunder to the Lender: (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Paragraph 11.3) the Lender receives an amount equal to the sum it would have received had such deductions not been made; (ii) the

Borrower shall make such deductions; and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

## 11.4 Governing Law

11.4.1 Governing Law. The validity, construction, enforcement, interpretation and performance of this Agreement, and the obligations arising hereunder, and any claim, controversy or dispute arising under or related hereto, the transactions contemplated hereby or the rights, duties and relationship of the parties hereto, shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in the State of New York, without regard to the principles thereof regarding conflict of laws (other than Section 5-1401 of the New York General Obligations Law, which shall apply), and any applicable laws of the United States of America.

11.4.2 VENUE. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS MAY AT THE LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND EACH PARTY WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

11.4.3 TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, WHICH CANNOT BE WAIVED, BORROWER HEREBY WAIVES AND COVENANTS THAT BORROWER WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE SUBJECT MATTER HEREOF, THE NOTE, OR ANY LOAN DOCUMENTS, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING OR WHETHER IN CONTRACT OR IN TORT OR OTHERWISE.

11.4.4 Nothing in this Agreement shall be deemed to apply to or limit Lender's right to (i) to exercise self-help remedies such as (but not limited to) setoff, (ii) foreclose judicially or nonjudicially against any real or personal property collateral, or to exercise judicial or nonjudicial power of sale rights, (iii) obtain from a court provisional or ancillary remedies (including, without limitation, injunctive relief, a writ of possession, prejudgment attachment, a protective order or the appointment of a receiver), or (iv) pursue its rights against any Person in a third-party proceeding in any action brought against Lender (including, without limitation, actions in

bankruptcy court). Lender may exercise the rights set forth in this Paragraph, during or after the pendency of any court proceeding.

**11.5     Guarantors**

11.5.1  To the fullest extent permitted by applicable law, each of Bron and Designee (each, a "**Guarantor**"), (a) as to its respective obligations under Paragraph 4.5 hereof, and (b) to the full extent any other of its obligations hereunder or under any other Loan Document may constitute obligations in the nature of a guarantee, waives all rights and defenses of sureties, guarantors, accommodation parties and/or co-makers and agrees that its obligations hereunder and under each Loan Document to which such Guarantor is a party shall be primary, absolute and unconditional, and that its obligations hereunder and thereunder shall be unaffected by any of such rights or defenses, including:

11.5.2  the unenforceability of any Loan Document against Borrower and/or any Guarantor;

11.5.3  any release or other action or inaction taken by the Lender with respect to the Collateral, the Loan, Borrower and/or the other Guarantor or any other guarantor or surety, whether or not the same may impair or destroy any subrogation rights of any Guarantor, or constitute a legal or equitable discharge of any surety or indemnitor;

11.5.4  the existence of any collateral or other security for the Loan, and any requirement Lender pursue any of such collateral or other security, or pursue any remedies it may have against Borrower and/or any other guarantor, including the other Guarantor;

11.5.5  any requirement that Lender provide notice to or obtain a Guarantor's consent to any modification, increase, extension or other amendment of the Loan, including the guaranteed obligations;

11.5.6  any right of subrogation (until payment in full of the Repayment Amount, including the guaranteed obligations, and the expiration of any applicable preference period and statute of limitations for fraudulent conveyance claims);

11.5.7  any defense based on any statute of limitations;

11.5.8  any payment by Borrower or any guarantor to the Lender if such payment is held to be a preference or fraudulent conveyance under bankruptcy laws or the Lender is otherwise required to refund such payment to Borrower or any other party; and

11.5.9  any voluntary or involuntary bankruptcy, receivership, insolvency, reorganization or similar proceeding affecting Borrower or any of its assets, or any guarantor or any of its assets.

Each Guarantor further waives any rights and defenses that are or may become available to Guarantor by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code. As provided below, the laws of the State of New York shall govern the validity, construction, performance and effect of this Agreement. The waivers set forth in this grammatical paragraph are included solely out of an abundance of caution, and shall not be construed to mean that any of the referenced provisions of California law are in any way applicable to either Guarantor or to any provision of this Agreement or of any of the Loan Documents.

## 11.6    Cumulative Remedies; No Prior Recourse to Collateral

The enumeration herein of Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Lender may have under the *Uniform Commercial Code* of any applicable jurisdiction, the *Personal Property Security Act* of any applicable jurisdiction, or other applicable law. Lender shall have the right, in its sole discretion, to determine which rights and remedies are to be exercised and in which order. The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. Lender shall have the right, in its sole discretion, to determine which rights and remedies are to be exercised and in which order.

## 11.7    Successors and Assigns

Lender may assign any or all of its rights and obligations hereunder without Borrower's consent or notice to Borrower; provided, however, that, unless otherwise instructed by Lender in writing, Borrower shall continue to make all payments due hereunder directly to Lender. Neither Borrower nor Designee may assign any of its respective rights or obligations hereunder without Lender's prior written consent and any purported assignment without such consent shall be void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns.

## 11.8    Severability

In the event any one or more of the provisions hereof is found to be invalid, illegal or unenforceable in any respect, such provision shall be curtailed and limited only to the extent necessary to bring it within legal requirements, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

## 11.9    Confidentiality

Without the prior written consent of Lender, neither this Agreement, nor any of the terms hereof may be delivered or disclosed to any third party, other than (on a confidential basis) legal counsel, accountants or financial advisors acting for Borrower, WGA, DGA, SAG-AFTRA, on an as-needed basis, and as otherwise may be required pursuant to a court order. In addition, this Agreement is intended solely for the benefit of the parties hereto and may not be relied on by any other party without the prior written consent of Lender.

**11.10   Entire Agreement, Counterparts**

This Agreement, the Note and the documents, instruments and agreements delivered (or to be delivered) pursuant hereto shall constitute the entire agreement between the parties hereto with respect to the Loan and shall supersede all other agreements written or oral with respect thereto. This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument. A signed and delivered facsimile copy or signature page of this Agreement, or a signed copy or signature page transmitted electronically in either a tagged image format file (TIFF) or a portable document format (PDF), shall be binding on the party signing the facsimile or electronically transmitted copy or signature page (with such signature page deemed accompanied by the last version of this Agreement transmitted between the parties), and such copy or signature page shall have the same effect as an original. Any party who delivers such a copy or signature page agrees to later deliver an original counterpart to any party which requests it, but failure to do so shall not affect the validity, enforceability, of binding effect of this Agreement, and the parties hereby waive any right they may have to object to such treatment.

**11.11   No Third Party Beneficiaries**

This Agreement is not made for the benefit of any third party or parties.

*[SIGNATURE PAGE TO FOLLOW]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement to be effective as of the day and year first written above.

**CREATIVE WEALTH MEDIA FINANCE CORP.**



By:  Jason Cloth
Its:  Authorized Signing Authority

The foregoing terms, conditions, representations and covenants expressly relating to Designee are hereby accepted and agreed by Designee:

**NEEDLE PRODUCTION SERVICES BC INC.**

By:
Name:
Title:

By:  Aaron L. Gilbert
Its:  Authorized Signing Authority

By:
Name:
Title:

By:
Its:  Authorized Signing Authority

The foregoing terms, conditions, representations and covenants expressly relating to Bron are hereby accepted and agreed by:

**BRON STUDIOS INC.**

By:
Name:
Title:

By:  Aaron L. Gilbert
Its:  Authorized Signing Authority

By:
Its:  Authorized Signing Authority

# SCHEDULE A

## DEFINITIONS

(a) "**Affiliated Person**" means, as to any Person, any other Person who directly or indirectly, controls, is controlled by, or is under common control with such Person. A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise.

(b) "**approval**" and "**approved**" as used herein with reference to an approval right granted to the Lender means that the Lender shall have the right in the Lender's sole discretion to approve or to withhold approval of the subject matter with respect to which the approval is required.

(c) "**Approved Cash Flow Schedule**" means the final cash flow schedule for the Picture, identified as such in writing by the Lender, the Borrower and all third Persons having approval rights with respect thereto and attached as <u>Schedule D</u> hereto.

(d) "**Approved Director**" means Jason Reitman.

(e) "**Approved Production Schedule**" means the final production schedule for the Picture, identified as such in writing by the Borrower, the Lender and all third Persons having approval rights with respect thereto.

(f) "**Budget**" or "**Approved Production Budget**" means the final budget for the Picture which shall not exceed **USD$3,250,000.00** unless approved in writing by Lender.

(g) "**Business Day**" or "**business day**" means any day that is not a Saturday, Sunday, or a day on which banks in the state of New York are required or permitted to be closed.

(h) "**Canada**" means the provinces and territories of Canada, including, without limitations, Alberta, British Columbia, Labrador, Manitoba, New Brunswick, Newfoundland, Nova Scotia, Ontario, Prince Edward Island, Québec, Saskatchewan and the territories of Nunavut, Northwest Territories, Yukon Territories.

(i) "**Chain of Title Documents**" means the documentation described in <u>Schedule B</u> attached to the Agreement.

(j) "**Closing Date**" means the date that Borrower has met all conditions precedent as provided for in Paragraph 6, to Lender's satisfaction.

(k)    "**Closing Documents**" or "**Transaction Documents**" means the agreements entered into by the Borrower and certain third parties in respect of the Picture, as more particularly described herein and the documents referenced on <u>Schedule C</u> attached hereto.

(l)    "**Delivery**" means that delivery and acceptance of the Delivery Items have taken place under the Distribution Agreements and, as applicable, the Sales Agent Agreement(s).

(m)    "**Delivery Date**" shall be such date as mutually agreed by Lender and Borrower in writing.

(n)    "**Delivery Items**" means the delivery items specified in each Distribution Agreement that are required to be delivered as a condition precedent to the payment of any portion of such Distributor's minimum guaranteed payment and which are of a technical quality suitable for the Distributor to exercise and commercially exploit such Distributor's rights.

(o)    "**Designee**" means Front Runner Productions Inc.

(p)    "**Distribution Agreement(s)**" means the agreement(s) between Borrower (or any Person acting on Borrower's behalf, including without limitation, a Sales Agent or any Person to whom rights in the Picture have been licensed pursuant to a tax mitigation system) and a Distributor licensing, granting or selling to the Distributor rights to distribute, broadcast, exhibit or otherwise exploit the Picture or any rights contained therein or thereto, including, without limitation, any and all rights relating to the merchandising, publishing, music and phonorecords derived from or connected with the Picture.

(q)    "**Distributor**" or "**Distributors**" means any Person with whom Borrower (or any Person acting on Borrower's behalf, including without limitation, a Sales Agent or any Person to whom rights in the Picture have been licensed pursuant to a tax mitigation system) have entered or will enter, into a Distribution Agreement with respect to the Picture or any rights therein or thereto.

(r)    "**Dollars**" or "**$**" or "**USD $**" means the lawful currency of the United States.

(s)    "**Event of Force Majeure**" means an act of God, war, riot, civil commotion, fire, casualty, strike, labor dispute, act of any federal, state or local authority, death, disability or default of any principal member of the cast or any principal member of the crew, or for any other similar or dissimilar reason beyond Borrower's reasonable control which causes a delay, interruption or suspension of production or delivery of the Picture.

(t)    "**Financing Plan**" means the financing plan which has been approved in writing by all Persons having authority to approve it, including Lender, and attached as <u>Schedule E</u> hereto.

(u)   "**Governmental Authority**" means any federal, provincial, state, municipal, local or other government or other governmental or public department, central bank, parliament, legislature, regulatory authority, agency, commission, board or court or other law, regulation or rule making entity having jurisdiction on behalf of any nation, state, province, municipality or district, or any subdivision ·thereof or any quasi-governmental, judicial or administrative authority exercising regulatory or taxing authority.

(v)   "**Gross Receipts**" means all cash or other consideration received by or credited to Borrower, Designee, (and/or their affiliates, assignees, Designee and successors) (or a Sales Agent on Borrower's behalf), which arises out of, is paid on account of, or constitutes proceeds of, the Picture, any exploitation of the Picture, or any assets of or rights in the Picture, specifically including any proceeds from the Tax Credits that are not required to repay interim financing in connection with the Tax Credits (as approved by Lender in writing) and also including any underages in respect of the Picture from any and all distribution and exploitation of the Picture in any and all media now known or hereafter devised, throughout the universe in perpetuity, in any and all languages, and any of its allied, underlying or incidental rights (copyright, trademark and intellectual property rights), including without limitation, exploitation of motion picture rights, all television rights (pay, free, film, tape, cassette, cable, live and otherwise) and all allied and incidental rights in the Picture, including by way of further illustrations, the exploitation of any and all sequel and remake rights, music rights, soundtrack album rights, merchandising rights, publishing rights, radio rights, stage rights and promotional and advertising rights.

(w)   "**Individual Producers**" means Aaron Gilbert, Zanne Devine, David Thwaites and, Jason Cloth and others to be named are executive producers.

(x)   "**Interparty Agreement**" means that certain interparty agreement which may be entered into by Lender, Borrower and any other secured party, if any, with respect to the Picture.

(y)   "**Key Cast**" means Leslie Odom Jr., Ruth Negga, Orlando Bloom, Frieda Pinto and Amy Schumer.

(z)   "**Laboratory**" or "**Laboratories**" means the laboratories which are engaged to perform laboratory services for the Picture and which are approved in writing by Lender.

(aa)  "**Laboratory Pledgeholder Agreement**" means the laboratory pledgeholder agreement among the Lender, the Borrower, and a Laboratory, in a form approved in writing by the Lender, as amended, modified, supplemented or restated from time to time.

(bb)  "**Lien**" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on

the common law, statute, or contract, and including without limitation, a security interest, charge, claim, or lien arising from a mortgage, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes.

(cc) "**Loan Documents**" means the Closing Documents and all other agreements, instruments, and documents relating to the Picture heretofore, now or hereafter evidencing, securing, guaranteeing, or otherwise relating to the Loan, the Collateral, the Lender's lien in the Collateral, or any other aspect of the transactions contemplated by this Agreement, as any of such agreements, instruments or documents may be amended, supplemented, or otherwise modified from time to time.

(dd) "**Net Receipts**" has the meaning specified in the Collection Agreement.

(ee) "**Non-Technical Specifications**" means that the Picture: (a) is based upon the Screenplay, subject to minor variations and/or minor alterations and minor editorial changes as may be required by reason of production exigencies that do not materially alter the storyline; (b) shall be capable of qualifying for a MPAA rating of not more restrictive than "R" (unless agreed in writing by Lender); (c) shall be directed by the Approved Director and include the acting services of the Key Cast in the specified roles or such other roles as may be approved in writing by Lender, or, in any such case, a replacement therefor selected with Lender's prior written approval; (d) shall be produced by the Individual Producers; and (e) shall not exceed the Budget, in each case in all respects as required under and in accordance with (and after having complied with and having procured compliance with all other related requirements and obligations set out in) the Distribution Agreements.

(ff) "**Notice of Assignment**" means, for each Distribution Agreement, a Notice of Assignment and Distributors' Acceptance, in form and substance acceptable to Lender, duly executed by Borrower or a Sales Agent as sales agent for Borrower and the Distributor under such Distribution Agreement.

(gg) "**Permitted Encumbrances**" shall mean (a) the rights of Lender under this Agreement and the other Loan Documents;; (b) SAG, DGA and WGA Liens, as applicable, subject to execution by the Borrower, and SAG, DGA and WGA, as applicable, and delivery to Lender of the subordination agreements in form approved by Lender in its sole discretion; (d) the Security Interest of a third party tax credit financier, if any, and (e) the Security Interest of Lender all of which (unless otherwise agreed by Lender pursuant to the Interparty Agreement) shall be subject and subordinate to the rights of Lender under this Agreement and the other Loan Documents.

(hh) "**Person**" means any entity, corporation, limited liability company, company, association, partnership, joint venture, joint stock company, unincorporated organization, trust, individual (including personal representatives, executors and

heirs of a deceased individual), nation, state, government (including governmental agencies, departments, bureaus, boards, divisions, and instrumentalities thereof) trustee, receiver or liquidator.

(ii)     "**Personal Property Security Act**" or "**PPSA**" means the applicable Personal Property Security Act in the jurisdiction where the Collateral may be located or in the jurisdiction the local law of which governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.

(jj)     "**Picture Elements**" means all physical elements of the Picture, to the extent applicable, including all negatives, duplicate negatives, fine grain prints, soundtracks, positive prints (cutouts and trims excepted), and sound, all video formats (including PAL/NTSC), and other physical properties in connection with the Picture and the trailer for the Picture, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised) soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims, non-analog recordings and tapes, including without limitation, any video digital recordings and HDTV format recordings, all digital cinematography recordings, digital files and other records and material analogous to any of the foregoing and all physical media and systems (or, as to any party, for physical media and systems not owned by such party, all of such party's rights of access and/or duplication with respect to such physical media and systems) on which any such recordings, files, records or material are stored, saved, copied or held, and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof, in each case in all respects as required under and in accordance with (and after having complied with and having procured compliance with all other related requirements and obligations set out in) the Distribution Agreements.

(kk)     "**Production Account**" means the account to be deposited for the express and sole benefit of the Picture.

(ll)     "**Production and Post-Production Schedules**" means the production schedule and post-production schedule for the Picture, approved in writing by all Persons having approval rights thereto.

(mm)     "**Production Service Agreement**" means the production services agreement between Borrower and Designee in respect of the Picture.

(nn)     "**Repayment Amount**" means all of Borrower's monetary obligations to Lender hereunder, under the Note and under the other documents, instruments and agreements to be executed by Borrower pursuant hereto and the Interest in

connection therewith and all fees, costs and expenses Borrower is obligated to pay Lender in connection therewith. For clarity, the Repayment Amount shall not include Lender's share of the Net Receipts as defined herein.

(oo) "**Sales Agent**" means the Domestic Sales Agent and/or the Foreign Sales Agent, as the case may be.

(pp) "**Sales Agent Agreement(s)**" means those agreements granting the Sales Agents rights in respect of the Picture to Sales Agents.

(qq) "**Security Documents**" has the meaning set forth in Paragraph 4.2.

(rr) "**Security Interest**" means a security interest in the Collateral and has the meaning given to such term by the applicable *Uniform Commercial Code*.

(ss) "**Tax Credits**" refers to all film production tax credits, rebates and other incentives and the proceeds therefrom in connection with the Picture.

(tt) "**Tax Credit Receipts**" refers all refunds, subsidies, rebates or other amounts payable in connection with the Tax Credits.

(uu) "**Tax Pass-Through Intermediary**" means any entity granted distribution rights in the Picture by the Foreign Sales Agent, as agent for the Borrower, in order to mitigate foreign withholding taxes that is approved in writing by the Lender.

(vv) "**Tax Pass-Through Intermediary License Agreements**" means the license agreements entered into by a Tax Pass-Through Intermediary, as authorized by the Foreign Sales Agent, in respect of the Picture.

(ww) "**Taxes**" means all present or future taxes, levies, imposts, deductions, withholdings and charges, including, without limitation, all income, capital or business taxes, imposed, assessed, levied or collected by or on behalf of any Governmental Authority, including any interest or employment withholdings, additions to tax or penalties applicable thereto.

(xx) "**Technical Specifications**" means the Picture Elements and the Picture, as reflected therein, as appropriate: (a) are in accordance with the technical requirements specified in the delivery schedule for the particular Picture Elements and are of first-class technical quality, suitable for exhibition in first-run motion picture theaters in the United States and Canada and are ready and suitable for use in the manufacture of release prints, print, and pre-print materials of the same technical quality, and the video materials included therein; (b) are photographed in color; (c) are in the English language; (d) are on digital, with an aspect ratio of 1.85:1 or 2.35:1; (e) constitute a sound Picture, fully titled, and assembled with the soundtrack synchronized with the photographic action thereof; and (f) have a running time of not less than ninety (90) minutes and no more than one hundred twenty (120) minutes, including main and end titles, in each case in all respects as required under and in accordance with (and after having complied with and having

procured compliance with all other related requirements and obligations set out in) the Distribution Agreements.

(yy)   "**Uniform Commercial Code**" or "**UCC**" means the New York Uniform Commercial Code; or the Uniform Commercial Code enacted in the jurisdiction the local law of which governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral; or the Uniform Commercial Code of any other jurisdiction to the extent the law of such jurisdiction is applicable. Reference to the "Uniform Commercial Code" of a particular jurisdiction means the Uniform Commercial Code of that jurisdiction.

(zz)   "**U.S.**" means the Unites States of America, its territories and possessions, including, without limitation, Baker Island, Caroline Islands (Palau and the Federated States of Micronesia), Guam, Marshall Islands, Northern Marianas, Puerto Rico, Samoa (American), U.S. Virgin Islands (St. Croix, St. John, St. Thomas), and Wake Island.

## SCHEDULE B

## CHAIN OF TITLE

**[Borrower to provide]**

## CLOSING DOCUMENTS

### Organizational Documents

1.     Memorandum and articles of incorporation or organization (or equivalent documents) of Borrower, Designee and Guarantor, and their managing members and shareholders, as applicable.

2.     Operating agreements and all other documents required to form Borrower, Guarantor and Designee, if applicable and have it qualified to do business under applicable law, including, without limitation, any foreign qualifications to do business as may be required.

3.     Letter of good standing from the appropriate authorities in the jurisdiction under the laws of which Borrower, Designee (if applicable) and Guarantor are organized or are qualified to do business as a foreign entity.

4.     Corporate or other organizational Resolutions.

### Loan Documents

1.     This Agreement.

2.     The Promissory Note.

3.     Production Service Agreement.

4.     Borrowing Certificates.

5.     Escrow Agreement.

### Security

6.     Security Agreements.

7.     Copyright Mortgage(s) and Assignment(s).

8.     Guarantees.

9.     Power of Attorney.

10.    Tax Credit Assignments and Directions, if applicable.

11.    Assignment and Security Agreement.

12.    Laboratory Pledgeholder Agreement(s).

13.    Copies of all applicable Lien Search Reports – to be obtained by Lender.

14.    UCC and PPSA Financing Statements – to be registered by Lender.

### Opinions

15.    Tax Credit Opinion.

16.    Corporate Opinion from Borrower's counsel (including Officer's Certificates).

17. Chain of Title Opinion (or acceptable Alternative approved in writing by Lender) and Chain of Title Documents

**<u>Other</u>**

18. Applicable Guild Subordination Agreements.

19. Interparty Agreement.

20. Collection Account Management Agreement.

21. Fully Executed Sales Agency Agreement(s), if applicable.

22. Distribution Agreements, if applicable.

23. Insurance Certificates and Policies with endorsements in favour of Lender

24. Holdback/Deferral Agreement, if applicable.

**<u>Production Documents</u>**

25. Key Cast and Crew Agreements (including director, director of photography, producers, production designer, composer and editor).

26. Approved Production Budget.

27. Approved Financing Plan.

28. Approved Cash Flow Schedule.

29. Approved Production Schedule.

30. Approved Delivery Schedule.

31. Approved Screenplay.

32. Script Clearance Report.

33. Title Clearance Report.

34. Production Services Agreement.

## SCHEDULE D

## APPROVED CASH FLOW SCHEDULE

See attached

**SCHEDULE E**

**FINANCING PLAN**

See attached

## SCHEDULE B

## TAX CREDIT ANALYSIS (TO BE ATTACHED HERETO)

## Needle In a Time Stack - Tax Credit Estimate
Based on Budget dated: May 30, 2018

**Canadian and BC Tax Credit**

**BC Tax Credit**

| | | | Gross Spend | Grind | | Qualified Spend |
|---|---|---|---|---|---|---|
| Individual Labour | 01 | $ | 6,413,758.00 | 0% | $ | 6,413,758.00 |
| Solely-owned Corp. Labour | 02 | | | 0% | $ | - |
| Multi-owned Corp. Labour | 04 | $ | 400,000.00 | 35% | $ | 260,000.00 |
| Sole-Proprietor Labour | 05 | | | | | |
| Non-labour | 06 | | | 100% | $ | - |
| **Total** | | **$** | **6,813,758.00** | | **$** | **6,673,758.00** |

| | | | |
|---|---|---|---|
| Basic BC Credit | 28% | $ | 1,868,652.24 |
| DAVE Credit | 16% | $ | 15,200.00 |
| **Total BC Credit** | | **$** | **1,883,852.24** |

**Federal Tax Credit**

| | | | Gross Spend | Grind | | Qualified Spend |
|---|---|---|---|---|---|---|
| Individual Labour | 01 and 81 | $ | 6,413,758.00 | 0% | $ | 6,413,758.00 |
| Solely-owned Corp. Labour | 02 and 82 | | | 0% | $ | - |
| Multi-owned Corp. Labour | 04 and 84 | $ | 400,000.00 | 35% | $ | 260,000.00 |
| Non-labour | 06 and 86 | | | 100% | $ | - |
| **Total** | | | | | **$** | **6,673,758.00** |

| | | | |
|---|---|---|---|
| Assistance: BC Credit | | $ | 1,883,852.24 |
| Net Qualified Spend | | $ | 4,789,905.76 |
| **Total Federal Credit** | 16% | **$** | **766,384.92** |

| | | |
|---|---|---|
| | **$** | **2,650,237.16** |