# EXHIBIT J

# TERM SHEET
# FINANCING FOR MOTION PICTURE PROJECT ENTITLED
# "THE NIGHTINGALE" (the "Picture")

| | |
|---|---|
| **Lender / Financier** | Under this agreement "Lender" shall be defined as BRON Creative Corp. (the "**Lender**"), which will advance the investment proceeds to the Borrower on behalf of all registered "Financiers" under this agreement and attached Participation Agreement. BRON Creative Corp. (the "**Lender**"), on behalf of **Rocking T Ranch, LLLP,** a liability limited partnership, (the **"Financier")** to BRON Creative Corp., in the amount of **$1,000,000 US$** representing a 30.77 % share of the total loan amount, as described below. |
| **Borrower:** | Nightingale Films Holdings Pty Ltd (the "Borrower"), an Australian corporation, wishes to obtain financing from Lender for the Picture, where the Picture shall accord with the Picture specifications attached hereto at Schedule "A" and made a part hereof. |
| **Accommodation Agreement:** | Lender requires that Nightingale Pictures Pty Ltd (the "Prod Co") and Borrower enter into an accommodation agreement with Lender whereby the copyright in and to the Picture and the underlying screenplay and any and all tangible or intangible assets of the Picture are subject to a first priority lien by Lender in the Lender Territory (as defined below). |
| **Copyright Owner:** | The ownership of the copyright in the Picture (including the copyright in the Approved Screenplay (as defined in Schedule "A") and all underlying rights, subsidiary and derivative production rights therein shall be owned by Borrower as to 98%, Screen Australia as to 1% and Screen Tasmania as to 1%. |
| **Completion Guarantor:** | Lender will require a completion guarantor, pre-approved in writing by Lender, whereby delivery of the Picture to Company is guaranteed, in favour of Lender. Film Finances Inc. and CineFinance LLC are hereby pre-approved. |
| **Loan and Repayment Amount:** | Subject to satisfaction of the Picture Specifications set forth in Schedule "A" and subject to satisfaction of all Conditions Precedent (defined herein) and such other conditions precedent as set forth in the loan and security agreement ("Loan Agreement") between Lender and Borrower in respect of the Picture, Financier will advance to Borrower via Creative Wealth Media Finance Corp, a loan in the amount of US$3,250,000 (the "Loan") to be used towards costs of the Picture. The Loan is exclusive of the Loan Facilitation Fee. The Loan, the Loan Facilitation Fee, any Interest thereon and default interest, penalties or fees shall be the "Repayment Amount". |

| | |
|---|---|
| **Minimum Interest, Repayment Terms and Repayment Amount:** | Early Advances (as hereafter defined), if any, and the Repayment Amount will bear an annual interest at a rate of 12% per annum, compounded annually (the "<u>Interest</u>"). The Repayment Amount shall be recouped from Gross Receipts. "<u>Gross Receipts</u>" shall mean all proceeds derived from the exploitation of the Picture throughout the world (excluding the ANZ Territory, as hereafter defined) (the "<u>ANZ Territory</u>"). Lender's primary recoupment shall be from Lender Territory Gross Receipts, less fees payable to the CAM (as defined below) pursuant to the CAMA (as defined below), guild residuals (which Borrower shall direct CAM to pay/reserve) and Sales Agent's approved expenses and commission and thereafter to Lender. |
| **Maturity Date and Default:** | The Loan shall have a maturity date that is 12 months from initial disbursement of the Loan, excluding any Early Advances, to the Completion Guarantor's escrow account (the "<u>Loan Maturity Date</u>"). After the Loan Maturity Date, or upon another event of default if earlier, the outstanding amount of the Repayment Amount shall bear a default interest rate of 17% per annum compounded annually thereafter. The Repayment Amount shall increase by such interest if Borrower cannot make such payments. |
| **Loan Facilitation Fee & Legal Fee** | Lender will charge a loan facilitation fee of five (5%) of the Loan to pay the costs and expenses (inclusive of Lender's legal fees) of Lender (the "<u>Loan Facilitation Fee</u>"), to be recouped from Gross Receipts of the Picture. The Loan Facilitation Fee shall, collectively, include all legal, administrative and corporate expenses of Lender, excluding only any legal and/or administrative fees and charges incurred should the Loan go into default. |
| **Closing Procedure:** | Prior to satisfaction of all Condition Precedent and closing of the completion bond, Lender may, from time to time, advance sums to Borrower (the "<u>Early Advances</u>"). The Early Advances shall be subject to: (i) interest and/or fees to be negotiated in good faith prior to disbursement; (ii) the security interests hereunder; and (iii) being spent solely in accordance with the Approved Budget. Lender will advance the Loan, less any Early Advances, to the Completion Guarantor's escrow account. |
| **Screen Australia Special Condition - Escrow** | Lender acknowledges that the Lender's entire contribution shall be paid into the Completion Guarantor's escrow account or the production account or some other mechanism approved by Screen Australia and Lender as a condition precedent to Borrower's first drawdown of Screen Australia's financing. |

| **Approved Budget:** | The final locked budget for the Picture shall not exceed AUD$12,000,000 without Lender's prior written approval. (the "<u>Approved Budget</u>").  The Approved Budget shall be sufficient to provide delivery to Sales Agent (as defined below) of all items required under their delivery schedule and those deliverables customarily required by Borrower in connection with licensing theatrical motion pictures. |
|---|---|
| **Use of Proceeds:** | Proceeds of the Loan shall be used exclusively to finance the production, post-production, and delivery of the Picture. |
| **Security:** | The obligations of Borrower and/or Prod Co (pursuant to the Accommodation Agreement) to Lender with respect to the Loan described herein shall be in first priority position for all collateral and any receipts therefrom in the Lender's Territory.  This interest shall be secured by all of Borrower's and Prod Co's assets, including, without limitation, Borrower's right, title and interest in or relating to the Picture, and all of Borrower's (and any of its respective affiliates') right, title and interest in any of the revenue arising out of or relating to the Picture (except as set forth below), and all tax and other incentives and so-called "soft monies" in connection with the Picture, also including, without limitation, the insurance policy issued in connection with the Picture as set forth in greater detail in the security documentation being entered into contemporaneously herewith, which security documentation will include a copyright mortgage and general security agreement (the "<u>Collateral</u>"). In addition to the related security documentation to be entered into contemporaneously herewith, Lender shall be entitled to file one or more financing statements in all applicable jurisdictions in order to perfect its security interest in the Collateral. |
| **Exclusion and Subordination:** | Notwithstanding the foregoing, Lender's priority position in the Collateral shall specifically exclude any rights, title and interest in and to the Picture (and any receipts derived from the Picture from the ANZ Territory) transferred or assigned to or held by Screen Australia and Screen Tasmania (which in respect of copyright shall be limited to 2% of the copyright in aggregate) and gross receipts from the ANZ Territory.  Furthermore, Lender acknowledges and agrees that Lender shall subordinate its security interest to customary guild liens, Screen Australia and Screen Tasmania as it pertains to dealing with priority of recoupment as set forth in the "Priority" section below. |
| **Priority:** | Lender will be entitled to recoup the Repayment Amount pursuant to the waterfall schedule (the "Waterfall") attached hereto as Schedule B and made a part hereof.  Lender will be entitled to recoup the Repayment Amount in second position from all Borrower share only of gross receipts derived from exploitation of the Picture in the ANZ |

| | |
|---|---|
| | Territory. |
| **Sales Agents/Distribution:** | With respect to the Lender Territory, Lender will be entitled to pre-approve in writing all domestic and foreign sales agents (the "Sales Agent").  Furthermore, Foreign sales agent will recoup a maximum marketing/sales expenses (inclusive of any flat fee market charges) of Seventy Five Thousand United States Dollars (US$75,000) until the Repayment Amount has been paid to Lender in full; and foreign sales agent shall receive a maximum sales commission of 7.5% (and 5% from the US Territory) until the Repayment Amount has been paid to Lender in full.  In addition to the deferred commission amount, Lender shall be entitled to a sales fee Override (as set forth in the Waterfall)  which shall be applicable against the Repayment Amount and payable to Lender until the Repayment Amount has been repaid in full.  Borrower shall provide copies of fully executed Distribution Agreements to Lender by email as soon as possible. |
| **Distribution Agreements** | Lender and Borrower shall agree on minimum take prices for all sales of the Picture throughout the world (which minimum take prices shall be subject to the approval of Screen Australia) ("<u>Agreed Take Prices</u>").

Until Lender has received the Repayment Amount in full, Lender and Borrower (who shall seek the prior approval of Screen Australia) shall have mutual approval of the terms of any proposed sale of the Picture in a "Major Territory" (as defined below) provided that in the event of a difference of opinion between Lender and Borrower (i) the opinion of Lender shall prevail for proposed sales which fall below the Agreed Take Prices and (ii) the opinion of Borrower shall prevail for proposed sales which fall at or above the Agreed Take Prices where such proposed distribution agreements do not provide for any term such as a release commitment, release date or hold back that conflicts with the domestic distribution agreement or could conflict with a domestic distribution agreement in Lender's reasonable opinion.

"<u>Major Territory</u>" means any or all of:  the world as one territory including or excluding Australia/New Zealand;  Europe as one territory; UK; Italy; France; Spain; Scandinavia as one territory; Germany; and Japan.

Notwithstanding the preceding, if the "domestic" distribution agreement (i.e. the distribution agreement for the United States or North America) provides for a minimum guarantee where payments up to an including the essential delivery payment (i.e. not inclusive of the final payment) are insufficient to repay the Repayment Amount, Lender shall have sole approval over such "domestic" |

| | |
|---|---|
| | distribution agreement provided that Lender shall provide Borrower meaningful consultation over the domestic distribution agreement. if the "domestic" distribution agreement provides for a minimum guarantee where payments up to an including the essential delivery payment (i.e. not inclusive of the final payment) that is sufficient to repay the Repayment Amount, Lender and Borrower shall mutually approve such "domestic" distribution agreement, where the tie breaking vote shall be accorded to Borrower.<br><br>Following Lender's recoupment of the Repayment Amount, Borrower shall have approval in its discretion over all sales of the Picture. |
| **Approvals:** | Lender will have customary lender approval rights, which shall be outlined in the Loan Agreement and shall include, without limitation, approvals over the:<br>1. Finance Structure;<br>2. Approved Budget;<br>3. Cash Flow;<br>4. Production and Post-Production Schedules;<br>5. Domestic and International Sales Companies (WME pre-approved for domestic (i.e. the United States and, with separate approval, Canada));<br>6. Key Cast and Crew - the following individuals are pre-approved:<br>    (i)    Jennifer Kent (writer)<br>    (ii)    Jennifer Kent (director)<br>    (iii)    Kristina Ceyton and Bruna Papandrea (producers) and Steve Hutensky (executive producer)<br>    (iv)    Aisling Franciosi and Sam Claflin (leads)<br>    (v)    Bryce Menzies, Marshalls & Dent (production lawyer)<br>    (vi)    Radek Ladczuk (DOP)<br>    (vii)    Alex Holmes (production designer)<br>    (viii)    Margot Wilson (costume designer)<br>    (ix)    Jed Kurzel (composer)<br>    (x)    Simon Njoo (picture editor)<br>    (xi)    Robert Mackenzie (sound designer)<br>    (xii)    Nikki Barrett (casting director)<br>7. Cast/Composer agreements; and<br>8. All contingent compensation payable to director, lead cast, other cast, writers, producers, executive producers and all other |

|  |  |
|---|---|
|  | "talent" (including deferments, bonuses and participations).|
|  | It is agreed that in the event of a disagreement, after good faith discussions with respect to items 7 and 8 above, then Borrower shall have the tie-breaker, except with respect to any contingent compensation that is paid prior to Lender recouping the Repayment Amount (e.g., box office bonuses advanced by a distributor) where there shall be no tie-breaker. It is expressly agreed by Borrower and Lender that neither party hereto shall unreasonably withhold or delay approvals under this Term Sheet so as to frustrate the development, production, distribution or other exploitation of the Picture. |
| **Collection Account:** | All revenues derived from exploitation of the Picture will be paid into a collection account administered by a collection account manager (a "<u>CAM</u>") approved in writing by Lender (Freeway is hereby pre-approved). Lender shall be a named party to the Collection Account Management Agreement (the "<u>CAMA</u>") and all amounts payable to Lender hereunder will be payable to Lender in accordance the terms and instructions of the CAMA in a form to be approved in writing by Lender. |
| **Net Profit/Additional Participation:** | In further consideration of Lender's agreement to advance the Loan in accordance with the terms hereof, Financier shall receive a proportionate (30.77%) profit participation interest of 6.5% of Lender's 10% net profits (as set forth in the Waterfall). |
| **Financing Documents:** | The following documents, and all others required by Lender at its discretion, shall constitute the "<u>Financing Documents</u>" required as conditions precedent to be satisfied (as determined by Lender in its sole discretion) prior to any advances under the Loan, it being agreed that the Loan shall be funded upon satisfaction of the Conditions Precedents specifically defined in the Loan Agreement:<br>1. Loan Agreement<br>2. Promissory Note<br>3. Borrowing Certificate<br>4. Power of Attorney<br>5. Interparty Agreement<br>6. Copyright Mortgage<br>7. General Security Agreement<br>8. Accommodation Agreement with Prod Co<br>9. CAMA<br>10. Financing Authorizations and Registration<br>11. Lab Pledgeholder Agreements<br>12. All other documents referred to in the Loan Agreement and any other documents as required by Lender. |

| | |
|---|---|
| **Credits:** | Provided Lender is not in breach of its obligations to Borrower under the Loan Agreement, Lender shall be accorded, one company credit in the form of "in association with" and 3 executive producer credits for Lender's designees which credits: (a) shall appear on screen, shared on a single card, and in the main titles of the Picture, wherever the main titles appear, in an average size of type no less favorable than the average size of type used to accord any other "Executive Producer" credit on the Picture; (b) shall be included in the billing block for the Picture, wherever the billing block appears including in all "paid ads" issued in connection with the Picture (except for congratulatory, nomination and award ads in which the only individual named is the recipient of the congratulations, nomination or award); (c) shall be included in paid advertisements for the Picture, ancillary products (including packaging for DVDs, soundtracks, etc.) and one-sheets, subject to customary distributor exclusions; and (d) the font size and duration and all other aspects of the foregoing credits shall be no less favorable than those provided to any other "Executive Producer" on the Picture. Provided the placement of the following credits shall be at the discretion of Borrower, Lender shall also receive two (2) "Co-Executive Producer" credits in the end titles of the Picture. |
| **Reporting** | At Lender's reasonable written request, until repayment of the Repayment Amount in full, Borrower shall provide a reporting letter (such letter may be via email) to Lender with an update as to the progress of production (including, but not limited to: cost reports, hot costs, wrap reports, production lists, production notices, bank reconciliations and trial balances), all items sent to the completion guarantor, changes to the budget, post production process, sales process, market strategies or any other pertinent information with regard to the Loan.  Such reporting letter shall be promptly provided by Borrower.  Lender may, at its travel cost and expense, visit the set and location at any time during production.  Borrower shall provide accommodations and ground transportation for Borrower on such visits. |
| **Premieres/Festivals:** | Lender shall be provided with eight (8) invitations to the Picture's U.S. and/or Canadian celebrity premiere (at Lender's discretion), if any, and all major film festival screenings of the Picture, if any. |
| **Covenants and Representations and Warranties:** | a. There is no action, suit or proceeding (actual or threatened) at law or in equity or by or before any governmental instrumentality or other agency concerning the Picture, or any investigation of the affairs concerning the Picture or the Collateral in any respect.<br>b. Borrower owns (or will own upon the existence of each of the following) all right, title and interest, in and to the Collateral including all right, title and interest necessary to make, distribute, |

|  |  |
|---|---|
|  | exhibit and otherwise exploit the Picture throughout the Lender Territory. |
|  | c. No material or matter used in or in connection with the Picture will, to the best of Borrower's knowledge, infringe any copyrights, statutory or common law, or violate the rights of any third party. |
|  | d. The Picture will be completed and delivered and will be technically acceptable to exhibition in first class theatres in the U.S., Australia and elsewhere. |
|  | e. Borrower is a duly constituted, registered and organized company and is in good standing under the laws governing it, and has the right and authority to enter into this Term Sheet and to grant the rights provided to Lender set forth herein and in the related Financing Documents. |
| **Conditions Precedent** | The long form Loan Agreement shall outline the complete set of conditions precedent ("<u>Conditions Precedent</u>") which shall include, but are not limited to: |
|  | a. <u>Chain of Title</u>. Chain of title, including proof of payment and a legal opinion, copyright registrations, in form and substance approved by Lender in its sole discretion, for the screenplay and the Picture, which provides that the distribution rights are held in the name of Borrower. |
|  | b. <u>Financing/ Security Documents</u>. Financing Documents and such other security documents as may be reasonably required by Lender, being fully executed (and notarized, if applicable) and unconditionally delivered to Lender. |
|  | c. <u>Corporate Documentation</u>. The articles of incorporation, shareholder agreements, resolutions and all other organizational documentation of Borrower and qualifications of Borrower qualified to do business under applicable law, including, without limitation, any foreign qualifications to do business as may be required and a corporate legal opinion in a form satisfactory to Lender. |
|  | d. <u>Key Cast and Crew Agreements</u>. All agreements for key cast, key crew (including director, director of photography, Producers, production designer, composer and editor) or drafts thereof. |
|  | e. <u>E&O and Production Insurance Policies</u>. Insurance policies with endorsements in favor of Lender as an additional insured. Borrower represents and confirms that that there are no "essential elements" and that E&O policy shall be in force and effect until, at least, the bonded delivery date (inclusive of its force majeure extension period) or the delivery date in any sales agent or distributor agreement, whichever is later. |

| | |
|---|---|
| | f.    <u>Proof of Financing and Close of Bond.</u> Binding financing agreement between Borrower and other financiers, in a form acceptable to Lender evidencing that the Approved Budget is fully financed and will be cashflowed in to the Borrower's production bank account in respect of the Picture and approved by the Completion Guarantor.<br><br>g.    <u>Finance Plan</u>. Approved Budget and Finance Plan, including, without limitation: (a) Producer Offset financier's legally binding commitment to advance the Producer Offset financier loan, (b) Screen Australia and other sovereign entities' legally binding commitment to advance the amount set forth in the finance plan to be approved in writing by Lender (or evidence of Borrower's ability to defer certain fees to offset any shortfalls), all to be used solely for the aforesaid purposes and secured (e.g., letter of credit, escrow, pre-funded, etc.) to the satisfaction of Lender.<br><br>h.    <u>Other Conditions</u>. Such other conditions precedent as are customary for transactions of this nature. |
| **Termination:** | In the event that the Conditions Precedent are not completed to Lender's satisfaction on or before January 30, 2017, Lender shall have no obligation to Borrower hereunder and this Term Sheet will be automatically terminated and of no force or effect. In the event that Lender elects in its sole discretion to advance any amount of the Loan to Borrower prior to the satisfaction of the Conditions Precedent, then such amounts will accrue interest in accordance with this Term Sheet and become immediately due and payable to Lender if this Term Sheet is terminated prior to the satisfaction of the Conditions Precedent. |
| **Additional Standard Terms** | The Loan Agreement shall include such terms as are standard in connection with senior lender agreements in the film industry, including but not limited to: standard affirmative covenants such as ongoing financial reporting obligations of Borrower, audit rights for Lender and notice of material changes, standard negative covenants, indemnification of Lender and remedies for events of default by Borrower. |
| **Confidentiality:** | The parties shall maintain at all times as confidential information the terms of this Term Sheet and the content of any negotiations between them, except that both parties may inform their respective advisors, regulatory authorities, counsel, lenders, or other equity holders, financiers and employees with a need to know as each party deems necessary (provided that all such persons are made aware of and agree to abide by the confidentiality hereof). |
| **Governing Law:** | This Term Sheet will be governed by the laws of the State of New |

|  | York. |
|---|---|
| **Other:** | All terms of this Term Sheet shall be legally binding agreements of the parties hereto. |
| **Counterparts:** | This Term Sheet may be executed in one or more counterparts and via electronic transmission, each of which shall constitute an original hereof and which together shall constitute one agreement. |

[SIGNATURE PAGE TO FOLLOW]

[SIGNATURE PAGE TO THE NIGHTINGALE TERM SHEET]

Agreed and accepted on this 17th day of October, 2018.

**Financier**

By: *(signature)*

Name: Tready A. Smith

Title: President of its GP, Rocking T AGP, Inc

**BRON CREATIVE CORP.**

By: *(signature)*

Name: Jason Cloth

Title: Director

## Schedule "A"

### Picture Specifications

The Picture shall be directed by Jennifer Kent ("Director"), shall be produced as a live action theatrical motion picture production by Nightingale Films Holdings Pty Ltd ("Producer"), shall have a running time of not less than 90 minutes (excluding main and end titles) nor more than 120 minutes (inclusive of main and end titles) shall qualify for a MPAA rating not more restrictive than "R" shall be based on and substantially conform to the approved screenplay dated November 2016 written by Jennifer Kent (the "Approved Screenplay"), subject to minor changes occasioned by the contingencies of production which do not materially alter characters or narrative, and shall be produced in accordance with the approved production budget (the "Approved Budget"), subject to minor variations within budget categories, and the approved production cash-flow schedule ("the "Approved Cash Flow") and the approved post-production schedule (the "Approved Schedule"), subject to deviations from the Approved Cash Flow and the Approved Schedule approved by Producer, Lender and the Picture's completion guarantor (the "Guarantor").  Producer shall obtain customary errors and omissions and general production insurance ("Customary Insurance").

### Approved Budget

The Approved Budget shall be not more than AUD$12,000,000 million, inclusive of all direct development and production costs and required customary contingency and an allowance for all delivery items (i) customarily required by U.S. "major" distributors for the domestic territory (the "Domestic Territory") and (ii) customarily required by first-class international sales agents who represent U.S. based producers ("Sales Agent") in connection with licensing theatrical motion pictures for the "International Territory" (i.e., the world excluding the Domestic Territory and Australia-New Zealand), a producer fee in the amount not to exceed the amount set forth in the Approved Budget for the producers (the "Producer Fee"), an overhead (the "Overhead") in the amount not to exceed the amount set forth in the Approved Budget and the premiums for Customary Insurance.  Neither Producer (nor any of its affiliates or the principals or employees of any of the foregoing) shall be entitled to any other payment out of the Approved Budget (whether denominated a fee or overhead or otherwise).  Neither director nor any entity furnishing services or assigning rights (nor any of its affiliates or the principals or employees of any of the foregoing) shall be entitled to receive any payments (however denominated) out of the Approved Budget in excess of the amounts set forth in the Approve Budget as director fee or as part of the Overhead.  No person or entity shall be entitled to receive a producer or executive producer or similar fee out of the Approved Budget (other than the Producer Fee) without the Lender's prior written approval.  The Approved Budget shall include all amounts necessary to effect delivery in accordance with the foregoing schedules (each of which shall be subject to alteration once the Domestic Distributor and the Sales Agent have been determined).

# SCHEDULE B

# WATERFALL SCHEDULE

A.  **ROW Territory (Worldwide – excluding ANZ and North America)**

All Collected Gross Receipts arising from the exploitation of the Picture in the ROW Territory shall be applied as follows:

1.  To CAM in payment of CAM's Remuneration and the CAM Expenses; and thereafter

2.  to any guilds in payment of the required guild residuals (or a reasonable reserve therefore), which shall be liquidated no less frequently than quarterly; and thereafter

3.  to ROW Sales Agent in payment of the non-deferred part of the ROW Sales Agent Commission (capped at 7.5%) and to Lender in payment of an override ("Override") on the ROW Sales Agent Commission which Override shall be an amount equal to 7.5% if the ROW Sales Agent Commission is 15% in total provided that if the ROW Sales Agent Commission is less than 15%, then the Override shall be reduced on a 1 to 1 basis with the ROW Sales Agent Commission down to a floor of 2.5% Override (i.e., if the ROW Sales Agent Commission is 10% or less); it being expressly agreed that in any event, the Override paid to Lender shall be applied 100% to repayment of the Repayment Amount and shall cease being paid to Lender upon repayment in full of the Repayment Amount; and thereafter

4.  to ROW Sales Agent in payment of its sales expenses; and thereafter

4.  ==to Lender until repayment in full of the Repayment Amount; and thereafter==

5.  to ROW Sales Agent in payment, if any, of the deferred part of the ROW Sales Agent Commission and any deferred Sales Expenses owing to ROW Sales Agent; and thereafter

6.  in accordance with heading D hereunder.

B.  **North American Territory**

All Collected Gross Receipts arising from the exploitation of the Picture in the North American Territory shall be applied as follows:

1. To CAM in payment of CAM's Remuneration and the CAM Expenses; and thereafter

2. to any guilds in payment of the required guild residuals (or a reasonable reserve therefore), which shall be liquidated no less frequently than quarterly; and thereafter

3. to the Domestic Sales Agent in payment of the non-deferred part of the Domestic Sales Agent Commission (i.e., 5%) and expenses; and thereafter

4. to Lender until repayment in full of the Repayment Amount; and thereafter

6. to the Domestic Sales Agent in payment, if any, of the deferred part of the Domestic Sales Agent Commission (i.e., an additional 5%), if any; and thereafter

7. in accordance with heading D hereunder.

**C.  ANZ Territory**

All Collected Gross Receipts arising from the exploitation of the Picture in the ANZ Territory shall be applied as follows:

1. To CAM in payment of CAM's Remuneration and the CAM Expenses; and thereafter

2. to any guilds in payment of the required guild residuals (or a reasonable reserve therefore), which shall be liquidated no less frequently than quarterly; and thereafter

3. in accordance with heading D hereunder.

**D.  Joint Provisions for the ANZ Territory, the ROW Territory and the North American Territory**

All Collected Gross Receipts received in the Collection Account following application in accordance with Headings A, B and C above, shall be applied as follows:

1. to equity investors (including the Borrower in respect of the Producer Offset) on a pari passu basis until they have recouped their respective investments including the Producer Offset for the Producer; it being agreed that (i) if Lender has not received repayment in full of the Repayment Amount, then any amounts of Collected Gross Receipts from Heading C above allocated to Borrower under this paragraph D2 shall be paid to Lender until repayment in full of the Repayment Amount and (ii) once the total Collected Gross Receipts distributed under this paragraph D1 is an amount equal to the sum of the investments of the equity investors excluding the Producer Offset for the Producer, then Lender shall receive 10% of 100% of all amounts thereafter paid to Borrower in respect of the Producer Offset under this paragraph D1; and thereafter

2. to Borrower in payment, with Screen Australia's prior consent, of a sum equal to any overages met by either the producers or Prod Co; and thereafter

3. to the Completion Guarantor in repayment of its contribution for completing the Picture, if any; and thereafter

4. the balance remaining shall constitute the Net Profits of the Picture and shall be distributed as follows:

   90% at Producer's discretion (inclusive of amounts required to be distributed to the equity investors and talent).

   10% to Lender, of which 6.5% will be allocated to the Financiers proportionately; BCA Alternative Income Fund, LP 69.23% and Rocking T Ranch, LLLP 30.77%.