UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

BAYSHORE CAPITAL ADVISORS, LLC, *et al.*,

                              Plaintiffs,

        v.

CREATIVE WEALTH MEDIA FINANCE
CORP., *et al.*,

                              Defendants.

———————————————————————

No. 22-CV-1105 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Seth D. DuCharme, Esq.
David A. Shargel, Esq.
Rachel B. Goldman, Esq.
Bracewell LLP
New York, NY
*Counsel for Plaintiffs*

Samuel J. Bazian, Esq.
William R. Fried, Esq.
Herrick Feinstein LLP
New York, NY
*Counsel for Defendants Creative Wealth Media Finance Corp., BRON Creative Corp., BRON Creative USA Corp., and Jason Cloth*

Joshua Schiller, Esq.
Boies Schiller Flexner LLP
New York, NY
*Counsel for Defendants BRON Studios, Inc., BRON Studios USA, Inc., and Aaron L. Gilbert*

Mitchell Schuster, Esq.
Eva M. Sullivan, Esq.
Kevin A. Fritz, Esq.
Meister Seelig & Fein PLLC
New York, NY
*Counsel for Defendants Hudson Valley Wealth Management, Inc., Christopher Conover, and David K. Jonas*

KENNETH M. KARAS, United States District Judge:

Bayshore Capital Advisors, LLC, BCA Alternative Income Fund, LP, and Rocking T Ranch, LLLP, (together, "Plaintiffs") bring this Action against Creative Wealth Media Finance Corp. ("CWMF"), BRON Creative Corp., BRON Creative USA Corp., Jason Cloth (together, "Creative Defendants"), BRON Studios, Inc., BRON Studios USA, Inc., Aaron L. Gilbert (together, "BRON Defendants"), Hudson Valley Wealth Management, Inc., Christopher Conover, David K. Jonas, (together, "Hudson Defendants", altogether "Defendants"), and Does 1–21, alleging substantive violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), conspiracy to violate RICO, 18 U.S.C. § 1962(d), as well as state law claims for fraud, breach of contract, aiding and abetting fraud, breach of the covenant of good faith and fair dealing, unjust enrichment, and accounting.  (*See generally* Am. Compl. ("AC") (Dkt. No. 54).)  Before the Court are Creative Defendants, BRON Defendants, and Hudson Defendants' Motions To Dismiss the Amended Complaint (the "Motions") pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6).  (*See* Dkt. Nos. 69, 72, 76).)  For the reasons stated herein, the Motions are granted in part and denied in part.

## I.  Background

### A.  Allegations and Materials Appropriately Considered

As a threshold matter, the Court must determine whether it may consider (1) the Needle contracts, the Lionsgate contracts, or the Nightingale contracts attached to Creative Defendants' Motion, BRON Defendants' Motion, and Plaintiffs' Opposition, (*see* Dkt. Nos. 74, 78, 83); (2) the "Project Evaluation Process", BRON Studios' "Active Productions" presentation, a letter dated July 8, 2020 from Ryan McWaters on behalf of DeRoyce Ltd., a letter dated December 8, 2021, from William R. Fried to Hon. Cathy Seibel in Case No. 21-CV-8259, a letter dated December 8, 2021, from Joshua I. Schiller to Hon. Cathy Seibel in Case No. 21-CV-8259, a

letter dated January 20, 2022, from Kevin Fritz to Hon. Cathy Seibel in Case No. 21-CV-8259,

or Hudson's announcements, dated November 6, 2018 and September 24, 2018, concerning

production partnerships for The Front Runner and A Simple Favor, attached to Plaintiffs'

Opposition, (*see* Dkt No. 83); or (3) the Library Purchase Term Sheets and litigation documents,

attached to Hudson's Motion to Dismiss, (*see* Dkt. No. 71) at this stage of the litigation.

### 1.  Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the

pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert

the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56."

*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002)

(citation omitted).  However, "the Court's consideration of documents attached to, or

incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken,

would not convert the motion to dismiss into one for summary judgment." *Id*. (citations

omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling

on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety. . .,

documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice") (quotation marks omitted); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir.

2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the

pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and

matters of which judicial notice may be taken.'") (alteration omitted) (quoting *Samuels v. Air

Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993)).  Under the Federal Rules of Evidence, a court

may take judicial notice of a fact outside of the pleadings provided that the fact "can be

accurately and readily determined from sources whose accuracy cannot reasonably be

questioned."  Fed. R. Evid. 201(b).

2.  Application

"Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

The crux of Plaintiffs' claim that the Hudson Defendants were part of the alleged Enterprise is their allegation that CWMF loaned $18 million to Hudson, which had lost money investing in various films and that CWMF and Hudson agreed that the loan would be repaid out of commissions.  (*See generally* AC.)  Accordingly, the Court can consider the Library Purchase Term Sheets which lay out the agreement between Hudson and CWMF which are incorporated by reference in the Amended Complaint.  The Court may also consider the letters dated December 8, 2021, from William R. Fried to Hon. Cathy Seibel in Case No. 21-CV-8259, dated December 8, 2021, from Joshua I. Schiller to Hon. Cathy Seibel in Case No. 21-CV-8259, and dated January 20, 2022, from Kevin Fritz to Hon. Cathy Seibel in Case No. 21-CV-8259 which detail the same agreement.  Similarly, the contracts referenced by Plaintiffs throughout the Amended Complaint, (AC ¶¶ 104, 138, 142, 145), are also incorporated by reference and may be

4

considered by this Court.  The "Project Evaluation Process," BRON Studios' "active productions" presentation, and the letter dated July 8, 2020 from Ryan McWaters on behalf of DeRoyce Ltd. are all referenced in the Amended Complaint as well and are therefore incorporated by reference.  (*Id.* ¶¶ 61, 78, 193–94.)  However, Hudson's announcements, dated November 6, 2018 and September 24, 2018, concerning production partnerships for The Front Runner and A Simple Favor were not referenced or relied upon in the Amended Complaint and are therefore not incorporated by reference.

"[C]ourts routinely take judicial notice of documents filed in other courts . . .  to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991); *see also Casey v. Odwalla, Inc.,* 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) ("[C]ourts may take judicial notice of public documents and matters of public record."); *O'Neal v. East Hampton Town*, No. 16-CV-579, 2017 WL 4174788, *1 n.2. (E.D.N.Y. Aug. 28, 2017) ("Judicial notice may be taken of the state court documentation submitted by defendants.") (collecting cases), *adopted sub nom. O'Neal v. Spota*, 2017 WL 4162307 (E.D.N.Y. Sept. 19, 2017).  However, "in taking judicial notice of such public records, the Court does so only to establish the fact of such litigation, not for the truth of the matters asserted in that proceeding." *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, at *7 (S.D.N.Y. Sept. 29, 2018) (quotation marks and citations omitted); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements [a document] contained—but again not for the truth of the matters asserted.") (quotation marks and emphases omitted).  Accordingly, this Court takes judicial notice of the cases supplied by Hudson Defendants.

B.  Factual Background

    1.  Parties

Bayshore Capital Advisors, LLC ("BCA") is a limited liability company organized under the laws of Florida, with its principal place of business located in Tampa, Florida.  (AC ¶ 10.) BCA is a registered investment advisor that provides clients with access to a variety of investment opportunities, and also makes direct investments through special purpose entities such as BCA Alternative Income Fund, LP ("BAIF").  (*Id*.)  BCA's members are individuals who are citizens of the State of Florida.  (*Id*. ¶ 11.)  BAIF is a limited partnership organized under the laws of Delaware, with its principal place of business located in Tampa, Florida.  (*Id*. ¶ 12.)  BAIF is an investment fund managed by BCA.  (*Id*.)  BAIF's general partner is BCA Alternative Income Fund GP, LLC, whose sole member is BCA, and is a citizen of Florida.  (*Id*. ¶ 13.)  BAIF's limited partners are citizens of Florida, South Carolina, Oregon, Tennessee, Texas, and the U.S. Virgin Islands.  (*Id*.)  Plaintiffs refer to BCA and BAIF together as "Bayshore."  (*Id*. ¶ 14.)

    Rocking T Ranch, LLLP ("RTR") is a limited liability limited partnership organized under the laws of Florida, with its principal place of business in Tampa, Florida.  (*Id*. ¶ 15.) RTR is an advisory client of BCA, and also loaned funds directly to Defendants.  (*Id*.)  RTR's partners are the Thomas D. Arthur GST Trust of 2012, the trustee of which is a citizen of the State of North Carolina, as well as Rocking T. MGP, Inc. and Rocking T AGP, Inc., which are both Florida corporations with their principal places of business in Florida.  (*Id*. ¶ 16.)

    Hudson Valley Wealth Management, Inc., ("Hudson") is a New York corporation with its principal place of business in Pearl River, New York, in Rockland County.  (*Id*. ¶ 17.)  Hudson describes itself as an investment advisor offering "holistic asset management services to high

net-worth families" that provides an "access point for investors to pursue a spectrum of investment opportunities in film and television in both liquid and longterm formats." (*Id*. ¶ 18.)  Christopher Conover ("Conover") is the founder and president of Hudson, and is a resident of Blauvelt, New York, in Rockland County.  (*Id*. ¶ 19.)  David K. Jonas ("Jonas") is a principal of Hudson, and is a resident of Westport, Connecticut.  (*Id*. ¶ 20.)

Creative Wealth Media Finance Corp., ("CWMF") is a corporation incorporated under the laws of Ontario, Canada, with its principal place of business in Toronto, Canada.  (*Id*. ¶ 21.) On its website, CWMF describes itself as "a prolific film and television financing company that has executive produced over 50 movies, while raising and deploying in excess of $650 million for a portfolio of critical hits, commercial blockbusters and cult favorites."  (*Id*. ¶ 22.)  CWMF is the primary financier for BRON Studios, defined below.  (*Id*. ¶ 23.)

Jason Cloth ("Cloth") is the founder of CWMF and serves as its managing director and is also the co-founder of Defendant BRON Creative, as described below.  (*Id*. ¶ 26.)  He resides in Toronto, Canada.  (*Id*. ¶ 24.)  Plaintiffs allege that Cloth also has substantial ties to the United States, including through, among other things, ownership of property and a business in Miami, Florida.  (*Id*.)  Plaintiffs further allege that Cloth and CWMF have significant ties to New York, and both regularly and systematically conduct business in the State, directly and through agents in the state, which include, Hudson, Conover, and Jonas.  (*Id*. ¶ 25.)

BRON Studios USA, Inc. describes itself as a global media and entertainment firm focusing on the strategic development, production, and financing of motion pictures, television, and digital media content.  (*Id*. ¶ 27.)  It is a corporation incorporated under the laws of Nevada with its principal place of business in Beverly Hills, California.  (*Id*.)

BRON Studios, Inc. is a corporation incorporated under the laws of the Province

of Vancouver, Canada, with its principal place of business in Vancouver, British Columbia.  (*Id.* ¶ 28.)  "Except where otherwise noted" Plaintiffs refer to "BRON Studios USA, Inc. and BRON Studios, Inc." as "BRON Studios."  (*Id.* ¶ 29.)  Plaintiffs allege that BRON Studios has significant ties to New York, and regularly and systematically conducts business in the State.  (*Id.* ¶ 30.)  Among other things, BRON Studios has an office in Manhattan and employees who work in the state.  (*Id.*)  Plaintiffs allege that "BRON Studios also conducts business in New York through agents, including CWMF, Hudson, Conover, and Jonas."  (*Id.*)  Aaron L. Gilbert ("Gilbert") is the chairman and chief executive officer of BRON Studios.  (*Id.* ¶ 31.)  He resides in Los Angeles, California, and Canada and is a citizen of Canada.  (*Id.*)

BRON Creative USA Corp. is a corporation organized under the laws of the State of Nevada, with its principal place of business in Beverly Hills, California.  (*Id.* ¶ 32.)  BRON Creative Corp. is a corporation incorporated under the laws of the Province of Ontario, with its principal office located in Toronto, Canada.  (*Id.* ¶ 33.)  "Except where otherwise noted" Plaintiffs refer to "BRON Creative USA Corp. and BRON Creative Corp." as "BRON Creative." (*Id.* ¶ 34.)  Plaintiffs allege that BRON Creative has significant ties to New York, and regularly and systematically conducts business in the State, directly and through agents, including Cloth, CWMF, BRON Studios, Gilbert, Hudson, Conover, and Jonas.  (*Id.* ¶ 35.)  Cloth and Gilbert are the owners and directors of BRON Creative.  (*Id.* ¶ 36.)  Plaintiffs allege that BRON Studios produces films, certain of which are financed by BRON Creative.  (*Id.* ¶ 44.)  BRON Studios' website states that "BRON [Studios] works alongside its colleagues at [CWMF], under the branding 'BRON Creative,' to provide equity or senior secured debt financing for studio motion pictures and global network series television."  (*Id.*)

2.  Factual Allegations Giving Rise to the Current Action

In 2016, Bayshore was introduced to Hudson, an investment advisor that claims on its website an ability to provide a "one of a kind investment opportunity specializing in funding independent and large studio films," featuring "a risk managed, progressive investment alternative that provides consistent and attractive returns with little volatility and no correlation with liquid, exchange traded market instruments."  (*Id*. ¶ 50.)

In an email dated August 15, 2016, Jonas sent an email to Bayshore's Chris Grizzard in which he explained that the "loans are collateralized by municipal production incentives and distribution guarantees, locking in double digit returns.  *Importantly, we are not trying to guess which films are going to be commercially successful* (the bet most investors get burned on); the returns are completely independent of this."  (*Id*. ¶ 52 (italics in original).)  Jonas' email attached a July 2016 presentation prepared by Hudson, which similarly underscored the purported security of the film financing, informing Bayshore that "[a]ll of the investments the fund makes are either **backed by contractual payment agreements** between production companies and distribution companies . . . or **State sponsored production incentives**," i.e., transferrable tax credits.  (*Id*. ¶ 53 (bold in original).)  The presentation also stated that "it's important to reiterate that these structured investment opportunities have absolutely nothing to do with the commercial success of a film or program."  (*Id.* ¶ 54.)  Likewise, a March 2016 presentation prepared by Hudson and sent to Bayshore said "[i]nvesting in the film and television production industry should provide extremely stable, uncorrelated investment returns relative to most major foreign and domestic equity indices," and that "most of the investments that the Fund will invest in generate returns and repay investors based solely on timely delivery of the completed project, not on box office or television success."  (*Id*. ¶ 55.)  Hudson "repeated these assurances in several

subsequent communications with Bayshore, including in substantially similar 'Pitchbooks' dated December 2016, February 2017, and June 2017."  (*Id*. ¶ 56.)

In early August 2017, Jonas, on behalf of Hudson, emailed Bayshore about a "new opportunity" for film financing, secured by contracts for the film's distribution rights.  (*Id*. ¶ 57.) Jonas informed Bayshore that it could expect a full return of principal plus interest within seven months, with an additional return from distribution companies approximately three months after the end of the film's cinema run.  (*Id*.)  Jonas' emails stated that Hudson, through Conover, had a "relationship with the production company and always seem[s] to have up to the minute color on these opportunities"; Plaintiffs allege the production company was BRON Studios.  (*Id*. ¶ 58.)

On August 14, 2017, Conover formally introduced Bayshore to CWMF, which Hudson described as the entity the loan would be "papered against," and which "is the financing strategic partner of BRON."  (*Id*. ¶ 59.)  The same day, Conover provided Bayshore with more detailed information about CWMF, including its most recent pitchbook stating that CWMF had financed more than 60 film projects and had no defaulted loans.  (*Id*. ¶ 60.)  Other documents prepared by CWMF and provided to Bayshore directly or by Hudson included a "Project Evaluation Process" document, which detailed CWMF's "sophisticated and rigorous review and approval process when considering projects," which are designed to "assess the viability of the project and if the proposed investment confirms to Fund requirements/parameters through the due diligence review process."  (*Id*. ¶ 61.)  CWMF also stated on its website that repayment of the film loans was not dependent on box office success.  (*Id.* ¶ 62.)

Plaintiffs allege these "statements by Defendants were false when made" because, for example, Plaintiffs discovered after "they loaned money that Defendants' position was that the investments were very much dependent upon box office success" and that "prior loans

orchestrated by the Enterprise were in default." (*Id.* ¶ 64.) Plaintiffs allege that a significant portion of Hudson's film financing portfolio had suffered significant losses. (*Id.*)

In late 2017, "Defendants persisted in soliciting Bayshore's funds for financing." (*Id.* ¶ 65.) Plaintiffs allege that Conover indicated in emails that he was relaying information to Bayshore that he had received from Cloth. (*Id.* ¶ 66.) For example, on September 15, 2017, Conover sent an email to Bayshore attaching a spreadsheet—prepared by CWMF—purporting to summarize prior loans that had already been fully or partially repaid. (*Id.* ¶ 67.) The spreadsheet listed 23 film projects—for 21 of the entries the spreadsheet indicated that the loan had been fully repaid. (*Id.* ¶¶ 68–69.)

Plaintiffs allege they later learned that the information contained on thespreadsheet was materially false and misleading. (*Id.* ¶ 70.) For example, the spreadsheet described the loan for the movie "The Layover" as having been fully repaid with a 50% return on investment. (*Id.* ¶ 71.) Plaintiffs have since discovered, however, a 2019 lawsuit brought by investors in that project against CWMF, BRON and Cloth, alleging that principal and interest remained outstanding. (*Id.*) In a separate lawsuit discovered by Plaintiffs, lenders who participated in the film "Drunk Parents" alleged that more than $2.7 million remains unpaid while the 2017 spreadsheet told Bayshore that the loan for that project "will pay in full with interest," plus additional potential upside following theatrical release. (*Id.* ¶ 72.)

In October 2017, Hudson sought to convince Bayshore to invest in the BRON film "The Front Runner," starring Hugh Jackman. (*Id.* ¶ 74.) Jonas told Bayshore in an email that "[w]e have continued to been [sic] busy with our friends at BRON/Creative Wealth," and that "we have been giving more time to find investors for Frontrunner, which is helpful." (*Id.*)

By 2017, nearly every film in which Hudson's clients invested was produced by BRON Studios.  (*Id*. ¶ 46.)  By 2018, Hudson announced that it had entered into a new venture with BRON called BRON Ventures, which it touted as "a division of the studio that will make strategic equity investments in content-driven production companies and leaders in the film, TV, digital and animation spaces."  (*Id*. ¶ 48.)

On February 5, 2018, Jonas emailed Bayshore informing it that Hudson's monthly returns for January 2018 would be "about +1.2%," and later emailed an updated version of the Hudson pitchbook presentation, mentioned above, showing Hudson's 2017 annual return of 8.10%.  (*Id*. ¶ 75.)  Later, in May of 2018, Hudson sent Bayshore a new document titled "Film Investment Risks and Mitigation Strategies" which reiterated that "Hudson's film finance strategy is focused exclusively on 'taking investment risk' where there is collateral in place . . . against which we will loan capital."  (*Id*. ¶ 76.)

Plaintiffs allege that "Defendants also sought to induce Bayshore's financing by emphasizing BRON Studios' participation in the film projects, lending a purported imprimatur of legitimacy to the financing scheme."  (*Id*. ¶ 77.)  For instance, "in May 2018 Hudson in coordination with BRON Studios relayed to Plaintiffs an April 2018 presentation detailing BRON Studios' active productions, as well as productions that had already been released and those that were in development."  (*Id*. ¶ 78.)  Plaintiffs also allege that CWMF was described to Bayshore by Defendants as BRON's "captive finance arm," and "both Hudson and CWMF sought to leverage their relationship with BRON to further induce Bayshore and others to provide financing."  (*Id*. ¶ 81.)

Plaintiffs conducted due diligence during the period preceding their investments, requesting extensive documentation and information from Defendants.  (*Id.* ¶ 82.)  However, according to Plaintiffs, "[a]t no time . . . did the information provided by Defendants reveal the falsity of their misstatements and misrepresentations."  (*Id.*)  During Bayshore's due diligence process, Bayshore asked Hudson to describe any "formal agreement with CWM/BRON re: participation in their projects," including "any agreement re: CWM/BRON purchasing any potentially future impaired loans from Hudson."  (*Id.* ¶ 83.)  Conover responded by email on July 3, 2018 that "[t]here is a formal agreement—we have right of first refusal on all of the films they finance and produce.  Creative has agreed to take any future impairments off our books at their full book value at the end of each calendar year."  (*Id.* ¶ 84.)

Plaintiffs allege this statement regarding CWMF's purported agreement to buy back impaired loans was materially false and misleading, and "clearly was intended as subterfuge to provide Bayshore additional assurances regarding the security of any loans it made."  (*Id.* ¶ 85.)  Instead, Plaintiffs allege "any agreement by CWMF to 'take any future impairments off our books' was a mere disguise, for tax purposes, of a nearly $18 million loan that had been made by CWMF to Hudson, and which would be paid off through commissions earned on each loan that Hudson sourced for CWMF."  (*Id.* ¶ 86.)  The loan from CWMF was structured as a "purchase" of Hudson's "existing interests in failed film projects" at Hudson's request.  (*Id.* ¶ 94.)  Hudson needed the loan from CWMF "due to significant losses in its film financing investments."  (*Id.* ¶ 93 (emphasis omitted).)  Neither the existence of this loan nor the reason for its necessity was ever disclosed to Bayshore.  (*Id.*)  Bayshore did not become privy to Hudson's financial troubles until years after it had already made its investments.  (*Id.*)  Plaintiffs allege that had they known

Hudson's financial situation, and that it "needed capital to prop up its books due to failed film financings, Plaintiffs would not have" loaned Defendants money.  (*Id.* ¶ 87.)

"After two years of solicitation, based on all of Defendants' allegedly false assurances and representations, Bayshore and Hudson entered into a sourcing agreement, dated June 29, 2018, with a term of 24 months with an optional six-month extension (the "Sourcing Agreement")."  (*Id.* ¶ 88.)  The Sourcing Agreement's stated "Intent" was that "BCA intends to participate in film loan opportunities sourced by Hudson that meet BCA's predefined loan criteria."  (*Id.* ¶ 89.)  Under the Sourcing Agreement such investment criteria included only films where Bayshore would have a first position lien on all assets of the financed film, as well as a "direct sight line to specific tax credit(s) and/or distribution right(s) collateral (either executed or unexecuted)."  (*Id.*)  For films that met this criteria, Bayshore agreed to an $8 million funding commitment.  (*Id.*)  The Sourcing Agreement stated that the projects would be "sourced by Hudson via its relationship with [CWMF]," and "[p]roduced or co-produced by BRON Studios USA Inc."  (*Id.* ¶ 90.)

On June 26, 2018, Jonas sent Bayshore a deal summary seeking $2.5 million in principal to finance the film "Needle In A Timestack" ("Needle").  (*Id.* ¶¶ 98–99.)  In the email, Jonas explained that "Needle was the first of the films we would like to allocate to," namely, it was the first film that Hudson wanted to provide financing to with a portion of Bayshore's $8 million. (*Id.* ¶ 100.)  Jonas's email confirmed that BRON Studios would be involved with the Needle film and also included an attached deal summary, likely prepared by CWMF.  (*Id.* ¶¶ 100–01.) The deal summary included information regarding Needle's cast and crew, details of the investment opportunity, and assured Bayshore that collateral would consist of a transferrable Canadian tax credit, that Bayshore's loan would earn interest at rate of 11% per annum, and that

the deal would return capital in less than 12 months.  (*Id.* ¶ 101.)  The deal summary also claimed that "[n]ormally the studio would simply utilize their banking facility for this portion of a project's financing, but in recognition of the importance of the relationship with Hudson, they are making this very secure paper available to our syndicate."  (*Id.* ¶ 102.)  Bayshore was told that the "tax credit is not dependent on either the commercial success or even the completion/delivery of the film" and that "distribution deals are currently being negotiated with digital distributors—all in excess of the total budget of the film."  (*Id.* ¶ 103.)

On July 5, 2018, Bayshore, through BAIF, entered into the Needle Financing Term Sheet ("Needle Term Sheet").  (*Id.* ¶ 104.)  Under the Needle Term Sheet, Bayshore agreed to participate in the financing of Needle in the amount of $2.5 million.  (*Id.*)  The Needle Term Sheet stipulated that all parties agreed that the $2.5 million loan would earn interest at 11% per annum for 12 months from the date of signing.  (*Id.*)  Additionally, the Needle Term Sheet guaranteed that after the initial 12 months, "any outstanding balance remaining will continue to earn interest at a rate of 1.5% per month until such time as it is repaid in full."  (*Id.*)

The Needle Term Sheet also provided that "Collateral for the BCA Financing" consisted of Canadian federal and British Columbia tax credits totaling more than $2.6 million.  (*Id.* ¶ 105.)  Under the Needle Term Sheet, Bayshore was also meant to receive contingent compensation of 6% of "any further proceeds received by BRON Studios USA Inc.," once the full balance of the loan was repaid.  (*Id.* ¶ 106.)  Cloth, acting as both the director of BRON Studios USA Inc. and managing partner of CWMF, signed the Needle Term Sheet.  (*Id.* ¶ 107.)  Hudson received a 1.5% sourcing fee in the amount of $37,500 for securing financing from Bayshore.  (*Id.* ¶ 108.)

The Needle Term Sheet agreement between Bayshore and BRON Studios USA, Inc. and CWMF was structured as a participation in a larger loan that had already been agreed to between CWMF and BRON Studios USA, Inc.  (*Id.* ¶ 109.)  This underlying loan agreement ("Needle Loan Agreement") was executed on May 8, 2018, two months before Bayshore signed the Needle Term Sheet.  (*Id.*)  As a part of this larger Needle Loan Agreement, CWMF agreed to lend $8.625 million to the Needle Film.  (*Id.* ¶ 110.)  CWMF's loan would earn interest at 11% per annum, and they would be entitled to a loan fee of $431,250.  (*Id.*)  The Needle Loan Agreement also gave CWMF the right to "participate in the film's revenues in an amount equal to 20% of Net Receipts as that term was separately defined in a Collection Account Management Agreement."  (*Id.* ¶ 111.)  The Needle Loan Agreement required full repayments of principal and interest—including that contributed by Bayshore—24 months after execution.  (*Id.* ¶ 112.)  This agreement also stipulated that BRON was required to "provide a reporting letter . . . to [CWMF] with an update as to the progress of production, changes to the budget, post-production process, sales process, market strategies or any other pertinent information with regard to the Loan," every month.  (*Id.* ¶ 114.)

"The Needle Loan Agreement, attached as Schedule A to the Needle Term Sheet, showed that Needle In A Timestack LLC, an entity controlled by BRON Studios, BRON Creative, CWMF, Cloth, and Gilbert, had an address of 153 West 27th Street in New York City—the same location is BRON Studios' New York operations.  In addition, the parties to the agreement irrevocably submitted to the jurisdiction of state and federal courts in New York County."  (*Id.* ¶ 115.)  Two months after the Needle Loan Agreement was signed, on July 4, 2018, Needle In A Timestack, LLC and Needle Production Services BC Inc., executed a Promissory Note for $9,071,200 in favor of CWMF.  (*Id.* ¶¶ 116.)  This promissory note was

meant to take effect on May 8, 2018, the same day the Needle Loan Agreement was executed. (*Id*. ¶ 117.)  Gilbert signed the promissory note on behalf of all of the Needle entities.  (*Id*.)  Like the Needle Loan Agreement, the BRON-controlled entities that executed the Promissory Note consented to the jurisdiction of New York State courts.  (*Id*.)

On July 3, 2019 a year after Bayshore's $2.5 million loan, Cloth send an email to Bayshore stating that "Needle In A Timestack is a great little film, we are currently in negotiations for global deal now from tow [sic] major streaming services.  *The value of both deals gets us out with full interest*.  I should have a final deal shortly."  (*Id*. ¶ 120.)  That same day, Bayshore expressed concerns about the initial 12-month regular interest period on Needle expiring.  (*Id*. ¶ 121.)  Cloth responded via email that the tax credit collateral would provide a "worst-case backstop" and stated "we will complete our deal to a streamer shortly" which he signed both as the managing partner of CWMF and director of BRON Creative.  (*Id*. ¶¶ 121–22.)

A year after this email, on a May 8, 2020 phone call, Bayshore claims that Cloth told it that physical production of Needle had been completed and that the film required re-editing, but that several streaming services were interested in the film and Cloth was trying to obtain a deal that would bring the most money for the film.  (*Id*. ¶ 125.)  Additional details about Needle's distribution were never provided.  (*Id*. ¶ 126.)  However, the film was ultimately distributed by Lionsgate, and is currently available on streaming services such as Amazon, Apple TV, in addition to Delta Airlines' inflight entertainment catalog.  (*Id*. ¶¶ 126-27.)  Bayshore did not receive any timely financial information regarding the Needle film including any information concerning the transactions by which Needle appeared on these streaming services.  (*Id*. ¶ 129.)  As of January 31, 2022, Bayshore is owed at least $4,057,191.78 in principal and interest on the

Needle production, as well as contingent compensation to which Bayshore may be entitled upon an examination of Defendants' books and records.  (*Id.* ¶¶ 118, 131.)

Around the same time that Bayshore was entering into the Needle Agreement, Plaintiffs Bayshore and RTR agreed to participate in the financing of "a slate of four films that BRON Studios, CWMF, and BRON Creative were producing" with Lionsgate, "The Spy Who Dumped Me," "A Simple Favor," "Anna," and "Chaos Walking" (together, the "Lionsgate Slate").  (*Id.* ¶ 132–133.)

On June 26, 2018, Jonas informed Bayshore about the Lionsgate Slate opportunity via email.  (*Id.* ¶ 134.)  In this email, Jonas represented that Lionsgate would be distributing the films and that any loan from Bayshore would earn 12% interest annually for the first 18 months, followed by 18% interest on any remaining balance thereafter.  (*Id.*)  In this email, Jonas assured Bayshore that all of the films were cross-collateralized.  (*Id.*)  Jonas also informed Bayshore that the Lionsgate Slate had a budget of more than $200 million and that the films would feature A-list celebrities.  (*Id.* ¶ 135.)  Before Bayshore and RTR agreed to participate in the Lionsgate Slate financing, BRON Creative entered into a separate agreement with non-party Hercules Film Investors ("Hercules"), to participate in the financing of the Lionsgate Slate (the "Hercules Partnership"), executed by Cloth and Gilbert.  (*Id.* ¶¶ 136–37.)

On July 9, 2018, Bayshore, through BAIF, entered into the Lionsgate Term Sheet with BRON Creative USA Corp., BRON Studios USA, Inc., and CWMF to participate in the financing of the Lionsgate Slate in the amount of $3.5 million.  (*Id.* ¶ 138.)  The term sheet was amended on August 1, 2018.  (*Id.*)  The Lionsgate Term Sheet stipulated that all parties agreed that "BCA shall be entitled to a fixed rate of return of twelve per cent (12%) per annum, compounded annually," for the first 18 months and that after those 18 months "any outstanding

18

balance remaining will continue to earn interest at a rate of 1.5% per month until repaid." (*Id.* ¶ 139.) Additionally, the Term Sheet gave Bayshore a right to receive 2.173% of any further proceeds received by BRON Creative after full repayment was made. (*Id.* ¶ 141.) "The Lionsgate Term Sheet further provided that full repayment was to be made no later than July 1, 2022." (*Id.* ¶ 140.)

On August 1, 2019, RTR entered into its own Term Sheet for the financing of the Lionsgate Slate. (*Id.* ¶ 142.) RTR's Term Sheet was nearly identical to the one signed by Bayshore. (*Id.*) RTR's invested $500,000 and "its percentage of proceeds after the repayment of principal and interest was 0.310%. (*Id.*) Both the Bayshore and RTR term sheets for the Lionsgate Slate "were executed by Cloth and Gilbert on behalf of BRON Creative USA Corp., Gilbert on behalf of BRON Studios USA, Inc., and by Cloth on behalf of CWMF." (*Id.* ¶ 145.)

Hudson received a 1.5% sourcing fee in the amount of $52,500 for Bayshore's commitment in the Lionsgate Slate Term Sheet. (*Id.* ¶ 143.) BRON was to receive payment of $320,000, BRON Creative $1,518,000, and CWMF $ $512,000 from Plaintiffs' loan. (*Id.* ¶ 144.)

In addition to the executed Term Sheets, there purportedly exists a Loan Security Agreement between Hercules and BRON Creative. (*Id.* ¶ 146.) This Loan Security Agreement, which was never provided to Bayshore or RTR, was executed on June 7, 2018 and listed Hercules as a borrower and BRON Creative as a lender. (*Id.*) "The obligation to repay Plaintiffs, however, was not dependent upon any parties' performance under this agreement with Hercules." (*Id.*)

In October 2018, a few months after Plaintiffs signed on to the Lionsgate Slate, Hudson and CWMF informed Plaintiffs that the films were performing well. (*Id.* ¶ 147.) Specifically, on

October 17, 2018, Hudson and CWMF sent a written update to Bayshore and RTR informing them that "The Spy Who Dumped Me" had earned $66 million in the worldwide box office against its $45.6 million production budget.  (*Id*. ¶ 148.)  In this written update Hudson and CWMF also assured Plaintiffs that the film's performance so far was "in line with the producer and distributor expectations," and "should lead to further solid revenue production from ancillaries such as DVD/Blue-Ray sales, Video on Demand rentals and sales, as well as streaming services (including airlines) over the course of the coming year."  (*Id*.)

Additionally, Hudson and CWMF informed Plaintiffs that another film in the Lionsgate Slate, "A Simple Favor," was "performing ahead of expectations."  (*Id.* ¶ 149.)  According to Hudson and CWMF, this film had earned $83 million at the worldwide box office against its $26.5 million production budget.  (*Id*.)  The update also alleged that the total box office figure would continue to grow once the film had undergone theater distribution in international markets and that "given the strong performance to this point, we also anticipate ancillary revenues to be commensurately strong."  (*Id.*)  The update from Hudson and CWMF also informed Plaintiffs that another film in the Lionsgate Slate, "Chaos Walking" starring Tom Holland and Daisy Ridley, had not been released yet.  (*Id.* ¶ 150.)

Hudson and Cloth continued to provide "assurances [of] repayment" to Plaintiffs about their loan for months after these updates.  (*Id.* ¶ 152.)  Cloth allegedly told Bayshore that its loan was "not in jeopardy of not being repaid" on August 16, 2019.  (*Id.*)  Additionally, "during a November 2019 telephone call between Bayshore's Grizzard and Conover, Conover assured Bayshore that Hudson's clients had participated in more than 30 deals with CWMF, and that it had never failed to pay what was owed."  (*Id.* ¶ 153.)  Plaintiffs contend that these statements were false when made and were made to prevent them from taking action to recover money

owed.  (*Id.* ¶ 154.)  Additionally, Conover made further assurances reporting that CWMF was set to earn $100 million in profit from an unrelated investment in the film "The Joker," which had earned $1 billion in the global box office.  (*Id.* ¶ 155.)

During this time Hudson and CWMF provided occasional reporting on the Lionsgate Slate, but they acknowledged that the information would be out of date and missing key financial information.  (*Id.* ¶ 156.)  On August 7, 2020, Bayshore received a partial repayment of its Lionsgate loan in the amount of $1,192,977.77 and on August 10, 2020, RTR received partial repayment in the amount of $168,898.28.  (*Id.* ¶ 157.)  No other repayments have been made. (*Id.* ¶ 158.)  "As of January 31, 2022, Bayshore and RTR are owed at least $4,520,939.00 and $641,198.85, respectively, in principal and interest on the Lionsgate Slate, as well as contingent compensation to which they may be entitled upon an examination of Defendants' books and records."  (*Id.* ¶ 158.)  Plaintiffs believe that BRON Creative has been repaid in full for its loan on the Lionsgate Slate and that a "substantial portion" of the money used to repay them consisted of Plaintiffs' money.  (*Id.* ¶ 159.)

A few months after Bayshore entered into the Needle and Lionsgate Agreements, Hudson approached the Plaintiffs on September 26, 2018 with an opportunity to finance another film called "The Nightingale" ("Nightingale") in the amount of $3.5 million.  (*Id.* ¶ 160.)  Hudson and CWMF, with BRON "necessarily participating as a producer," presented Nightingale as an opportunity "collateralized by already completed minimum guaranteed distribution sales in international markets (via FilmNation Entertainment one of the largest international film distributors) thus far of $3.5 million."  (*Id.* ¶ 161.)  According to CWMF , Nightingale was already complete and had been shown at the Venice Film Festival in September 2018.  (*Id.* ¶ 162.)

In an email dated October 8, 2018, Jonas suggested that the financing for Nightingale be structured as "a Purchase Agreement rather than a loan." (*Id.* ¶ 163.) Under this structure, Bayshore would effectively purchase "the rights to approx. $3.5 million for $3.25 million today (or something akin to this)." (*Id.*) Jonas explained that Bayshore was essentially guaranteed to recoup its loan because the existing negotiated sales by FilmNation, which BRON Studios and BRON Creative would be in first position to receive, exceeded the amount of the loan. (*Id.* ¶ 165.) On the same day this email was sent, Conover sent Bayshore a copy of sales estimates from FilmNation reflecting projected sales of $3,565,000. (*Id.* ¶ 166.)

Unbeknownst to Plaintiffs, at the time of the October 8, 2018 email, "Defendants" were involved in a dispute with another lender who had contributed funds to Nightingale. (*Id.* ¶ 167.) The dispute between Defendants and the other financers of Nightingale ripened into a lawsuit, brought by Premium Properties Limited and Colonia Trustco against, among others, BRON Creative, Cloth, and Gilbert (the "Prior Nightingale Claim"), only days after Plaintiffs provided their financing. (*Id.* ¶ 168.) The plaintiffs in the Prior Nightingale Claim alleged that "BRON Creative breached a term sheet and participation agreement for financing Nightingale, including by failing to provide documents requested, failing to collect and pay out amounts due under parties' agreements, and failing to properly secure the collateral." (*Id.* ¶ 169.) The facts of the Prior Nightingale Claim allege that BRON Creative pledged the same collateral to multiple lenders as "first priority" including the collateral that Defendants pledged to Bayshore and RTR in October 2018. (*Id.* ¶ 170.) Plaintiffs did not know about this dispute until after they realized that they would not be repaid for their contributions to Nightingale and contend that they would not have agreed to provide financing for Nightingale had they known about the dispute with the other financers. (*Id.* ¶¶ 167, 171.)

However, in reliance on the information they had been provided, Bayshore, through BAIF, entered into a Term Sheet with BRON Creative Corp., dated October 17, 2018 (the "Nightingale Term Sheet"). (*Id.* ¶ 172.) The Nightingale Term Sheet was signed by Cloth on behalf of BRON Creative. (*Id.*) Bayshore's participation was limited to $2,250,000, representing a 69.23% interest in the larger loan that Jonas had earlier described. (*Id.* ¶ 173.) "As stated by the Nightingale Term Sheet, this participation was structured such that Bayshore's funds were payable to BRON Creative which, as 'Lender,' would advance those funds to Nightingale Film Holdings Pty Ltd.—the entity producing the film." (*Id.*)

Under the Nightingale Term Sheet, the "Repayment Amount," which included Bayshore's participation, would earn an annual interest of 12% and would mature 12 months from the date of the initial disbursement of the loan. (*Id.* ¶ 174.) After the date of maturation, the outstanding Repayment Amount would be subject to default interest at 17%. (*Id.*) Bayshore was to be repaid out of gross receipts, meaning all proceeds derived from Nightingale from all sources worldwide, excluding Australia and New Zealand. (*Id.* ¶ 175.) The Nightingale Term Sheet also provided that the Loan "shall be in first priority position for all collateral receipts therefrom in the Lender's Territory," which included the entire world except Australia and New Zealand. (*Id.* ¶ 176.)

Security and collateral were defined expansively by the Nightingale Term Sheet to include:

> all of Borrower's and Prod Co's assets, including, without limitation, Borrower's right, title and interest in or relating to the Picture [Nightingale Production], and all of Borrower's (and any of its respective affiliates') right, title and interest in any of the revenue arising out of or relating to the Picture (except as set forth below), and all tax and other incentives and so-called "soft monies' in connection with the Picture . . .

(*Id.* ¶ 177.)  On the same day that Bayshore signed the Nightingale Term Sheet, RTR entered into a separate – but largely identical – term sheet for financing the Nightingale.  (*Id.* ¶ 178.) Under RTR's Nightingale Term Sheet, BRON Creative would advance loan proceeds to Nightingale Film Holdings Pty Ltd. on behalf of RTR in the amount of $1 million.  (*Id.*)

In total, Plaintiffs have invested $3,250,000 in Nightingale.  (*Id.* ¶ 179.)  Under the Nightingale Term Sheets BRON Creative was to receive a "loan fee" of 5% of the loan, or $162,500.  (*Id.* ¶ 180.)  Both Nightingale Term Sheets had a maturity date of 12 months after initial loan disbursement which would be on or around October 17, 2019.  (*Id.* ¶ 181.)[1]

Hudson and CWMF provided assurances to Plaintiffs about the success of Nightingale. (*Id.* ¶ 183.)  On January 11, 2019, Conover and Grizzard exchanged emails discussing the news that Nightingale had been sold to IFC Films.  (*Id.* ¶ 184.)  In this email exchange, Conover explained that "the IFC acquisition was separate from the collateral originally securing Plaintiffs' loan, and thus provided even greater loan protection."  (*Id.*)  Again in July 2019, Cloth provided assurances that the FilmNation and IFC distribution proceeds would provide a quick repayment for Plaintiffs' loans.  (*Id.* ¶ 185.)  Cloth claimed that "[w]e anticipate being paid out all at once, at worst we might see two payments (one from Film Nation for foreign $ and one from IFC for the domestic $."  (*Id.* ¶ 185.)

Plaintiffs continued to seek repayment, information regarding the status of the distribution agreements, and documentation regarding the collateral that Defendants had promised.  (*Id.* ¶ 186.)  On October 17, 2019—a year after the Nightingale Loan was made—

---

[1] Both term sheets are governed by New York Law.  (*Id.* ¶ 181.)  Additionally, in the underlying Loan and Security Agreement between Nightingale Film Holdings Pty Ltd., as borrower, and BRON Creative as lender, the parties agreed that any claims would be governed by New York Law and that New York County would be the exclusive jurisdiction for any disputes.  (*Id.* ¶ 182.)

Cloth assured Bayshore that "payments for Nightingale would start to arrive within weeks." (*Id.* ¶ 187.) When no payments were received, Conover, acting on behalf of Hudson, and Cloth, told Bayshore to "be patient, and that none of Hudson's deals with CWMF had ever defaulted." (*Id.*) However, no money was ever repaid and as of January 31, 2022, Bayshore and RTR are owed at least $3,787,029.97 and $1,683,124.43, respectively, in principal and interest on Nightingale, in addition to any contingent compensation. (*Id.* ¶ 188.)

By mid-2020, nearly two years after Plaintiffs' initial loans, Defendants "began to promise" that Plaintiffs' loans would be repaid from sources other than the film financing projects. (*Id.* ¶ 189.) On a May 8, 2020 telephone call, Cloth told Bayshore that BRON Studios was about to close on a line of credit with Comerica which would allegedly provide BRON Studios with "tens of millions of dollars." (*Id.* ¶ 190.) "Cloth, on behalf of BRON Studios, told Bayshore that this money would be used to pay off Bayshore's loans and others like it." (*Id.*) "Over the following months Plaintiffs sought additional information about the Comerica financing, and were continually told that the Comerica financing was going forward." (*Id.* ¶ 191.) In July 2020, Cloth told Bayshore that BRON Studios had been "working with a UK financier for the better part of 6 months arranging financing for general corporate purposes, including the repayment of older unpaid loans. The negotiations are in their latter stages and Bayshore is earmarked to have all its loans repaid with the first advance of funding." (*Id.* ¶ 192.)

In response to requests for proof regarding these alleged transactions, Bayshore received a letter dated July 8, 2020 from Ryan McWaters of DeRoyce Capital. (*Id.* ¶ 193.) In this letter, McWaters claimed that DeRoyce Capital and BRON Media Corp. were "presently in advanced negotiations with the intention of allocating investment in excess of $100,000,000 across BRON's various operating divisions" and that "approved use-of-funds has been consented to

retire loans in films that have taken longer than anticipated to repay . . . ." (*Id*.)  Plaintiffs allege that McWaters is a confederate of Defendants and that the assurances made in this letter were a component of the scheme.  (*Id.* ¶ 194.)  This allegation is based on the fact that the address used by McWaters in the United States is the same as BRON Studios' address in Los Angeles and that the "purportedly prestigious London address is merely a shared office space." (*Id*.)  Defendants never provided any additional substantive information about the purported financing and Defendants were never repaid their outstanding loan amounts.  (*Id.* ¶ 195.)

Plaintiffs allege that "nearly every project in which BRON was the producer together with CWMF, BRON Creative, or Cloth, resulted in investors lending money and not being repaid.  These include not only the films at issue in this lawsuit—Needle In A Timestack, A Simple Favor, The Spy Who Dumped Me, Chaos Walking, and The Nightingale—but also projects that harmed other lenders, such as Drunk Parents, Fonzo, Greyhound, and Bombshell. On the other hand, for films produced by BRON Studios independent of the Enterprise, it appears that the projects were not tainted by Defendants' criminal conduct and lenders were repaid." (*Id.* ¶ 79.)

C.  Procedural History

Plaintiffs filed their original Complaint on February 8, 2022, (Dkt. No. 1), and their Amended Complaint on May 18, 2022, (Dkt. No. 54).  Hudson Defendants, Creative Defendants, and BRON Defendants filed the three separate Motions to Dismiss and accompanying Memorandums of Law on August 26, 2022.  (*See* Not. of Mot. (Dkt. No. 69); Mem. of Law in Supp. of Mot. ("Hudson Defs.' Mem.") (Dkt. No. 70); Not. of Mot. (Dkt. No. 72); Mem. of Law in Supp. of Mot. ("Creative Defs.' Mem.") (Dkt. No. 75); Not. of Mot. (Dkt. No. 76); Mem. of Law in Supp. of Mot. ("BRON Defs.' Mem.") (Dkt. No. 77).)  Plaintiffs filed their Opposition

on October 10, 2022.  (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 81).)  Hudson Defendants, Creative Defendants, and BRON Defendants filed their Replies on October 31, 2022.  (*See* Reply to Mot. ("Hudson Defs.' Reply Mem.") (Dkt. No. 88); Reply to Mot. ("Creative Defs.' Reply Mem.") (Dkt. No. 89); Reply to Mot. ("BRON Defs.' Reply Mem.") (Dkt. No. 91).)

On February 23, 2023, this Court ordered Plaintiffs, Creative Defendants, and BRON Defendants to submit supplemental briefing related to the Court's jurisdiction.  (Dkt. No. 98.)  Plaintiffs, Creative Defendants, and BRON Defendants submitted supplemental briefing on March 2, 2023.  (*See* Supplemental Brief ("Creative Defs.' Supp. Mem.") (Dkt. No. 101); Supplemental Brief ("BRON Defs.' Supp. Mem.") (Dkt. No. 102); Supplemental Brief ("Pls.' Supp. Mem.") (Dkt. No. 103).)

## II.  Discussion

### A.  Standard of Review

#### 1.  Rule 12(b)(2)

On a Rule 12(b)(2) motion, the plaintiff has the burden of establishing that the court maintains jurisdiction over the defendant.  *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir. 2003).  However, "prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction."  *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (alteration, italics, citations, and quotation marks omitted); *see also Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008) ("Where . . . a district court relies on the pleadings and affidavits, and chooses not to conduct a full-blown evidentiary hearing, plaintiffs need only make a prima facie showing of personal

jurisdiction over the defendant." (citation and quotation marks omitted)). "[A] prima facie

showing of jurisdiction does not mean that [the] plaintiff must show only some evidence that

[the] defendant is subject to jurisdiction; it means that [the] plaintiff must plead facts which, if

true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't*

*Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997). A plaintiff may "make this showing

through his own affidavits and supporting materials, containing an averment of facts that, if

credited . . . , would suffice to establish jurisdiction over the defendant." *Whitaker v. Am.*

*Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (alteration, citations, and quotation marks

omitted).

    While a court may consider materials beyond the pleadings, the court must credit a

plaintiff's allegations in support of jurisdiction and "construe the pleadings and any supporting

materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian*

*Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé v. Queen Bee of Beverly Hills, LLC*,

616 F.3d 158, 163 (2d Cir. 2010)); *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–

80 (2d Cir. 1993) ("[W]here the issue is addressed in affidavits, all allegations are construed in

the light most favorable to do the plaintiff and doubts are resolved in the plaintiff's favor,

notwithstanding a controverting presentation by the moving party."). However, "[p]leadings that

assert only 'conclusory non-fact-specific jurisdictional allegations' or state a 'legal conclusion

couched as a factual allegation' do not meet this burden." *Pruthi v. Empire City Casino*, No. 18-

CV-10290, 2022 WL 596370, at *2 (S.D.N.Y. Feb. 28, 2022) (quoting *Jazini*, 148 F.3d at 185);

*see also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (explaining

that a court cannot "draw 'argumentative inferences' in the plaintiff's favor" in considering Rule

12(b)(2) motion (quoting *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992))).

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B.  Analysis

Because BRON and Creative Defendants move to dismiss pursuant to Rules 12(b)(2) arguing the Court lacks personal jurisdiction, "the Court must first address the preliminary question[ ] of . . . personal jurisdiction before considering the legal sufficiency of the allegations in the amended complaint."  *Corrado v. N.Y. Unified Court Sys.*, 163 F. Supp. 3d 1, 10 (E.D.N.Y. 2016) (citation and quotation marks omitted), *aff'd*, 698 F. App'x 36 (2d Cir. 2017) (summary order); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant [because] a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . .").

1.  Personal Jurisdiction Authorized by Civil RICO Statute

The Second Circuit has held that 18 U.S.C. § 1965 "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the

30

defendant is found." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir. 1998). Rather, the court explained, "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *Id.* "Therefore, personal jurisdiction over at least one defendant must be present through traditional means before one may invoke the nationwide service of process provision of 18 U.S.C. § 1965(b)." *Regency Cap., LLC v. Corpfinance Int'l, Inc.*, No. 02-CV-5615, 2003 WL 22400200, at *1 (S.D.N.Y. Oct. 20, 2003).

"Once that initial personal jurisdiction is established, the statute authorizes the court's assertion of nationwide personal jurisdiction over other parties, including co-defendants and third-party defendants, where the 'ends of justice' so require." *Hitachi Data Sys. Credit Corp. v. Precision Discovery, Inc.,* 331 F. Supp. 3d 130, 145 (S.D.N.Y. 2018) (citation omitted). Courts in the Second Circuit have interpreted the phrase "the ends of justice" to permit the exercise of "personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action." *RXUSA Wholesale, Inc. v. Steel City Pharm., LLC*, No. 06-CV-3885, 2008 WL 11417667, at *2 (E.D.N.Y. Aug. 7, 2008) (quotation marks omitted); *see also PT United Can Co.*, 138 F.3d at 71 n.5 ("'[T]he ends of justice' to refer to a case in which there is no district with personal jurisdiction over all defendants."). No Party has argued that there is a court that would have personal jurisdiction over all Defendants, but no Party contends that this Court does not have jurisdiction over Hudson and Conover. Courts may also be permitted to exercise personal jurisdiction over such defendants for other claims that arise out of the same operative facts as the civil RICO claim, even if personal jurisdiction would not otherwise be present as to those claims. *See IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056–57 (2d Cir. 1993).

"The Second Circuit's . . . interpretation [in *PT United* ] of 1965(b) as providing for jurisdiction over additional parties not residing in the district if the ends of justice require, would seem to all permit the assertion of personal jurisdiction over RICO defendants residing abroad." *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 86 F. Supp. 2d 137, 140 (E.D.N.Y. 2000) (citations and quotation marks omitted).  In order to comply with due process, "any such additional defendant need meet only a national contacts test, meaning they must have minimum contacts with the United States."  *Hitachi Data Sys. Credit Corp.*, 331 F. Supp. 3d at 145 (citing *Herbstein v. Bruetman*, 768 F. Supp. 79, 81 (S.D.N.Y. 1991)); *see also Bakken Res., Inc. v. Edington*, No. 15-CV-8686, 2019 WL 1437273, at *3 (S.D.N.Y. Mar. 29, 2019) ("To comply with due process, any such additional defendant need meet only a 'national contacts' test, meaning they must have minimum contacts with the United States."); *Madanes v. Madanes*, 981 F. Supp. 241, 260 (S.D.N.Y. 1997) (explaining that "[i]n the case of a defendant not present in the jurisdiction, such contacts may be demonstrated by: (1) doing business in the United States; (2) doing an act in the United States; or (3) causing an effect in the United States by an act done elsewhere").

Courts in the Second Circuit have held that foreign "defendants must be served with process within the United States" for the court to have personal jurisdiction under the RICO statute.  *Nat'l Asbestos Workers Med. Fund*, 86 F. Supp. 2d at 140 (collecting cases); *see also Herbstein*, 768 F. Supp. at 81 (exercising RICO jurisdiction over Argentinian corporation whose director was served in Illinois); *Nordic Bank PLC v. Trend Grp., Ltd.*, 619 F. Supp. 542, 564 (S.D.N.Y. 1985) (holding that to exercise RICO jurisdiction "any foreign party against whom a RICO claim is asserted must be served with process in this country"); *see also Stauffacher v. Bennett*, 969 F.2d 455, 460–61 (7th Cir. 1992) ("The RICO statute authorizes nationwide service

of process, but not international service." (italics omitted)); *Brink's Mat Ltd. v. Diamond*, 906 F.2d 1519, 1521–22 (11th Cir. 1990) (same).

Here, Plaintiffs contend that the agreement by counsel for the BRON and Creative Defendants to accept service of the Complaint constitutes service of process on the BRON and Creative Defendants within the United States. (Pls.' Mem. 6.) No court in the Second Circuit has directly addressed the question of whether service upon a foreign defendant's United States counsel constitutes service of process within the United States.

Under the Federal Rules of Civil Procedure, an individual "may be served in a judicial district of the United States" by "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e)(2)(C). Additionally, "[u]nless federal law provides otherwise or the defendant's waiver has been filed . . . a foreign corporation . . . must be served in a judicial district of the United States" by, in one instance "delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(h)(1)(B). In *Nuevos Destinos, LLC v. Peck*, No. 19-CV-45, 2020 WL 6318219 (D.N.D. Mar. 10, 2020), the court held that RICO's jurisdictional provision under 18 U.S.C. § 1965(b) existed for a foreign defendant when a designated agent for the company was served in the United States pursuant to Federal Rules of Civil Procedure 4(h)(1)(B) because that defendant was not served abroad. [2] *Id*. at *2. Here, Creative and BRON Defendants' United States counsel

---

[2] Creative Defendants cite to a Western District of Washington case which determined that service upon an attorney cannot qualify as service within the United States for the purposes of RICO. (Creative Defs.' Supp. Mem. 7.) However, that line of Western District of Washington cases is distinguishable because the foreign defendant at issue was explicitly served according to Rule 4(f)(3) which addresses, by its very terms, "service upon individuals in a foreign country" and allows service "in a place *not* within any judicial district of the United States." *Cascade Yarns, Inc. v. Knitting Fever, Inc*., No. C10-861, 2011 WL 1042578, at *1

were authorized to accept service on behalf of their clients. (Shargel Decl. Ex. B.) Creative and

BRON Defendants do not argue that their attorneys were not agents authorized to receive service

of process. Accordingly, this Court holds that service upon BRON and Creative Defendants'

United States counsel constitutes service within the United States.[3]

Next, the Court must determine whether the foreign Creative and BRON Defendants had

sufficient national contacts, meaning they must have minimum contacts with the United States.

*See Hitachi Data Sys. Credit Corp.*, 331 F. Supp. 3d at 145. Plaintiffs allege that CWMF and

Hudson had a "formal agreement" described as an agreement that CWMF would "take any future

impairments off [Hudson's] books" which "was a mere disguise, for tax purposes, of a nearly

---

(W.D. Wash. Mar. 18, 2011) (emphasis added). Accordingly, the court held that service upon the foreign defendant's attorney "cannot qualify as service in the United States for the purposes of RICO jurisdiction" when the defendant is served according to Rule 4(f)(3) which explicitly provides for service *not within any judicial district of the United States*. *Id*. at *2.

[3] The Court is mindful of *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015), where the court held that a "district court relying on § 1965 may only exert this jurisdictional pull over defendants 'residing in any other district,' not foreign defendants." *Id*. at 343 (citation omitted). However, that court noted that courts have held RICO jurisdiction extends to foreign defendants in instances where those defendants are served within the United States but explained that the plaintiff "does not argue that this happened here." *Id*. at 343 n.7. The *Elsevier* court also noted that the "parties stipulated as to the service of the Summons and Complaint on defendants 'without prejudice to any of [the Defendants'] right to challenge this Court's personal jurisdiction over them.'" *Id.*

Because *Elsevier* does not clarify whether the foreign defendants were served via attorneys located in the United States and the plaintiff in that case did not argue that service occurred in the United States, the case is not determinative here. However, the Court acknowledges that the question of whether §1965 can be utilized to exert personal jurisdiction over foreign defendants is unresolved in the Second Circuit. *See Laborers Loc. 17 Health & Ben. Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593, 601 (S.D.N.Y. 1998) ("[P]laintiffs asserting RICO claims against foreign defendants must rely on the long-arm statute of the state in which they filed suit."); *Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*, 817 F. Supp. 326, 332 (E.D.N.Y. 1993) ("[T]he court may exercise personal jurisdiction in a civil RICO action over a foreign defendant if (i) the defendant is served within the United States and such exercise of jurisdiction satisfies federal due process requirements, or (ii) the defendant is served without the United States and such exercise of jurisdiction satisfies both federal due process requirements and the forum state's jurisdictional requirements.").

$18 million loan that had been made by CWMF to Hudson, and which would be paid off through commissions earned on each loan that Hudson sourced for CWMF."  (AC ¶¶ 84–86.)  The Sourcing Agreement between Plaintiffs and Hudson also confirms that CWMF and Hudson had an ongoing business relationship as the sourcing agreement made clear that projects would be "sourced by Hudson via its relationship with [CWMF]."  (*Id*. ¶ 90.)  Plaintiffs also allege that documents prepared by CWMF were transmitted directly or indirectly to Plaintiffs which contained false statements.  (*Id*. ¶ 67.)  Plaintiffs allege that these contacts with the United States are the basis for the alleged RICO enterprise and predicate acts, and therefore Plaintiffs have sufficiently alleged CWMF had minimum contact with the United States.  *See Nagoya Venture Ltd. v. Bacopulos*, No. 96-CV-9317, 1998 WL 307079, at *4 (S.D.N.Y. June 11, 1998) (holding that plaintiff sufficiently demonstrated defendant took "actions that (at a minimum) caused an effect in the United States" when defendants were "alleged to have acted directly or indirectly through BHIL, in New York City, in furtherance of the RICO scheme described in the Complaint" (alteration and quotation marks omitted)); *Herbstein*, 768 F. Supp. at 82 (holding that personal jurisdiction over a foreign defendant was proper under RICO where defendant caused letters and other documents which contained fraudulent statements to be mailed and transmitted by wire in the United States).

Next, Plaintiffs allege that Cloth is the founder of CWMF and serves as its managing director and is also the cofounder of BRON Creative.  (AC ¶ 26.)  Cloth signed term sheets for Needle in a Time Stack and Lionsgate on behalf of BRON Creative USA Corp. as its director and CWMF as its managing partner.  (Shargel Decl. Ex. F., G., H.)  Plaintiffs also alleged that Cloth sent emails to Bayshore signed as the managing partner of CWMF director of BRON Creative that included false information, for instance by assuring Bayshore that the tax credit

collateral would provide a "worst case backstop" for the needle loan.  (AC ¶¶ 121–22.)
Accordingly, Plaintiffs have made the requisite showing that Cloth had minimum contacts with
the United States.  *See Fed. Trade Comm'n by James v. Quincy Bioscience Holding Co., Inc*.,
389 F. Supp. 3d 211, 219 (S.D.N.Y. 2019) (holding individuals had substantial contacts with the
United States when they controlled companies based in Wisconsin); *Herbstein*, 768 F. Supp. at
82 (holding that personal jurisdiction over a foreign defendant proper where defendant caused
letters and other documents which contained fraudulent statements to be mailed and transmitted
by wire in the United States).

Plaintiffs allege that Gilbert is the chairman and CEO of BRON Studios.  (AC ¶ 31.)  The
term sheets for Lionsgate are signed by Gilbert on behalf of BRON Creative USA Corp. as its
director and BRON Studios USA, Inc. as its president.  (Shargel Decl. Ex. G., H.)  Gilbert also
"divides his time between BRON offices in Los Angeles and Vancouver."  (Shargel Decl. Ex.
D.)  Accordingly, Plaintiffs have shown that Gilbert has minimum contacts with the United
States.  *See Fed. Trade Comm'n by James,* 389 F. Supp. 3d at 219 (holding individuals had
substantial contacts with the United States when they controlled companies based in Wisconsin);
*Bank of Crete, S.A. v. Koskotas*, No. 88-CV-8412, 1991 WL 177287, at *2 (S.D.N.Y. Aug. 30,
1991) (holding defendant had minimum contacts with the United States in part because he
"visited this country repeatedly, several times a year, and conducted business here during those
visits").

BRON Defendants argue that the Amended Complaint does not establish that BRON
Studios, Inc had the requisite minimum contacts with the United States.  (BRON Defs.' Mem 7.)
The Court agrees that Plaintiffs have not sufficiently demonstrated that this Court has personal
jurisdiction over BRON Studios, Inc.  Plaintiffs' pleadings refer to BRON Studios, Inc. and

BRON Studios USA, Inc. collectively as "BRON Studios" throughout the Amended Complaint. (AC ¶ 29.)  Plaintiffs contend that while "BRON Studios, Inc. . . . may be incorporated in Canada, and ha[s] an office there, BRON Studios is also alleged to conduct substantial business in the United States, including through its offices in Los Angeles and New York City."  (Pls.' Mem. 8.)  However, Plaintiffs have not made representations in their Amended Complaint specifically regarding BRON Studios, Inc.'s contacts with the United States and more specifically, its conducting of business in New York and California.  (*See generally* AC.)  Moreover, there are clear instances of the American entities working independently from their Canadian entities, for example, the Sourcing Agreement stated that projects would be "sourced by Hudson via its relationship with [CWMF]," and "[p]roduced or co-produced by *BRON Studios USA Inc*."  (*Id*. ¶ 90 (emphasis added).)  Indeed, in arguing that BRON Studios, Inc. had minimal contacts with the United States, Plaintiffs cite to paragraphs in the Amended Complaint, none of which refer to BRON Studios, Inc. specifically.  (Pls.' Mem. 8–9.)  Because BRON Studios has a United States entity, this Court cannot assume that BRON Studios, Inc. has conducted business in the United States.  Indeed, it is possible that BRON Studios USA, Inc. is solely responsible for the BRON contacts in the United States.  So, for instance, while Plaintiffs point out that "BRON Studios . . . [has] offices in New York City, and [has] used that address to transact business related to the film financing scheme," this Court cannot determine whether the office belongs to and is utilized by BRON Studios, Inc. or BRON Studios USA, Inc.  (Pls.' Mem. 10.)  Accordingly, Plaintiffs have not alleged that BRON Studios, Inc. has minimum contacts with the United States to justify the exercise of personal jurisdiction.

Similarly, Plaintiffs' pleadings refer to BRON Creative Corp. and BRON USA Creative Corp. as "BRON Creative."  (*Id*. ¶ 34.)  However, Plaintiffs have specifically alleged that they,

which are United States-based companies, entered into the Nightingale Term Sheet with BRON

Creative Corp., which had a New York choice of law provision—a contract from which

Plaintiffs' claim their damages stem.  (AC ¶ 172; Shargel Decl. Ex. I.); *In re Bernard L. Madoff*

*Inv. Sec. LLC*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009) (holding defendants had minimal

contacts with the United States when the "Customer Agreements executed by Defendants to

open their New York BLMIS accounts contain Choice of Law clauses deeming the contracts to

be made in New York, subject to New York law").  Furthermore, Creative Defendants have not

argued that BRON Creative Corp. did not have minimum contacts with the United States.  (*See*

*generally* Creative Defs.' Mem.)  Accordingly, Plaintiffs have shown that BRON Creative Corp.

had minimal contacts with the United States.[4]

---

[4] Creative Defendants additionally argue that the "claims against them should be severed" and then dismissed on  forum non conveniens grounds.  (Creative Defs.' Reply Mem. 8.)  Rule 21 of the Federal Rules of Civil Procedure provides that a court may "sever any claim against a party."  Fed. R. Civ. P. 21.  "In resolving a motion for severance, courts consider (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *Rudersdal v. Harris,* No. 18-CV-11072, 2022 WL 263568, at *6 (S.D.N.Y. Jan. 28, 2022) (citation and quotation marks omitted)).  Severance is appropriate where it "will serve the ends of justice and further the prompt and efficient disposition of the litigation."  *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd*., 806 F. Supp. 2d 712, 720 (S.D.N.Y. 2011) (citation and quotation marks omitted).  Deciding whether to sever is "committed to the sound discretion of the trial court."  *State of N.Y. v. Hendrickson Bros., Inc*., 840 F.2d 1065, 1082 (2d Cir. 1988).  "The Federal courts view severance as a procedural device to be employed only in exceptional circumstances."  *Oram v. SoulCycle LLC,* 979 F. Supp. 2d 498, 503 (S.D.N.Y. 2013) (citation and quotation marks omitted).

First, "[t]here appears to be no rigid rule as to what constitutes the same series of transactions or occurrences.  Courts in the Second Circuit, however, have repeatedly interpreted the phrase 'same transaction' to encompass 'all logically related claims.'"  *Laser Kitten, LLC v. Marc Jacobs Int'l, LLC*, No. 17-CV-8613, 2019 WL 1147599, at *3 (S.D.N.Y. Mar. 13, 2019) (citations and quotation marks omitted); *Todaro v. Siegel Fenchel & Peddy, P.C.*, No. 04-CV-2939, 2008 WL 682596, at *2 (E.D.N.Y. Mar. 3, 2008) ("[D]istrict courts in this Circuit generally permit all logically related claims by or against different parties to be tried in a single proceeding." (citations and quotation marks omitted)).  Given that Plaintiffs' theory of the case is

2.  Plaintiffs' RICO Allegations Under § 1962(c)

Plaintiffs' substantive RICO cause of action against Defendants is brought pursuant to 18

U.S.C. § 1962(c).  Under § 1962(c), it is "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).  Section 1964(c) of "RICO creates a

---

that Defendants engaged in a series of transactions that, cumulatively, were intended to defraud Plaintiffs, this Court finds that this factor does not support severance, at the least, as it pertains to Plaintiffs' RICO claims at this stage.  Second, it is clear that Plaintiffs' RICO claims would involve common questions of law and fact as, for instance, Plaintiffs allege all Defendants were members of a RICO enterprise and partook in a scheme to defraud Plaintiffs, which would require an analysis of similar legal and factual questions.  As the second "factor only requires there to be some common question of law or fact, it clearly weighs against severance."  *Laser Kitten, LLC*, 2019 WL 1147599 at *3.  Third, "[w]hether judicial economy is best served by severance turns on whether the Court believes that having one trial encompassing all claims will be more efficient than having separate trials."  *Id.* (citation and quotation marks omitted).  Here, "severing [the RICO claims] would hinder settlement and judicial economy" as there would be significant overlap between evidence pertaining to any scheme to defraud Plaintiffs.  *Id.* ("While [the] [d]efendant's discovery demands and witness testimony may differ with respect to each [p]laintiff, the [p]laintiffs' discovery demands and witness testimony will have extensive overlap, addressing the common transactions and occurrences that led to the creation, marketing, and sales of [the] [d]efendant's allegedly infringing products.").  "It is thus clear to the Court that keeping this case joined would be far more efficient for settlement and, indeed, an eventual trial than splitting this case into multiple actions.  Accordingly, this factor weighs against severance."  *Id.*  Fourth, "[s]everance is appropriate where a joint trial could lead to confusion of the jury.  However, where, as here, the case is in its initial stages and the Court is responsible for deciding relevant legal and factual questions, prejudice is not yet a germane concern."  *Id.* (alteration, citation, and quotation marks omitted).  Accordingly, the Court does not find this issue to be germane at the motion to dismiss stage.

   Finally, "[w]hile nearly every trial involving multiple [parties] will involve some separate issues of fact that call for testimony from different witnesses on entirely unrelated matters, the more appropriate question . . . is whether separate trials will require substantial overlap of witnesses or documentary proof."  *Id.* (citation, quotation marks, and emphasis omitted).  Given the likelihood of common witnesses and documentary proof relating to the questions of a RICO enterprise and a scheme to defraud Plaintiffs, this factor militates against severance.  Because the factors weigh against severance of the RICO claim, the Court denies Creative Defendants request to sever the RICO claim.  *Id.* (denying motion to sever when all five factors weighed against severance).

private cause of action for 'any person injured in his business or property by reason of a violation of section 1962' of RICO." *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting 18 U.S.C. § 1964(c)).  RICO thus permits injured parties to sue "individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'" *Reich v. Lopez*, 858 F.3d 55, 59 (2d Cir. 2017) (quoting 18 U.S.C. §§ 1962, 1964).

"To establish a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Curtis v. Greenberg*, No. 20-CV-824, 2021 WL 4340788, at *7 (E.D.N.Y. Sept. 23, 2021) (quoting *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013)); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (same).  "The requirements of section 1962(c) must be established as to each individual defendant." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).")).

### a.  Racketeering Activity

Plaintiffs allege that Defendants, "working together for the purpose of gaining access to funds to use in their financing scheme, solicited and induced Plaintiffs to participate in the financing through a series of material misrepresentations, omissions, and false statements including, among others, that the loans would be repaid within months, that repayment was not dependent upon the film's commercial success, that each financing opportunity was secured by

collateral, and that Hudson and CWMF had a proven track record upon which no loans had defaulted and investors had been fully repaid."  (AC ¶ 4.)

Because Plaintiff must adequately plead that each individual defendant has committed racketeering activity, the Court must analyze Plaintiffs allegations as to each individual defendant, rather than the collective "scheme" when determining predicate unlawful acts.  *See DeFalco*, 244 F.3d at 306 ("The requirements of section 1962(c) must be established as to each individual defendant.").

### i.  Applicable Law

"An enterprise . . . engages in a pattern of racketeering activity when its members commit at least two racketeering acts . . . that both are related to one another and have a nexus to the enterprise (the so-called predicate acts)."  *United States v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020) (citations, quotation marks, and alterations omitted), *as amended* (Sept. 1, 2020), *cert. denied sub nom. Anastasio v. United States*, 141 S. Ct. 1114 (2021).  Thus, "[t]o state a claim of a substantive RICO violation under § 1962(c), a plaintiff must allege, among other things, two or more predicate acts constituting a pattern of racketeering activity."  *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (citation and quotation marks omitted).

"Section 1961(1) sets forth an exhaustive list of predicate 'acts' that can constitute a pattern of 'racketeering activity,' including section 1341 and 1343 (mail and wire fraud, respectively)."  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  "The mail fraud and wire fraud statutes prohibit a person who 'devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,' from using the mails or interstate or foreign wire facilities 'for the purpose of executing such scheme or artifice or attempting so to do.'"  *Crawford v. Franklin*

*Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014) (quoting 18 U.S.C. §§ 1341, 1343).  Thus,

"wire [and mail] fraud ha[ve] three elements: (1) a scheme to defraud, (2) money or property that

is the object of the scheme, and (3) use of the wires [or mail] to further the scheme." *Empire*

*Merchs., LLC*, 902 F.3d at 139 (citation omitted).  "The first element, the scheme to defraud, is

measured by a nontechnical standard.  It is a reflection of moral uprightness, of fundamental

honesty, fair play and right dealing in the general and business life of members of society." *Id*.

(citations and quotation marks omitted).  "To meet the second element, the plaintiff must show

that the object of the scheme—'the thing obtained,' or to be obtained—is 'property in the hands

of the victim . . . .'" *Id*. (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).  "[A]ny

[mailing or] wire that 'is part of the execution of the scheme to defraud as conceived by the

perpetrator at the time' satisfies the third element." *Id*. (quoting *Schmuck v. United States*, 489

U.S. 705, 715 (1989)).  "Although the mailed or wired communication need not itself be

fraudulent to violate [the fraud statutes], it must, by the terms of the statutory sections, be made

in furtherance of the fraudulent scheme." *Crawford*, 758 F.3d at 488.

Importantly, RICO claims alleging fraudulent predicate acts "are subject to the

heightened pleading standards of [Federal Rule of Civil Procedure] 9(b), which requires that

averments of fraud be 'stated with particularity.'" *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353,

359 (2d Cir. 2013) (alterations omitted) (quoting Fed. R. Civ. P. 9(b)).  In the context of a civil

RICO claim, "all allegations of fraudulent predicate acts[ ] are subject to the heightened pleading

requirement of [Rule 9(b)]." *First Cap.Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159, 178

(2d Cir. 2004).

In general, "[p]laintiffs must plead . . . mail [or wire] fraud with particularity, and

establish that the [communications] were in furtherance of a fraudulent scheme." *Lundy*, 711

F.3d at 119.  This normally requires that "[a]llegations of predicate mail and wire fraud acts . . .

state the contents of the communications, who was involved, and where and when they took

place, and should explain why they were fraudulent."  *Spool v. World Child Int'l Adoption

Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alterations, citations, and quotation marks omitted).

"To satisfy this requirement, a complaint must specify the time, place, speaker, and content of

the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead

those events which give rise to a strong inference that the defendant had an intent to defraud,

knowledge of the falsity, or a reckless disregard for the truth."  *Cohen*, 711 F.3d at 359 (citation

and quotations omitted).  "RICO claims premised on mail or wire fraud must be particularly

scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from

allegations that, upon closer scrutiny, do not support it."  *Crawford*, 758 F.3d at 489 (citation

omitted).

 However, "courts in the Second Circuit have applied a different standard in cases where

the plaintiff claims that mails or wires were simply used in furtherance of a master plan to

defraud, but does not allege that the communications themselves contained false or misleading

information."  *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (alterations,

citation, and quotation marks omitted).  "In such cases, including complex civil RICO actions

involving multiple defendants, Rule 9(b) does not require that the temporal or geographic

particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be

stated with particularity."  *Id*. 145–46 (citation and quotation marks omitted).  "Instead, Rule

9(b) requires only that the plaintiff delineate with adequate particularity in the body of the

complaint, the specific circumstances constituting the overall fraudulent scheme."  *Id*. (citation

and quotation marks omitted); *see also Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 456–57 (S.D.N.Y. 2018) (collecting cases).

### ii.  Hudson Defendants

Hudson Defendants argue that the Amended Complaint fails to adequately allege their knowing participation in any predicate acts and that Plaintiffs have failed to meet the Rule 9(b) pleading standard, namely that the Hudson Defendants acted with the requisite fraudulent intent. (*See* Hudson Defs.' Mem. 17–20; Hudson Defs.' Reply Mem. 1–7.)

Plaintiffs argue they have satisfied Rule 9(b) because the Amended Complaint alleges "that interstate wires were used in furtherance of a master plan to defraud."  (Pls.' Mem.  29.) Plaintiffs invoke the slightly relaxed Rule 9(b) pleading standards, which only apply when a plaintiff "does not allege that the communications themselves contained false or misleading information."  *Angermeir*, 14 F. Supp. 3d at 145 (alterations, citations, and quotation marks omitted); *see also id.* at 145–46 ("In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity . . . [but] requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme."). However, Plaintiffs cannot have it both ways.  If Plaintiffs allege specific false statements allegedly made by Hudson Defendants, as they have done throughout the Amended Complaint, the sufficiency of Plaintiffs' allegations must be reviewed under the standard Rule 9(b) pleading standard, requiring that "allegations of predicate mail and wire fraud acts . . . state the contents of the communications, who was involved, and where and when they took place, and should

explain why they were fraudulent." *Spool*, 520 F.3d at 185 (alterations, citation, and quotation marks omitted).

"Although Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the event which they claim give rise to an inference of knowledge." *Devaney v. Chester,* 813 F.2d 566, 568 (2d Cir. 1987); *see also In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (same); *Freydl v. Meringolo*, No. 09-CV-7196, 2010 WL 3026578, at *4 (S.D.N.Y. Aug. 2, 2010) (same). "This can consist of allegations as to who 'possessed . . . knowledge' of the fraud, 'when and how they obtained [that] knowledge,' or even why they 'should have known' of the fraud." *In re DDAVP Direct Purchaser Antitrust Litig.,* 585 F.3d at 695 (citation omitted). Plaintiffs "must plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (citation and quotation marks omitted). "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Strock*, 982 F.3d at 66 (citation omitted).

Even taking Plaintiffs allegations as true, Plaintiffs do not allege in the Amended Complaint that the Hudson Defendants knew or were otherwise informed that many of their statements were false. (*See generally* AC.)  Additionally, Plaintiffs also failed to explain why many of the statements attributed to Hudson Defendants were false when made. (*See generally*

45

Pls.' Mem.)  Plaintiffs' allegations that "Defendants[] . . . knowingly ma[de] materially false or

misleading statements, or material omissions, through the wires, to induce Plaintiffs and other

similarly situated lenders to participate in film financings, in violation of 18 U.S.C. § 1343 (wire

fraud)[,]" (AC ¶ 210), are insufficient—indeed "[w]hile Rule 9(b) does not require that

knowledge be pled with the same particularity as the elements of the alleged fraud, courts in this

Circuit have held that simple assertions of knowledge are insufficient[,]" *Landy v. Mitchell*

*Petroleum Tech. Corp.*, 734 F. Supp. 608, 621 (S.D.N.Y. 1990).

  For instance, Plaintiffs allege that a March 2016 presentation prepared by Hudson stated

that the fund would repay investors "based solely on timely delivery of the completed project,

not on box office or television success." (AC ¶ 55.)  Plaintiffs additionally allege Jonas'

August 15, 2016 email explained that the "loans are collateralized by municipal production

incentives and distribution guarantees", that "*we are not trying to guess which films are going to*

*be commercially successful* (the bet most investors get burned on); the returns are completely

independent of this" and attached a pitchbook, which stated "[a]ll of the investments the fund

makes are either **backed by contractual payment agreements** between production companies

and distribution companies . . . or **State sponsored production incentives**," i.e., transferrable

tax credits." (*Id*. ¶¶ 52–53.)  However, Plaintiffs have not alleged why these representations

regarding the fund and similar "Pitchbook" dated December 2016, February 2017, and June 2017

were false when they were made, some which occurred years before Plaintiffs signed the

Sourcing Agreement with Hudson. (*Id*. ¶¶ 55.)[5]   Indeed, "[P]laintiffs must do more than say that

the statements . . . were false and misleading; they must demonstrate with specificity why and

---

[5] While Plaintiffs allege that Hudson "needed capital to prop up its books due to failed
film financings" Plaintiffs have not alleged in their Amended Complaint when Hudson
experienced a loss in their film financing.  (AC ¶ 87.)

how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 463 (S.D.N.Y. 2021) ("Rule 9(b) requires that the pleading explain why the statements were fraudulent." (citation and quotation marks omitted)).

Plaintiffs have additionally not alleged why (1) Jonas' February 5, 2018 email to Bayshore stating that Hudson's monthly returns for January 2018 would be "about +1.2%," and subsequent delivery of an "updated version of the Hudson pitchbook presentation" which showed that Hudson's 2017 annual return was 8.10%, (2) Conover and Plaintiffs' November 2019 telephone conversation where Conover stated that Hudson's clients had participated in more than 30 deals with CWMF and that it had never failed to pay what was owed, (3) Conover's statement that CWMF would make $100 million in profit from its investment in "the Joker," and (4) Hudson's statements to Plaintiffs in October 2018 that the Lionsgate Slate films were performing well were misrepresentations at the time they were made.  (AC ¶¶ 75, 147, 153, 155.)  Plaintiffs have not alleged, for instance, that any of Hudson's clients who participated in deals with CWMF had failed to recoup their loans at the time Conover made the statement. Instead, Plaintiffs only state that the statement was false when made because "the Enterprise *had* failed to pay what was owed to other financiers."  (*Id.* ¶ 154 (emphasis in original).)  However, the losses Hudson is alleged to have suffered in its film financing are not alleged to have stemmed from business with any Defendant in this case.  Additionally, Plaintiffs have not alleged any facts indicating that CWMF did not make $100 million in profit from its investment in the Joker, that, if the statement was false, Conover knew such a statement was false, that the Lionsgate Slate films were performing not well, or that Jonas' statements regarding Hudson's projected and past returns were false.

Plaintiffs additionally point to (1) Conover's August 14, 2017 email containing CWMF's pitchbook as an attachment, which "heralded CWMF's success, including that it had financed more than 60 film projects and, critically highlighted the assertion that it had no default of loans",  (2) Conover's September 15, 2017 email containing a spreadsheet prepared by CWMF summarizing prior loans that had been fully or partially repaid, (3) Jonas' June 26, 2018 email containing a deal summary for the Needle which was "likely prepared" by CWMF which assured Plaintiffs the collateral would consist of a transferable Canadian tax credit, (4) Jonas' June 26, 2018 email stating that the Lionsgate Slate investment was "cross collateralized," and that Plaintiffs loan would earn interest at 12% annually for the first 18 months, followed by 18% interest on any remaining balance, and (5) Conover's January 11, 2019 email stating that the domestic distribution rights for Nightingale had been sold which would provide greater loan protection, as "individual acts in violation of" the wire fraud statute that contained "materially false or misleading statements, or material omissions."   (*Id*. ¶¶ 60, 67, 101, 134, 184, 210, 211.) However, these allegations do not suggest any basis for inferring that Hudson Defendants knew the statements were false or were seeking to defraud Plaintiffs, they only illustrate that Hudson Defendants relied on information they received from other Defendants regarding the film loans. *See Landy*, 734 F. Supp. at 621–22 (holding knowledge was not sufficiently alleged under Rule 9(b) when "there is nothing in the amended complaint that indicates the factual basis for plaintiffs' assertion that CNA had knowledge of the alleged falsity of the offering material that it distributed" and "[w]hile other defendants had direct connections with the offering memoranda and materials that make averment of knowledge acceptable under Rule 9(b), CNA had no connection to or involvement in preparation of those materials").  Additionally, in May 2018, Hudson sent Bayshore a new document that stated "Hudson's film finance strategy is focused

exclusively on 'taking investment risk' where there is collateral in place."  (AC ¶ 76.)  However, Plaintiffs have pled that it was CWMF who failed to secure the collateral, at least as to the Needle film, and they do not explain how or why Hudson should have known that CWMF would fail to do so.  (*Id.* ¶ 130.)

Likewise, Plaintiffs contend Jonas' October 8, 2018 email advising that "Plaintiffs' participation in Nightingale would entitle it to 'first position' to recoup its investment, while at the same time failing to disclose the existence of a dispute with a third-party investor who had previously invested in Nightingale" is proof of fraud.  (*Id.* ¶ 211.)  However, Plaintiffs do not allege the Hudson Defendants were named as defendants in any of the Premium Properties Lawsuits.  (*Id.* ¶ 168.)  Indeed, Jonas sent the October 8, 2018 email prior to the lawsuit being filed.  (*Id.* ¶¶ 168, 172, 211.)  There are no facts suggesting that the Hudson Defendants knew or should have known about the Nightingale dispute or that the information was publicly available at the time.  Accordingly, Plaintiffs fail to "plead those events which give rise to a strong inference that [the Hudson Defendants] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth" as to any of the above statements.  *Cohen*, 711 F.3d at 359 (citation and quotation marks omitted).

Finally, Plaintiffs additionally allege that Conover told Plaintiffs on July 3, 2018, that "*Creative has agreed to take any future impairments off our books at their full book value at the end of each calendar year*."  (AC ¶ 84.)  Plaintiffs allege any such agreement was merely a "disguise, for tax purposes, of a nearly $18 million loan that had been made by CWMF to Hudson, and which would be paid off through commission earned at each loan that Hudson sourced for CWMF."  (*Id.* ¶ 86.)  Accordingly, Plaintiffs allege that Conover's statement that CWMF had agreed to "take any future impairments off our books" was a lie.  (*Id.* ¶ 94.)

Plaintiffs allege Hudson needed the loan "*due to significant losses in its film financing investments.*"  (*Id.* ¶ 93.)  Plaintiffs further allege that had they known that Hudson "was in dire financial straits, and needed capital to prop up its books due to failed film financing, Plaintiffs would not have made the loans" that they did.  (*Id.* ¶ 87.)  Taking Plaintiffs' allegations as true, Conover omitted information about the financial agreement between Hudson and CWMF. However, Plaintiffs do not provide facts that would lead to the strong inference that Conover omitted this information with the intent to further a scheme to defraud Plaintiffs by, for instance, promising and then failing to secure collateral.  It only raises the inference that Conover intended to conceal its own losses, which Plaintiffs do not allege are related to any Defendant in this case.

However, even if this omission constituted a predicate act, as Plaintiffs have not sufficiently pled two predicate acts undertaken by any Hudson Defendant, the Court grants the Hudson Defendants' Motion to Dismiss with respect to the RICO claims.  *See GWG MCA Cap., Inc. v. Nulook Cap., LLC*, No. 17-CV-1724, 2020 WL 10508196, at *8 (E.D.N.Y. June 28, 2020) (noting that when "multiple defendants are accused of mail and wire fraud, the plaintiff must particularize and prove each defendant's participation in the fraud as well as each defendant's involvement in the two necessary predicate acts" (quotation marks and citation omitted)); *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 496 (S.D.N.Y. 2007) ("A RICO plaintiff must show that each defendant participated in the RICO enterprise by engaging in at least two predicate acts." (italics omitted)), *aff'd*, 328 F. App'x 695 (2d Cir. 2009) (summary order).

### iii.  BRON Studios USA, Inc. and Gilbert

Plaintiffs do not argue that the BRON Studios USA, Inc. or Gilbert made fraudulent statements and instead are basing their RICO claim on the argument that these BRON Studios

Defendants "knowing[ly] or intentional[ly] participation in the alleged scheme to defraud." (Pls.' Mem. 25.)

First, many of Plaintiffs' references to "BRON Studios" are improper: the term groups BRON Studios Canada and BRON Studios USA, Inc. even though the alleged agreements in the Amended Complaint refer to specific entities. (*See e.g.,* AC ¶ 90.) *See also In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 269 n.18 (Bankr. S.D.N.Y. 2008) (noting that the amended complaint "fails to identify which of the Goldman Sachs Entities did what, and violates the rules against group pleading").

Second, Plaintiffs focus on the "BRON Defendants' role as producers of the films" and their purported business relationships with other Defendants, (*see* Pls.' Mem 24–30), but "[m]erely pleading a close relationship with another entity that is alleged to have made particular misleading statements is insufficient" to state a RICO claim based on fraud, *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998). Absent more, the Amended Complaint's descriptions of business relationships cannot constitute intentional participation in a fraud.

Plaintiffs additionally point to the term sheets that BRON Studios USA, Inc. signed which they claim "evinces an intent . . . to participate in the scheme." (Pls.' Mem. 24.) But nothing in those agreements, suggests knowledge of, or intent to participate in, predicate acts or a scheme to defraud Plaintiffs. Plaintiffs also speculate that the BRON Studios Defendants "must have" been participating in Hudson's alleged misstatements, but the Amended Complaint offers no plausible basis for such an inference. (Pls.' Mem. 26.) The Amended Complaint does not identify any instance where Hudson represented to Plaintiffs misinformation that must have come directly from Gilbert or BRON Studios USA, Inc. For instance, Plaintiffs contend that the Hudson Defendants' statement that the film financings were secure and would be "**backed by**

**contractual payment agreements** between production companies and distribution companies . . . or **State sponsored production incentives**" must have been made with the BRON Defendants' knowing participation.  (*Id.* (emphasis in original).)   However, it is not clear from the Amended Complaint that Hudson Defendants were referring to BRON Studio Defendants specifically or that the statement was false when this statement was made in 2016.  (AC ¶ 53.)

Plaintiffs argue that "[p]ost-financing conduct also underscores BRON Studios' knowing participation in the scheme."  (Pls.' Mem. 28.)[6]  Plaintiffs allege that in July 2020, Cloth told Bayshore that "BRON Studios had been 'working with a UK financier for the better part of 6 months arranging financing for general corporate purposes, including the repayment of older unpaid loans.'"  (AC ¶ 192.)  Bayshore then received an email from Ryan McWaters of DeRoyce Capital, with Cloth CCed stating that DeRoyce Capital and BRON Media Corp. were in "advance negotiations with the intention of allocating investment in excess of $100,000,000" which could be used to retire loans.  (*Id.* ¶ 193.)  Plaintiffs assert in the Amended Complaint that the "address used by McWalters in the United States is the same as BRON Studios address in Los Angeles[,]" (*id.* ¶ 194), and argue in their Opposition that the company is "likely a sham given that it shares a business address in the United States with BRON Studios." (Pls.' Mem. 28).  However, McWalters uses the BRON Studio address only in addressing the letter to "BRON Media Corp." not in his signing of the letter.  (Shargel Decl. Ex. N.)  Thus, Plaintiffs have not plausibly shown from these facts that the BRON Studios Defendants or Gilbert participated in any fraudulent cover up.

Finally, Plaintiffs allege that "nearly every project in which BRON was the producer together with CWMF, BRON Creative, or Cloth, resulted in investors lending money and not

---

[6] Plaintiffs additionally failed to specify which BRON Studios entity they refer to.

being repaid.  These include not only the films at issue in this lawsuit—Needle In A Timestack,

A Simple Favor, The Spy Who Dumped Me, Chaos Walking, and The Nightingale—but also

projects that harmed other lenders, such as Drunk Parents, Fonzo, Greyhound, and Bombshell.

On the other hand, for films produced by BRON Studios independent of the Enterprise, it

appears that the projects were not tainted by Defendants' criminal conduct and lenders were

repaid."  (AC ¶ 79.)  Accordingly, Plaintiffs have themselves pled facts demonstrating that it was

CWMF, BRON Creative, or Cloth's involvement rather than BRON Studios USA, Inc.'s upon

which the non-repayment of loans hinged.

Because Plaintiffs have not alleged any fact plausibly demonstrating that BRON Studios

USA, Inc. or Gilbert were involved in a scheme to defraud Plaintiffs or engaged in any predicate

acts, the RICO claims against them are dismissed.

### iv.  CWMF, BRON Creative USA Corp., BRON Creative Corp., Cloth

Plaintiffs argue that the fact that Creative Defendants executed the term sheets "evinces

an intent . . . to participate in the scheme."  (Pls.' Mem. 24.)  However, Plaintiffs do not explain

how entering into a contractual agreement with Plaintiffs demonstrates an intent to participate in

a fraudulent scheme to defraud Plaintiffs.  Indeed, "claims of unfulfilled contracts have been

rejected as the basis for inferring fraudulent intent."  *Sunwealth Glob. HK Ltd. v. Pinder Int'l,

Inc.*, No. 20-CV-1436, 2021 WL 1145245, at *11 (S.D.N.Y. Mar. 23, 2021) (holding that

fraudulent intent could not be inferred from the defendant entering multiple contracts with a

plaintiff and not performing on any of them since "contractual breach, in and of itself, does not

bespeak fraud" (citation omitted)); *LCS Group, LLC v. Shire LLC*, No. 18-CV-2688, 2019 WL

1234848, at *10–11 (S.D.N.Y. Mar. 8, 2019) (finding that allegations that defendants signed a

contract despite having no intent to comply with the terms did not satisfy a fraud-based RICO claim).

Plaintiffs also allege that "BRON Creative" pledged the same collateral to multiple lenders as first priority for the financing of Nightingale. (AC ¶ 170.) However, Plaintiffs do not specify which BRON Creative entity did this, a deficiency that is dispositive. *See In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. at 269 n.18 (faulting a complaint that failed to identify which corporate entity engaged in misconduct). In their Opposition, Plaintiffs argue that Hudson stated the loans would be "papered" against "CWMF and the Creative Defendants," (Pls.' Mem 26), but their actual allegation is that Hudson described *CWMF* as the entity the loan would be "papered against" (AC ¶ 59). They similarly claim that Hudson passed information to them "from the Creative and BRON Defendants," (Pls.' Mem. 26), but the documents Plaintiffs reference, namely the "pitchbooks," spreadsheet, and "Project Evaluation Process" documents were all allegedly prepared and sent by CWMF. (*Id.*; AC ¶¶ 60-61, 67.) It is unclear how this demonstrates any intent to participate in the scheme to defraud Plaintiffs on the part of BRON Creative USA or BRON Creative Corp.

However, Plaintiffs have alleged that CWMF engaged in predicate acts because its communications knowingly contained false or misleading information. For instance, Plaintiffs contend that a CWMF spreadsheet sent on September 15, 2017 misrepresented the success of prior financings. (AC ¶¶ 67–72.) The CWMF spreadsheet indicated that certain films had been fully repaid when in fact, they had not been. (*Id.*) Indeed, Plaintiffs point to a 2019 lawsuit against CWMF, BRON and Cloth which alleges the principal and interest for a loan on a film "The Layover" remain outstanding while the spreadsheet described the loan as fully repaid with a 50% return on investment. (*Id.* ¶ 71.) Accordingly, the representation that the loan had been

repaid was a clear misrepresentation at the time it was made, and that information was clearly in CWMF's control.[7]

Plaintiffs additionally allege that Cloth provided false assurances that Plaintiffs' loans would be repaid—Plaintiffs allege that in July 2019, Cloth assured Plaintiffs that "the FilmNation and IFC distribution proceeds would provide a quick repayment for Plaintiffs' loans" and on August 16, 2019, Cloth told Bayshore that "the loan is not in jeopardy of not being repaid." (AC ¶ 152.) However, "a false promise by a party to a contract that he will fulfill the terms of an agreement, [] does not constitute predicate criminal activity in [the RICO] context." *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 253 (D. Conn. 2014) (quotation marks omitted) (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19–20 (2d Cir. 1996)); *Lefkowitz v. Reissman*, No. 12-CV-8703, 2014 WL 925410, at *4 (S.D.N.Y. Mar. 7, 2014) ("[T]he statement upon which the fraud claim is predicated [in the RICO context] must be something more than a false promise by a party to a contract that he will fulfill the terms of the agreement."); *see also Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 364 (D. Conn. 2018) ("In the RICO context, the statement upon which the fraud is predicated must be more

---

[7] Plaintiffs additionally allege that on August 14, 2017, "Conover provided Bayshore with more detailed information about CWMF, including its most recent pitchbook stating that CWMF had financed more than 60 film projects and had no defaulted loans." (AC ¶ 60.) However, Plaintiffs have not alleged that CWMF defaulted on loans prior to August 14, 2017. Plaintiffs further claim that CWMF's website stated that its financings were not dependent on box office success was a misrepresentation. (*Id.* ¶ 62.) Indeed, Plaintiffs have alleged that CWMF failed to obtain the financing guarantees afforded by the tax credit collateral. (*Id.* ¶ 130.) However, Plaintiffs have not alleged when this misrepresentation was made, namely when it appeared on CWMF's website. This is fatal, as under Rule 9(b) "[a]llegations of predicate mail and wire fraud acts . . . [must] state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent." *Spool*, 520 F.3d at 185. Plaintiffs' allegations regarding the CWMF Project Evaluation Process fail for the same reason. (AC ¶ 61.)

than a false promise by a party to a contract that the party will fulfill the terms of the agreement.").  "A plaintiff asserting fraud based on a counterparty's allegedly false promise to perform must: '(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.'"  *Lefkowitz*, 2014 WL 925410, at *4 (citing *Bridgestone/Firestone, Inc*., 98 F.3d at 20).

Plaintiffs do not allege that Cloth owed some legal duty beyond the obligations contained within the contracts.  Nor do false assurances of payment constitute the existence of a statement "collateral or extraneous" to the contract, meaning the misrepresentation of "a present fact" as opposed to a "defendant's future intent to honor that contract."  *Id*. at *5 (holding that false statement that defendant would use plaintiff's funds for investment purposes and would repay plaintiff with principal plus interest at the expiration of the loan was not a statement collateral or extraneous to the contract but rather a false promise that defendant would repay the loan and therefore did not constitute a predicate act for RICO purposes (citation omitted)).  "And, although a successful RICO claim would permit Plaintiff to recover treble damages, these are not the special damages described in *Bridgestone* that would permit a fraud claim in these circumstances.  Instead, Plaintiff would need to show some loss independent of the damages allegedly incurred for breach of contract."  *Id*. (citation and quotation marks omitted); *see also Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001) (dismissing RICO mail fraud claims that were duplicative of breach of contract claims).  Here, Plaintiffs have not plausibly alleged any such independent loss.

However, Plaintiffs also alleged that Cloth sent emails to Bayshore signed as the managing partner of CWMF and director of BRON Creative on July 3, 2019, that included false assurances to Bayshore that that the tax credit collateral would provide a "worst case backstop" for the needle loan when in actuality, CWMF had failed to obtain the financing guarantees afforded by the tax credit collateral.[8] (AC ¶¶ 121–22, 130.)  "[M]isrepresentations of present facts made post-contract formation [] are collateral or extraneous to the contract."  *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 260 (S.D.N.Y. 2017) (alterations, citation, and quotation marks omitted); *see also Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 520–21 (S.D.N.Y. 2016) (same); *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Inv. Ltd.*, No. 00-CV-9214, 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003) ("Misrepresentations made after a contract is entered into which relate to a present fact that would exist if the contract were performed, are collateral or extraneous to the contract . . . and are actionable in fraud."); *Int'l Elecs., Inc. v. Media Syndication Glob., Inc.*, No. 02-CV-4274, 2002 WL 1897661, at *2 (S.D.N.Y. Aug. 17, 2002) (holding that the plaintiff's fraud claim was not precluded where "the[] injuries flowed not from any failure by [the defendant] to do what it contracted to do, but from its related but nevertheless distinct deception" wherein the defendant was "misleading [the] plaintiff into believing that [the defendant] was discharging its obligations" under the contract).

Accordingly, because Cloth's alleged statement was a misrepresentation of a present fact that would exist had the contract been performed, the statement is not merely a promise to perform under the contract.  Plaintiffs have sufficiently alleged that Cloth made the statement, on behalf of CWMF, knowing its falsity with the intent to "prevent[] Plaintiffs from taking steps to

---

[8] Plaintiffs do not allege which BRON Creative entity Cloth was signing on behalf of and accordingly, this Court cannot determine which of the entities is responsible for this comment.

enforce their rights to repayment and other remedies."  (AC ¶ 8.)  *See also Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20-CV-4650, 2022 WL 912965, at *14 (S.D.N.Y. Mar. 29, 2022) ("Plaintiffs have alleged at least two predicate acts: that defendants perpetuated fraud in the sale of securities and engaged in wire fraud by drafting the fraudulent white paper and business summary to induce plaintiffs to invest $250,000 in the enterprise as well as by lying to plaintiffs to cover up the fraudulent statements concerning the alleged $30 million investment from Staxx.").

Finally, Plaintiffs point to numerous communications from Cloth regarding possible deals that would be used to repay Plaintiffs, for instance: (1) Cloth's email regarding Needle, dated July 3, 2019, that "we are currently in negotiations for global deal from tow [sic] major streaming services," and that "*the value of both deals gets us out with full interest*"; (2) statements made by Cloth during a May 8, 2020 phone call that several streaming services were interested in the Needle film and that Cloth was trying to obtain a deal that would bring the most money for the film; (3) Cloth's May 18, 2020 telephone call where he told Bayshore that BRON Studios was "about to close on a line of credit with Comercia" which would be used to pay off Bayshore's loans; and (4) Cloth's email on July 1, 2020 stating that BRON Studios had been "working with a UK financier for the better part of 6 months arranging financing for general corporate purposes, including the repayment of older unpaid loans."  (AC ¶¶ 120, 125, 190–92.) However, Plaintiffs have not alleged why these statements were false when they were made. While Plaintiffs allege that in the letter from the UK company received by Bayshore on July 8, 2020, the "address used by McWalters in the United States is the same as BRON Studios address in Los Angeles[,]" (AC ¶¶ 193–94), and argue in their Opposition that the company is "likely a sham given that it shares a business address in the United States with BRON Studios[,]" (Pls.'

Mem. 28), McWalters uses the BRON Studio address only in addressing the letter to "BRON Media Corp." not in his signing of the letter, (Shargel Decl. Ex. N).

As Plaintiffs have alleged that CWMF committed at least two predicate acts, the RICO claim survives against them.  However, as Plaintiffs have not alleged two predicate acts against Cloth, BRON Creative Corp., or BRON Creative USA Corp. or alleged they were involved in a scheme to defraud Plaintiffs, the RICO claims against them do not survive.

### b. Pattern

To violate RICO, an individual must do more than merely engage in racketeering activity; rather, the statute requires a "pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added).  And RICO defines a pattern of racketeering activity to require at least two acts of racketeering activity occurring within a ten-year period. *Id*. § 1961(5).  Here, the predicate acts were alleged to have occurred within a ten-year period.  Nonetheless, the Supreme Court has imposed additional requirements that must be met for racketeering activity to constitute a "pattern": "while two acts are necessary, they may not be sufficient." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989) (citation omitted).  A plaintiff additionally "must show that the racketeering predicates . . . amount to or pose a threat of continued criminal activity." *Id*. at 239 (emphasis in original).  In turn, "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241.  Consequently, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc*., 67 F.3d 463, 466 (2d Cir. 1995) (quotation

marks omitted).  Thus, the Amended Complaint could adequately plead a pattern of racketeering

activity either by alleging that Defendants engaged in repeated racketeering activity extending

over a substantial period of time or by alleging that they have engaged in racketeering activity

that by its nature projects into the future with a threat of repetition.  Because the Amended

Complaint adequately alleges neither, the RICO claim must fail.

For a complaint to adequately allege closed-ended continuity, the predicate acts pled

must extend over "a substantial period of time."  *GICC Cap. Corp.*, 67 F.3d at 466.  Although no

bright-line rule defines which periods of time are "substantial," "[p]redicate acts extending over

a few weeks or months . . . do not satisfy this requirement."  *H.J. Inc.*, 492 U.S. at 242.  Indeed,

the Second Circuit "generally requires that the crimes extend over at least two years."  *Reich*,

858 F.3d at 60 (citation omitted).  The allegations in the Amended Complaint fail to meet this

threshold.  Plaintiffs plausibly allege predicate acts spanning from September 15, 2017 to July 3,

2019, which does not meet this Circuit's two year requirements.  Plaintiffs argue that the Court

should consider the scheme as a whole rather than focusing on the predicate acts alone to

determine whether closed ended continuity exists.  (Pls.' Mem. 31.)  However, "the duration of a

pattern of racketeering activity is measured by the RICO predicate acts the defendants commit."

*Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21-CV-10597, 2023 WL 374120, at *11

(S.D.N.Y. Jan. 24, 2023) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187

F.3d 229, 243 (2d Cir. 1999)).[9]

---

[9] Plaintiffs argue that "efforts by Defendants to conceal their fraud are actionable, and serve to prolong the fraudulent scheme."  (Pls.' Mem. 32.)  However, "fraudulently conceal[ing] [] illegal activities for a number of years is inadequate to satisfy the continuity requirement of the RICO statute."  *Bangladesh Bank v. Rizal Com. Banking Corp.,* No. 19-CV-983, 2020 WL 1322275, at *7 (S.D.N.Y. Mar. 20, 2020).

However, even if Plaintiffs had established predicate acts lasting over two years, they would still fail to adequately allege closed-ended continuity.  "The mere fact [] that predicate acts span two-years is insufficient, without more, to establish a pattern of racketeering activity." *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 571–72 (S.D.N.Y. 2018).  "Other factors, such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists."  *Id*. (citation and quotation marks omitted).  Plaintiffs at most allege a single scheme to deprive them of their money through Defendants' misrepresentations regarding the stability of the film financing investments and entering contracts they did not intend to honor. Accordingly, Plaintiffs' "closed-ended continuity claims also fail because they are more akin to garden variety breach of contract and tort claims than a large-scale civil RICO claim." *MinedMap, Inc. v. Northway Mining, LLC*, No. 21-CV-1480, 2022 WL 570082, at *2 (2d Cir. Feb. 25, 2022) (summary order) (holding there was no close ended continuity because "[a]t most, there is one scheme here: Maranda forming his companies, collecting capital to execute the scheme, and contracting with MinedMap to host the Miners, despite knowing that the defendant companies did not have the capacity to fulfill this contract, and then refusing to return the Miners"); *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 182 ("At bottom, Plaintiffs have alleged that Sohrab engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding. But however egregious Sohrab's fraud on Plaintiffs may have been, they have failed to allege that he engaged in a pattern of racketeering activity."); *Caravella v. Hearthwood Homes Inc.*, No. 05-CV-1529, 2007 WL 2886507, at *9 (N.D.N.Y. Sept. 27, 2007) (holding plaintiffs failed to allege close ended continuity when the complaint alleged a "single, non-complex scheme to

obtain real estate commissions by fraudulently inducing individuals to purchase homes with inadequate water supply"); *FD Prop. Holding, Inc. v. U.S. Traffic Corp.*, 206 F. Supp. 2d 362, 373 (E.D.N.Y. 2002) (holding plaintiffs failed to allege closed ended continuity given the "limited number of perpetrators and [the] alleged non-complex scheme to obtain monies under a sales' contract"); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F. Supp. 579, 583–84 (S.D.N.Y. 1989) (holding that a complaint which alleged "a closed-ended, single scheme involving three perpetrators, (a company and two of its directors), one victim, and an uncomplicated transaction []essentially relating to a simple breach of contract," over a thirteen month period failed to plead continuity).

Alternatively, a complaint can allege a pattern of racketeering activity by satisfying the requirements for open-ended continuity. "To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit, S.A.*, 187 F.3d at 242. "[W]here the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Id.* at 243*; see also H.J. Inc.*, 492 U.S. at 230 ("Otherwise, it must be shown that the predicates establish a threat of long-term racketeering activity—for example, because the predicates themselves involve a distinct threat of such activity; because they are part of the regular way of doing business for an ongoing entity such as a criminal association or legitimate business; or because they are a regular means of conducting or participating in an ongoing RICO enterprise." (emphasis omitted)). Furthermore, as with closed-ended continuity, open-ended continuity must be evaluated based only on the

predicate acts adequately pled in the complaint.  *Paul Hobbs Imports Inc.*, 2023 WL 374120, at
*11.

Here, Plaintiffs fail to sufficiently plead open-ended continuity.  First, it is well
established law that fraud does not fall within the "inherently unlawful" category of predicate
acts so as to imply a threat of continued criminal activity.  *See, e.g., Westchester Cnty. Indep.
Party v. Astorino*, 137 F. Supp. 3d 586, 611 (S.D.N.Y. 2015) ("Moreover, the conduct alleged in
the SAC does not fall within the 'inherently unlawful' category, because 'fraud (the object of
which is by definition to obtain money or property from others) has been held not to be
'inherently unlawful' in the RICO continuity context." (ciataion and quotation marks omitted));
*World Wrestling Entm't, Inc.*, 530 F. Supp. 2d at 516 ("While embezzlement, extortion, bribery,
and money laundering are in pursuit of inherently unlawful goals, fraud is not." (citations
omitted)); *Int'l Bhd. Of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) ("[F]raud
(the object of which is by definition to obtain money or property from others) has been held not
to be 'inherently unlawful' in the RICO continuity context."); *see also Ixotic AG v. Kammer,* No.
09-CV-4345, 2015 WL 270028, at *12 (E.D.N.Y. Jan. 21, 2015) ("Despite the fact that it
allegedly took place in different locations around the world and involved dummy entities and
individuals, the scheme alleged here is a relatively simple one: through wire communications,
the defendants held out the promise of releasing loan proceeds to the plaintiffs—with no
intention of ever doing so—who in turn, continued to enter additional contracts with and make
continued payments to the defendants based on an erroneous belief that the defendants would
ultimately release the loan funds.  Such a fraudulent scheme—with the single goal of defrauding
a single group of victims—does not inherently pose a threat of repetition that projects into the
future, and therefore fails to establish open-ended continuity.").

Nor have Plaintiffs alleged that the predicate acts of wire fraud were "the regular way" that defendants operated their business.  While Plaintiffs point to other instances where a combination of the Defendants have failed to honor contract provisions and pay back loans, (AC ¶¶ 72, 79, 169), Plaintiffs have not alleged that such contract disputes involved wire fraud.  (*See generally id.*)  For instance, Plaintiffs allege that in a lawsuit brought by Premium Properties Limited and Colonia Trustco against, among others, BRON Creative, Cloth, and Gilbert, "BRON Creative breached a term sheet and participation agreement for financing Nightingale, including by failing to provide documents requested, failing to collect and pay out amounts due under parties' agreements, and failing to properly secure the collateral." (*Id.* ¶ 169.)  However, there is no allegation that this contract dispute is predicated on any wire fraud.  The handful of wire fraud predicates Plaintiffs have alleged is insufficient to allege that the predicate acts of wire fraud were "the regular way" that Defendants operated their business.  *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 407 (S.D.N.Y. 2013) (holding four fraudulent transactions which entailed wire transfer payments was insufficient to successfully assert a business model based on such predicate acts).

Because Plaintiffs have not alleged continuity, the RICO claim cannot stand.

### 3.  Plaintiff's RICO Allegations under § 1962(d)

Plaintiffs also raise a RICO conspiracy claim under 18 U.S.C. § 1962(d).  (*See* AC ¶¶ 224–28.)  "To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) . . . plaintiff must prove (1) that there existed a conspiracy to commit acts that, if successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of the conspiracy in some manner (although not necessarily by the commission of any RICO

predicate acts himself)." *Martin Hilti Fam. Tr. V. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 340 (S.D.N.Y. 2019) (citation and quotation marks omitted).  A defendant must have agreed to participate "in a charged enterprise's affairs through a pattern of racketeering, not [simply] a conspiracy to commit predicate acts."  *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 409 (S.D.N.Y. 2015) (quotation marks omitted) (quoting *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009)); *see also Crawford*, 758 F.3d at 487 ("To establish a violation of § 1962(c), a plaintiff must show that the defendant conducted, or participated in the conduct[ ] of[,] a RICO enterprise's affairs through a pattern of racketeering activity.").  Here, Plaintiffs' RICO conspiracy claim falters for a simple reasons: because Plaintiffs have not sufficiently stated a substantive RICO claim under § 1962(c), Plaintiffs' conspiracy claim fails as a matter of law. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds*, 525 U.S. 128 (1998); *Paul Hobbs Imports Inc.*, 2023 WL 374120, at *13 ("[S]ince the Complaint does not predicate its subsection 1962(d) count on an agreement to engage in any conduct other than the acts alleged to violate subsection 1962(c), the Court's dismissal of the substantive count requires dismissal of the conspiracy count as well.").

Accordingly, Plaintiffs' allegations of RICO conspiracy are dismissed as to all Defendants.

### 4.  State Law Claims

Without RICO jurisdiction, which confers personal jurisdiction over defendants for other claims that arise out of the same operative facts as the civil RICO claim, even if personal jurisdiction would not otherwise be present as to those claims, this Court must establish personal

jurisdiction over the BRON and Creative Defendants who moved to dismiss under 12(b)(2).  *See IUE AFL-CIO Pension Fund*, 9 F.3d at 1056-57.  To satisfy the New York long-arm statute, a plaintiff must plead some act by which the defendant "purposely availed itself of the privilege of conducting activities in New York, thereby invoking the benefits and protections of its laws." *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 108 (E.D.N.Y. 2020) (alterations and citation omitted).

### a.  Personal Jurisdiction Authorized by Long Arm Statute

### i.  Specific Jurisdiction: Section 302(a)(1)

Under New York law, "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1). Plaintiffs must meet two requirements to establish personal jurisdiction under Section 302(a)(1): "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Eades v. Kennedy PC Law Offs.*, 799 F.3d 161, 168 (2d Cir. 2015) (citation omitted).  Section 302 "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010) (citation omitted).  Section 302(a)(1) long-arm jurisdiction exists "over commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions."  *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 850 N.E.2d 1140, 1143 (N.Y. 2006) (citations omitted).

A non-domiciliary defendant transacts business in New York when "on his or her own initiative, the non-domiciliary projects himself or herself into this state to engage in a sustained and substantial transaction of business." *D&R Glob. Selections, S.L. v. Bodega Olegario Falcon Pineiro*, 78 N.E.3d 1172, 1175 (N.Y. 2017) (citation and alteration omitted).  "Accordingly, the purposeful creation of a continuing relationship with a New York corporation supports the exercise of personal jurisdiction." *Sirius XM Radio Inc. v. Aura Multimedia Corp.*, No. 21-CV-6963, 2022 WL 18587769, at *2 (S.D.N.Y. July 18, 2022) (quotation marks and citation omitted), *report and recommendation adopted*, 2023 WL 243615 (S.D.N.Y. Jan. 17, 2023).

It is not enough that a non-domiciliary defendant transact business in New York to confer long-arm jurisdiction.  Under the second prong, the plaintiff's claim must have an "articulable nexus" or "substantial relationship" with the defendant's transaction of business in New York. *See D&R Global Selections*, 78 N.E.3d at 1176.  "At the very least, there must be a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former . . . ."  *Id*. (quotation marks and citation omitted); *cf. Bristol-Myers Squibb Co. v. Superior Court of Cal*., 582 U.S. 255, 262 (2017) ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." (quotation marks and citation omitted)).  "[A]n articulable nexus or substantial relationship exists where at least one element arises from the New York contacts"; however, "[t]he nexus is insufficient where the relationship between the claim and transaction is too attenuated or merely coincidental." *D&R Global Selections*, 78 N.E.3d at 1176 (quotation marks and citations omitted).  A "plaintiff must establish the court's jurisdiction with respect to each claim asserted." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig*., 529 F. Supp. 3d 111,

135 (S.D.N.Y. 2021) (emphasis omitted) (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

Plaintiffs argue that personal jurisdiction exists under CPLR 302(a)(1). To support this position, Plaintiffs point to the fact that the "BRON and Creative Defendants entered into a long-standing business relationship with Hudson, and the scope of their relationship with the New York-based company was substantial." (Pls.' Mem. 10.) Plaintiffs also note that "by 2017, nearly every film which Hudson's clients invested was produced by BRON Studios", which was effectuated by BRON and Creative Defendants' communication via email and telephone with Hudson in New York—specifically Hudson relaying CWMF's pitchbook, the project evaluation process, and spreadsheets prepared by CWMF purporting to summarize prior loans in which CWMF was involved. (*Id.*) However, this Court notes that all of the documents Plaintiffs point to were allegedly prepared by CWMF. (*Id.*)

Plaintiffs also allege that "BRON Studios" had a relationship with Hudson because of an email from Conover that stated that Hudson had a "relationship with the production company and always seem[s] to have up to the minute color on these opportunities." (AC ¶¶ 46, 58.) Plaintiffs also allege that Jonas told Bayshore in an email that "[w]e have continued to been [sic] busy with our friends at BRON/Creative Wealth." (*Id.* ¶ 74.) However, Plaintiffs have not alleged which BRON Studios entity had a relationship with Hudson. "To allege personal jurisdiction over a defendant, group pleading is not permitted. Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant." *In re Aegean*, 529 F. Supp. 3d at 135. Plaintiffs additionally allege that "by 2018, Hudson announced that it had entered into a new venture with BRON called BRON Ventures, which it touted as 'a division of the studio that will make strategic equity investments in content-driven production companies and leaders in the

film, TV, digital and animation spaces.'" (AC ¶ 48.)  However, Plaintiffs have not alleged that any of their causes of action stem from BRON Ventures.  (*See generally id.*)  Indeed, Plaintiffs have not explained what element of any cause of action stems from Hudson's business relationship with any BRON Defendant, nor have they alleged any facts indicating that either of the BRON Creative entities had a business relationship with Hudson.

Plaintiffs additionally point to the fact that the Term Sheet for Nightingale is governed by New York law, which Plaintiffs allege shows "that BRON Creative Corp., which is owned by Gilbert and Cloth availed itself directly of the laws of the State." (Pls.' Supp. Mem. 3 (citation omitted).)  The Second Circuit has provided a non-exhaustive set of four factors to consider in such instances namely:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc.*, 362 F.3d at 22.

Plaintiffs do not allege that the Nightingale Term Sheet was with a New York corporation, that the Term Sheet was negotiated or executed in New York, that BRON Creative Corp. visited New York for the purposes of meeting with the parties to the contract regarding the relationship, or that the contract requires the sending of notices or payments into New York or subjects them to supervision in New York.  A choice of law clause is a "significant factor" weighing in favor of jurisdiction.  *Id.* at 23.  However, a choice of law clause "alone, [] is insufficient to confer personal jurisdiction over a non-domiciliary." *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 375 (S.D.N.Y. 2009) (citing *Galgay v. Bulletin Co.,*

*Inc.*, 504 F.2d 1062, 1065–66 (2d Cir. 1974)); *see also Berkshire Cap. Grp., LLC v. Palmet Ventures, LLC,* No. 06-CV-13009, 2007 WL 2757116, at *3–4 (S.D.N.Y. Sept. 21, 2007)*, aff'd,* 307 F. App'x 479 (2d Cir. 2008) (summary order); *Premier Lending Servs., Inc. v. J.L.J. Assocs.*, 924 F. Supp. 13, 17 (S.D.N.Y. 1996) ("While it is appropriate to give some weight to choice of law provision, a choice of law clause alone is not dispositive." (citation omitted)).  "Accordingly, while relevant, a contract with a New York choice-of-law clause is not sufficient to qualify as transacting business for the purposes of New York's long-arm statute."  *Gatx Corp. v. Georgia Power Co.*, No. 18-CV-9758, 2019 WL 4511629, at *4 (S.D.N.Y. Sept. 19, 2019).  Without more, this Court does not have personal jurisdiction over BRON Creative Corp.  *See id*. (holding personal jurisdiction did not exist when defendants "only link to New York is that it contracted with a New York corporation and that contract had a New York choice-of-law clause"); *accord Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 788–89  (2d Cir. 1999) ("[N]o court has extended § 302(a)(1) to reach a nondomiciliary who never entered New York, who was solicited outside of New York, who performed outside of New York such services as were performed, and who is alleged to have neglected to perform other services outside of New York." (quoting *Mayes v. Leipziger*, 674 F.2d 178, 185 (2d Cir. 1982)).

Plaintiffs cite to the fact that BRON Studios has offices in New York City and "the underlying loan agreement that was part of the Needle financing showed that Needle In A Timestack LLC—an entity controlled by the BRON and Creative Defendants—used 153 West 27th Street as its headquarters" which they contend is "more than sufficient to establish personal jurisdiction under 302(a)(1)."  (Pls.' Mem. 10.)  However, Plaintiffs have not alleged what business activity occurred at that address that is related to any state cause of action in this case. Plaintiffs have not explained how the address used by Needle in a Timestack LLC—a separate

entity not party to this lawsuit—when entering into the Needle loan agreement, to which Plaintiffs themselves are not parties, confers personal jurisdiction over any BRON or Creative Defendant.  Accordingly, Plaintiffs have not alleged that this Court has jurisdiction over either BRON Creative or BRON Studios entity, or Gilbert.

Plaintiffs additionally allege that CWMF and Hudson had a "formal agreement" described as an agreement that CWMF would "take any future impairments off [Hudson's] books" which "was a mere disguise, for tax purposes, of a nearly $18 million loan that had been made by CWMF to Hudson, and which would be paid off through commissions earned on each loan that Hudson sourced for CWMF." (AC ¶¶ 84–86.)  The Sourcing Agreement between Plaintiffs and Hudson also confirms that CWMF and Hudson had an ongoing business relationship as the Sourcing Agreement made clear that projects would be "sourced by Hudson via its relationship with [CWMF]." (*Id*. ¶ 90.)  Accordingly, this Court must determine whether CWMF's business relationship with Hudson has an "articulable nexus or substantial relationship" to Plaintiffs' claims.  *D&R Global Selections*, 78 N.E.3d at 1176 (quotation marks and citations omitted).  Plaintiffs bring fraud, breach of contract, breach of the covenant of good faith and fair dealing, accounting, and unjust enrichment claims against CWMF.  (*See generally* AC.)

Plaintiffs argue that the result of CWMF's, and presumably by extension, Cloth's, business relationship with Hudson, a New York company, was that Plaintiffs entered into a contract with CWMF that it then breached.  (Pls.' Supp. Mem. 3.)  However, Plaintiffs do not cite to any case standing for the proposition that such an attenuated relationship can confer personal jurisdiction.  (*Id*. at 3-4.)  For instance, Plaintiffs cite to *State v. Vayu, Inc.*, —N.E.3d—, 2023 WL 1973001 (N.Y. Feb. 14, 2023), arguing that "[i]n furtherance of Defendants'

agreements and business activities, Hudson solicited financing for the Creative/BRON film

projects from Bayshore, with information provided by CWMF and BRON Studios, that

'designedly and materially forwarded the negotiation and performance of the contract' with

Plaintiffs."  (*Id*. at 3.)  However, in *Vayu*, the New York Court of Appeals determined that a

meeting in New York between a New York University and an out-of-state defendant—parties

which already had a two-year long business relationship—and subsequent emails memorializing

the modified terms of their agreement "designedly and materially forwarded the negotiation and

performance of the contract for sale" of unmanned aerial vehicles.  *Vayu, Inc.,* 2023 WL

1973001, at *3 (citation omitted); *see also Traffix, Inc. v. Herold*, 269 F. Supp. 2d 223, 226–27

(S.D.N.Y. 2003) (finding personal jurisdiction over non-domiciliary who traveled to New York

for preliminary discussions and meetings and engaged in ongoing telephonic and email

communications); *ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.*,

775 F. Supp. 650, 655 (S.D.N.Y. 1991) ("Contract negotiations in New York will satisfy that

standard if the discussions 'substantially advanced' or were 'essential to' the formation of the

contract or advanced the business relationship to a more solid level.").  Plaintiffs here do not

allege that any meetings regarding the contracts with CWMF occurred in New York nor do they

allege that any of the information provided by CWMF to Hudson which was then sent to

Plaintiffs was akin to a modified agreement such that it substantially advanced negotiations.

The New York Court of Appeals' decision in *D & R Global Selections, S.L.* is instructive

as to the required level of connection between the New York transactions and cause of action to

establish long-arm jurisdiction.  78 N.E.3d 1172.  There, a plaintiff sued a Spanish winery for the

alleged breach of an oral agreement pursuant to which plaintiff agreed to solicit and find a

United States distributor to import the winery's wine.  *Id*. at 1174.  Per that agreement, (i) the

defendant went with plaintiff to New York several times to attend wine industry events; (ii) plaintiff introduced defendant to a New York-based distributor at an event in New York; (iii) defendant returned to New York at least twice to promote its wine with plaintiff and the New York-based distributor; and (iv) defendant eventually entered into a distribution agreement with the New York-based distributor.  *Id.* at 1174–75.  Because defendant's alleged refusal to pay commissions to plaintiff from the sales to the New York distributor were "at the heart of plaintiff's claim" and "both sides engaged in activities in New York in furtherance of their agreement," the Court of Appeals reversed the Appellate Division's finding that jurisdiction was lacking and held that there was a sufficient "articulable nexus or substantial relationship between defendant's New York activities and the parties' contract, defendant's alleged breach thereof, and potential damages."  *Id.* at 1176–77.  Plaintiffs here do not allege that any of the negotiations regarding contracts between CWMF and Plaintiffs occurred in New York, that any such contracts concerned New York, or that any CWMF representative was ever physically present in New York.

Plaintiffs also contend that their contracts with CWMF are "at the heart of [P]laintiffs' claims for fraud . . . and unjust enrichment," and that "each claim is based on BRON and Creative Defendants' business relationship with Hudson, established and ongoing in New York, and the activities and efforts to solicit and obtain financing."  (Pls.' Supp. Mem. 4.)  Plaintiffs simply state that while "each of the counts has unique elements, all contain 'at least one element [that] arises from the New York contacts.'"  (*Id.* (citation omitted).)  Plaintiffs, however, have not identified any element of the fraud or unjust enrichment claim that stems from CWMF's business relationship with Hudson or cited cases in support of their proposition.  While CWMF sent documents to Hudson which were then sent to Plaintiffs that Plaintiffs argue contain false

statements, sending documents into New York alone cannot confer jurisdiction under Section 302(a)(1).  *See, e.g.*, *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) ("New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York."); *Aquiline Cap. Partners LLC v. FinArch LLC*, 861 F. Supp. 2d 378, 388 (S.D.N.Y. 2012) ("Courts have consistently held . . . that [repeated phone calls and emails] with New York does not support the exercise of personal jurisdiction where the undisputed facts demonstrate that the defendant 'did not seek out a New York forum.'" (citation omitted)).  Furthermore, Plaintiffs make no argument as to their accounting cause of action and its articulable nexus to any Defendant's New York contacts.

Therefore, because Plaintiffs have failed to make a prima facie showing that Defendants transacted business in New York *and* that any of their State claims arise out of New York transactions, the Court does not have personal jurisdiction over any Defendant under § 302(a)(1).  *See Al -Ahmed v. Twitter, Inc.*, 553 F. Supp. 3d 118, 127 (S.D.N.Y. 2021) ("Because [plaintiff] has not demonstrated that claims . . . arise from [defendant]'s business conduct in New York, he has not satisfied the requirements of C.P.L.R. § 302(a)(1).").

### ii.  Specific Jurisdiction: Section 302(a)(2)

Plaintiffs additionally argue that personal jurisdiction exists under § 302(a)(2).  Section 302(a)(2) provides that personal jurisdiction may apply where a defendant commits tortious conduct while physically present in New York.  *See also Bank Brussels Lambert*, 171 F.3d at 790 (reaffirming that a "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)"); *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 418 (S.D.N.Y. 2010) ("New York courts and the Second Circuit have consistently

interpreted § 302(a)(2) jurisdiction narrowly and have held that to qualify for jurisdiction under this subsection, a defendant's act or omission [must have] occur[red] within the State." (citations omitted) (collecting cases)); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, No. 03-CV-1681, 2004 WL 2199547, at *12 (S.D.N.Y. Sept. 29, 2004) ("The Second Circuit has interpreted § 302(a)(2) to require that the tortious act itself physically be performed within New York State." (alterations and quotation marks omitted) (citing, inter alia, *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997))); *Japan Press Serv., Inc. v. Japan Press Serv., Inc*., No. 11-CV-5875, 2013 WL 80181, at *9 (E.D.N.Y. Jan. 2, 2013) ("Section 302(a)(2) confers personal jurisdiction over a non-domiciliary defendant only when they commit acts within the state . . . ."); *Roth v. El Al Israel Airlines, Ltd*., 709 F. Supp. 487, 490 (S.D.N.Y. 1989) ("Section 302(a)(2) requires that the tort be committed in New York and defendant must actually be in New York when the tort is committed.").  While Plaintiffs argue that "Defendants transacted business in New York and committed tortious acts here" they do not explain what tortious act was committed in New York.  (Pls.' Mem 9.)  Plaintiffs merely assert that "BRON Studios and, by extension its financing arm, CWMF, have offices in New York City" and "have used that address to transact business related to the film financing scheme."  (*Id*. at 10.)  Plaintiffs cite to the fact that "the underlying loan agreement that was part of the Needle financing showed that Needle In A Timestack LLC—an entity controlled by the BRON and Creative Defendants—used 153 West 27th Street as its headquarters," which they contend is "more than sufficient to establish personal jurisdiction under . . . 302(a)(2), given that the BRON and Creative Defendants' New York activities resulted in tortious conduct against Plaintiffs."  (*Id*.)  However, Plaintiffs have not alleged what business activity occurred at that address that is related to any cause of action in this case.  "Pleadings that assert only 'conclusory non-fact-

specific jurisdictional allegations' or state a 'legal conclusion couched as a factual allegation'" do not suffice to establish personal jurisdiction. *Pruthi*, 2022 WL 596370, at *2 (citing *Jazini*, 148 F.3d at 185); *see also DeLorenzo v. Viceroy Hotel Grp., LLC,* 757 F. App'x 6, 8 (2d Cir. 2018) (summary order) ("'[C]onclusory non-fact-specific jurisdictional allegations' or 'legal conclusion[s] couched as a factual allegation' will not establish a prima facie showing of jurisdiction." (quoting *Jazini*, 148 F.3d at 185)).

### iii.  Agency Jurisdiction

Plaintiffs additionally contend that this Court has personal jurisdiction over the "BRON and Creative Defendants" under Sections 302(a)(1) and 302(a)(2) through a theory of agency jurisdiction.  (Pls.' Mem 11–13.)  Indeed, jurisdiction under Section 302(a) may be based on the acts of an agent where "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (citation omitted). Similarly, "personal jurisdiction under Section 302(a)(2) may also be predicated on acts taken by an agent." *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 430 (E.D.N.Y. 2012). "Although the New York long-arm statute and the Due Process Clause of the U.S. Constitution are not technically coextensive, the Second Circuit has observed that the New York requirements for agency (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'" *Charles Schwab Corp.*, 883 F.3d at 85 (citation omitted).

Courts have found these elements satisfied in circumstances where, for example, the nonresident defendant shared decision-making authority or where the nonresident defendant played an active role in directing the intermediary's activities relating to the specific in-forum

transactions at issue.  *Chloe*, 616 F.3d at 169 (imputing company's New York contacts to

nonresident defendant where that defendant profited from company's in-forum handbag sales,

had joint access to company bank account, and "shared in the decision-making and execution of

the purchase and sale of handbags"); *Shpak v. Curtis*, No. 10-CV-1818, 2011 WL 4460605, at *9

(E.D.N.Y. Sept. 26, 2011) (finding that plaintiffs adequately alleged an agency relationship

where nonresident defendants were alleged to have directed in-forum intermediaries to take

specific actions and make specific misrepresentations in New York in furtherance of alleged

fraud scheme).

Plaintiffs point to Jonas' email in October 2017 to Bayshore "that BRON and CWMF had

given Hudson 'more time to find investors for Frontrunner, which is helpful'" and that Hudson

"made clear that 'the studio,' in 'recognition of the importance of the relationship with Hudson,

[is] making this very secure paper available to our syndicate.'"  (Pls.' Mem. 12.)  The statements

indicate that Hudson was investing in, not working for or at the direction of any Defendant.

Indeed, the statements do not plausibly allege that BRON or Creative Defendants shared

decision-making authority with Hudson or played an active role in directing Hudson's activities.

Plaintiffs also argue that because "in each of the transactions at issue, Hudson presented

term sheets to Plaintiffs that had already been executed by Cloth and Gilbert on behalf of BRON

Studios, CWMF, and BRON Creative," Hudson needed their assent and approval before it could

commit Plaintiffs to any transaction.  (*Id.* at 12–13.)  First, the Amended Complaint does not

make such a claim.  Second, Plaintiffs do not explain why this claim indicates that any

Defendant exercised control over Hudson's activities.  The cases Plaintiffs rely upon are

inapposite.  (*Id.* at 13.)  In *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331 (S.D.N.Y. 2015), the

Court found that the foreign defendants—PTI and Grossman—were subject to personal

jurisdiction in New York through the acts of its New York agent, IBIS, who purchased and paid for fraudulent journal subscriptions on the defendants' behalf. *Id*. at 344–46. Critically, Grossman was the CEO of PTI and IBIS and therefore controlled IBIS. *Id*. at 345. And in *Barbarotto Int'l Sales Corp. v. Tullar*, 591 N.Y.S.2d 188 (App. Div. 1992), the court determined the control element existed when a foreign defendant hired plaintiff as its exclusive sales representative to solicit business in New York on behalf of defendant pursuant to an agency agreement, defendant exercised control over plaintiffs by retaining right to accept or reject sales of its equipment made by plaintiffs, and plaintiffs solicited business in New York for the defendants pursuant to that agreement. *Id*. at 189. Plaintiffs have not alleged a similar level of control here. For example, they have not alleged that Hudson was hired by any Defendant in this case, but have only alleged that some Defendants had a business relationship with Hudson.

Because Plaintiffs have not alleged that any Defendants directed or controlled Hudson, this Court cannot maintain jurisdiction on the basis of an agency relationship. *N.Y. v. Mountain Tobacco Co*., 55 F. Supp. 3d 301, 312–13 (E.D.N.Y. 2014) (finding plaintiff failed to demonstrate personal jurisdiction over defendant based on an agency theory where it "d[id] not offer any allegations to indicate that [the defendant] exercised control over [the purported agent]'s activities in New York"); *cf. Love v. West*, No. 19-CV-10799, 2021 WL 431210, at *4 (S.D.N.Y. Feb. 8, 2021) (holding control element existed for the purposes of agency when out-of-state party employed, managed, and supervised the in-state party, and authorized and funded the in-state party's travel to New York as part of his work); *Fischman v. Mitsubishi Chem. Holdings Am.*, *Inc.*, No. 18-CV-8188, 2020 WL 7388654, at *2 (S.D.N.Y. Dec. 16, 2020) (holding that the element of control was satisfied when out-of-state party made the decision and directed an in-state party to promote a plaintiff).

iv.  Conspiracy Jurisdiction

New York courts have found that, "[f]or purposes of [N.Y. C.P.L.R. Section 302(a)(2)], a co-conspirator can be an agent" in certain circumstances.  *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 605 (App. Div. 1998) (citation omitted), *aff'd on other grounds*, 720 N.E.2d 892 (N.Y. 1999); *see also Reeves v. Phillips*, 388 N.Y.S.2d 294, 296 (App. Div. 1976) ("The acts of a co-conspirator may, in an appropriate case, be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant." (citation omitted)).  "To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a [forum] to subject that co-conspirator to jurisdiction in that [forum]."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021) (citation omitted), *cert. denied*, 142 S. Ct. 2852 (2022).  "Courts then consider whether 'a defendant's membership in the conspiracy' should confer jurisdiction based on whether; '(1) the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators.'"  *Black v. Dain*, No. 16-CV-1238, 2016 WL 11794335, at *3 (E.D.N.Y. Dec. 29, 2016) (citations omitted).

"To establish conspiracy-based personal jurisdiction pursuant to New York's long arm statute, a plaintiff must [] mak[e] a prima facie showing of a conspiracy . . . ."  *Berkshire Bank v. Lloyds Banking Grp. plc*, No. 20-CV-1987, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (summary order), *cert. denied*, 143 S. Ct. 286 (2022); *LaChapelle v. Torres*, 1 F. Supp. 3d 163, 170 (S.D.N.Y. 2014) (same).  "To state a proper claim for conspiracy to defraud the plaintiff

79

must allege both [the] primary tort [of fraud] and also show the four elements of a conspiracy: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *FAT Brands Inc. v. PPMT Cap. Advisors, Ltd*., No. 19-CV-10497, 2021 WL 37709, at *11 (S.D.N.Y. Jan. 5, 2021) (citation omitted). "A scheme to defraud, i.e. a plan to obtain something of value through misrepresentations or omissions of material fact, is such a corrupt agreement." *Dukes Bridge, LLC v. Sec. Life of Denver Ins. Co.*, No. 10-CV-5491, 2020 WL 1908557, at *67 (E.D.N.Y. Apr. 17, 2020), *aff'd*, 2021 WL 5986871 (2d Cir. Dec. 17, 2021).

In order to plausibly allege a corrupt agreement existed between Hudson and Creative or BRON Defendants, Plaintiffs must allege Hudson had some knowledge of any alleged scheme to defraud them. *See Pittman v. Grayson*, 149 F.3d 111, 122–23 (2d Cir. 1998) (requiring plaintiffs to allege that defendants had "know[ledge of] the wrongful nature of the primary actor's conduct" in order to state claims for aiding-and-abetting liability and conspiracy); *Eaves v. Designs for Fin., Inc*., 785 F. Supp. 2d 229, 257–58 (S.D.N.Y. 2011) ("[A]llegations of 'intimate business relationship between' defendant and third-party, '[defendant's] knowledge of [third party's] unlawful acts,' and fraudulent misrepresentations 'constitute sufficient facts from which a trier of fact could infer an agreement.'"). However, Plaintiffs have not pled any facts indicating that Hudson Defendants were aware of any scheme CWMF or any other Defendant had to defraud Plaintiffs. *Cherotti v. Exphand, Inc*., No. 20-CV-11102, 2022 WL 2108604, at *7 (S.D.N.Y. June 10, 2022) (holding plaintiffs failed to plead conspiracy when plaintiffs "have not pled any facts suggesting that [the defendants] entered into a 'corrupt agreement' or that they took any action to intentionally further such an agreement"); *cf. Sargiss v. Magarelli*, 909 N.E.2d

573, 576 (N.Y. 2009) ("If there was a fraudulent scheme, Julius's knowledge of it and participation in it are clear because it would have been impossible for decedent to carry out the fraudulent scheme as alleged without Julius knowing of the scheme and participating in it."). Because Plaintiffs have not plausibly alleged that Hudson knew of any scheme and therefore had a corrupt agreement with Creative or BRON Defendants, this Court does not have personal jurisdiction over them.

### b.  Fraud Claims Against Hudson Defendants

"Under New York law, the five elements of fraud are (1) a material misrepresentation or omission of fact (2) made by [a] defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (citation and quotation marks omitted); *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 784 (2d Cir. 2003) ("To succeed on a theory of fraudulent misrepresentation under New York law, a plaintiff must show that the defendant made a false representation of a material fact to the plaintiff and that the plaintiff suffered injury as a result of justifiable reliance upon that fact.").

Hudson Defendants argue that Plaintiffs "fail to show that the alleged misrepresentations made by either Conover or Jonas demonstrated a present intent to deceive," and that Plaintiffs failed to "demonstrate that the Hudson Defendants knew that any of the statements or information conveyed [were] false at the time when they were made."  (Hudson Defs.' Mem. 22.)  As described above, *supra*, II.B.2.ii, Plaintiffs have not alleged that many of the statements attributed to Hudson Defendants were false when made or were made with Hudson Defendants' knowledge of their falsity.  However, Plaintiffs have plausibly alleged Conover omitted material

information about the financial agreement between Hudson and CWMF that would have affected

their decision to invest, because "[h]ad Bayshore known that Hudson was in dire financial straits,

and needed capital to prop up its books due to failed film financing, Plaintiffs would not have

made the loans."  (AC ¶¶ 83–94.)

"Fraudulent intent may be inferred either through proof of a motive and clear opportunity

to commit fraud or through facts indicating 'conscious behavior' that evinces fraudulent intent."

*World Wide Comm's, Inc. v. Rozar*, No. 96-CV-1056, 1997 WL 795750, at *5 (S.D.N.Y. Dec.

30, 1997) (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185–86 (2d Cir. 1995)).

Plaintiffs have alleged a plausible motive, namely that Conover was "motivated primarily by the

goal of repaying [Hudson's] debt to CWMF" and therefore intended to conceal its own losses to

prevent Plaintiffs from backing out of any prospective deal with Hudson.  (AC ¶ 96.)

Accordingly, Plaintiffs plausibly alleged a fraud claim against Conover.  *See Great W. Ins. Co. v.

Graham*, No. 18-CV-6249, 2020 WL 3415026, at *25 (S.D.N.Y. June 22, 2020) (holding that

plaintiff sufficiently alleged motive when defendants benefited from the retention of Plaintiff's

money to "repay old debts").  However, as Plaintiffs have not alleged that Jonas engaged in any

knowing misrepresentations, the fraud claim against him is dismissed.

Corporate scienter requires that "someone whose intent could be imputed to the

corporation acted with the required scienter," or that the statements "would have been approved

by corporate officials sufficiently knowledgeable about the company to know that those

statements were misleading."  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428,

439–40 (S.D.N.Y. 2017) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex

Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  In both the securities fraud and common law

fraud contexts, courts have imputed to the corporate defendant intent based on the intent of

officers and directors acting within the scope of their employment.  *See, e.g., In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017) (imputing intent of senior officers to corporation); *Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038, 2016 WL 1629325, at *14–15 (S.D.N.Y. Apr. 21, 2016) (imputing intent to subsidiary unit's CFO, who was "below the corporate level"); *Pa. Pub. Sch. Emps' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363–64 (S.D.N.Y. 2012) (imputing intent to vice president, assistant vice president, and general counsel); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (imputing intent to mortgage department head); *In re Ambac Fin. Grp. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y 2010) (imputing intent to CEO, CFO, executive vice president, and member of committee that approved fraud); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (imputing intent to CEO, regional vice president, vice president of corporate finance, and unidentified senior managers); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (imputing intent to vice chairman, vice president, and managing director).  Accordingly, as a founder and president of Hudson, Conover's intent can be imputed to Hudson.

### c.  Breach of Contract Claim Against Hudson

"[T]o state validly a breach of contract claim under New York law, 'a plaintiff need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Fort Prods., Inc. v. Men's Med. Clinic, LLC*, No. 15-CV-376, 2016 WL 797577, at *2 (S.D.N.Y. Feb. 23, 2016) (alteration omitted) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Hudson Defendants argue that Plaintiffs have not alleged that Hudson's breach of contract was the direct and proximate cause of their losses.  (Hudson Defs.' Mem. 22–23.)  As part of its prima facie breach of contract claim, a plaintiff must prove "damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  In doing so, "a plaintiff must prove that a defendant's breach" both "directly and proximately caused his or her damages." *Id*. at 525.  To establish proximate cause, a plaintiff must demonstrate that the damages are not "so remote as not to be directly traceable to the breach" or "the result of other intervening causes." *Id.* at 526 (italics omitted) (citing *Kenford Co. v. Erie Cty*., 493 N.E.2d 234, 235 (N.Y. 1986)).

The Hudson Defendants argue that Hudson cannot be liable for breaching the Sourcing Agreement, because "Plaintiffs cannot adequately plead that the Hudson Defendants alleged breach of contract was the direct and proximate cause of their losses" because the facts indicate that CWMF and BRON Defendants "not the Hudson Defendants—directly and proximately caused Plaintiffs' alleged losses."  (Hudson Defs.' Mem. 23.)

Under the Sourcing Agreement, Hudson agreed to identify film participation opportunities for Plaintiffs that fit specific criteria, specifically films where Plaintiffs "would have a first position lien on all assets of the finance film, as well as a 'direct sightline to specific tax credit(s) and/or distribution rights collateral (either executed or unexecuted).'"  (AC ¶ 89.) Plaintiffs claim that Hudson breached the Sourcing Agreement by failing to adhere to these sourcing criteria.  (Pls.' Mem. 48.)  "[T]he proximate cause test may still be met even when 'acts of a third person intervene between the defendant's conduct and the plaintiff's injury,' provided that 'the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [actions].'"  *Mexico Infrastructure Fin., LLC v. Corp. of Hamilton*, No. 17-CV-6424,

2020 WL 4572679, at *4 (S.D.N.Y. Aug. 7, 2020) (citations omitted).  Generally, "[q]uestions of proximate cause and foreseeability should [] be resolved by the factfinder."  *Voss v. Netherlands Ins. Co.*, 8 N.E.3d 823, 829–30 (N.Y. 2014) (citations omitted); *see also Vista Food Exch., Inc. v. Comercial De Alimentos Sanchez S de R L de C.V.*, —F. Supp. 3d—, 2022 WL 4227307, at *8 (S.D.N.Y. Sept. 13, 2022) ("[W]here different reasonable and legally sufficient inferences of proximate cause are possible, the question is for the jury." (citations omitted)).  If Hudson did indeed fail to do due diligence to adequately ensure that the loans Plaintiffs participated in were secured by a first position lien on the assets of the financed film as well as a "direct sight line" to collateral, the alleged acts of the other Defendants could arguably be a foreseeable consequence of such a failure.  Accordingly, the Court denies the motion to dismiss Plaintiffs' breach of contract claim against Hudson at this stage.  *See Mexico Infrastructure Fin., LLC*, 2020 WL 4572679, at *4 (holding that "if Plaintiff bargained for the Escrow Agreement's contractual requirements to minimize a foreseeable risk that MIF's funds could be misappropriated without such contractual safeguards, then the acts of Michael MacLean could arguably be considered a normal or foreseeable consequence of the failure to heed such safeguards, rendering BNYM's alleged breaches of the Escrow Agreement the proximate cause of Plaintiff's damages"); *Bank of New York Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, No. 11-CV-0505, 2011 WL 2610661, at *7 (S.D.N.Y. June 27, 2011) (noting that the "failure by an individual, (not party to the contract), to perform actions anticipated by the Defendant" does not "completely immunize[] the Defendant from any claim brought against" and holding that a question of proximate cause in light of an intervening actor was "appropriately left to the finder of fact").

<u>d.  Implied Covenant of Good Faith and Fair Dealing Against Hudson</u>

"Under New York law, parties to an express contract are bound by an implied duty of good faith . . . ."  *Arcadia Bioscis., Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) (quoting *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 159 (S.D.N.Y. 2018) ("The promise of good faith and fair dealing is treated as an implied provision in every contract . . . ." (citations and quotation marks omitted)).  The implied covenant is "breached when a party acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement."  *Skillgames, LLC v. Brody*, 767 N.Y.S.2d 418, 423 (App. Div. 2003) (citation and quotation marks omitted); *see also Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) ("The implied covenant . . . embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (citation and quotation marks omitted)).  "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'"  *Gaia House Mezz LLC v. State Street Bank & Tr. Co.*, 720 F.3d 84, 93 (2d Cir. 2013) (citation omitted).

"A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract."  *Arcadia*, 356 F. Supp. 3d at 400 (citation and quotation marks omitted); *see also Harris*, 310 F.3d at 81 ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); *JGB (Cayman) Newton, Ltd. v. Sellas Life Scis. Grp. Inc.*, No. 18-CV-3095, 2018 WL 5266877, at

*13 (S.D.N.Y. Oct. 23, 2018) ("When a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." (quotation marks and alteration omitted) (quoting *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013))).  An implied covenant of good faith and fair dealing claim can be maintained along with a breach of contract claim "only if the damages sought by the plaintiff for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract."  *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 498 (S.D.N.Y. 2017) (citation omitted).

Plaintiffs contend that even if Hudson "did not breach the explicit terms of the Sourcing Agreement, Hudson's other conduct, including its complicity with the other defendants' fraudulent scheme, deprived Plaintiffs . . .  the benefits of its bargain under the Sourcing Agreement."  (Pls.' Mem 50.)  However, as discussed, Plaintiffs have not alleged that Hudson was involved in any fraudulent scheme with any other Defendant.  Because Plaintiffs have not alleged a breach of the implied covenant that is not tied to their damages resulting from the breach of contract, the claim cannot survive.  *See Polcom USA, LLC v. Affiliated FM Ins. Co.*, 551 F. Supp. 3d 290, 298 (S.D.N.Y. 2021) (dismissing breach of the implied covenant as duplicative of a contract claim).

### e.  Unjust Enrichment Claims Against Hudson Defendants

Under New York law, the existence of a valid contract typically bars recovery based on the quasi-contract theory of unjust enrichment.  *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458–59 (S.D.N.Y. 2016).  Indeed, in New York, unjust enrichment "is an equitable claim that is unavailable where an adequate remedy at law exists."  *Henkels & McCoy Grp., Inc. v. Verizon Sourcing, LLC*, No. 21-CV-9576, 2022 WL 1185817, at *4 (S.D.N.Y. Apr. 21, 2022)

(citation omitted).  "Courts generally dismiss claims for quantum meruit on the pleadings . . . when it is clear from the face of the complaint that there exists an express contract that clearly controls."  *Franze v. Bimbo Foods Bakeries Distrib., LLC,* No. 17-CV-3556, 2019 WL 1244293, at *2 (S.D.N.Y. Mar. 15, 2019) (citation omitted).  "In circumstances where the parties dispute whether there is an enforceable written contract at all . . . Rule 8(d)(2) of the Federal Rules of Civil Procedure permits a plaintiff to plead claims for breach of contract and, in the alternative, claims for . . . unjust enrichment."  *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494, 516 (S.D.N.Y. 2014) (citation and quotation marks omitted).  "However, where 'there is a valid and enforceable contract between the parties, and the subject matter of the unjust enrichment claim is covered by the contract' the unjust enrichment claim must be dismissed."  *Id*. (citing *CBS Broad. Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006)).  Here, there is no claim that the contract between Hudson and Plaintiffs at issue is unenforceable.  Accordingly, the unjust enrichment claims against Hudson Defendants are dismissed.  *See INTL FCStone Markets, LLC v. Agro Santino OOD*, No. 20-CV-2658, 2021 WL 2354567, at *1 (S.D.N.Y. June 9, 2021) ("As for unjust enrichment, Agro's claim must be dismissed as duplicative of its breach-of-contract claim."); *cf. Khmaladze v. Vorotyntsev*, No. 16-CV-8029, 2019 WL 1746006, at *4 (S.D.N.Y. Apr. 18, 2019) (holding that a plaintiff may plead a claim for unjust enrichment in the alternative when the counterparty maintains that the underlying contract is unenforceable).

### 5.  Jurisdictional Discovery

Plaintiffs request this Court authorize jurisdictional discovery.  (Pls.' Mem. 15–16.) Whether to allow jurisdictional discovery is "a decision as to which a district court enjoys substantial discretion."  *Keren Chasanim Corp. v. Vill. of Kiryas Joel*, No. 07-CV-262, 2008 WL

11518871, at *5 (S.D.N.Y. Nov. 10, 2008); *see also Broidy Cap. Mgmt. LLC v. Benomar*, 944
F.3d 436, 446 (2d Cir. 2019) ("[T]he district court has considerable latitude in devising the
procedures it will follow to ferret out the facts pertinent to jurisdiction." (quoting *Foremost-
McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990))).  "[A] court . . .
does not abuse its discretion in denying jurisdictional discovery 'if the party seeking discovery
cannot articulate a reasonable basis for the court first to assume jurisdiction.'"  *Beierwaltes v.
L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 828 (2d Cir. 2021)
(quoting *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016)).

"While the bar for granting jurisdictional discovery is low, and it is appropriately granted
where a plaintiff's allegations make a sufficient start toward establishing personal jurisdiction, if
the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional
discovery is generally not granted."  *Reed Int'l, Inc. v. Afghanistan Int'l Bank*, —F. Supp. 3d—,
2023 WL 2138600, at *4 (S.D.N.Y. Feb. 21, 2023) (citations and quotation marks omitted); *see
also Spetner v. Palestine Inv. Bank,* 495 F. Supp. 3d 96, 117 (E.D.N.Y. 2020) ("Jurisdictional
discovery is appropriate where there are contested allegations sufficient to articulate a colorable
basis for personal jurisdiction, which could be established with further development of the
factual record.").  "However, if a plaintiff has identified a genuine issue of jurisdictional fact,
discovery is appropriate even in the absence of a prima facie showing as to jurisdiction."  *Reed
Int'l, Inc.*, 2023 WL 213860, at *4.  Nevertheless, "a court is not obligated to subject a foreign
corporation to discovery where the allegations of jurisdictional facts . . . fail to state a basis for
the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not
uncover facts sufficient to sustain jurisdiction, and discovery need not be granted to permit a
fishing expedition for jurisdictional facts."  *Id*. (citations and quotation marks omitted).

Plaintiffs have not raised an issue of jurisdictional fact here.  There is no question of fact as to the contacts Cloth, CWMF, BRON Creative Corp., and BRON Creative USA, Corp. had with New York.  And while Plaintiffs have alleged that "BRON Studios" had an office in New York (AC ¶ 30), they have only made conclusory assertions that business was transacted there that relates to the claims at issue, accordingly they have not provided "non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place."  *Lopez v. Cookies SF, LLC,* No. 21-CV-5002, 2022 WL 4385407, at *2 (S.D.N.Y. Sept. 22, 2022) (citation omitted).  Accordingly, the Court denies Plaintiffs' request for jurisdictional discovery.[10]

### III.  Conclusion

For the foregoing reasons, Defendants' Motions are denied in part and granted in part. The BRON and Creative Defendants' Motions are granted.  The Hudson Defendants' Motion is granted as to the RICO, implied covenant of good faith and fair dealing, and unjust enrichment claims and the fraud claim against Jonas.  The Hudson Defendants' Motion is denied as to the breach of contract claim and the fraud claim against Hudson and Conover.  If Plaintiffs wish to file a second amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order.  Plaintiffs are further advised that the second amended complaint will completely replace, not supplement, the instant Amended Complaint.  The second amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to

---

[10] The Court notes that even if it has personal jurisdiction over BRON and Creative Defendants, there are serious questions about whether the state law claims would survive on forum non conveniens grounds.

consider.  If Plaintiffs fail to timely file a second amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on May 1, 2023 at 11:30 AM.  The Clerk of the Court is respectfully requested to terminate the pending motion at Dkt. Nos. 69, 72, 76.

SO ORDERED.

Dated:   March 31, 2023
         White Plains, New York

_____
KENNETH M. KARAS

United States District Judge